**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| BRINK'S GLOBAL SERVICES USA, INC., | ) | **REDACTED PUBLIC VERSION** |
| | ) | |
| Plaintiffs, | ) | Case No.: 1:22-cv-06653-PGG |
| | ) | |
| v. | ) | |
| | ) | |
| BONITA PEARL INC., *et al.* | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## DEFENDANTS' AMENDED RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL CIV. R. 56.1

Defendants [name] respectfully submit this Defendants' Response to Plaintiff's Statement of Undisputed Material Facts pursuant to Local Civ. R. 56.1 in opposition to Plaintiff's Motion for Summary Judgment against Defendants.

## I.   OVERVIEW OF BRINK'S BUSINESS AND THE SUBJECT CONTRACT

1.     Brink's is a transportation company that has shipped precious metals, pharmaceuticals, jewelry, and other valuables for around thirty-five years. Declaration of Robert F. Redmond ("Redmond Decl."), filed herewith, Ex. 1-55 (M. Beech 30(b)(6) Depo.), at pp. 84:1985:2; 123:10-24.

**Response:** Admitted

2.     Brink's, the entity in this litigation, is different than entities such as The Brink's Company (Plaintiff's ultimate parent company) and Brink's, Inc. (Plaintiff's direct parent company, which is known for its familiar armored car "Cash-in-Transit" or "CIT" services). Declaration of Michael Beech ("Beech Decl."), filed herewith, ¶ 4.

467257

**Response:**  Admitted.

3.      Brink's, the entity here, uses an "Over-the-Road" (or "OTR") tractor-trailer division that, prior to the loss in this litigation, had never suffered a loss in thirty-five years. Beech Decl., ¶ 4; Redmond Decl., Ex. 1-55 (M. Beech 30(b)(6) Depo.), at pp. 130:6-17; Ex. 1-56 (M. Beech Expert Depo.), at pp. 104:4-18.

**Response:**  Admitted.

4.      When transporting valuables, Brink's allocates risk by having customers identify the value of each shipment of valuables (the "Declared Value"), which becomes Brink's maximum amount of liability in the event of a loss. Beech Decl., ¶ 5.

**Response:**  Disputed.  This is a legal conclusion based on an inaccurate statement of the individual transactions and the documents. The shippers (defendants) were not asked to identify the value of their merchandise; rather they were asked how much insurance they wanted for purposes of completing the manifest.  They were invoiced based on "insurance value." They weren't asked to set a "declared value" so "identify the value of each shipment" did not happen orally or by contract. Also, the manifest form does not ask for "Declared Value;" it asks for "Carriage Value," which Brinks' personnel testified is the same as insurance value.  Testimony of clients and Gloria Corrales; copies of invoices

5.      Use of a limitation of liability provision based on the Declared Value is customary and standard within the secured transport industry. Beech Decl., ¶ 6.

**Response:**      Not disputed.

6.     In order to plan for potential liability, purchase the requisite insurance, and provide consistent, economical contractual terms to customers across the country, Brink's relies upon its customers to accurately identify the Declared Value of their shipments. Beech Decl., ¶ 21.

> **Response:** Disputed.  See Defendants' Fact Nos. 366-375; also  Shuman Decl., Ex. A-9 (Malki Depo) at pp. pp. 213:19-214:10; 217:20-218:10; 218:22-219:21; 220:1-221:2; 221:9-10; 222:2-14; 322:6-20; 358:8-21; 387:13-388:6; 389:4-19; 392:23-393:14.  Shuman Decl Ex. A-12 (Leung Depo) at pp. 147:1-14.  Shuman Decl. Ex. A-27 (Bruce Woerner Depo) at pp. 78-92.

7.     If customers were allowed to try to collect more than their Declared Value, Brink's would not be able to provide consistent, economical contractual terms to customers. Further, the increased risk and uncertainty would almost certainly result in higher rates for Brink's shipping services. Beech Decl., ¶ 21.

> **Response:** Disputed.  Nothing in the transaction advised customers that Brinks' liability was capped.  The terms aren't "consistent, economical" if customers aren't cautioned to state the actual value.  Disputed.  See Defendants' Fact Nos. 366-375; also  Shuman Decl., Ex. A-9 (Malki Depo) at pp. pp. 213:19-214:10; 217:20-218:10; 218:22-219:21; 220:1-221:2; 221:9-10; 222:2-14; 322:6-20; 358:8-21; 387:13-388:6; 389:4-19; 392:23-393:14.  Shuman Decl Ex. A-12 (Leung Depo) at pp. 147:1-14.  Shuman Decl. Ex. A-27 (Bruce Woerner Depo) at pp. 78-92.

8.     Given that Brink's serves customers throughout the United States (including in all 50 states), Brink's tries to provide customers with consistent, predictable terms by using the Brink's Global Services Valuable Transport Contract. Beech Decl., ¶ 7.

> **Response:** Disputed.  Brinks did not "try to provide customers with these terms because at point of sale, the customers were told to do something different.  Disputed.  See Defendants' Fact Nos. 366-375; also  Shuman Decl., Ex. A-9 (Malki Depo) at pp. pp. 213:19-214:10; 217:20-

3

218:10; 218:22-219:21; 220:1-221:2; 221:9-10; 222:2-14; 322:6-20; 358:8-21; 387:13-388:6; 389:4-19; 392:23-393:14.  Shuman Decl Ex. A-12 (Leung Depo) at pp. 147:1-14.  Shuman Decl. Ex. A-27 (Bruce Woerner Depo) at pp. 78-92.

9.      Brink's Global Services Valuable Transport Contract contains several important representations and warranties to which Brink's customers assent when shipping valuables, including, for example:

> **II. CUSTOMER REPRESENTATIONS AND WARRANTIES; INDEMNIFICATION OF BRINK'S**....
> (c) You have properly and accurately described the Property in the Shipment and declared its actual monetary value both for carriage purposes ("**Declared Value**");...(e) You agree to be bound by the accuracy of all descriptions, valuations and other particulars furnished to Brink's for customs, consular and other purposes; (f) UNLESS OTHERWISE SPECIFICALLY AGREED IN WRITING, YOU WILL NOT TENDER TO BRINK'S ANY SHIPMENT WITH AN ACTUAL VALUE IN EXCESS OF THE LIMITS SET OUT IN SECTION X.C HEREINBELOW , OR ANY SHIPMENT IN EXCESS OF THE DECLARED VALUE; (g) You understand that providing a Declared Value significantly below the actual value of the Shipment, without the written consent of Brink's, constitutes fraud against Brink's and may constitute insurance fraud....

Beech Decl., Ex. B (Contract, § II).

**Response:**  Defendants admit that the text of the Global Services Valuables Transport Contract, Exhibit B, contains the passage quoted in Paragraph 9.  Otherwise, Paragraph 9 expresses a legal conclusion and not a fact.

10.      Brink's Global Services Valuable Transport Contract states that the required representations and warranties by the customer are an essential element of the Contract:

> **IV. AGREEMENT TO TERMS / CONVENTIONS, ETC.** A. **Agreement to Terms.** You understand and agree that Brink's has undertaken to provide the Service You have designated based upon the foregoing representations warranties and undertakings made by You.

Beech Decl., Ex. B (Contract, § IV.A).

4

467257

**Response:**  Defendants admit that the text of the Global Services Valuables Transport Contract, Exhibit B, contains the passage quoted in Paragraph 10.  Otherwise, Paragraph 10 expresses a legal conclusion and not a fact.

11.     Per the Contract's terms, the Declared Value listed by the customer is the metric for determining Brink's maximum liability in the event of a loss:

> **X.     DECLARED   VALUES;   BRINK'S   LIABILITY; LIMITATIONS ON BRINK'S LIABILITY.** Where a Convention applies to an International Shipment, the liability of Brink's shall be governed by and limited according to the applicable rules of such Convention. In all other circumstances, the following provisions shall apply.
>
> **A. <u>Declared Values</u>.** Prior to or at the time that You tender an international Shipment to Brink's, You shall provide Brink's the Customs Value of Your Shipment(s). You shall also provide Brink's the Declared Value for all Your Shipment(s), whether transported internationally or domestically, including each Consignment(s) and each container in Your Consignment(s), which shall be equal to or exceed the Customs Value.
>
> **B. <u>Liability</u>.** In the event that any of the Property included in the Shipment is lost during the period in which Brink's is responsible, Brink's will pay to You the <u>actual</u> monetary value of the Property which is lost, up to the Declared Value. In the event that any of the Property included in the Shipment is damaged during the period in which Brink's is responsible, Brink's will pay You the lesser of the cost to repair the Property or the reduction in actual monetary value caused by the damage. Payment shall be contingent upon Your cooperation with any investigation into the loss and execution of all documentation reasonably requested by Brink's. Any loss or damage payment is further subject to the terms and limitations contained in this Contract and any Rider(s) to this Contract. Under no circumstance will Brink's Liability for loss of or damage to Property exceed the lesser of the Declared Value or the actual monetary value of the Property as of the date of loss....

Beech Decl., Ex. B (Contract, § X).

**Response:**      Defendants admit that the text of the Global Services Valuables Transport Contract, Exhibit B, contains the passage quoted in Paragraph 11, although it is not separated into

paragraphs (or printed in large, legible font) as presented here.  Otherwise, Paragraph 11 expresses

a legal conclusion and not a fact.

      12.    The Contract also contains a further limitation on liability in the event that the

customer fails to comply with the representations and warranties set out in the Contract:

> **X. DECLARED VALUES; BRINK'S LIABILITY; LIMITATIONS ON BRINK'S LIABILITY.**
> ...
> **C.**    <u>**Limitations on Liability**</u>. In all circumstances, Brink's Liability is subject to the following limitations, to which You agree:
> ...
> 8.    Brink's will not be liable for loss or damage of a Shipment if You fail to comply with any of the representations and warranties set out in this Contract. Upon loss or damage to Property, the parties shall promptly and diligently assist each other to establish the identity of the Property lost or damaged and shall take all such other reasonable steps as may be necessary to assure the maximum amount of salvage at a minimum cost. Affirmative written proof of the Property lost or damaged, subscribed and sworn to by You and substantiated by Your books, records and accounts shall be furnished to Brink's.

Beech Decl., Ex. B (Contract, § X.C.8).

      **Response:**    Defendants admit that the text of the Global Services Valuables Transport

Contract, Exhibit B, contains the passage quoted in Paragraph 12.  Otherwise, Paragraph 12

expresses a legal conclusion and not a fact.

      13.    In addition to the above terms limiting Brink's liability to no more than the

Declared Value, the Brink's Contract also has several key terms relating to disputes. For example, the

Contract bars non-contract damages, including tort damages and consequential damages:

> 2. Brink's Liability whether as a result of breach of contract, tort, indemnity, warranty or otherwise, shall not, under any circumstances, include special, incidental, consequential, indirect or punitive losses or damages including but not limited to, loss of profits (whether direct or indirect), loss of market, loss of business, loss of goodwill, lost sales or other indirect or consequential losses, interest or attorneys' fees, whether or not caused by the fault or neglect of Brink's and whether or not Brink's had knowledge that such losses or damages might be incurred.

467257

Beech Decl., Ex. B (Contract, § X.C.2).

      **Response:** Defendants admit that the text of the Global Services Valuables Transport Contract, Exhibit B, contains the passage quoted in Paragraph 13.  Otherwise, Paragraph 13 expresses a legal conclusion and not a fact.

      14.     Additionally, the Contract imposes obligations intended to ferret out fraud and malfeasance. These provisions include several, broad cooperation clauses, including:

> **D.  Records.** You will maintain complete and accurate accounting records related to the Service provided by Brink's to You and shall upon request from Brink's, provide such records to Brink's to resolve any disputes between You and Brink's.

Beech Decl., Ex. B (Contract, § III.D).

> Payment shall be contingent upon Your cooperation with any investigation into the loss and execution of all documentation reasonably requested by Brink's.

Beech Decl., Ex. B (Contract, § X.A).

      **Response:**    Defendants admit that the text of the Global Services Valuables Transport Contract, Exhibit B, contains the passage quoted in Paragraph 14.  Otherwise, Paragraph 14 expresses a legal conclusion and not a fact.

      15.     In the event of a loss, the Contract requires each affected customer to provide a sworn statement attesting to the value of the missing property, while substantiating such lost property with the customer's books, records, and accounts:

> ...Upon loss or damage to Property, the parties shall promptly and diligently assist each other to establish the identity of the Property lost or damaged and shall take all such other reasonable steps as may be necessary to assure the maximum amount of salvage at a minimum cost. Affirmative written proof of the Property lost or damaged, subscribed and sworn to by You and substantiated by Your books, records and accounts shall be furnished to Brink's.

Beech Decl., Ex. B (Contract, § X.C.8).

467257

**Response:**      Defendants admit that the text of the Global Services Valuables Transport

Contract, Exhibit B, contains the passage quoted in Paragraph 15.  Otherwise, Paragraph 15

expresses a legal conclusion and not a fact.

16.      The Contract also includes a specific procedure that customers must follow in the

event of a loss, including a requirement to provide timely notice to Brink's:

> **XI. MAKING A CLAIM; DISPUTE RESOLUTION.**
> **A. <u>Making a Claim.</u>** In the event of any loss or damage to Your
> Property, You must notify Brink's in writing of Your intention to
> bring a claim within twenty-four (24) hours after discovery of any loss
> of or damage to Your Property, but in no event more than within:
> - four (4) days of the agreed or anticipated date of delivery of Your
>   Property, in the event of total loss of or non-delivery of Your
>   Property;
> - seven (7) days following delivery of Your Property, in the event
>   of partial loss of or damage to Your Property;
> - In the event that You do not notify Brink's of Your intention to
>   bring a claim within the time limits herein, any claim shall be
>   absolutely waived and barred.
> - In any event, any proceedings against Brink's must be commenced
>   and written notice thereof provided to Brink's within one year of
>   the event giving rise to the cause of action against Brink's. If
>   proceedings are not so commenced, the cause of action shall be
>   absolutely barred and Brink's shall be discharged from all and any
>   liability whatsoever and howsoever arising.

Beech Decl., Ex. B (Contract, § XI.A).

**Response:**      Defendants admit that the text of the Global Services Valuables Transport

Contract, Exhibit B, contains the passage quoted in Paragraph 16 but deny that Brinks enforces that

clause based on evidence in moving papers of Gloria Corrales providing and seeking claim forms

after this deadline.   Otherwise, Paragraph 16 expresses a legal conclusion and not a fact.

17.      The Contract also includes an integration clause, which provides that the entire

agreement between the parties is contained in the written Contract and supporting documents, that

the written agreement supersedes all other understandings, offers, or agreements (including any

purported *oral* offers or agreements), and that the Contract cannot be altered or amended except in a writing signed by both parties:

> **XVI. INTEGRATION CLAUSE.** This Contract constitutes the entire agreement between the parties with respect to any Shipment and shall supersede all other understandings, offers and agreements, whether written or oral, between You and Brink's concerning the Shipment. The illegality or invalidity of any paragraph, clause or provision contained in this Contract shall not affect or invalidate the remainder of this Contract. This Contract shall not be altered or amended except in a writing signed by the parties. The titles of each section of this Contract are for the convenience of the parties and do not affect the interpretation of the Contract.

Beech Decl., Ex. B (Contract, § XVI).

**Response:**    Defendants admit that the text of the Global Services Valuables Transport Contract, Exhibit B, contains the passage quoted in Paragraph 17.  Otherwise, Paragraph 17 expresses a legal conclusion and not a fact.

18.    Finally, the Contract states that customers must communicate any instructions about their shipment to Brink's via "e-mail to a Brink's e-mail address, or any other recordable means of communication specifically authorized in writing by Brink's," and that the customer may not rely on "any communications made outside of such official means of communication":

> **XV. COMMUNICATION**. You agree that You will only communicate release and delivery or any other instructions relating to Your Shipment or the Services to Brink's employees through email to a Brink's e-mail address, or any other recordable means of communication specifically authorized in writing by Brink's (communications on Brink's letterhead). You hereby understand and agree that You may not rely on any communications made outside of such official means of communication....

Beech Decl., Ex. B (Contract, § XV).

**Response:**    Defendants admit that the text of the Global Services Valuables Transport Contract, Exhibit B, contains the passage quoted in Paragraph 18, and note that this passage only

9

467257

pertains to Defendants' communications to Brinks, not Brinks' communications to Defendants. Otherwise, Paragraph 18 expresses a legal conclusion and not a fact.

19.     When Brink's is going to take possession of the shipment, Brink's then gives the customer a Pickup Manifest form that the customer must sign. On the Pickup Manifest, the customer has another opportunity to input or change the Declared Value of the shipment. Beech Decl., ¶ 15, Ex. A.

**Response:**     Admitted.

20.     Meanwhile, the terms and conditions of Brink's Global Services Valuable Transport Contract are printed on the back of each Pickup Manifest form. Beech Decl., ¶ 9, Ex. A.

**Response:**     Admitted.

21.     When the customer signs the Pickup Manifest form, the customer explicitly acknowledges that "ALL SHIPMENTS ARE SUBJECT TO THE TERMS OF CONTRACT" and that he or she is "agree[ing] to the terms and conditions of Brink's Global Services Valuable Transport Contract." Beech Decl., ¶ 8, Ex. A.

**Response:**     Admitted.

22.     Once the customer has an opportunity to review and sign the original, white copy of the Pickup Manifest form, the customer is then provided the yellow carbon copy version of the form. Beech Decl., ¶ 12.

**Response:**     Defendants admit that once the customer signs the original, white copy of the Pickup Manifest form, the customer is then provided the yellow carbon copy version of the form. Shuman Decl., Ex.A-21 (Wu Depo.), A-8 (Malki Depo) at 302:21-303:4.

23.     Brink's typically provides customers at least an hour to review and fill out the Pickup Manifest (and to review the terms and conditions of the Contract on the reverse side), and Brink's often provides customers up to 24 hours to do so. Beech Decl., ¶ 10.

467257

**Response:**  Disputed.  Brinks provides the package with the Pickup Manifest sometime within the last hour of the show when its customers are rushing to finalize any sales, close down their booths, pack their merchandise into the Brinks bags, and release that merchandise into the custody of the Brinks show specialists.  Shuman Decl., Ex.A-21 (Wu Depo.), A-8 (Malki Depo) at 302:21-303:4

24.    At all relevant times, Brink's Global Services Valuable Transport Contract was also available on Brink's website in a large-font version, located at http://www.brinksglobal.com/terms of use/transport contract.aspx Beech Decl., ¶ 14, Ex. C.

**Response:**  Defendants admit that the Brink's Global Services Valuables Transport Contract was available on Brink's website, but dispute that it appears in a large-font version. Beech Decl., Ex. C.

## II.    DEFENDANTS AND THEIR LONGSTANDING HISTORY OF ENGAGING BRINK'S SERVICES—WHILE ASSENTING TO THE SAME TERMS

25.    Defendants are jewelry companies that have a long, extensive history of engaging Brink's to ship their jewelry and other valuables. Beech Decl., ¶ 17.

**Response:**  Defendants admit they are jewelry companies that have a history of engaging Brink's to ship their jewelry and other valuables.  Based on the chart in ¶26, Defendants have averaged in some cases less than three shipments per year and in no case more than seven per year over the last ten years, and in some years (e.g. before 2019 and in 2020 and 2021) did not use Brinks at all.  Redmond Decl., Ex. 1-88 (J. Chang Depo (Vol. I)), at pp. 80:13-16; 118:25-119:2.

26.    Before the subject loss, each Defendant in this litigation transacted with Brink's to transport valuables on *dozens of prior occasions*, including to transport shipments all over the United States:

467257

| Defendant Jewelry Company | Shipments with Brink's to Transport Defendant's Jewelry (Since 2012) | States Where Defendant Contracted with Brink's to Pickup or Dropoff Jewelry<br><br>(*not* including states that Brink's passed through during interstate shipments) |
|---|---|---|
| Treasure Connection | 30 | TX, KY, LA, CA, MD, NV, PA, VA, MI, HI, NY |
| Forty-Seventh & Fifth, Inc. | 41 | TN, CA, VA, TX, IL, NY |
| Lam's Jade Center, Inc. | 28 | MA, VA, TX, CA, HI, AZ |

467257

| S&N Diamond | 54 | OH, CA, IL, VA, TX, MD, NV, MS, LA, TN, AZ |
|---|---|---|
| Petri Gems, Inc. | 43 | IL, CA, MA, VA, TX, MD, WA, AZ |
| Hawaiian Design Jewelry Company | 39 | IL, VA, CA, TX, MD, HI, MN, NY |
| Pan Lovely Jewelry Company | 32 | MA, NJ, CA, NC, VA, MI, TX, MD, FL, AZ, NV |
| Lee's International Jewelry, Inc. | 29 | NY, CA, FL, VA, TX, NV, HI, AZ, KY |
| Supreme Collection Corporation | 70 | CA, MA, NY, VA, TX, AZ, IL, OH, MD, HI, NV, MI |
| Denver Trading Company Kimmimoto | 49 | IL, MA, VA, CA, TX, MD, AZ, WA, CO |

[Beech Decl., ¶ 17.]

**Response:**     Admitted as to the numbers and specific states involved, which is not all over the United States.

27.     For each of the above engagements, Defendants agreed to the same (or substantially similar) terms and conditions, including a New York forum selection clause, an express requirement that the customer accurately state the "Declared Value" of the shipment, and a limitation of liability provision that limited Brink's liability to the *lesser* of the Declared Value or the actual value of any lost or stolen items and an express exclusion of non-contract damages. Beech Decl., ¶ 18.

**Response:** Disputed. The contract changed over time. Woerner testimony and examples of Manifests.

28.     Defendants were also familiar with the terms and conditions of Brink's Global Services Valuable Transport Contract because they negotiated a group rate through two trade organizations—Jewelry Importers & Manufacturers Association International ("JIMA") and National Chinese American Jewelers Association ("NCAJA")—and the JIMA/NCAJA rate sheet yet again stated that Brink's services were "subject to the Brink's Global Services Terms and Conditions of Contract." Redmond Decl., Ex. 1-70 (J. Malki Depo., Exhibit 13); Redmond Decl., Ex. 1-22 (Brink's Second Requests for Admission to Forty Seventh & Fifth, Exhibits 3, 4, and 15); Redmond Decl., Ex. 1-34 (Forty-Seventh & Fifth's Responses to Request for Admissions, Set Two, Nos. 12, 13, and 25); Redmond Decl., Ex. 1-88 (J. Chang Depo. (Vol. I)), at pp. 69:7-72:25; 76:21-25; 80:25-81:2; 119:22-120:9; 129:17-20; Ex. 1-90 (J. Chang Depo. (Vol. II)), at pp 286:5290:18.

> **Response:**     Admit that Joseph Chang negotiated a group rate for the two trade organizations identified and that the rate sheet contained the statement, in smaller than the surrounding font, that Brink's services were "subject to the Brink's Global Services Terms and Conditions of Contract."  Disputed that Defendants were therefore familiar with the terms and conditions of Brink's Global Services Valuable Transport Contract.  .

29.     Indeed, when Joseph Chang from Defendant Treasure Connection Fine Jewelry, Inc. negotiated with Brink's on behalf of JIMA and NCAJA, Mr. Chang explicitly acknowledged the key terms and conditions of Brink's Contract by signing a *large-font* version of the Contract and separately initialing each of the five pages of the large-font Contract. Redmond Decl., Ex. 1-31 (Brink's Second Requests for Admission to Treasure Connection Fine Jewelry, Exhibit No. 15); Redmond Decl., Ex. 1-43 (Treasure Connection Fine Jewelry's Responses to Brink's Second Requests for Admission, Nos. 26, 27); Ex. 1-88 (J. Chang Depo. (Vol. I)), at pp. 69:7-72:25; 76:21-25; 80:25-81:2; 119:22-120:9; 129:17-20; Ex. 1-90 (J. Chang Depo. (Vol. II)), at pp 286:5-290:18.

**Response:**      Disputed that the version of the Contract signed by Joseph Chang had a large font, disputed that Joseph Change acknowledged the key terms and condition by signing and initialing, and further disputed that the version of the Contract identified was the version Brinks was using at the time of the loss.  Redmond Decl., Ex. 1-31 (Brink's Second Requests for Admission to Treasure Connection Fine Jewelry, Exhibit No. 15); Beech Decl., Ex. C; Declaration of Steven C. Shuman (Shuman Decl.), Ex. A-1 (Brink's Complaint in this case, Ex. 1, Dkt. 1-1).  Joseph Chang signed in order to feed his family and Brinks was the only choice to enable him to run his business.  Redmond Decl., Ex. 1-88 (J. Chang Depo (Vol. 1) at 71:21-74:5; 75:18-22)

30.      Finally, Brink's made the Contract available to Defendants in yet another way. In the months and years before the subject loss, Brink's employees sent emails to most, if not all, of the Defendants in this action (or their representatives) while including an email signature that stated: "**All services subject to the terms and conditions of the Brink's Global Services Valuables Transport Contract.**" The hyperlink in the emails directed Defendants to the large-font version of the Global Services Valuables Transport Contract available on Brink's website (http://www.brinksglobal.com/terms of use/transport contract.aspx). Beech Decl., ¶ 14, Exs. C, D.

**Response:**  Disputed.  The reference to the hyperlink in all e-mails appeared below the signature in font smaller than all surrounding font, and all e-mails either post-dated the July 10, 2022 loss in this case or pre-dated that loss by years, when the hyperlink led to a different form of contract than was on the back of Defendants manifests, albeit one still with small font.  Beech Decl., Ex. D; Redmond Decl., Ex. 1-31 (Brink's Second Requests for Admission to Treasure Connection Fine Jewelry, Exhibit No. 15) compared to Beech Decl., Ex. C.

## III.   DEFENDANTS HAD OTHER OPTIONS IF THEY DID NOT WISH TO USE BRINK'S

31.     At all times, Defendants had other options if they did not want to use Brink's to transport their jewelry. Besides transporting their own jewelry and bearing their own risk, Defendants could have engaged a different secured transport company, such as Loomis, Garda, or Malca-Amit, among others. Beech Decl., ¶ 22.

> **Response:**     Disputed.  Defendants had no choice but Brinks.  Redmond Decl., Ex. 1-88 (J. Chang Depo (Vol. 1) at 75:18 – 76:7; 77:4-78:1; 82:6-9; 88:4-12).

32.     In fact, in some years prior to 2022, Defendants had group rates with other secured transport companies, such as Malca-Amit or Loomis, and used those companies rather than Brink's to transport their valuables between jewelry shows. Redmond Decl., Ex. 1-88 (J. Chang Depo. (Vol I)), at pp. 82:10 – 22; 84:10 – 15; 89:13 – 24; Ex. 1-90 (J. Chang Depo. (Vol. II)), at pp 287:18 – 288:7; Beech Decl., ¶ 23.

**Response:**   Admitted.

33.     Defendants also frequently used other secured transport companies, including Malca-Amit and Loomis, to handle individual shipments. For example, Brink's has sometimes been asked by certain Defendants to transfer their valuables to another secured transport company so that the other company can complete another shipment. Beech Decl., ¶ 23, Ex. E.

> **Response:**     Admitted except as to "frequently" and except as to transportation from jewelry shows when Brinks was the designated carrier.  Redmond Decl., Ex. 1-88 (J. Chang Depo (Vol. 1) at 75:18 – 76:7; 77:4-78:1; 88:4-12).

34.     In their California Complaint, even Defendants acknowledge that they had a few "other options for secured transport of jewelry and gemstones." Redmond Decl., Ex. 103 (California Complaint, ¶ 25).

467257

**Response:**   Disputed.  The California complaint says "had few other options," not "a few other options," and Defendants had no other secured transportation options from jewelry shows at the time of this loss besides Brinks.   Redmond Decl., Ex. 103 (California Complaint, ¶25) and Ex. 1-88 (J. Chang Depo (Vol. I)), at pp. 75:18 - 76:7; 77:4-78:1; 82:6-9; 88:4-12.

35.     In other words, Brink's was not the only option available for the subject transport on July 10, 2022; rather, Defendants chose to utilize Brink's, while agreeing to Brink's Global Services Valuable Transport Contract. Beech Decl., ¶ 22.

**Response:**   Disputed.  Defendants had no choice but Brinks.  Redmond Decl., Ex. 1-88 (J. Chang Depo (Vol. 1) at 75:18 – 76:7; 77:4-78:1; 82:6-9; 88:4-12).

## IV.   DEFENDANTS EACH ASSENTED TO THE TERMS OF BRINK'S CONTRACT ON JULY 10, 2022

36.     On July 10, 2022, Defendants were selling jewelry and other items at the International Gem and Jewelry Show at the San Mateo County Convention Center in San Mateo County, California ("San Mateo show"). Redmond Decl., Ex. 1-65 (Viger Depo., Ex. 1, L.A. County Sheriff's Department Incident Report); Redmond Decl., Ex. 1-103 (Defendants' California Complaint, ¶ 9).

**Response:**   Admitted.

37.     On July 10, 2022, at the end of the show, Defendants each contracted with Brink's to transport their jewelry and other items after the conclusion of the San Mateo show. Many of the Defendants were shipping their items to the next Intergem show, which was set to take place a week later in Pasadena, California. Meanwhile, a few of the jewelers were shipping their items to a different ultimate destination, such as back to their own office. Beech Decl., ¶ 8, Ex. A (Defendants' Pickup Manifests).

467257

**Response:**      Admitted.

38.      As a condition precedent for shipping Defendants' valuables after the San Mateo show, Brink's required each Defendant to accept the Brink's Global Services Valuable Transport Contract. Beech Decl., ¶ 15, Ex. A (Defendants' Pickup Manifests).

**Response:**      Admitted.

39.      Each Defendant explicitly accepted Brink's Contract by having an authorized representative sign a Pickup Manifest at the conclusion of the San Mateo show, while agreeing to pay Brink's to ship their valuables from San Mateo to their listed ultimate designation. [Beech Decl., ¶ 8, Ex. A (Defendants' Pickup Manifests); *see also* Redmond Decl., Exs. 1-1 – 1-43 (collecting Responses to Requests for Admission relating to the July 10, 2022 Pickup Manifests)

**Response:**      Admitted that each Defendant had an authorized representative sign a Pickup Manifest at the conclusion of the San Mateo show and agreed to pay Brink's to ship their valuables from San Mateo to their ultimate destination.  Disputed as to each Defendant explicitly accepting Brink's Contract because it was illegible, unconscionable, and induced by fraud.  Redmond Decl., Exs. 1-1 – 1-43, responses to Requests for Admission Nos. 3-6

40.      The terms and conditions of Brink's Contract were included on the Pickup Manifest that each Defendant's authorized representative signed. Beech Decl., ¶ 9, Ex. A; *see also* Redmond Decl., Exs. 1-1 – 1-43 (collecting Responses to Requests for Admission relating to the July 10, 2022 Pickup Manifests).

**Response:**      Admit that an illegible version of Brink's Contract was included on the reverse side of the Pickup Manifest with no reference to that fact on the front side.  Beech Decl., Ex. A.

467257

41.     Each Defendant's authorized representative declared the value of that Defendant's July 10, 2022 shipment by having an opportunity to fill in or edit the Carriage Value (i.e., Declared Value) on the Pickup Manifest. Here is an example from Bonita Pearl's Pickup Manifest:



[Beech Decl., ¶¶ 10, 11, Ex. A (Defendants' Pickup Manifests); *see also* Redmond Decl., Exs. 11 – 1-43 (collecting Responses to Requests for Admission relating to the July 10, 2022 Pickup Manifests).

**Response:**     Disputed.  Each Defendant set forth the insurance amount desired, not the value of the shipment.  See Defendants' Fact Nos. 366-375.   Also, nothing in the Brink's Valuables Transport Contract says "Carriage Value" means the full value of the shipment, or means "Declared Value" or means actual value.  Beech Decl., Ex. B.

42.     Just below the details about the Declared Value, each of the Defendants' representatives then explicitly acknowledged that the July 10, 2022 shipment was "SUBJECT TO THE TERMS OF CONTRACT" and that he or she was "agree[ing] to the terms and conditions of Brink's Global Services Valuable Transport Contract":

467257

Beech Decl., ¶ 8, Ex. A (Defendants' Pickup Manifests).

**Response:**      Admit that the highlighted language was at the bottom of the Pickup Manifest.  Disputed that the Manifest contained "details" or "Declared Value."  The Manifest has no space for "details", and only calls for "Carriage Value", with no language on the front or back saying "Carriage Value" means "Declared Value".  Beech Decl., Exs. A, B, and C.

43.      Indeed, all eleven Defendants in this litigation have **admitted that their authorized representative signed the Pickup Manifest**, and that the **Pickup Manifests are authentic**. Redmond Decl., Ex. 1-1 (Brink's First Discovery Requests to Bonita Pearl, Exhibit A); Ex. 1-11 (Bonita Pearl, Inc.'s Responses to Brink's First Discovery Requests), Request for Admission No. 1; Ex. 1-21 (Brink's Second Requests for Admission to Bonita Pearl, Inc., Exhibit No. 17); Ex. 1-35 (Bonita Pearl Inc.'s Responses to Brink's Second Requests for Admission, Request Nos. 29, 30); Ex. 1-2 (Brink's First Discovery Requests to Forty Seventh & Fifth, Exhibit A); Ex. 1-12 (Forty Seventh & Fifth, Inc.'s Responses to Brink's First Discovery Requests, Request for Admission No. 1; Ex. 1-22 (Brink's Second Requests for Admission to Forty Seventh & Fifth, Inc., Exhibit No. 12; Ex. 1-34 (Forty Seventh & Fifth's Responses to Brink's Second Requests for Admission, Request Nos. 21, 22); Ex. 1-3 (Brink's First Discovery Requests to Hawaiian Design Jewelry, Exhibit A); Ex. 1-13 (Hawaiian Design Jewelry's Responses to Brink's First Discovery Requests, Request for Admission No. 1); Ex. 1-23 (Brink's Second Requests for Admission to

Hawaiian Design Jewelry, Exhibit No. 1); Ex. 1-35 (Hawaiian Design Jewelry's Responses to Brink's Second Requests for Admission, Request Nos. 10, 11); Ex. 1-4 (Brink's First Discovery Requests to Kimimoto Jewelry's, Exhibit A); Ex. 1-14 (Kimimoto Jewelry's  Responses to Brink's First Discovery Requests, Request for Admission No. 1); Ex. 1-24 (Brink's Second Requests for Admission to Kimimoto Jewelry, Exhibit No. 17); Ex. 1-36 (Kimimoto Jewelry's Responses to Brink's Second Requests for Admission, Request Nos. 26, 27); Ex. 1-5 (Brink's First Discovery Requests to Lam's Jade Center, Exhibit A); Ex. 1-15 (Lam's Jade Center's Responses to Brink's First Discovery Requests, Request for Admission No. 1); Ex. 1-25 (Brink's Second Requests for Admission to Lam's Jade Center, Exhibit No. 13); Ex. 1-37 (Lam's Jade Center's Responses to Brink's Second Requests for Admission, Request Nos. 25, 26); Ex. 16 (Brink's First Discovery Requests to Lee's International Jewelry, Exhibit A); Ex. 1-16 (Lee's International Jewelry's Responses to Brink's First Discovery Requests, Request for Admission No. 1); Ex. 1-26 (Brink's Second Requests for Admission to Lee's International Jewelry, Exhibit No. 2); Ex. 1-38 (Lee's International Jewelry's Responses to Brink's Second Requests for Admission, Request Nos. 11, 12); Ex. 1-7 (Brink's First Discovery Requests to Pan Lovely Jewelry Inc., Exhibit A; Ex. 1-17 (Pan Lovely Jewelry Inc.'s Responses to Brink's First Discovery Requests, Request for Admission No. 1); Ex. 1-27 (Brink's Second Requests for Admission to Pan Lovely Jewelry Inc., Exhibit No. 33); Ex. 1-39 (Pan Lovely Jewelry Inc.'s Responses to Brink's Second Requests for Admission, Request Nos. 43, 44); Ex. 1-8 (Brink's First Discovery Requests to Petri Gems, Inc., Exhibit A); Ex. 1-18(Petri Gems, Inc.'s Responses to Brink's First Discovery Requests, Request for Admission No. 1); Ex. 1-28 (Brink's Second Requests for Admission to Petri Gems, Inc., Exhibit No. 7); Ex. 1-40 (Petri Gems, Inc.'s Responses to Brink's Second Requests for Admission, Request Nos. 17, 18); Ex. 1-9 (Brink's First Discovery Requests to S & N Diamond, Exhibit A; Ex. 1-19(S & N Diamond's Responses to Brink's First Discovery Requests, Request for Admission No. 1); Ex. 1-29 (Brink's

Second Requests for Admission to S & N Diamond, Exhibit No. 15); Ex. 1-41 (S & N Diamond's Responses to Brink's Second Requests for Admission, Request Nos. 25, 26); Ex. 1-9 (Brink's First Discovery Requests to Supreme Collection Corp., Exhibit A; Ex. 1-20 (Supreme Collection Corp.'s Responses to Brink's First Discovery Requests, Request for Admission No. 1); Ex. 1-30 (Brink's Second Requests for Admission to Supreme Collection Corp., Exhibit Nos. 1, 7); Ex. 1-42 (Supreme Collection Corp.'s Responses to Brink's Second Requests for Admission, Request Nos. 10, 18, 19); Ex. 1-10 (Brink's First Discovery Requests to Treasure Connection Fine Jewelry, Exhibit A); Exs. 1-32 (Treasure Connection Fine Jewelry's Responses to Brink's First Discovery Requests, Request for Admission No. 1); Ex. 1-31 (Brink's Second Requests for Admission to Treasure Connection Fine Jewelry, Exhibit No. 22); Ex. 1-43 (Treasure Connection Fine Jewelry's Responses to Brink's Second Requests for Admission, Request Nos. 34, 35.

**Response:**  Admitted

44.     Pursuant to established protocol, before Brink's employees collected the shipments on July 10, 2022, each of Defendants' representatives was provided with a packet that included the original Pickup Manifest form (a white version with a yellow carbon copy attached to it), along with the terms and conditions of Brink's Contract printed on the reverse side, bags to hold the shipments, red seals used to seal the shipments, labels, and other materials. Beech Decl., ¶¶ 9 – 11, Ex. A; Redmond Decl., Ex 1-57 (G. Corrales Depo.), at pp. 92:11–95:15; 99:10-101:12.

**Response:**     Admitted, but the terms and conditions of Brink's Contract were illegible, even when enlarged on a computer.  Beech Decl., Exs. A and B.

45.     On July 10, 2022, after receiving the packet, each Defendant had time to prepare and seal their shipments, complete their review of the Contract's terms, declare the value of the shipment on the Pickup Manifest (including by calculating a new value for their inventory if it had changed significantly from sales or purchases at the San Mateo show), and sign the form stating

467257

that they were agreeing to the Contract. Beech Decl., ¶¶ 8, 10, Redmond Decl., Ex 1-57 (G. Corrales Depo.), at pp. 92:11–95:15; 99:10-101:12.

**Response:**    Disputed.  There was no time to review the Contract or calculate a new value for inventory.  Brinks provides the package with the Pickup Manifest sometime within the last hour of the show when its customers, Defendants, are rushing to finalize any sales, close down their booths, pack their merchandise into the Brinks bags, and release that merchandise into the custody of the Brinks show specialists.  Shuman Decl., Ex.A-21 (Wu Depo.), A-8 (Malki Depo) at 302:21-303:4.

46.    Pursuant to established protocol, Defendants (and other shippers also at the San Mateo show) loaded and sealed their own bags before bringing those sealed bags to Brink's for shipment. Redmond Decl., Ex 1-57 (G. Corrales Depo.), at pp. 92:11–95:15.]

**Response:**   Admitted.

47.    Brink's did not re-open the sealed bags that Defendants delivered to Brink's for shipment. Instead, Brink's would accept the sealed bags without inspection of the contents, while relying on Defendants' representations about the Declared Value of their shipments. [Redmond Decl., Ex 1-57 (G. Corrales Depo.), at pp. 92:11–95:15; Beech Decl., ¶¶ 10, 16.

**Response:**                    Admitted that Brink's did not re-open the sealed bags that Defendants delivered to Brink's for shipment.  Disputed that Brink's never inspected the contents to the extent Brink's show specialist would see those contents while at the show before they were sealed in the bags.  Also disputed that Brink's relied on Defendants' representation about the Declared Value because Brink's knew it sought only insurance value from the jewelers, knew that jewelers routinely submitted insurance values that were less than the actual value of the merchandise (in some cases because they had other, less expensive insurance), and Brink's had even changed its Contract as a result of

23

that knowledge to try to protect against claims.  Shuman Decl., Ex. A-9 (Malki Depo) at pp. pp. 213:19-214:10; 217:20-218:10; 218:22-219:21; 220:1-221:2; 221:9-10; 222:2-14; 322:6-20; 358:8-21; 387:13-388:6; 389:4-19; 392:23-393:14.  Shuman Decl Ex. A-12 (Leung Depo) at pp. 147:1-14.  Shuman Decl. Ex. A-27 (Bruce Woerner Depo) at pp. 78-92.

48.    After Defendants (and other shippers at the San Mateo show) provided their sealed bags to Brink's and executed Pickup Manifest forms at the conclusion of the San Mateo show, Brink's then loaded 73 sealed bags onto a tractor-trailer from Brink's Over-the-Road fleet. Redmond Decl., Ex 1-58 (T. Motley Depo.), at pp. 76:2-24; 147:9-13.

**Response:**    Admitted except as to the number of bags.  It was 74 bags.  Shuman Decl., Ex. A-3 (Motley Depo. Exhibit following testimony)

49.    The Brink's tractor-trailer left the San Mateo show bound for a secure Brink's storage yard at 1821 South Soto St. in Los Angeles. Redmond Decl., Ex 1-58 (T. Motley Depo.), at pp. 76:2-24; Ex. 1-65 (Viger Depo., Exhibit 1, L.A. County Sheriff's Department Incident Report).

**Response:**    Admitted.

## V.    ON JULY 11, 2022, THE BRINK'S TRACTOR-TRAILER IS BURGLARIZED DURING TRANSIT

50.    The subject tractor-trailer was crewed by two Brink's employees, Tandy Motley and James Beaty, who are based out of Salt Lake City, Utah. Redmond Decl., Ex 1-58 (T. Motley Depo.), at pp. 22:15-17; 73:24-74:15.]

**Response:**    Admitted.

51.    The route assigned to Mr. Motley and Mr. Beaty originated in Salt Lake City, Utah. Mr. Motley and Mr. Beaty departed Utah in the early morning hours of July 10, 2022, while

heading toward the San Mateo show in San Mateo, California. [Redmond Decl., Ex. 1-59 (Motley ELD Log), p.1; Ex. 1-61 (Beaty ELD Log), p.1.]

**Response:**    Admitted.

52.    After picking up the shipments from the San Mateo show, Mr. Motley and Mr, Beaty were scheduled to deliver the shipments of jewelry to the Los Angeles area, before then continuing on to Colorado to pick up pharmaceuticals, and then driving the pharmaceutical shipment across the country to Georgia. Redmond Decl., Ex 1-58 (T. Motley Depo.), at pp. 62:17-63:8; 165:6-23.

**Response:**    Admitted.

53.    As Over-the-Road truck drivers (also known as long-haul truck drivers), Mr. Motley and Mr. Beaty were required to drive for many hours in a day, several days per week, for several weeks at a time, all while driving a tractor-trailer that can weigh up to 80,000 pounds. Declaration of Don Tullos ("Tullos Decl."), filed herewith, ¶ 7.

**Response:**    Admitted.

54.    Like all Over-the-Road truck drivers, Mr. Motley and Mr. Beaty were required to follow U.S. Department of Transportation ("D.O.T.") regulations, including the so-called "Sleeper Berth Provision" that requires a driver to have at least 10 hours of rest time before that driver can have another 14-hour shift. Tullos Decl., ¶ 8.

**Response:**    Admitted.

55.    When working in tandem teams, Over-the-Road truck drivers such as Mr. Motley and Mr. Beaty alternate between being the on-duty driver and taking the required "sleeper berth" time, so that they can complete timely and efficient routes over long distances. Tullos Decl., ¶ 9.

**Response:**    Admitted

56.     If a tandem team of Over-the-Road drivers did *not* alternate roles and instead both drivers stayed on-duty throughout the same 14-hour window, then, per D.O.T. regulations, the tractor-trailer would not be able to move for at least 10 hours while *both* drivers took a mandated rest period. Tullos Decl., ¶ 10.

**Response:**     This statement is ambiguous, but if it refers to both drivers staying on duty during the entirety of the hypothetical 14-hour period, it is Admitted.

57.     These types of D.O.T. regulations are mandated to ensure that Over-the-Road truck drivers are provided sufficient rest, both for the sake of the driver and to ensure the safety of other individuals on the road. Tullos Decl., ¶ 11.

**Response:**     Admitted.

58.     When Mr. Motley and Mr. Beaty departed from Utah in the early morning hours ofJuly 10, 2022, Mr. Motley drove the first leg of the route—from Salt Lake City to Spring Creek, Nevada—while Mr. Beaty rested. Tullos Decl., ¶ 6; Redmond Decl., Ex. 1-59 (Motley ELD Log), p.1; Ex. 1-61 (Beaty ELD Log), p.1

**Response:**     Admitted.

59.     The drivers then switched, with Mr. Beaty driving the next leg of the route—from Spring Creek, Nevada to San Mateo, California—while Mr. Motley took his mandated rest period. [Redmond Decl., Ex. 1-58 (T. Motley Depo.), at pp. 182:15-183:2; Ex. 1-59 (Motley ELD Log), p.1; Ex. 1-61 (Beaty ELD Log), p.1]

**Response:**     Admitted.

60.     The Brink's tractor-trailer then arrived at the San Mateo show on July 10, 2022 around 4:22 p.m. M.T. (or 3:22 p.m. P.T.).  Redmond Decl., Ex. 1-61 (Beaty ELD Log), p.1, line 19; Tullos Decl., ¶ 12.

**Response:**      Disputed.  While this is an accurate statement based on Beaty's driver's log, Motley testified that they arrived, spent 15-20 minutes getting food, and then it was 3:00 p.m.  Redmond Decl., Ex. 1-58 (T. Motley Depo) at p. 82:2-14.

61.      Although the ELD shows Mr. Beaty as logged into the sleeper berth immediately upon arrival in San Mateo at 4:30 p.m. M.T. (or 3:30 p.m. P.T.), this is an error because Mr. Beaty testified that he spent several hours walking around the San Mateo show and assisted the Brink's show staff with processing shipments. Redmond Decl., Ex 1-60 (J. Beaty Depo.), at p. 49:8 – 13; Tullos Decl. ¶ 13, 15.

**Response:**  Disputed.  Beaty testified that he was assisting Brink's personnel for "a couple of hours."  Redmond Decl., Ex 1-60 (J. Beaty Depo.), at p. 49:8 – 13.  Beaty also confirmed he entered the sleeper berth at 3:39 p.m. P.T. Shuman Decl. Ex. A-4 (Beaty Depo), p. 119:3-120:8

62.      Mr. Motley also testified that Mr. Beaty worked inside the jewelry show for a lengthy period after arriving at the show. Redmond Decl. Ex. 1-58 (T. Motley Depo., p. 82:2 – 83:6).

**Response:**  Admit that Motley testified Beaty was "helping with some things" after arriving at the show.  Dispute that Motley testified Beaty did so for a "lengthy period of time." To the contrary, Motley testified that Beaty stayed awake for 1 to 1-1/2 hours after arrival. Redmond Decl. Ex. 1-58 (T. Motley Depo., pp. 82:2 – 83:6; 92:6-12).

63.      Ultimately, the tractor-trailer was fully loaded and departed from the San Mateo show around 8:21 p.m. P.T. on July 10, 2022. Mr. Motley was the driver of the tractor-trailer when it left the San Mateo show. Redmond Decl., Ex. 1-59 (Motley ELD Log), p.1, line 8; Redmond Decl., Ex 1-58(T. Motley Depo.), at pp. 92:6 – 92:25; Tullos Decl., ¶ 14.

**Response:**   Admit the tractor-trailer was fully loaded and departed from the San Mateo show with Motley as the driver.  Admit that according to Motley's log, it left the show at 8:21 p.m. P.T.  Dispute that according to Motley's testimony it left the show at 8:21 P.T. Motley testified that it left the show at 7:00 or 8:00 pm. P.T.  Redmond Decl., Ex. 1-59 (Motley ELD Log), p.1, line 8; Shuman Decl., Ex. A-3, p. 90:18-91:1.

64.    Because Mr. Beaty had been driving earlier in the day (driving over 538 miles from Spring Creek, Nevada to San Mateo, California), he retired to the sleeper berth for a mandatory rest period of at least 10 hours, as required by D.O.T regulations, after he finished working at the jewelry show. Redmond Decl., Ex. 1-60 (J. Beaty Depo.), at pp. 49:8 – 13, 55:18 – 56:7, 120:23 – 121:25; Redmond Decl., Ex. 1-58 (T. Motley Depo., pp. 82:2 – 83:6, 98:25 – 100:9, 104:24 – 105:10)] ; Tullos Decl., ¶ 15.

**Response:**   Admitted that Beaty had driven earlier in the day from Spring Creek, Nevada to San Mateo, California, over 538 miles, and that he retired to the sleeper berth.  Disputed that the mandatory rest period under D.O.T. regulations had to be 10 consecutive hours or had to be spent entirely in the sleeper berth.  Shuman Decl., Ex. A-6 (September 27, 2023 Lupton expert report) at pp. 5-8 (pp. 6-9 of pdf), §§3-4.

65.    While he was driving south down Interstate 5 in California, around 12:49 a.m. P.T., Mr. Motley stopped the tractor-trailer in the Buttonwillow Rest Area to use the restroom for five minutes. [Redmond Decl., Ex. 1-58 (T. Motley Depo.), at pp. 104:24-105:8; Ex. 1-59 (Motley ELD Log), p. 3, line 4; Tullos Decl., ¶ 16.

**Response:**    Admitted.

66.    After that, Mr. Motley drove for another hour until he reached the Flying J Truck Stop in Lebec, California. Redmond Decl., Ex. 1-58 (T. Motley Depo.), at pp. 40:9–41:21, 106:18–107:17; Ex. 1-59 (Motley ELD Log), p. 3, line 4; Tullos Decl., ¶ 17.

467257

**Response:**     Admitted.

67.     Having driven nearly 300 miles (from San Mateo to Lebec), at 1:56 am P.T., Mr. Motley stopped at the Flying J to take a 30-minute meal break, as outlined in D.O.T. regulations. Redmond Decl., Ex. 1-58 (T. Motley Depo.), at pp. 40:9 – 41:21, 106:18 – 107:17; Ex. 1-59 (Motley ELD Log), p. 3, line 7; Tullos Decl., ¶ 17.

**Response:**                    Admit that Motley drove nearly 300 miles from San Mateo to Lebec, and that at 1:56 a.m. P.T. he stopped at the Flying J to take a 30-minute meal break.  Disputed that the break was required by D.O.T. regulations.  D.O.T. regulations only require a 30-minute break after eight hours of driving, and the entire trip from San Mateo to Los Angeles required only 6-1/2 hours of driving, the last hour of which Beaty did.  Redmond Decl., Ex.1-59 (Motley ELD Log) p.3, line 8 and page 4, line 6; Redmond Decl., Ex. 1-61 (Beaty ELD Log) p.3, lines 3-4; Lupton Declaration and 49 C.F.R. §395.3(a)(3)(ii),

68.     At the Flying J, Mr. Motley parked the tractor-trailer in a well-lit area, around other tractor-trailers (including a truck from Amazon and a truck from Walmart), and there was a direct line of sight between the Flying J building and the back of the Brink's tractor-trailer. Redmond Decl., Ex. 1-63 (Viger Depo.), at pp. 51:21-52:17; Ex. 1-64 (Swigart Depo.), at pp. 108:22-109:18]

**Response:**     Disputed.  Once inside the Flying J building, Motley could not see the back of the Brink's tractor-trailer.  Shuman Decl., Ex. A-3 (Motley Depo), p.108:25-109:19.

69.     Mr. Motley estimates that he was away from the tractor-trailer for approximately 17 minutes, while he used the restroom and got food inside the Flying J. [Redmond Decl., Ex. 158 (T. Motley Depo.), at pp. 130:17–131:14.]

**Response:**     Disputed.  Per binding admission in Brink's complaint, Motley was away from the truck for 27 minutes, from 2:05 a.m. to 2:32 a.m.  Shuman Decl., Ex. A-1, Brink's Complaint, ¶19.

70.     During that time, Mr. Motley left Mr. Beaty asleep in the sleeper berth so that Mr. Beaty could meet his D.O.T.-mandated 10 hours of rest, and so that Mr. Beaty could take over for the next leg of the trip to Colorado once Mr. Motley reached Los Angeles. Redmond Decl., Ex 158 (T. Motley Depo.), at pp. 99:24–100:15, 108:25–110:10.

**Response:**     Admitted that Motley left Beaty asleep in the sleeper berth.  Disputed that Motley had to do that for Beaty to get his D.O.T.-mandated 10 hours of rest.  Per the logs, and Brink's Complaint, and Beaty's own testimony, Beaty already had been in the sleeper berth for 10 hours.  Moreover, the D.O.T. mandates only seven hours of sleep, which Beaty had even if he stayed up two hours after arrival at San Mateo, and another three hours off duty, before driving again, which means Motley could have awakened him to guard the goods while Motley took his not yet mandated half-hour break.  Redmond Decl., Ex. 1-61 (Beaty ELD Log) p.2, line 19 (Beaty asleep at 3:28 p.m. P.T.); Redmond Decl., Ex. 1-59 (Motley ELD Log) p.4, line 6-7 (Motley arrives at 1:54 a.m. and off duty at 1:56 a.m. P.T.); Shuman Decl., Ex. A-1, Brink's Complaint, ¶19 (Motley left truck at 2:05 a.m.); Redmond Decl., Ex 1-60 (J. Beaty Depo.), at p. 49:8 – 13 (Beaty testified he spent two hours of off-duty time helping Brink's personnel at the show, which still left him with 8-1/2 hours of sleep plus 2 hours of off duty time for a total of 10-1/2 hours of rest); Shuman Decl., Ex. A-4 (Beaty Depo.) at p. 120:5-18; 133:24 – 134:24 (Beaty testified he was in the sleeper berth from 3:39 p.m. July 10, 2022 to 2:55 a.m. July 11, 2022, more than 10 hours when Motley pulled in at 2:05 a.m. per Brink's Complaint or 1:54 a.m. per Motley's Log, and Motley could have awakened him).

Beaty also testified that Motley could have awakened him, interrupting the ten hours, and Beaty could have completed the ten hours afterward before driving again.  Shuman Decl., Ex. A-4 (Beaty Depo.) at p.123:21 – 124:12

71.     As noted above, Mr. Beaty worked at the jewelry show for several hours after arriving at the show at 3:22 p.m. P.T. Redmond Decl., Ex. 1-60 (J. Beaty Depo.), at pp. 49:8 – 13, 55:18 – 56:7); Redmond Decl. Ex. 1-58 (T. Motley Depo., p. 82:2 – 83:6)]; Tullos Decl., ¶¶ 13, 15]. He did not have 10 hours of rest in the sleeper berth at 1:56 a.m. P.T. when Motley parked the tractor trailer. [Redmond Decl. Ex. 1-60 (J. Beaty Depo.), pp. 55:20 – 56:7, 120:23 – 121:25; Redmond Decl. Ex. 1-58 (T. Motley Depo.) at pp. 82:2 – 83:6, 98:25 – 100:9, 104:24 – 105:10; Tullos Decl., ¶¶ 15 – 18.

**Response:**  Disputed.  According to his initial testimony—but not his ELD Log--Beaty assisted "a couple hours" after arriving at the show, but in either case, that was his off-duty time per the Log, so in either case, he had the required 10 hours of off duty time.  According to Beaty's later testimony, he was in the sleeper berth for more than 10 hours when Motley pulled into the Flying J, and Motley could have awakened him.  Further, disputed that Motley parked the tractor trailer at 1:56 a.m. P.T. as Brinks has judicially admitted in its Complaint that Motley pulled into Flying J at 2:05 a.m. P.T.   Redmond Decl., Ex. 1-61 (Beaty ELD Log) p.2, line 19 (Beaty asleep at 3:28 p.m. P.T.); Redmond Decl., Ex. 1-59 (Motley ELD Log) p.4, line 6-7 (Motley arrives at 1:54 a.m. and off duty at 1:56 a.m. P.T.); Shuman Decl., Ex. A-1, Brink's Complaint, ¶19 (Motley left truck at 2:05 a.m.); Redmond Decl., Ex 1-60 (J. Beaty Depo.), at p. 49:8 – 13 (Beaty testified he spent two hours of off-duty time helping Brink's personnel at the show, which still left him with 8-1/2 hours of sleep plus 2 hours of off duty time for a total of 10-1/2 hours of rest).  Shuman Decl., Ex. A-4 (Beaty Depo.) at p. 120:5-18; 133:24 – 134:24 (Beaty testified he was in the sleeper berth

from 3:39 p.m. July 10, 2022 to 2:55 a.m. July 11, 2022, more than 10 hours when Motley

pulled in at 2:05 a.m. per Brink's Complaint or 1:54 a.m. per Motley's Log, and Motley

could have awakened him).  Beaty also testified that Motley could have awakened him,

interrupting the ten hours, and Beaty could have completed the ten hours afterward before

driving again.  Shuman Decl., Ex. A-4 (Beaty Depo.) at p.123:21 – 124:12

72.    Had Mr. Motley awoken Mr. Beaty each time he took a rest break—i.e., at the

Buttonwillow Rest Area and then later at the Flying J in Lebec—Mr. Beaty would have had to

restart his D.O.T.-mandated rest each time. In other words, when they made it to Los Angeles,

both Mr. Motley and Mr. Beaty would have had to stop the truck and take a 10-hour break, rather

than continuing on to the next leg of their journey to Colorado. Tullos Decl., Ex. A (Tullos Expert

Depo.), at pp. 192:9-194:6; Tullos Decl., ¶ 17 – 18.]

**Response:**    Disputed.  .  According to his initial testimony—but not his ELD Log--Beaty

assisted "a couple hours" after arriving at the show, but in either case, that was his off-duty

time per the Log, so in either case, he had the required 10 hours of off duty time.  According

to Beaty's later testimony, he was in the sleeper berth for more than 10 hours when Motley

pulled into the Flying J, and Motley could have awakened him.    Redmond Decl., Ex. 1-61

(Beaty ELD Log) p.2, line 19 (Beaty asleep at 3:28 p.m. P.T.); Redmond Decl., Ex. 1-59

(Motley ELD Log) p.4, line 6-7 (Motley arrives at 1:54 a.m. and off duty at 1:56 a.m. P.T.);

Shuman Decl., Ex. A-1, Brink's Complaint, ¶19 (Motley left truck at 2:05 a.m.); Redmond

Decl., Ex 1-60 (J. Beaty Depo.), at p. 49:8 – 13 (Beaty testified he spent two hours of off-

duty time helping Brink's personnel at the show, which still left him with 8-1/2 hours of

sleep plus 2 hours of off duty time for a total of 10-1/2 hours of rest).  Shuman Decl., Ex. A-

4 (Beaty Depo.) at p. 120:5-18; 133:24 – 134:24 (Beaty testified he was in the sleeper berth

from 3:39 p.m. July 10, 2022 to 2:55 a.m. July 11, 2022, more than 10 hours when Motley

pulled in at 2:05 a.m. per Brink's Complaint or 1:54 a.m. per Motley's Log, and Motley

could have awakened him).  Beaty also testified that Motley could have awakened him,

interrupting the ten hours, and Beaty could have completed the ten hours afterward before

driving again.  Shuman Decl., Ex. A-4 (Beaty Depo.) at p.123:21 – 124:12.  Don Tullos,

Brink's expert, testified that according to Beaty's Log and according to Beaty's testimony,

Beaty had fulfilled the requirement for ten hours of rest.  Shuman Decl., Ex. A-5 (Tullos

Depo) at p.112:12 – 113:23; Shuman Decl., Ex. A-6 (September 27, 2023 Lupton Expert

Report, pp.5-8 (pp. 6-9 of pdf), §§3-4.

74.      When Mr. Motley returned to the tractor trailer after approximately 17 minutes in

the Flying J, he saw that the seal from the back of the tractor-trailer was cut and lying on the

ground. Mr. Motley then inspected the truck's rear lock and found that it had been removed.

[Redmond Decl., Ex. 1-58 (T. Motley Depo.), at pp. 130:17–133:12; Ex. 1-62 (Viger Depo.,

Exhibit 1, L.A. County Sheriff's Department Incident Report)].

**Response:**  Admitted except as to the time period of 17 minutes.  Brink's has judicially

admitted that time period was 27 minutes, from 2:05 a.m. to 2:32 a.m.  Shuman Decl., Ex.

A-1 (Brink's Complaint), ¶19.

75.      Mr. Motley immediately called law enforcement and his superiors at Brink's to

report the burglary. [Redmond Decl., Ex. 1-58 (T. Motley Depo.), at pp. 130:24–131:14; 131:19

– 133:9.]

**Response:**   Disputed.  Motley waited a few minutes before calling first his superiors at

Brink's and then law enforcement.  Redmond Decl., Ex. 1-58 (T. Motley Depo.), at pp.

130:24–132:24.

76.      Of the bags that had been loaded onto the tractor-trailer in San Mateo, only 49

remained in the tractor-trailer after the theft. [Redmond Decl., Ex 1-52 (Scally Expert Report) at

p. 5 and Appendix A; Ex. 1-63 (Viger Depo., Exhibit 1, L.A. County Sheriff's Department Incident Report).]

**Response:**   Admitted.

77.     The Los Angeles County Sherriff's Department investigated the theft by sending two deputies—the senior officer Deputy Jeremy Viger (now Sergeant Viger) and Deputy David Swigart. [Redmond Decl., Ex. 1-63 (Viger Depo., Ex. 1, L.A. County Sheriff's Department Incident Report); Ex. 1-64 (Swigart Depo.), at pp. 21:17-22:11; 22:15-19.]

**Response:**   Admitted.

78.     The Los Angeles County Sherriff deputies found metal shavings near the ledge of the trailer, indicating that the thieves had somehow cut the lock off the door of the tractor-trailer while it was at the Flying J. [Redmond Decl., Ex. 1-64 (Swigart Depo.), at pp. 84:3-17; 115:1822.]

**Response:**   Admitted.

79.     Both Mr. Motley and Mr. Beaty were professional and fully cooperated with the Los Angeles County Sherriff deputies during the investigation. [Redmond Decl., Ex. 1-62 (Viger Depo.), at pp. 56:13-57:23; Ex. 1-64 (Swigart Depo.), at pp. 117:22-118:8; 118:16-120:20]

**Response:**   Admitted.

80.     To date, law enforcement has not been able to identify the thief or thieves who broke into the truck, and there is no evidence that anyone from Brink's was involved. [Redmond Decl., Ex. 1-62 (Viger Depo.), at pp. 60:19-61:4; Ex. 1-64 (Swigart Depo.), at pp. 136:24-137:9; 141:16-21.]

**Response:**   Disputed.  There is evidence from which one could infer that one or both Brink's drivers were involved.  Motley and Beaty both observed suspicious people at the jewelry show watching them.  Motley did not report that to anyone at the show, but told the investigating sheriffs about it very quickly after they arrived following the theft.

Motley spent 90 minutes on the phone while driving from San Mateo to Lebec. Motley claims to have been watching out for vehicles following him, yet never saw anyone following him. It is highly improbable that jewelry thieves were just waiting at a truck stop in Lebec for a Brink's truck to pull in. Motley chose a truck stop with no roving security when just 15 miles to the north there was a truck stop with roving security, and Motley did not park backed up against anything—even another truck—that would make access to his trailer difficult. Motley left Beaty sleeping even though Beaty had completed his mandatory 10-hour rest period, or at least his mandatory seven hours of sleep. Motley left his firearm in the truck, and even after seeing the lock missing and seal compromised did not go get it. Motley did not get food and bring it back to the truck, even though he knew he left Beaty sleeping. Motley testified he was only in the Flying J for about 17 minutes, during which ████████████████████████████████████ ██████████ open the trailer door, remove 24 bags of jewelry weighing around 50 lbs. each that were stacked at the far end of the trailer, close the trailer door behind them, and disappear without Motley (or anyone else) seeing them and without waking Beaty. The thieves had to know Beaty would be asleep and had to know when Motley would emerge from the building and be within sight of his trailer. The thieves also seemed to know which bags were higher value, as the tags were color-coded based on value and Defendants who suffered theft of less than all their bags had the more valuable bag stolen. When Motley did not immediately wake up Beaty but instead made calls to his superiors upon discovery of the broken seal. He called law enforcement last, after calling around to his superiors at Brinks, which gave ample time for a getaway. Nelson Rosario, one of the people Motley called, did not even ask how the event happened. Additionally, one bag of jewelry seems to have mysteriously disappeared, as the truck manifest shows 77 bags originally

35

scheduled and three deleted leaving an erroneously-calculated remainder of 73, of which 49 remained and 24 were determined stolen.  Also, the evidence cited only indicates that the investigating officers do not know the identity of the thieves and have no evidence the drivers were "involved" as criminal suspects.  There is no evidence as to whether the FBI or the Los Angeles County Sheriff has identified any of the thieves since the depositions of Sergeant Viger and Deputy Swigert, or has evidence someone from Brink's was involved.  Shuman Decl., Ex. A-3 (Motley Depo), pp. 93:14 – 96:7; 101:11-104:13; 109:20-22; Shuman Decl., Ex. A-4 (Beaty Depo), pp. 58:4 – 59:7; 95:24 – 99:23; Decls. of Kim Sater, Joseph Chang, Paul Wong.; Redmond Decl., Ex. 1-62 (Viger Depo)., at pp. 60:19-61:4; Ex. 1-64 (Swigart Depo.), at pp. 136:24-137:9; 141:16-21.  Shuman Decl. Ex. A-30

80.     Mr. Motley's actions at the Flying J, including his decision to allow Mr. Beaty to remain in the sleeper berth to continue his DOT mandated 10-hour crew rest, complied with industry standards and accepted practices at all times. [Tullos Decl., ¶ 19, Ex. A (Tullos Expert Report).]

**Response:**  Disputed.  Shuman Decl., Ex. A-6 (September 27, 2023 Lupton Expert Report, p.9, §7.

81.     Likewise, Brink's use of a tractor-trailer and a two-man crew to transport the shipment was consistent with industry custom and practice, given the declared values of the shipments. Redmond Decl., Ex. 1-53 (Paxman Report), p. 4; Ex. 1-54 (Beech Expert Report), pp. 1-2, 4; Ex. 1-52 (Scally Report), pp. 2, 13.]

361.    **Response:**                    Disputed.  Brinks knew it was carrying more value than was stated on the manifests.  Shuman Decl., Ex. A-9 (Malki Depo) at pp. pp. 213:19-214:10; 217:20-218:10; 218:22-219:21; 220:1-221:2; 221:9-10; 222:2-14; 322:6-20; 358:8-21; 387:13-388:6; 389:4-19; 392:23-393:14.  Shuman Decl Ex. A-12 (Leung Depo) at pp. 147:1-14.  Shuman Decl. Ex. A-27 (Bruce Woerner Depo) at pp. 78-92.

## VI.   DEFENDANTS REFUSE TO ACCEPT THEIR DECLARED VALUES OR HONOR THEIR PRIOR AGREEEMENTS UNDER THE BRINK'S CONTRACT

82.   According to the values declared by the shippers on their Pickup Manifests before the theft, the total value of the stolen bags was $8.7 million (although this amount includes bags owned by shippers that are not a party to this lawsuit):

| Shipper | Missing Pieces | Total Pieces in Shipment | Wgt - lbs | Declared Values from Shipper |
|---|---|---|---|---|
| ARAT JEWELRY | 1 | 2 | 45.0005 | $        300,000.00 |
| BONITA PEARL | 1 | 2 | 63.0006 | $        200,000.00 |
| BONITA PEARL | 1 | 2 | 66.0007 | $        200,000.00 |
| EL DORADO | 1 | 2 | 32 | $     1,200,000.00 |
| FORTY-SEVENTH & FIFTH | 1 | 2 | 50 | $          50,000.00 |
| FORTY-SEVENTH & FIFTH | 1 | 2 | 50 | $          50,000.00 |
| HAWAIIAN DESIGN JEWELRY | 1 | 1 | 49.0005 | $        400,000.00 |
| KIMMIMOTO dba DTC | 1 | 5 | 75.0008 | $     1,800,000.00 |
| KIMMIMOTO dba DTC | 1 | 5 | 63.0006 | $        350,000.00 |
| KIMMIMOTO dba DTC | 1 | 5 | 65.0007 | $        350,000.00 |
| KIMMIMOTO dba DTC | 1 | 5 | 63.0006 | $        350,000.00 |
| LAM'S JADE CENTER, INC | 1 | 2 | 49.0005 | $        200,000.00 |
| Lee's International Inc. | 1 | 1 | 47.0005 | $     1,000,000.00 |
| Luvell INC / DBA DAmati Fine Jewelry | 1 | 2 | 112.0011 | $          50,000.00 |
| PAN LOVELY JEWELRY | 1 | 2 | 64.0007 | $        100,000.00 |
| PAN LOVELY JEWELRY | 1 | 2 | 69.0007 | $        100,000.00 |
| PETRI GEMS | 1 | 1 | 46 | $        300,000.00 |
| S & N DIAMOND | 1 | 2 | 36 | $        400,000.00 |
| S. Georgios | 1 | 1 | 30.0003 | $        700,000.00 |
| SUPREME GEMS CORP. | 1 | 2 | 64.0007 | $        200,000.00 |
| SUPREME GEMS CORP. | 1 | 2 | 60.0006 | $        200,000.00 |
| TREASURE CONNECTION | 1 | 2 | 50.0005 | $        200,000.00 |
| Total | | | | $     8,700,000.00 |

[Beech Decl., ¶ 25; Ex. A (Defendants' Pickup Manifests).]

**Response:**   Admitted that the amounts of the stolen bags listed in the "Carriage Value" boxes of the Defendants and others are accurate.

467257

83.     Three of the affected jewelry companies have resolved their claims. Defendant Arat Jewelry and Defendant El Dorado Jewelry, Inc., which each were formerly part of this lawsuit, resolved their claims early in the litigation. Both companies have dismissed their claims against Brink's with prejudice. Meanwhile, another jewelry company called S. Georgios, which was never a party to this litigation, also previously resolved its claims by accepting the Declared Value of its lost shipment. S. Georgios accepted prompt payment of its Declared Value and is not a party to this (or any other) lawsuit. [Beech Decl., ¶ 26; Dkt. No. 123 (Stipulation and Order Dismissing Arat Jewelry Corp.); Dkt. No. 136 (Stipulation and Order Dismissing El Dorado Jewelry, Inc.)]

**Response:**   Admitted.

84.     The shipper listed as "Luvell INC / DBA DAmati Fine Jewelry" also is not a party to this lawsuit, as Brink's is pursuing that entity in New York state court. [Beech Decl., ¶ 27; Redmond Decl., Ex. 1-103.]

**Response:**   Admitted,

85.     For the eleven Defendants remaining in this lawsuit, the combined Declared Value for the lost shipments is $6.45 million. [Beech Decl., ¶ 28.]

**Response:**   Admit that for the eleven Defendants remaining in this lawsuit, the combined amounts set forth in the "Carriage Value" boxes of their manifests for their stolen merchandise is $6.45 million.

86.     Nonetheless, in their parallel California state court lawsuit, Defendants seek to avoid the terms of Brink's Contract's and instead claim that their shipments were worth around $100 million, which they now demand from Brink's. [Redmond Decl., Ex. 1-103 (Fourth Amended Complaint in California Action).][3]

**Response:**   Disputed.  Defendants are not demanding $100 million from Brink's.  The California case has been stayed as to Brink's, and Defendants do not believe the measure

of damages in New York is full retail value as Defendants believe could be recoverable in California.  Shuman Decl., Ex. A-7 (September 7, 2023 Minute Order of the California Superior Court in *Chang, et al. v. Brinks Global Services, USA, Inc., et al.,* p. 7, §I(d).

87.     Based on their current claims, all the Defendants substantially under-declared the value of their shipments on the Pickup Manifests, or alternatively they are significantly inflating the values now. [Beech Decl., ¶ 29; Redmond Decl., Ex. 1-56 (M. Beech 30(b)(6) Depo.) at pp. 32:17, 233:24–25, 234:19–21.]

> **Response:**  Disputed that Defendants are inflating the values of their merchandise. Admitted that the values filled into the "Carriage Valie" boxes on the manifests are substantially less than the replacement value or full retail value of the merchandise shipped.

88.     Despite the obligation in Brink's Contract that Defendants were required to provide timely notice to Brink's after the theft, some of the Defendants failed to provide any notice to Brink's. Bonita Pearl, Inc., Hawaiian Design Jewelry Co., S & N Diamond Corp., and Treasure Connection Fine Jewelry, Inc. never submitted a notice of claim to Brink's. [Beech Decl., ¶¶ 30 – 31.]

> **Response:**  Admitted.

## VII. FACTS RELATING TO EACH DEFENDANT

89.     There are eleven remaining Defendants in this action: Bonita Pearl, Inc.; Forty-Seventh & Fifth, Inc.; Hawaiian Design Jewelry, Co.; Kimmimoto Jewelry; Lam's Jade Center, Inc.; Lee's International Jewelry, Inc.; Pan Lovely Jewelry; Petri Gems Inc.; S & N Diamond Corp; Supreme Collection Corporation; and Treasure Connection Fine Jewelry, Inc. [Dkt. No. 1 (Brink's Complaint; Dkt. No. 123 (Stipulation and Order Dismissing Arat Jewelry Corp.); Dkt. No. 136 (Stipulation and Order Dismissing El Dorado Jewelry, Inc.).]

467257

**Response:**   Admitted.

### A.    Defendant Bonita Pearl, Inc.

90.    Defendant Bonita Pearl, Inc. ("Bonita Pearl") is owned and operated by Mr. Ming Cheng. [Redmond Decl., Ex 1-66 (M. Cheng Depo. Vol. I), at pp. 30:21 -- 22.]

**Response:**   Admitted.

91.    Mr. Cheng declared $400,000 as the value of his shipment on the July 10, 2022 Pickup Manifest, but he is now claiming that the value of his lost shipment is $2,377,000. [Beech Decl., Ex. A; Redmond Decl., Ex. 1-1 (Brink's First Discovery Requests to Bonita Pearl, Inc., Exhibit A); Redmond Decl., Ex. 1-11 (Bonita Pearl's First Responses to Brink's Discovery Requests, Interrogatory No. 5; Redmond Decl., Ex 1-68 (M. Cheng Depo. Vol. II), at pp. 65:5 – 66: 9; Ex 1-66 (M. Cheng Depo. Vol. I), at pp. 194:5 – 194:23, 200:12 – 200:20; Ex 1-69 (Bonita Pearl Inventory List, M. Cheng Depo., Exhibit 31).]

**Response:**   Admitted that the insurance amount stated on the Bonita Pearl Pickup Manifest was $400,000.  Admitted that claimed retail value of Bonita Pearl's lost shipment is $2,377,000.

92.    While Mr. Cheng was born in Hong Kong in 1957, he moved to the United States in 1978 and has been living in the United States for over 45 years. Redmond Decl., Ex 1-66 (M. Cheng Depo. Vol. I), at pp. 26:16 – 28:5.

**Response:**   Admitted.

93.    Mr. Cheng has been conducting jewelry transactions in English for over 30 years. Redmond Decl., Ex 1-68 (M. Cheng Depo. Vol. II), at pp. 6:17 – 7:3.

**Response:**   Admitted.

94.     Mr. Cheng reads and signs contracts and e-mails in English. Redmond Decl., Ex 1-66 (M. Cheng Depo. Vol. I), at pp. 75:10 – 83:6.

**Response:**    Disputed.  Mr. Cheng is only able to read limited jewelry-related e-mails and documents.  He relies on his son or others to assist him with English, including e-mails. Shuman Decl., Ex. A-8 (M. Cheng Depo. Vol. I), pp. 103:20-22; 107:24-108:7; 110:9-22; 112:1-9; 112:20-113:2; 118:15-119:1;166:14-168:4.

95.     When Bonita Pearl previously sold jewelry to customers online, Mr. Cheng would ship the items to customers using U.S. Postal Service, while sometimes intentionally under-valuing the shipments if he considered the carriage cost to be too high. Redmond Decl., Ex 1-68 (M. Cheng Depo. Vol. II), at pp. 14:8 – 17; 15:9 – 23.

**Response:**    Admitted that Mr. Cheng would undervalue items shipped to customers by "a little bit" if "the price of the item is too high."

96.     Like many of the Defendants' owners, Mr. Cheng is active in NCAJA, the National Chinese American Jewelry Association. Mr. Cheng is a Director of the NCAJA. Redmond Decl., Ex 1-66 (M. Cheng Depo. Vol. I), at pp. 30:23 – 32:11; Ex 1-67 (M. Cheng Depo. Exhibit 6, NCAJA Website).

**Response:**    Admitted.

97.      Bonita Pearl has extensive experience with secured transport companies, since Bonita Pearl has been utilizing secured transport companies to transport its shipments for almost four decades—since 1984. Redmond Decl., Ex 1-66 (M. Cheng Depo. Vol. I), at pp. 64:3 – 14; 127:15 – 128:7; 163:24 – 164:6; 199:21 – 200:4.

**Response:**    Admitted that Bonita Pearl has been utilizing secured transport companies to transport its shipments since 1984.  Disputed that this is "extensive experience," as the exhibit testimony established only 14 pickup manifests for

Brinks, 40 for Malca Amit, and at least one with Loomis, which averages out to less than 1-1/2 shipments per year.  Redmond Decl., Ex 1-66 (M. Cheng Depo. Vol. I), at pp. 163:24 – 164:6 and Ex. 1-67.

98.     In fact, prior to the July 10, 2022 shipment, Bonita Pearl had transacted with Brink's and assented to Brink's terms on at least 42 prior occasions. Beech Decl., ¶17; Redmond Decl., Ex 1-66 (M. Cheng Depo. Vol. I), at pp. 163:1 – 164:6; 199:10 – 200:4; Ex 1-67 (M. Cheng Depo, Exhibit 24).

> **Response:**   Disputed.  Redmond Decl., Ex. 1-67 contains only 14 Brink's pickup manifests, and Mr. Cheng testified in his deposition only that if there were 42 manifests, it would indicate 42 transactions.  Redmond Decl., Ex. 1-67 and Cheng Depo., Vol. I at p.163:14-22.

99.     Each time Bonita Pearl shipped its goods with Brink's, it signed a Pickup Manifest and expressly stated that it was agreeing to the Brink's Contract. Redmond Decl., Ex 1-66 (M. Cheng Depo. Vol. I), at pp. 163:1 – 164:6; Redmond Decl., Ex. 1-67 (M. Cheng Depo, Exhibit 24).

> **Response:**   Admitted that each time Bonita Pearl shipped its goods with Brink's, it signed a Pickup Manifest which stated that it was agreeing to the Brink's Contract. Disputed that Bonita Pearl intended to agree to those terms as Ming Cheng was unable to read not only the terms, but the statement that Bonita Pearl was agreeing to them.  Shuman Decl., Ex. A-8 (M. Cheng Depo. Vol. I), pp. 103:20-22; 107:24-108:7; 110:9-22; 112:1-9; 112:20-113:2; 166:14-167:7.

100.    Besides having previously received and assented to Brink's Contract on at least 42 prior occasions, prior to the July 10, 2022 shipment, Mr. Cheng also received multiple emails from a Brink's employee that included an email signature that stated: "**All services subject to the terms and**

conditions of the **Brink's Global Services Valuables Transport Contract."** The hyperlink in the emails directed Mr. Cheng to the large-font version of the Brink's Contract that is available on Brink's website (http://www.brinksglobal.com/terms of use/transport contract.aspx). Redmond Decl., Ex 1-21 (Brink's Second Requests for Admission to Bonita Pearl, Inc.); Redmond Decl., Ex. 1-33 (Bonita Pearl's Responses to Request for Admissions, Set Two).

> **Response:**   Disputed that Bonita Pearl previously received and assented to Brink's Contract on at least 42 prior occasions before July 10, 2022, as evidence only shows 14 signed Pickup Manifests including July 10, 2022, and Ming Cheng was unable to read not only the terms, but the statement that Bonita Pearl was agreeing to them.  Disputed that the statement referring to the contract in the e-mails is part of the e-mail signature, as it typically appears, if at all, below the signature block in a font smaller than any other in the e-mail.  Disputed that the website version is large-font, as it is still only 8-point font.  Otherwise admitted. Redmond Decl., Exs. 1-21 (Exs. 2, 8, and 15 thereof) and 1-67 (Depo Ex. 24 thereof); Shuman Decl., Ex. A-8 (M. Cheng Depo. Vol. I), pp. 103:20-22; 107:24-108:7; 110:9-22; 112:1-9; 112:20-113:2; 166:14-167:7; Declaration of Michael Beech, Ex. 3.

> 101.   Further, as a member and Director of NCAJA, Mr. Cheng also received multiple rate sheets from NCAJA prior to July 10, 2022, stating that the rates were explicitly "subject to the Brink's Global Services Terms and Conditions." Redmond Decl., Ex. 1-33 (Bonita Pearl's Responses to Request for Admissions, Set Two); Ex 1-66 (M. Cheng Depo. (Vol. I)), at pp. 48:8–51:20; Ex 1-21 (BGS' Requests for Admissions to Bonita Pearl, Set Two at Ex. 11 (BRINKS_0006989 – 0006992)); Ex 1-33 (Bonita Pearl's Responses to Request for Admissions, Set Two); Ex 1-66 (M. Cheng Depo. (Vol. I)), at pp. 34:7 – 37:15.]

> **Response:**   Admitted.

102.     Prior to July 10, 2022, Bonita Pearl had also shipped with another secured transport company, Loomis, on at least 57 prior occasions. Redmond Decl., Ex 1-68 (M. Cheng Depo. Vol. II), at pp. 64:3 – 14; Redmond Decl., Ex 1-66 (M. Cheng Depo. Vol. I), at pp. 163:24 – 164:6; Redmond Decl. Ex 1-67 (M. Cheng Depo., Exhibit 25).

      **Response:**   Disputed.  All the evidence cited contains only three manifests from Loomis. Mr. Cheng did not testify that there were 57 Loomis manifests, only that if there were 57 manifests, that would be the amount of the shipments.  Redmond Decl. Ex 1-67 (M. Cheng Depo., Exhibit 25); Redmond Decl., Ex 1-68 (M. Cheng Depo. Vol. II), at pp. 64:7 – 14;

103.     Moreover, prior to July 10, 2022, Bonita Pearl had also shipped its valuables with yet another secured transport company, Malca-Amit, on at least 105 prior occasions. Redmond Decl., Ex 1-66 (M. Cheng Depo. Vol. I), at pp. 127:15 – 128:7; Redmond Decl., Ex. 1-67 (M. Cheng Depo., Exhibit 18).

      **Response:**   Admitted.

104.     Like Brink's, the other secured transport companies also had their terms and conditions on the back of their manifests, required Bonita Pearl to state a "declared value," and included a limitation of liability based on the declared value. These procedures were standard and customary within the secured transport industry. Redmond Decl., Ex 1-66 (M. Cheng Depo. Vol. I), at pp. 125:16 – 127:14; Redmond Decl., Ex 1-67 (M. Cheng Depo., Exhibit 20); Redmond Decl., Ex. 1-21 (BGS' Requests for Admissions to Bonita Pearl, Set Two, at Ex. 14 (Loomis Manifests, BONITA P 00123 – BONITA P 000129, BONITA P 000133, and BONITA P 00186 – BONITA P 00190)); Beech Decl., ¶ 6.

      **Response:**   Admitted, except disputed that other carriers did this "Like Brink's."  Other carriers used the term "Declared Value" on the face of the manifest, whereas Brink's used an altogether different term, "Carriage Value," that it did not define or use in the contract.

Redmond Decl., Ex. 1-21 (BGS' Requests for Admissions to Bonita Pearl, Set Two, at

Exs. 14 and 15; Beech Decl., Ex. C

105.    Mr. Cheng claims that he never read any of the terms or conditions from *any* of the

secured transport companies—Brink's, Loomis, or Malca-Amit—despite repeatedly using the

companies to ship Bonita Pearl's valuables and assenting to their terms on dozens of occasions.  Mr.

Cheng repeatedly suggested that he did not have to read the terms and conditions since the

companies did not instruct him to read them. Redmond Decl., Ex 1-66 (M. Cheng Depo. Vol. I),

at pp. 35:17 – 22; 47:9 – 47:13; 67:20 – 71:1; 114:22 – 122:21; 166:14 – 168: 4; Redmond Decl.,

Ex. 1-68 (M. Cheng Depo. Vol. II), at pp. 68:5 – 69:19.

> **Response:**    Disputed that Mr. Cheng repeatedly suggested he did not have to read the
>
> terms and conditions since the companies did not instruct him to do so.  His testimony was
>
> that the companies' failure to tell him to read them was one additional reason—beside his
>
> inability to read English and the font size--that he did not read them.  Otherwise admitted.
>
> Redmond Decl., Ex 1-66 (M. Cheng Depo. Vol. I), at pp. 114:22 – 122:21; 166:14 – 168:
>
> 4;

106.    As for the subject shipment on July 10, 2022, Mr. Cheng signed the Pickup

Manifest on behalf of Bonita Pearl, while assenting to Brink's Contract. [Beech Decl., Ex. A;

Redmond Decl., Ex 1-33 (Bonita Pearl's Responses to Brink's Requests for Admission, Set One),

No. 1; Ex 1-66 (M. Cheng Depo. Vol. I), at pp. 154:10 – 12; 196:23 – 197:9; Ex. 1-33 (Bonita

Pearl's Responses to Brink's Requests for Admission, Set Two), No. 17.).

> **Response:**    Admitted that Mr. Cheng signed the Pickup Manifest for the subject
>
> shipment on behalf of Bonita Pearl.  Disputed that he assented to Brink's Contract because
>
> he could not read it, did not have anyone else read it, did not know the terms of it, and
>
> could not even read the line saying he was agreeing to the terms.  Shuman Decl., Ex. A-8

45

(M. Cheng Depo. Vol I), pp. 103:20-22; 107:24-108:7; 110:9-22; 112:1-9; 112:20-113:2; 118:15-119:1;166:14-168:4.

107.    For the July 10, 2022 shipment, Mr. Cheng declared the value of Bonita Pearl's shipment as $400,000 ($200,000 each for two bags). Beech Decl., Ex. A; Ex. 1-33 (Bonita Pearl's Responses to Brink's Requests for Admission, Set Two), No. 17.

**Response:**    Disputed.  Mr. Cheng stated a "Carriage Value", which he understood meant the amount of insurance he wanted, of $400,000 ($200,000 each for two bags).  Shuman Decl., Ex. A-8 (M. Cheng Depo) at pp. 131:1-25; 141:24-142:11; 150:13-21; 154:13-22; 189:19-190:6; 195:8-23.

108.    For the July 10, 2022 shipment, Mr. Cheng admittedly declared a value of $400,000 ($200,000 for each of two bags) because it was his "habit" to declare that amount—including when Mr. Cheng was shipping with other secured transport companies, such as Malca-Amit, Loomis, and Dunbar. Redmond Decl., Ex 1-68 (M. Cheng Depo. (Vol. II)), at pp. 65:5–66:24; Ex 1-66 (M. Cheng Depo. (Vol. I)), at pp. 194:5–194:24.

**Response:**    Admitted that it was Mr. Cheng's habit to state an insurance value of $400,000 ($200,000 for each of two bags), including when Mr. Cheng was shipping with other secured transport companies, such as Malca-Amit, Loomis, and Dunbar.

109.    After the theft, on July 12, 2022, Brink's employee Gloria Corrales sent an e-mail to Bonita Pearl, through Mr. Cheng, while attaching a claim form on which Bonita Pearl could list information regarding its lost inventory. Redmond Decl., Ex 1-66 (M. Cheng Depo. (Vol. I)), at pp. 179:25–181:3; Ex 1-21 (BGS' Requests for Admission to Bonita Pearl, Set Two, at Ex. 6 (Corrales July 12, 2022 E-mail, BRINKS_000549); Redmond Decl., Ex. 1-33, Bonita Pearl's Responses to Second Requests for Admission.

**Response:**    Admitted.

110.    On July 22, 2022, Ms. Corrales sent another e-mail attaching the claim form. [Redmond Decl., Ex 1-66 (M. Cheng Depo. (Vol. I)), at pp. 179:25–181:3;

**Response:**    Admitted.

111.    Bonita Pearl never sent any Notice of Claim to Brink's. Redmond Decl., Ex 1-66 (M. Cheng Depo. (Vol. I)), at pp. 179:25–181:3; Beech Decl., ¶¶ 30 – 31.

> **Response:**    Admitted that Bonita Pearl never sent a document entitled Notice of Claim, but disputed that Bonita Pearl never asserted a claim or attempted to submit a claim. Arnold Duke of Intergem, the show operator, presented a claim on behalf of  Bonita Pearl and the other jewelers and sought to settle the claim before litigation.  Also, Mr. Cheng completed the claim form and attempted to send it to Brinks.  Redmond Decl., Ex 1-66 (M. Cheng Depo. (Vol. I)), at pp. 179:25–180:5.  Declaration of Ming Chen.

112.    During this litigation, Bonita Pearl has now claimed that its lost bags were not actually worth the declared amount of $400,000, but that they were actually valued at $2,377,306. Redmond Decl., Ex 1-66 (M. Cheng Depo. (Vol. I)), at pp. 200:12 – 200:20; Ex 1-69 (Bonita Pearl Inventory List, M. Cheng Depo., Ex. 31).

> **Response:**    Admitted, based on full retail value.

113.    In Bonita Pearl's end of year 2021 federal tax return, however, Mr. Cheng represented to the I.R.S. that Bonita Pearl's entire inventory was worth only $ ███████ Redmond Decl., Ex 1-69 (Bonita Pearl Form 1120-S U.S. Income Tax Return, M. Cheng Depo., Ex. 29); Ex 1-68 (M. Cheng Depo. (Vol. II)), at pp. 37:15-38:4.] Mr. Cheng testified that his entire inventory was contained in the stolen shipment. Redmond Decl., Ex 1-66 (M. Cheng Depo. (Vol. I)), at pp. 177:3-178:2.

114.    **Response:**    Admitted that the inventory value on the end of year 2021 tax return, at historical cost, was $316,572 and that the entire inventory, plus consignment good from five

other companies and goods purchased in 2022.  Redmond Decl., Ex 1-69 (Bonita Pearl Form

1120-S U.S. Income Tax Return, M. Cheng Depo., Ex. 29); Ex 1-68 (M. Cheng Depo. (Vol. II)),

at pp. 37:15-38:4.] Mr. Cheng testified that his entire inventory was contained in the stolen

shipment. Redmond Decl., Ex 1-66 (M. Cheng Depo. (Vol. I)), at pp. 177:3-178:2.

115.    In this litigation, Mr. Cheng calculated the value of Bonita Pearl's lost items by

adding in items owned by other companies (that Bonita Pearl now claims to have included in its

own shipment), multiplying the cost of all the items by 2.5, 2.6, 2.65, or 2.7, and making other

adjustments. Redmond Decl., Ex 1-66 (M. Cheng Depo. (Vol. I)), at pp. 200:12 – 201:17; Ex 168

(M. Cheng Depo. (Vol. II)), at pp. 53:17 – 57:5.

> **Response:**    Admitted, except as to the 2.5 number, which appears nowhere in the
>
> testimony cited, and except as to the omission of Mrs. Cheng's jewelry, which also was
>
> stolen and included in the calculated value. Redmond Decl., Ex 1-66 (M. Cheng Depo.
>
> (Vol. I)), at pp. 200:12 – 201:17; Ex 168 (M. Cheng Depo. (Vol. II)), at pp. 53:17 – 57:5.

### B.    Defendant Forty-Seventh & Fifth, Inc.

115.    Defendant Forty-Seventh & Fifth, Inc. ("Forty-Seventh & Fifth") is owned and

operated by Jean Malki, as well as his partner Sam Chammas. Redmond Decl., Ex 1-70 (J. Malki

Depo.), at pp. 18:3-12; 29:3-34:15.

> **Response:**    Admitted.

116.    On the company's July 10, 2022 Pickup Manifest, Mr. Malki declared $100,000

($50,000 each for two bags) as the value of the shipment, but he is now claiming that the value of

the lost shipment is $6,172,851. Redmond Decl., Ex 1-70 (J. Malki Depo.), at pp. 322:1-12; 329:6–

334:1.

> **Response:**    Disputed.   Mr. Malki did not declare the value of the shipment to be
>
> $100,000.  He requested $100,000 in insurance from Brinks on the shipment.  He was told

the box on the manifest was just for insurance desired and nobody at Brinks ever used the

term "declared value" or said he was supposed to fill in the actual value of his merchandise,

even though he told Gloria Corrales he had multiple individual pieces worth more than the

$100,000 insurance value listed on the manifest.  Shuman Decl., Ex. A-9 (Jean Malki

Depo.), at pp. 147:11-19; 148:14-20; 149:6-24; 188:2-14; 188:20-190:20; 194:5-20;

217:20-218:10; 218:22-219:23; 220:14-221:2; 222:2-14; 281:4-10; 322:6-20; 358:8-25;

387:13 – 389:25; 392:23 – 393:17; 393:24 – 398:8.  Admitted that the full retail value of

the stolen shipment of Forty-Seventh & Fifth is $6,172,851.

117.    Mr. Malki was born in Syria, but he has been living in the United States for over

34 years. Redmond Decl., Ex. 1-70 (J. Malki Depo.), at pp. 19:4-15.

**Response:**    Admitted.

118.    Mr. Malki speaks English at home with his wife and children. Redmond Decl., Ex

1-70 (J. Malki Depo.), at pp. 82:3-10.

**Response:**    Admitted.

119.    Mr. Malki previously attended various college courses in the United States, with

such classes being taught in English. Redmond Decl., Ex. 1-70 (J. Malki Depo.), at pp. 19:19-

22:25.

**Response:**    Admitted.

120.    A few years after arriving in the United States, Jean Malki started working in the

jewelry industry—first for Zales and then later for a different retail jeweler. Redmond Decl., Ex

1-70 (J. Malki Depo.), at pp. 19:4-15; 23:15-22; 37:10-23.

**Response:**    Admitted.

121.    In or around 1999, Mr. Malki then became a licensed insurance agent and

started selling "almost everything" in the insurance industry, including property, casualty, life,

and health insurance. Mr. Malki continues to be an insurance agent in the State of California. Redmond Decl., Ex. 1-70 (J. Malki Depo.), at pp. 38:13 – 41:8; 46:12–24.

**Response:**    Admitted

122.    In 2000, while selling insurance, Mr. Malki also started selling diamonds for a jewelry company called Diamonds by Angie. Redmond Decl., Ex. 1-70 (J. Malki Depo.), at pp. 62:12-20.

**Response:**    Admitted.

123.    In 2000, Mr. Malki further obtained a degree in Business Administration from Cal State Los Angeles. Redmond Decl., Ex. 1-70 (J. Malki Depo.), at pp. 78:1–79:5.

**Response:**    Admitted.

124.    In 2012, Mr. Malki and some partners purchased the company Forty-Seventh & Fifth, which was a jewelry company. The Sale and Purchase Agreement was in English. Redmond Decl., Ex. 1-70 (J. Malki Depo.), at pp. 49:22–65:16; 75:5–23.

**Response:**    Admitted

125.    Two years later, Mr. Malki and his partners purchased the assets of a Texas company, again while using a Purchase Agreement in English, and while using a lawyer who worked for Defendant Forty-Seventh & Fifth. Redmond Decl., Ex 1-70 (J. Malki Depo.), at pp. 82:22-89:19.

**Response:**    Admitted.

126.    Further confirming the sophistication of Defendant Forty-Seventh & Fifth, at the time of the subject theft on July 11, 2022, Mr. Malki had an active Jeweler's Block insurance policy that covered the company's jewelry inventory, including $1,000,000 in coverage for property that was being transported to a trade show by a secured transport company. Redmond Decl., Ex 1-70 (J. Malki Depo.), at pp. 102:12-111:10; Ex 1-71 (J. Malki Depo., Ex. 5).. In completing the

insurance policy application, Mr. Malki certified that his jewelry inventory was worth $1,000,000. Redmond Decl., Ex1-70 (J. Malki Depo.), at pp. 102:12-111:14.

> **Response:**   Admitted that at the time of the subject theft on July 11, 2022, Forty-Seventh & Fifth had a Jeweler's Block insurance policy in effect that covered the company's jewelry inventory, including $1,000,000 in coverage for property that was being transported to a trade show by a secured transport company.  Disputed that this establishes "sophistication" on his part, since the insurance was procured through an agent, Meslee Insurance Services, which prepared the application, and the insurance was coordinated on behalf of Forty-Seventh & Fifth by an employee named Rick.  Disputed also that Mr. Malki certified that his jewelry inventory was worth $1,000,000, as the application plainly states on p.3 that the last inventory was $1,500,000 and the inventory had been $1,750,000 within the preceding twelve months, at historical cost.  The amount of insurance requested was $1,000,000. Redmond Decl., Ex 1-70 (J. Malki Depo.), at pp. 102:12-111:14; Ex 1-71 (J. Malki Depo., Ex. 5).

127.    In completing the insurance policy application, Jean Malki also certified that he had a good command of the English language, and that he had read and understood the policy terms. Redmond Decl., Ex. 1-70 (J. Malki Depo.), at pp. 70:21-72:8; 74:8-19; Ex. 1-71 (J. Malki Depo., Ex. 5).

> **Response:**   Admitted that Mr. Malki certified he had a good command of the English language for purposes of the insurance application.  Disputed that he certified he had read and understood the policy terms.  The certification relates only to the application.  Redmond Decl., Ex. 1-70 (J. Malki Depo.), at pp. 70:21-72:8; 74:8-19; Ex. 1-71 (J. Malki Depo., Ex. 5).

128.     Prior to July 2022, Forty Seventh & Fifth regularly used secured shippers such as Brink's, Malca-Amit, and Loomis to transport its jewelry. Redmond Decl., Ex 1-70 (J. Malki Depo.), at pp.176:23–178:5; 215:11–216:3.

**Response:**    Disputed that Forty-Seventh & Fifth regularly used Brink's, Malca-Amit, and Loomis.  Forty-Seventh & Fifth used Brinks only an average of about four times per year since 2012.  The exhibits to Malki's deposition contain only three manifests from Malca-Amit.  Disputed also that Brink's is a secured shipper, as it claims to have no obligation to guard the merchandise it is carrying, it has protocols allowing one driver to be away from the vehicle on a break and the other to be sleeping, and it fastened the door of a trailer carrying tens of millions of dollars of jewelry (based on just the Carriage Value stated, not the actual value) with just a padlock in a hasp that could be compromised in six seconds. See chart at No. 26 above. Redmond Decl., Ex 1-70 (J. Malki Depo.), at pp.176:23–178:5; 215:11–216:3; Redmond Decl., Ex. 1-71 (J. Malki Depo, Ex. 22); Shuman Decl., Ex. A-10 (J. Malki Depo, Ex. 23); Shuman Decl., Ex. A-11 (M. Beech Depo, Vol. I (4/17/23)) at pp. 138:5 – 142:20; 89:3-90:22; 92:7-93:24; 97:25-99:16; 100:16-101:1; Shuman Decl. Ex. A-12 (M. Beech Depo, Vol. II (9/13/23)) at pp. 138:W. Jeffrey Stiles expert report (¶2 under Findings and Analysis) and accompanying video; .

129.     In fact, prior to July 10, 2022, Jean Malki his partners had used Brink's to ship jewelry (and had assented to Brink's Contract) on at least 41 prior occasions for Forty-Seventh & Fifth, and on at least 50 prior occasions when including both Forty-Seventh & Fifth and Diamonds by Angie. Beech Decl., ¶ 7; Redmond Decl., Ex 1-71 (J. Malki Depo., Ex. 17); Ex. 1-70 (J. Malki Depo.), at pp. 247:2-302:20.

**Response:**    Admitted that prior to July 10, 2022, Jean Malki his partners had used Brink's to ship jewelry on 41 occasions for Forty-Seventh & Fifth.  Disputed that Malki had any

partnership interest in Diamonds by Angie.  Disputed that Malki assented to Brink's Contract.   Redmond Decl., Ex. 1-70 (J. Malki Depo.), at pp. 53:6-8; 292:9-19; 295:9-296:4; Shuman Decl., Ex. A-11 (Malki Depo.) at pp. 302:15-303:6;

130.   On each of the prior occasions that Forty-Seventh & Fifth shipped its goods with Brink's, the company's representatives signed a Pickup Manifest and expressly stated that the company was agreeing to the Brink's Contract. Redmond Decl., Ex 1-71 (J. Malki Depo., Ex. 17).

**Response:**   Admit.

131.   Prior to the July 10, 2022 shipment, Mr. Malki and his partners also received emails from Brink's employees that included an email signature stating: "**All services subject to the terms and conditions of the Brink's Global Services Valuables Transport Contract.**" The hyperlink in the emails directed Forty-Seventh & Fifth to the large-font version of the Brink's Contract that is Available on Brink's website:

(http://www.brinksglobal.com/terms_of_use/transport_contract.aspx). Redmond Decl., Ex 1-71 (J. Malki Depo., Ex. 14); Ex (Brinks Request for Admissions to Forty-Seventh & Fifth's, Set Two, Ex 3, 4, 5, 12; Ex 1-34 (Forty-Seventh & Fifth's Responses to Request for Admissions, Set Two), No. 12; 13, 14, 22; Ex 1-70 (J. Malki Depo.), at pp. 202:6-208:14.

**Response:**      Disputed as to partners as no evidence supports that Brinks e-mailed Mr. Malki's partner.  Disputed that the statement referring to the contract in the e-mails is part of the e-mail signature, as it typically appears, if at all, below the signature block in a font smaller than any other in the e-mail, and Mr. Malki never saw it.  Disputed that the website version is large-font, as it is still only 8-point font.  Otherwise admitted.  Redmond Decl., Exs. 1-71 (J. Malki Depo., Ex. 14); Ex 1-22 (Brinks Request for Admissions to Forty-Seventh & Fifth's, Set Two, Ex 3, 4, 5, 12; Ex 1-34 (Forty-Seventh & Fifth's Responses to Request for Admissions, Set Two), No. 12; 13, 14, 22; Ex 1-70 (J. Malki Depo.), at pp. 202:6-208:14.; Declaration of Michael Beech, Ex. 3.

132.    Further, Mr. Malki also received multiple rate sheets from JIMA prior to July 10, 2022, stating that the rates were "subject to the Brink's Global Services Terms and Conditions." [Redmond Decl., Ex 1-71 (J. Malki Depo., Ex. 13); Ex 1-22 (Brinks Request for Admissions to Forty-Seventh & Fifth's , Set Two, Ex 4); Ex 1-34 (Forty-Seventh & Fifth's Responses to Request for Admissions, Set Two), No. 14; Ex 1-71 (J. Malki Depo., Ex. 14).

**Response:**    Admitted, but note that the quoted language was in very small print calculated to be overlooked.

134.    Prior to July 10, 2022, Forty-Seventh & Fifth had also shipped with another secured transport company, Malca-Amit, on numerous prior occasions. Redmond Decl., Ex 1-71 (J. Malki Depo., Ex. 22); Ex. 1-70 (J. Malki Depo.), at pp. 380:6-386:1.

**Response:**    Disputed that Forty-Seventh & Fifth shipped with Malca-Amit on numerous prior occasions.  The exhibits to Malki's deposition contain only three manifests from Malca-Amit.  Redmond Decl., Ex 1-71 (J. Malki Depo., Ex. 22)

135.    Prior to July 10, 2022, Forty-Seventh & Fifth had also shipped its jewelry with the secured transport company of Loomis on prior occasions, including to transport its inventory to Intergem jewelry shows. Redmond Decl., Ex. 1-70 (J. Malki Depo.), at pp. 177:13-23; 215:22-24.

**Response:**    Admitted.

136.    Despite engaging them on numerous occasions, Mr. Malki did not read any of the terms and conditions from any of the secured transport companies. Redmond Decl., Ex 1-70 (J. Malki Depo.), at pp. 380:6-386:1; 386:12-14.

**Response:**    Admitted.

137.    As for the subject shipment on July 10, 2022, Mr. Malki signed the Pickup Manifest on behalf of Forty-Seventh & Fifth, while assenting to Brink's Contract. Beech Decl., Ex. A; Redmond Decl., Ex 1-12 (Forty-Seventh & Fifth's Responses to Brink's Requests for Admission,

Set One), No. 1; Ex 1-22 (Brinks Request for Admissions to Forty-Seventh & Fifth's , Set Two, Ex 3, 5); Ex. 1-34 (Forty-Seventh & Fifth's Responses to Brink's Requests for Admission, Set Two), No. 12, 14.]

> **Response:**    Admitted that Mr. Malki signed the July 10, 2022 Pickup Manifest on behalf of Forty-Seventh & Fifth.  Disputed that he assented to Brink's Contract, as he never saw it and was required to sign in the rush of show closing.  Shuman Decl., Ex. A-11 (J. Malki Depo.), 302:5-303:6

138.    For the July 10, 2022 shipment, Mr. Malki declared the value of Forty-Seventh & Fifth's shipment as $100,000 ($50,000 each for two bags). Beech Decl., Ex. A; Ex 1-22 (Brinks Request for Admissions to Forty-Seventh & Fifth's , Set Two, Ex 5); Ex. 1-34 (Forty-Seventh & Fifth's Responses to Brink's Requests for Admission, Set Two), No. 14.]

**Response:**    Disputed.  For the July 10, 2022 shipment, Mr. Malki requested insurance in the amount of $100,000 ($50,000 each for two bags).   Shuman Decl., Ex. A-9 (Jean Malki Depo.), at pp. 147:11-19; 148:14-20; 149:6-24; 188:2-14; 188:20-190:20; 194:5-20; 217:20-218:10; 218:22-219:23; 220:14-221:2; 222:2-14; 281:4-10; 322:6-20; 358:8-25; 387:13 – 389:25; 392:23 – 393:17; 393:24 – 398:8.  Redmond Decl., Ex. 1-22, Ex. 11.

139.    In years past, Forty-Seventh & Fifth had declared the value of its shipments as $800,000 or more, but in 2021 and 2022, the company started routinely declaring the value of its shipments as $100,000 because Forty-Seventh & Fifth had a Jeweler's Block Insurance Policy in those later years. [Redmond Decl., Ex. 1-71 (J. Malki Depo., Ex 17; Ex. 1-22 (Brinks Request for Admissions to Forty-Seventh & Fifth's, Set Two, Ex 5); Ex. 1-34 (Forty-Seventh & Fifth's Responses to Brink's Requests for Admission, Set Two), No. 14; Ex 1-70 (J. Malki Depo.), at pp. 247:10–302:11; 323:4-326:12.

> **Response:**    Admitted.

467257

139.   Mr. Malki's decision to start listing a Declared Value of $100,000 was a "business decision" based on what the company felt it could afford, while having separate protection in 2021 and 2022 under the Jeweler's Block policy. Redmond Decl., Ex 1-70 (J. Malki Depo.), at pp. 323:4 – 326:12.

> **Response:**   Admitted, but also based on risk assessment in light of belief that Brink's would be guarding the merchandise and taking other common sense steps to keep it secure. Declaration of Jean Malki.

140.   In declaring the value of the company's shipment as $100,000, Mr. Malki understood that Forty-Seventh & Fifth's shipment would "never [be] be fully insured," but he nonetheless proceeded based on the company's "business decision" to minimize the cost. Redmond Decl., Ex 1-70 (J. Malki Depo.), at pp. 323:4 – 15.

> **Response:**   Admitted, but the business decision included a risk assessment in light of the expectation that as a secured transport company, Brink's would be guarding the merchandise and taking other common sense steps to keep it secure.  Declaration of Jean Malki.

141.   In this litigation, Forty-Seventh & Fifth now claims that the value of its items lost on July 11, 2022 was $6,172,851.00. [Redmond Decl., Ex 1-12 (Forty-Seven & Fifth's Response to First Set of Interrogatories, No. 5); Ex 1-70 (J. Malki Depo.), at pp. 329:6–334:1.]

> **Response:**   Admitted based on the full retail value of items lost.

142.   Forty-Seventh & Fifth's newly claimed value of $6,172,851 is far more than the company has ever declared for any of its shipments, regardless of the secured transport company. Redmond Decl., Ex. 1-71 (J. Malki Depo., Ex. 17); Ex 1-70 (J. Malki Depo.), at pp. 247:10–302:11; 323:4-326:12.

> **Response:**   Admitted.

143.     In this litigation, Mr. Malki calculated the newly claimed value of Forty-Seventh & Fifth's lost items by randomly selecting 50 missing pieces and doing a review of "reasonable" web sites (not high-end jewelry websites). This internet search then led Mr. Malki to conclude that a multiplier of between 2 and 2.5 times the cost would be reasonable. Mr. Malki then multiplied all of his costs by at least 1.7 times. Redmond Decl., Ex 1-70 (J. Malki Depo.), at pp. 329:6-338:19.

**Response:**     Admitted, except as to the phrase "newly claimed".

144.     In his company's end of year 2021 federal tax return, Mr. Malki represented to the I.R.S. that Forty-Seventh & Fifth's entire inventory was worth only $███████ at the end of 2021. Redmond Decl., Ex 1-44 (Forty-Seventh & Fifth Form 1120-S U.S. Income Tax Return).

**Response:**     Admitted.

145.     Following the July 11, 2022 theft, Forty-Seventh & Fifth has already collected a nearly $1 million payout in insurance money under its 2022 insurance policy. Redmond Decl., Ex 1-70 (J. Malki Depo.), at pp. 105:15-111:10; Ex 1-71 (J. Malki Depo., Ex. 8).

**Response:**     Admitted.

**C.     Hawaiian Design Jewelry, Co.**

146.     Defendant Hawaiian Design Jewelry Co. ("Hawaiian Design") is owned and operated by Sammy Leung and Amy Leung. Redmond Decl. Ex. 1-72, (S. Leung Depo.), pp. 23:14 – 24:7.

**Response:**     Admitted.

147.     Mr. Leung declared $400,000 as the value of his shipment on the July 10, 2022 Pickup Manifest, but he is now claiming that the value of his lost shipment is $1,904,106.80. Beech Decl. Ex. A; Redmond Decl. Ex. 1-13, (Hawaiian Design Jewelry, Inc's Responses to Brink's Global Services First Discovery Requests, Interrogatory No. 5).

**Response:**   Disputed.  Mr. Leung set forth the desired insurance value on the July 10, 2022 Pickup Manifest.  Admitted that the value of his lost shipment is $1,904,106.80 based on full retail value.  Redmond Decl., Ex. 1-72 at p. 31:14-24.

148.    Mr. Leung was born in Hong Kong, but he has lived and worked in the United States for 50 years. Redmond Decl., Ex. 1-72 (S. Leung Depo.), pp. 11:16 – 22:17.

**Response:**   Admitted.

149.    Mr. Leung and his wife have operated several retail businesses since the 1970s, including selling paintings to tourists in Waikiki, Hawaii. Redmond Decl., Ex. 1-72 (S. Leung Depo.), at pp. 12:14 – 17:2; 18:5 – 19:18.

**Response:**   Disputed.  Mr. Leung sold T-shirts and coral rings, not paintings, and only operated one other business, a jewelry sales business.  Redmond Decl., Ex. 1-72 (S. Leung Depo.), at pp. 12:14 –17:2; 18:5 – 19:18.

150.    They have conducted all of their businesses in English. Redmond Decl., Ex. 1-72 (S. Leung Depo.), at pp. 14:11 – 14:13; 17:3 – 18:4; 19:15 – 21.

**Response:**   Admitted.

151.    Not only did Mr. Leung and his wife conduct their businesses in English, but they also review and sign various contracts in English, and conduct their other legal proceedings in English without the use of an interpreter. [Redmond Decl., Ex. 1-72 (S. Leung Depo.), at pp. 17:7 – 18:4; 28:20 – 24; 25:23 – 26:14); Ex 1-35 (Hawaiian Design Jewelry, Inc.'s Responses to Requests for Admission, Set Two, No. 13); Ex. 1-23 (Brink's Global Services USA, Inc.'s Second Requests for Admission to Hawaiian Design Jewelry, Ex. 3).].

**Response:**   Admitted.

152.    Mr. Leung has attended jewelry shows for about forty years, in that time becoming very experienced with using secured transport companies like Malca-Amit, Loomis,

and Brink's to ship Hawaiian Design's jewelry from show to show. [Redmond Decl., Ex. 1-72 (S. Leung Depo.), pp. 60:2 – 60:11; 69:7 – 73:6; 85:19 – 86:3; 159:19 – 22.]

> **Response:**    Disputed that Mr. Leung has become very experienced using secured transport companies like Malca-Amit, Loomis and Brink's.  He has used Loomis less than ten times.  Hawaiian Design Jewelry has used Brink's less than four times a year on average.  Mr. Leung was unfamiliar with the concept that there was a liability limitation on recovery in the event his goods were not delivered.  Admitted that the Mr. Leung has attended jewelry shows for about forty years.  Redmond Decl., Ex. 1-72 (S. Leung Depo.), pp. 60:2 – 60:11; 69:7 – 73:6; 85:19 – 86:3; SOF 26 above.

153.    Indeed, Hawaiian Design transacted with Brink's and assented to the Contract at least 39 separate times before the July 10, 2022 theft. [Beech Decl., ¶ 7; Redmond Decl., Ex. 172 (S. Leung Depo.), pp. 46:25 – 53:7; Ex. 1-73 (Exhibit 04 to S. Leung Depo.).].

> **Response:**    Admitted that Hawaiian Design transacted with Brink's 39 separate times before the July 10, 2022 theft.  Disputed that Hawaiian Design assented to the Contract because the print was too small for Mr. Leung to see and nobody ever informed him there was a contract on the back of the manifest or that it was available in larger print.  Redmond Decl., Ex. 172 (S. Leung Depo.), pp.49:17-50:15; 52:10-53:7.

154.    Even after the July 2022 theft, Hawaiian Design shipped its goods with Brink's several times because it still "trust[ed] Brink's." [Redmond Decl., Ex. 1-73 (Exhibit 04 to S. Leung Depo.); Ex. 1-72 (S. Leung Depo.), pp. 40:25 – 54:15; BGS' Requests for Admission to Hawaiian Jewelry Designs, Set Two, at Ex. 2 (BRINKS_0005200-5324)].

> **Response:**    Admitted that even after the July 2022 theft, Hawaiian Design shipped its goods with Brink's several times because it had no choice and also still "trust[ed] Brink's".

Redmond Decl., Ex. 1-73 (Exhibit 04 to S. Leung Depo.); Ex. 1-72 (S. Leung Depo.), pp. 40:25 –46:17.

155.    In fact, around the same time that Hawaiian Design sued Brink's in California Superior Court, Hawaiian Design transacted with Brink's to ship its goods to a jewelry show in Illinois, while assenting once again to the very same terms and conditions in Brink's Contract. [BGS' Requests for Admission to Hawaiian Jewelry Designs, Ex. 2 (BRINKS_0005200-5324); Ex. 1-73 (Exhibit 04 to S. Leung Depo.); Ex. 1-72 (S. Leung Depo.), pp. 40:17 – 42:1; 54:10 – 15.]

> **Response:**    Disputed.  The shipment to Illinois pre-dated the suit in California and Hawaiian Design did not assent to the terms and condition in Brink's Contract because it could not read the print on the back of the manifest and was not made aware of a larger print version.  Redmond Decl., Ex. 1-73 (Exhibit 04 to S. Leung Depo.); Ex. 1-72 (S. Leung Depo.), pp. 49:17-50:15; 52:10-53:7.

157.    Every time that Hawaiian Design shipped its goods with Brink's, it signed a Pickup Manifest and expressly stated that it was agreeing to the Brink's Contract. [Redmond Decl., Ex. 1-72 (S. Leung Depo.), pp. 37:24 – 38:5.]. Hawaiian Design did the same when it shipped its goods with Malca-Amit and Loomis. [Redmond Decl., Ex. 1-72 (S. Leung Depo.) 60:2 – 60:11; 69:16 – 71:25.]

> **Response:**    Admitted that whenever Hawaiian Design shipped its goods with Brink's, Malca-Amit or Loomis, it signed a Pickup Manifest that expressly stated that it was agreeing to the Brink's, Malca-Amit, or Loomis Contract.

158.    Not only had Hawaiian Design shipped with Brink's and other secured transport companies many times prior to the theft, Hawaiian Design – like other Defendants – also received numerous e-mails from Brink's employees that included an e-mail signature stating:

"**All services subject to the terms and conditions of the Brink's Global Services Valuables Transport Contract.**" The hyperlink in the e-mails directed Hawaiian Design to the large-font version of the Brink's Contract that is available on Brink's website (http://www.brinksglobal.com/terms_of_use/transport_contract.aspx). Redmond Dec., Ex. 1-35 (Hawaiian Design Jewelry, Inc.'s Responses to Requests for Admission, Set Two, Nos. 16, 17, 18, 19, 20, 21, 25, 27, 28, 29); Ex. 1-23 (Brink's Global Services USA, Inc.'s Second Requests for Admission to Hawaiian Design Jewelry, Exhibits 6, 7, 8, 9, 10, 11, 13, 15, 16, and 17)].

> **Response:**    Admitted that Hawaiian Design had shipped with Brink's and other secured transport companies prior to the theft and that Hawaiian Design received multiple e-mails containing the hyperlink referred to, but below the signature and in smaller letters than the rest of the e-mail, so calculated not to be noticed.  Ex. 1-23 (Brink's Global Services USA, Inc.'s Second Requests for Admission to Hawaiian Design Jewelry, Exhibits 6, 7, 8, 9, 10, 11, 13, 15, 16, and 17)].

159.    Additionally, as a member of JIMA, Hawaiian Design received multiple rate sheets from NCAJA/JIMA prior to July 10, 2022, each providing that the rates were explicitly, "subject to the Brink's global services Terms and Conditions." Redmond Dec., Ex. 1-35 (Hawaiian Design Jewelry, Inc.'s Responses to Requests for Admission, Set Two, Nos. 15, 21, 23, 24, and 29); Ex. 1-23, (Brink's Global Services USA, Inc.'s Second Requests for Admission to Hawaiian Design Jewelry, Exhibits 5, 11, 12, and 17).]

> **Response:**    Disputed.  Evidence cited contains only one rate sheet, for 2022.  Admitted that the quoted language is on it, but again in very small print calculated to obscure rather than highlight the language.

160.    In addition to using Brink's to transport its goods between shows, Hawaiian Design also contracted with Brink's to store its goods during the COVID-19 pandemic. [Redmond Decl.,

Ex. 1-72 (S. Leung Depo.), pp. 62:17 – 82:27; Ex. 1-35 (Hawaiian Design Jewelry, Inc.'s Responses to Requests for Admission, Set Two, No. 14); Ex. 1-23 (Brink's Global Services USA, Inc.'s Second Requests for Admission to Hawaiian Design Jewelry, Exhibit 4).]

**Response:** Admitted.

161.    Like the Brink's Contract, the Storage Agreement limited Brink's liability in the event of a loss and required Hawaiian Design to select a declared value prior to signing. [Redmond Decl., Ex. 1-23 (Hawaiian Design Jewelry, Inc.'s Responses to Requests for Admission, Set Two, No. 14); Ex. 1-35 (Brink's Global Services USA, Inc.'s Second Requests for Admission to Hawaiian Design Jewelry, Exhibit 4).]

**Response:**    Admitted that the Storage Agreement limited Brink's liability in the event of a loss and required Hawaiian Design to select a declared value prior to signing.  Disputed that this was like the Brink's Contract because the Pickup Manifest called for Carriage Value, a term not used in the Brink's Contract, and one explained by Brinks as insurance value.  Shuman Decl., Ex. A-12, at pp. 31:14-20; 33:17-24; 38:6-25; 51:7-13; 52:6-8; 90:2-12; 140:8-142:19.

162.    In the Storage Agreement, Hawaiian Design selected a declared value of $300,000 for its goods. This was the minimum value included in the price of storage at the time, so Hawaiian Design selected that amount. [Redmond Decl., Ex. 1-35 (Hawaiian Design Jewelry, Inc.'s Responses to Requests for Admission, Set Two, No. 14); Ex. 1-23 (Brink's Global Services USA, Inc.'s Second Requests for Admission to Hawaiian Design Jewelry, Exhibit 4); Ex. 1-72 (S. Leung Depo., pp. 90:16 – 91:19).]

**Response:**    Admitted.

163.    In his forty years in the jewelry show business, Mr. Leung never read any of the contracts from any secured transport company—including the Brink's Contract, the Malca-Amit contract, or the Loomis contract—despite regularly signing pickup manifests and using these companies to ship his goods. [Redmond Decl., Ex. 1-72 (S. Leung Depo.), pp. 54:7 – 56:9, 67:19 – 68:19; 64:1 – 65:6.]

**Response:**    Admitted because Mr. Leung could not read the print on the back of the manifest and was not made aware of a larger print version.  Redmond Decl., Ex. 1-72 (S. Leung Depo.), pp. 49:17-50:15; 52:10-53:7.

164.    On July 10, 2022, Mr. Leung signed the subject Pickup Manifest on behalf of Hawaiian Design, assenting once more to the Brink's Contract. [Beech Decl. Ex. A; Redmond Decl. Ex. 1-72 (S. Leung Depo.), pp. 31:2 – 31:21, 42:2 – 42:5; Ex. 1-35 (Hawaiian Design Jewelry, Inc.'s Responses to Requests for Admission, Set Two, Nos. 10 and 11); Ex. 1-23 (Brink's Global Services USA, Inc.'s Second Requests for Admission to Hawaiian Design Jewelry, Exhibit 1).]

**Response:**    Admitted that on July 10, 2022, Mr. Leung signed the subject Pickup Manifest on behalf of Hawaiian Design.  Disputed that he assented to the terms of the Brink's Contract of which he was not aware and could not read because they were too small for him to make out, nobody told him they were there, and nobody told him a larger print version was available.    Redmond Decl., Ex. 1-72 (S. Leung Depo.), pp. 49:17-50:15; 52:10-53:7.

165.    For the July 10, 2022 shipment, Mr. Leung declared the value of Hawaiian Design's shipment as $400,000. [Beech Decl. Ex. A (Hawaiian Design Pickup Manifest); Redmond Decl., Ex. 1-35 (Hawaiian Design Jewelry, Inc.'s Responses to Requests for Admission, Set Two, Nos. 10 and 11); Ex. 1-23 (Brink's Global Services USA, Inc.'s Second Requests for Admission to Hawaiian Design Jewelry, Exhibit 1); Ex. 1-72 (S. Leung Depo.), pp. 31:14 – 24.]

**Response:**        Disputed.  For the July 10, 2022 shipment, Mr. Leung set forth the desired insurance amount of $400,000.  Shuman Decl., Ex. A-12, at pp. 31:14-20; 33:17-24; 38:6-25; 51:7-13; 52:6-8; 90:2-12; 140:8-142:19.

166.    After the theft, Mrs. Leung gave an August 2022 interview to the Los Angeles Times about Hawaiian Design's loss. [Redmond Decl. Ex. 1-73 (S. Leung Depo. Exhibit 18); Ex. 1-72 (S. Leung Depo.), pp. 121:5 – 124:3.]

**Response:**    Admitted.

167.    Mrs. Leung told the Los Angeles Times that "the cost of her stolen merchandise was at least $700,000." [Redmond Decl. Ex. 1-73 (S. Leung Depo. Exhibit 18); Ex. 1-72 1-72 (S. Leung Depo.), pp. 121:5 – 124:3.]

**Response:**    Admitted.

168.    She admitted that while the actual cost was $700,000, she "assigned her goods a declared value of $400,000 because a higher sum would make it too expensive to ship." [Redmond Decl. Ex. 1-73 (S. Leung Depo. Exhibit 18); Ex. 1-72 (S. Leung Depo.), pp. 121:5 – 124:3.]

**Response:**    Admitted.

169.    Mr. Leung echoed this in his deposition in this action, noting that Hawaiian Design would "need to pay more" to declare its goods for the $700,000 value. Redmond Decl. Ex. 1-72 (S. Leung Depo.), pp. 123:19 – 124:5.]

**Response:**    Admitted.

170.    In this litigation, Hawaiian Design now claims that its lost property is actually worth even more: $███████. [Redmond Decl. Ex. 1-13 (Hawaiian Design's Response to Brink's Global Services USA, Inc.'s First Discovery Requests, Interrogatory No. 5); Ex. 1-72 (S. Leung Depo.), pp. 127:15 – 129:2.]

**Response:**    Admitted that is the full retail value of Hawaiian Design's stolen jewelry (including consignment goods).

171.    In Hawaiian Design's year-end tax return for 2021, however, Hawaiian Design represented to the I.R.S. that the value of its entire inventory was $███████. [Redmond Decl. Ex. 1-45 (Hawaiian Design Tax Return).]

**Response:**    Admitted based on historical cost of just Hawaiian Design's inventory (excluding consigned merchandise that was stolen).

172.    In this litigation, Mr. Leung calculated the value of Hawaiian Design's property by adding an additional 50% to the cost of the items, which he then determined to be $1,904,106.80 – not the $700,000 Mrs. Leung had represented to the Los Angeles Times. [Redmond Decl. Ex. 1-73 (S. Leung Depo. Exhibit 18); Ex. 1-72 (S. Leung Depo.), pp. 121:5 – 124:3, 127:15 – 129:2.]

**Response:**    Disputed that Mrs. Leung represented to the Los Angeles Times that the cost was $700,000.  She said "at least $700,000", which did not necessarily include merchandise on consignment.  Mr. Leung's figure includes merchandise on consignment, which was about two-thirds of Hawaiian Design's shipment.  Otherwise admitted.  Redmond Decl. Ex. 1-73 (S. Leung Depo. Exhibit 18); Ex. 1-72 (S. Leung Depo.), p. 124:6-25; Shuman Decl., Ex. A12 (S.Leung Depo) at p. 125:1-11..

173.    After the theft, on July 12, 2022, Brink's employee Gloria Corrales sent an e-mail to Hawaiian Design through Amy Leung, attaching a claim form from Brink's upon which Hawaiian Design would list information regarding its lost inventory. [Sobers Decl. Ex. A (BRINKS_000543).]

**Response:**    Admitted.

174.    Ten days later, Gloria Corrales followed up with another e-mail to Amy Leung regarding Hawaiian Design's claim form, which remained incomplete. [Sobers Decl. Ex. B (BRINKS_000570).]

**Response:**    Admitted.

175.    Hawaiian Design never sent a Notice of Claim to Brink's. [Beech Decl. ¶¶ 30 –

31.]

**Response:**    Admitted.

**D.    Kimmimoto Jewelry**

176.    Defendant Kimmimoto Jewelry ("Kimmimoto") has been owned and operated by

Mr. Kim Sater and his wife Rebecca Yum since 1992. [Redmond Decl., Ex 1-74 (K. Sater Depo.)

at pp. at 129:9-131:11.]

**Response:**    Admitted.

177.    Mr. Sater declared $3,200,000 as the total value of Kimmimoto's shipment on the

July 10, 2022 Pick Up Manifest, but is now claiming that the value of the company's lost shipment

is $16,934,649.00 [Redmond Decl., Ex 1-74 (K. Sater Depo.) at pp. 132:22-133:18; Ex 1-14

(Kimmimoto's Responses to Brink's Interrogatories, Set One, No. 5); Ex 1-75 (K. Sater Depo,

Ex. 29); Ex 1-24 (Brink's Request for Admissions to Kimmimoto, Set Two, Ex. 16), No. 25; Ex

1-36 (Kimmimoto's Responses to Request for Admissions, Set Two), No. 25.]

> **Response:**    Disputed. Mr. Sater set forth an insurance value, i.e. the amount of insurance
>
> desired, on the July 10, 2022 Pick Up Manifest.  Otherwise, admitted.  Shuman Decl., Ex.
>
> A-13 (K. Sater Depo.) at pp. 41:19 – 44:2; 45:10 – 46:1; 209:14-25; 210:9-211:1; 211:17
>
> – 212:9; 253:2-7.

178.    Mr. Sater was born in Lebanon in 1949 and immigrated to the United States in

1970 where he enrolled at Loretto Heights College, in Denver, Colorado and graduated with a

business degree. [Redmond Decl., Ex 1-74 (K. Sater Depo.) at pp. 102:15-103:13.]

**Response:**    Admitted.

179.   Mr. Sater can read and understand English as well as any college graduate. [Redmond Decl., Ex 1-74 (K. Sater Depo.) at pp. 213:12-214:9.]

> **Response:**   Disputed.  Mr. Sater does not have perfect English, cannot always read English, and often speaks in Arabic.  Redmond Decl., Ex 1-74 (K. Sater Depo.) at pp. 213:12-214:22.

180.   Kim Sater entered the jewelry business in Colorado in the early 1970s, at first opening a small store selling gold jewelry, then opening a business called Denver Diamonds in Aurora, Colorado. [Redmond Decl., Ex 1-74 (K. Sater Depo.) at pp. 109:12-119:10.]

> **Response:**   Disputed as to the small store selling gold jewelry.  It sold "low-end jewelry". Otherwise admitted.  Redmond Decl., Ex 1-74 (K. Sater Depo.) at p. 111:1-16.

181.   In the 1980s, Mr. Sater formed a jewelry business with Frank Petri (owner of Defendant Petri Gems) and the pair sold diamonds at various trade shows. Initially, Mr. Sater would personally carry merchandise from show to show, but then began using secured shipping with Dunbar and Brink's in the 1990s. [Redmond Decl., Ex 1-74 (K. Sater Depo.) at pp. 129:9-131:11; Ex 1-75 (K. Sater Depo, Ex. 7).]

> **Response:**   Admitted.

182.   During his career as a jeweler in the United States, Mr. Sater has communicated with customers primarily in English. [Redmond Decl., Ex 1-74 (K. Sater Depo.) at pp. 213:4-215:11].

> **Response:**   Disputed.  Mr. Sater has communicated with customers in both English and Arabic, with neither stated to be primary.  Redmond Decl., Ex 1-74 (K. Sater Depo.) at pp. 213:4215:11.

183.   From the later 1990s to the present, Kimmimoto has regularly transported jewelry with Brink's, Dunbar, Loomis, and Malca-Amit. [Redmond Decl., Ex 1-74 (K. Sater Depo.) at pp.

143:1-143:3; 194:16-199:10; Ex 1- 24 (Brink's Request for Admissions to Kimmimoto, Set Two, Ex. 26); Ex 1-36 (Kimmimoto's Responses to Request for Admissions, Set Two), No. 36.]

**Response:**    Admitted.

184.    Prior to the July 10, 2022 shipment, Kimmimoto had used Brink's to transport its jewelry on at least 49 prior occasions. [Redmond Decl., Ex 1-74 (K. Sater Depo.) at pp. 252:6-254:14; Ex 1-24 (Brink's Request for Admissions to Kimmimoto, Set Two, Ex. 16) Ex 1-36 Kimmimoto's Responses to Request for Admissions, Set Two), No. 25.]

**Response:**    Admitted.

185.    Kimmimoto has also regularly contracted with Brink's to store the company's merchandise at Brink's secured storage facilities. [Redmond Decl., Ex 1-74 (K. Sater Depo.) at pp. 148:21-151:16; Ex 1-24 (Brink's Request for Admissions to Kimmimoto, Set Two, Ex. 14); Ex 1-36 (Kimmimoto's Responses to Request for Admissions, Set Two), No. 23.]

**Response:**    Disputed.    Kimmimoto entered one contract to store the company's merchandise at Brink's secured storage facilities.  [Redmond Decl., Ex 1-74 (K. Sater Depo.) at pp. 148:21-151:16; Ex 1-24 (Brink's Request for Admissions to Kimmimoto, Set Two, Ex. 14); Ex 1-36 (Kimmimoto's Responses to Request for Admissions, Set Two), No. 23.]

186.    Kimmimoto, through Mr. Sater, also received multiple emails from Brink's employees that included an email signature that stated: "**All services subject to the terms and conditions of the Brink's Global Services Valuables Transport Contract.**" The hyperlink in the emails directed Mr. Cheng to the large-font version of the Brink's Contract that is available on Brink's website (http://www.brinksglobal.com/terms_of_use/transport_contract.aspx). [Redmond Decl., Ex 1-74 (K. Sater Depo.) at pp. 187:6-191:13; Ex 1-24 (Brink's Request for

Admissions to Kimmimoto, Set Two, Ex. 2); Ex 1-36 (Kimmimoto's Responses to Request for Admissions, Set Two), No. 11.]

> **Response:**   Admitted that Kimmimoto received multiple e-mails containing the hyperlink referred to, but below the signature and in smaller letters than the rest of the e-mail, so calculated not to be noticed.  Ex 1-24 (Brink's Request for Admissions to Kimmimoto, Set Two, Exs. 2 and 3)

187.   Mr. Sater is a member of NCAJA and the special rate sheet he signed on behalf of Kimimoto in 2022 expressly states "all services "all services subject to the Brink's Global Transport Valuables Transport Contract. [Redmond Decl., Ex 1-74 (K. Sater Depo.) at pp. 57:8 – 17; Ex 1-75 (K. Sater Depo, Ex. 11.]

> **Response:**   Disputed that Mr. Sater signed the special rate sheet on behalf of Kimmimoto in 2022.  Disputed that the 2022 rate sheet says "all services subject to the Brink's Global Transport Valuables Transport Contract.  Redmond Decl., Ex 1-74 (K. Sater Depo.) at pp. 57:8 – 17; Shuman Decl., Ex. A-13, Kim Sater Deposition Exhbits, Ex. 12, p.3.

188.   For the July 10, 2022 shipment, Mr. Sater declared the value of Kimmimoto's shipment as $3,200,000 for a total of five parcels (i.e., five sealed bags) of jewelry. [Redmond Decl., Ex 1-74 (K. Sater Depo.) at pp. 132:22 – 133:18; Ex 1-24 (Brink's Request for Admissions to Kimmimoto, Set Two, Ex. 16); Ex 1-36 (Kimmimoto's Responses to Request for Admissions, Set Two), No. 25.]

> **Response:**   Disputed.   For the July 10, 2022 shipment, Mr. Sater set forth an insurance value for Kimmimoto's shipment of $3,200,000 for a total of five parcels (i.e., five sealed bags) of jewelry.   Shuman Decl., Ex. A-13 (K. Sater Depo.) at pp. 41:19 – 44:2; 45:10 – 46:1; 209:14-25; 210:9-211:1; 211:17 – 212:9; 253:2-7.   For the July 10, 2022 shipment, Mr. Sater declared a value of $3,200,000 on Kimmimoto's stolen shipment because that

was value "he wanted to have." [Redmond Decl., Ex 1-74 (K. Sater Depo.) at pp. 212:5-9.]

**Response:**   Disputed.  For the July 10, 2022 shipment, Mr. Sater stated the value of $3,200,000 as the amount of insurance he "wanted to have" on Kimmimoto's stolen shipment.  Shuman Decl., Ex. A-13 (K. Sater Depo), pp 211:17 – 212:9.

189.   After the theft, on July 12, 2022, Brink's employee Gloria Corrales sent e-mail correspondence to Kimmimoto attaching a claim form from Brink's. [Redmond Decl., (K. Sater Depo.) at pp. 248:4-248:25; Ex 1-75 (K. Sater Depo., Ex 24).]

**Response:**  Admitted.

190.   Subsequently, on July 22, 2022, Brink's employee Gloria Corrales sent another email correspondence to Kimmimoto following up on her prior message regarding the Brink's Notice of Claim form, which remained incomplete. [Redmond Decl., Ex 1-74 (K. Sater Depo.) at pp. 249:1-250:15; Ex 1-75 (K. Sater Depo., Ex. 24).]

**Response:**   Admitted.

191.   Mr. Sater eventually sent a completed claim form to Brink's on behalf of Kimmimoto regarding its lost inventory, but then directed Gloria Corrales to hold off on submitting the form internally with Brink's. [Redmond Decl., Ex 1-74 (K. Sater Depo.) at pp. 249:1-250:15; Ex 1-75 (K. Sater Depo., Ex. 24).]

**Response:**   Admitted.

192.   Subsequent to the theft, Kimmimoto continued to utilize Brink's services, while continuing to assent to the same terms and conditions. Two days after the theft, on July 14, 2022, Kimmimoto used Brink's to transport one parcel with a declared value of $500,000.00 from Los Angeles, California to Aurora, Colorado. [Redmond Decl., Ex 1-24 (Brink's Request for

467257

Admissions to Kimmimoto, Set Two, Ex. 16); Ex 1-36 (Kimmimoto's Responses to Request for Admissions, Set Two), No. 25.]

> **Response:**   Disputed.  The $500,000 was the insurance value.  Otherwise, admitted. Shuman Decl., Ex. A-13 (K. Sater Depo.) at pp. 41:19 – 44:2; 45:10 – 46:1; 209:14-25; 210:9-211:1; 211:17 – 212:9; 253:2-7.

193.    Notably, Kimmimoto also had a Jeweler's Block insurance policy with Lloyd's of London from August 14, 20201 to August 14, 2022 which afforded coverage for the theft. [Redmond Decl., Ex 1-75 (K. Sater Depo., Ex. 9).]

> **Response:**   Disputed that Kimmimoto had a Jeweler's Block insurance policy with Lloyd's of London and that the Jeweler's Block insurance policy it did have afforded coverage for the theft.  Kimmimoto's Jeweler's Block insurance policy was issued by Jeweler's Mutual Insurance Company and required as a condition of coverage for any shipment that the airbill, shipper's label and packaging contain no description of the shipment as jewelry and contain no monetary values.  The Pick Up Manifest described the goods as jewelry and contain a monetary figure in the Carriage Value box, so Kimmimoto would have been disqualified for coverage.  The policy also had no specific coverage for secured transport and afforded only $10,000 of coverage, with a $1,000 deductible, for good away from Kimmimoto's premises. Additionally, the policy attached to the motion did not go into effect until after July 10, 2022.  Redmond Decl., Ex 1-75 (K. Sater Depo., Ex. 9), at pp. 11-12.  However, Mr. Sater claims that he ultimately decided against submitting a claim under Kimmimoto's Jeweler's Block insurance policy. [Redmond Decl., Ex 1-74 (K. Sater Depo.) at pp. 91:4 – 93:19.]

> **Response:**   Admitted.

E.      **Lam's Jade Center, Inc.**

195.    Defendant Lam's Jade Center, Inc. is owned by spouses Paul and Leona Wong. [Redmond Decl., Ex. 1-37 (Lam's Jade Center, Inc.'s Responses to Requests for Admission, Set Two, Nos. 27, 28); Ex. 1-25 (Brink's Global Services USA, Inc.'s Second Requests for Admission to Lam's Jade Center, Ex. 14 (August 10 E-mail to G. Corrales; Subject: Documents for Stolen Goods) (BRINKS_000797-000858))]. Ex. 1-76, P. Wong Depo. at 102:17-102:22].

**Response:**    Admitted.

196.    Paul Wong has been living in the United States since 1962 and has worked in the jewelry industry in 1980. [Ex. 1-76, P. Wong Depo. at 91:18-92:4].

**Response:**    Admitted.

197.    Paul and Leona Wong started Lam's Jade Center, Inc. in September 1982. [Redmond Decl., Ex. 1-77 (P. Wong Depo. Ex. 15) (Articles of Incorporation of Lam's Jade Center, Inc.) (BRINKS_0006227); [Ex. 1-76, P. Wong Depo. at 209:16-209:25].

**Response:**    Admitted.

198.    Paul Wong interacts with customers of Lam's Jade Center in English, and does the same with Brink's employees and people at InterGem. [Ex. 1-76, P. Wong Depo. at 92:5-92:22].

> **Response:**    Disputed.  Wong interacts with customers mostly in Chinese, with InterGem occasionally in English, and with Brink's in simple English.  Redmond Decl., Ex. 1-76, (P. Wong Depo). At pp. 92:592:22

199.    Leona Wong generally arranges shipments of Lam's Jade Center's goods with Brink's and does so in English. [Ex. 1-76, P. Wong Depo. at 115:16-118:18].

> **Response:**    Admitted, but in broken English.

73

467257

200.    Confirming their business sophistication, from 1990 to 1997, Paul and Leona

Wong hired Philadelphia, Pennsylvania law firm Panitch Schwarze Jacobs & Nadel, P.C. to

prosecute a trademark with the United States Department of Commerce Patent and Trademark

Office, on behalf of Lam's Jade Center. [Redmond Decl., Ex. 1-37 (Lam's Jade Center, Inc.'s

Responses to Requests for Admission, Set Two, No. 31); Ex. 1-25 (Brink's Global Services

USA, Inc.'s Second Requests for Admission to Lam's Jade Center, Ex. 17 (United States

Patent and Trademark Filings) (BRINKS_0006230 - 0006258)].

**Response:**    Disputed that this confirms any sophistication.  The Wongs had one

attorney, Mr. Kwon, who had helped them and he coordinated the work of Panitch Schwarze

Jacobs & Nadel, P.C. to prosecute a trademark with the United States Department of Commerce

Patent and Trademark Office, on behalf of Lam's Jade Center.  The Wongs do not have

experience working with lawyers around the country. The Wongs never even spoke to anyone at

the Panitch firm and didn't even need to speak with Mr. Kwon about it because he knew how to

do it.  Shuman Decl., Ex. A-15 (Paul Wong Depo.) at pp. 205:1 – 209:15.

202.    Leona Wong also corresponds with Brink's personnel in English. [Redmond

Decl., Ex. 1-37 (Lam's Jade Center, Inc.'s Responses to Requests for Admission, Set Two,

No. 10); Ex. 1-25 (Brink's Global Services USA, Inc.'s Second Requests for Admission to

Lam's Jade Center, Ex. 1 (July 23, 2020 E-mail to T. Sobers) (BRINKS_0006164-65))].

**Response:**    Admitted.

203.    Lam's Jade Center. Inc. has used Brink's services to securely ship its goods over

25 times in the past five years. Redmond Decl. Ex. 1-37 (Lam's Jade Center, Inc.'s Responses to

Requests for Admission, Set Two, No. 24)]; Ex. 1-25 (Brink's Global Services USA, Inc.'s

Second Requests for Admission to Lam's Jade Center, Ex. 12 (Lam's Jade Center, Inc. Brink's

Shipment History) (BRINKS_0006043 – BRINKS_0006111)].

467257

**Response:**    Disputed.  The collection of shipping documents comprising BRINKS 0006043-BRINKS 0006111 documents only 24 distinct shipments.  Redmond Decl. Ex. 1-25 (Brink's Global Services USA, Inc.'s Second Requests for Admission to Lam's Jade Center, Ex. 12 (Lam's Jade Center, Inc. Brink's Shipment History) (BRINKS_0006043 – BRINKS_0006111).

204.    Over the years, Lam's Jade Center had many additional opportunities to review the terms and conditions of the Brink's Contract. For example, in 2022, Lam's Jade Center sent an email to Brink's, attaching an autopay enrollment sheet and a signed document pertaining to a special InterGem show rate for JIMA and NCAJA members. The document expressly states: "this rate agreement is subject to the Brink's Global Services Terms and Conditions of Contract." [Redmond Decl., Ex. 1-37 (Lam's Jade Center, Inc.'s Responses to Requests for Admission, Set Two, No. 20)]; Ex. 1-25 (Brink's Global Services USA, Inc.'s Second Requests for Admission to Lam's Jade Center, Ex. 10 (Special 2022 JIMA and NCAJA Intergem Show Rate) (BRINKS_006172 – 73)].

**Response:**  Disputed.  The autopay enrollment sheet and the show rate sheet do not contain any link to the Brink's Contract or any information as to where to find it. Admitted that the show rate sheet contains the quoted words, but in the smallest print on the page in the middle of six lines of such small print not calculated to draw the reader's attention. Redmond Decl., Ex. 1-25 (Brink's Global Services USA, Inc.'s Second Requests for Admission to Lam's Jade Center, Ex. 10 (Special 2022 JIMA and NCAJA Intergem Show Rate) (BRINKS_006172 – 73).

205.    Prior to the July 10, 2022 shipment, Lam's Jade also received emails from Brink's employees that included an email signature stating: "**All services subject to the terms and conditions of the Brink's Global Services Valuables Transport Contract.**" The hyperlink in

the emails directed Lam's Jade to the large-font version of the Brink's Contract that is available on Brink's website (http://www.brinksglobal.com/terms of use/transport contract.aspx). [Redmond Decl., Ex. 1-37 (Lam's Jade Center, Inc.'s Responses to Requests for Admission, Set Two, No. 10)]; Ex. 1-25 (Brink's Global Services USA, Inc.'s Second Requests for Admission to Lam's Jade Center, Ex. 1 (T. Sobers Email: "RE: collections.pdf") (BRINKS_0006164); Ex. 1-37 (Lam's Jade Center, Inc.'s Responses to Requests for Admission, Set Two, No. 11)]; Ex. 125 (Brink's Global Services USA, Inc.'s Second Requests for Admission to Lam's Jade Center, Ex. 2 (BRINKS_0006154)].

**Response:**    Admitted that Lam's Jade received e-mails containing the hyperlink referred to, but below the signature and in smaller letters than the rest of the e-mail, so calculated not to be noticed.  Disputed that the e-mails directed Lam's Jade to a large-font version of the Brink's Contract, in that the version on the website is still less than a 10-point font.  Redmond Decl., Ex. 1-25 (Brink's Global Services USA, Inc.'s Second Requests for Admission to Lam's Jade Center, Ex. 1 (T. Sobers Email: "RE: collections.pdf") (BRINKS_0006164); Ex. 125 (Brink's Global Services USA, Inc.'s Second Requests for Admission to Lam's Jade Center, Ex. 2 (BRINKS_0006154); Beech Decl., Ex. 3-C.

206.    On July 10, 2022, Lam's Jade Center contracted with Brink's to ship Lam's Jade Center's valuables from the show in San Mateo, California to the International Gem and Jewelry Show in Pasadena, California. [Beech Decl. Ex. A (Lam's Jade Center Pickup Manifest); Redmond Decl. Ex. 1-37 (Lam's Jade Center, Inc.'s Responses to Requests for Admission, Set Two, Nos. 25, 26)]; Ex. 1-25 (Brink's Global Services USA, Inc.'s Second Requests for Admission to Lam's Jade Center, Ex. 13 (Lam's Jade Center, Inc. San Mateo 2022 InterGem Pickup Manifest) (BRINKS_0006109-10)].

**Response:**    Admitted.

207.     Paul Wong, on behalf of Lam's Jade, signed the July 10, 2022 Pickup Manifest, entering into the Brink's Global Services Valuables Transport Contract with Brink's for the shipment of the company's valuables. [Beech Decl. Ex. A (Lam's Jade Center Pickup Manifest); Redmond Decl. Ex. 1-37 (Lam's Jade Center, Inc.'s Responses to Requests for Admission, Set Two, Nos. 25, 26)]; Ex. 1-25 (Brink's Global Services USA, Inc.'s Second Requests for Admission to Lam's Jade Center, Ex. 13 (Lam's Jade Pickup Manifest) (BRINKS_0006109-10)].

**Response:**     Admitted that Paul Wong, on behalf of Lam's Jade, signed the July 10, 2022 Pickup Manifest.  Disputed that he entered into the Brink's Global Services Valuables Transport Contract because the manifest did not direct him to it, the words on the back of the manifest were illegible, and Mr. Wong does not read English.  Redmond Decl.; Ex. 1-25 (Brink's Global Services USA, Inc.'s Second Requests for Admission to Lam's Jade Center, Ex. 13 (Lam's Jade Pickup Manifest) (BRINKS_0006109-10)]; Shuman Decl., Ex. A--15 (Paul Wong Depo.) at pp. 25:13-14; 167:18-168:2; 190:19-191:12; 194:14-16. The reverse of the pickup manifest contained the terms and conditions of the Brink's Valuables Global Transport Contract. [Beech Decl. Ex. A (Lam's Jade Center Pickup Manifest); Redmond Decl. Ex. 1-37 (Lam's Jade Center, Inc.'s Responses to Requests for Admission, Set Two, Nos. 25, 26)]; Ex. 1-25 (Brink's Global Services USA, Inc.'s Second Requests for Admission to Lam's Jade Center, Ex. 13 (Lam's Jade Pickup Manifest) (BRINKS_0006109-10)].

**Response:**   Admitted.

208.     Directly above Paul Wong's signature on the pickup manifest, the form stated "I confirm the shipment details contained herein are correct and agree to the terms and conditions of the Brink's Global Services Valuable Transport Contract." [Beech Decl. Ex. A (Lam's Jade

Center Pickup Manifest); Redmond Decl. Ex. 1-37 (Lam's Jade Center, Inc.'s Responses to

Requests for Admission, Set Two, Nos. 25, 26)]; Ex. 1-25_(Brink's Global Services USA, Inc.'s

Second Requests for Admission to Lam's Jade Center, Ex. 13 (Lam's Jade Pickup Manifest)

(BRINKS_0006109-10)].

> **Response:**   Admitted.

209.    For the July 10, 2022 shipment, Paul Wong declared the value of Lam's Jade

Center's shipment as $400,000 ($200,000 for each bag). [Beech Decl. Ex. A (Lam's Jade Center

Pickup Manifest); Redmond Decl. Ex. 1-37 (Lam's Jade Center, Inc.'s Responses to Requests

for Admission, Set Two, Nos. 25, 26)]; Ex. 1-25 (Brink's Global Services USA, Inc.'s Second

Requests for Admission to Lam's Jade Center, Ex. 13 (Lam's Jade Pickup Manifest)

(BRINKS_0006109-10)].

> **Response:**   Disputed.  For the July 10, 2022 shipment, Paul Wong stated an insurance
> value for Lam's Jade Center's shipment of $400,000 ($200,000 for each bag), which
> Brinks itself repeatedly suggested to him.  Shuman Decl., Ex. A-15 (Paul Wong Depo.)
> pp. 53:5-54:17, 73:15-25, 74:9-25, 77:6-11, 79:12-80:1, 82:15-84:4, 118:20-119:5,
> 147:23-148:16. 158:14-25; Shuman Decl., Ex. A-16 (Paul Wong Depo, Ex. 6).

210.    In fact, Lam's Jade had been declaring the value of shipments with armored

transit companies such as Malca Amit, Dunbar, and Loomis to be $400,000.00 for "decades"

without regard to the actual value of the goods being shipped. This practice was not unique to

their shipments with Brink's. [Ex. 1-76, P. Wong Depo. at 124:14 – 126:23].

**Response:**      Admitted that Lam's Jade had been stating the insurance value of shipments with

armored transit companies such as Malca Amit, Dunbar, and Loomis to be $400,000.00 for

"decades" without regard to the actual value of the goods being shipped. This practice was not

unique to their shipments with Brink's.

On July 11, 2022, one of the two parcels shipped by the Lam's Jade was stolen in the theft. The other bag was not stolen. [Ex. 1-76, P. Wong Depo. at 179:5 – 179:8].

> **Response:**   Admitted.

212.     The parcel that was not stolen was listed as bearing seal number R147317 and was shipped under air bill 11021429123. [Beech Decl. Ex. A (Lam's Jade Center Pickup Manifest); Redmond Decl. Ex. 1-37 (Lam's Jade Center, Inc.'s Responses to Requests for Admission, Set Two, Nos. 17, 18)]; Ex. 1-25 (Brink's Global Services USA, Inc.'s Second Requests for Admission to Lam's Jade Center, Ex. 8 (Email to Lam's Jade Center, Inc. from G. Corrales regarding delivery Confirmation of Parcel) (BRINKS_000377-378); Ex. 1-37 (Lam's Jade Center, Inc.'s Responses to Requests for Admission, Set Two, Nos. 25, 26)]; Ex. 1-25 (Brink's Global Services USA, Inc.'s Second Requests for Admission to Lam's Jade Center, Ex. 13 (Lam's Jade Pickup Manifest) (BRINKS_0006109-10)]; [Ex. 1-76, P. Wong Depo. at 180:7 – 181:8].

> **Response:**     Admitted.

213.     The stolen parcel was listed as bearing seal number R147316. [Beech Decl. Ex. A (Lam's Jade Pickup Manifest); [Redmond Decl. Ex. 1-37 (Lam's Jade Center, Inc.'s Responses to Requests for Admission, Set Two, Nos. 17, 18)]; Ex. 1-25 (Brink's Global Services USA, Inc.'s Second Requests for Admission to Lam's Jade Center, Ex. 8 (Email to Lam's Jade Center, Inc. from G. Corrales regarding delivery Confirmation of Parcel) (BRINKS_000377-378); Ex. 1-37 (Lam's Jade Center, Inc.'s Responses to Requests for Admission, Set Two, Nos. 25, 26)]; Ex. 1-25 (Brink's Global Services USA, Inc.'s Second Requests for Admission to Lam's Jade Center, Ex. 13 (Lam's Jade Center, Inc. San Mateo 2022 InterGem Pickup Manifest) (BRINKS_0006109-10)].

> **Response:**     Admitted.

214.    On August 10, 2022, Leona Wong sent an e-mail and attachments to Brink's, alleging for the first time that the merchandise stolen on July 11, 2022 was actually worth "$1,138,490.00 fair market value." [Redmond Decl., Ex. 1-37 (Lam's Jade Center, Inc.'s Responses to Requests for Admission, Set Two, Nos. 27, 28); Ex. 1-25 (Brink's Global Services USA, Inc.'s Second Requests for Admission to Lam's Jade Center, Ex. 14 (August 10 E-mail to G. Corrales; Subject: Documents for Stolen Goods) (BRINKS_000797-000858))].

**Response:**    Admitted, with fair market value meaning full retail value, which Defendants do not believe is the measure of damages in New York.

216.    The letter also stated: "All these years, we have trusted Brinks for its reputation and trustworthiness. We depended on Brinks to transport our goods from one show to another show. It became habit to declare our merchandise for only $400,000.00. This amount does not represent the fair market value of the goods since we never expected that it would be robbed. Our lost merchandise is worth $1,138,490.00." [Redmond Decl., Ex. 1-37 (Lam's Jade Center, Inc.'s Responses to Requests for Admission, Set Two, Nos. 27, 28); Ex. 1-25 (Brink's Global Services USA, Inc.'s Second Requests for Admission to Lam's Jade Center, Ex. 14 (August 10 E-mail to G. Corrales; Subject: Documents for Stolen Goods) (BRINKS_000797-000858))].

**Response:**    Admitted.

217.    Lam's Jade represented to the I.R.S., in its 2020 Form 1120 U.S. Income Tax Return, that the value of its entire inventory was $▮▮▮▮▮▮ at the end of 2020. The inventory reported to the I.R.S. would have included the merchandise that was recovered in the bag that was not stolen. [Redmond Decl. Ex. 1-48, (Lam's Jade Center Tax Return) (LAMS_000128-29)].

**Response:**    Admitted.

218.    Lam's Jade now claims an even higher figure. Paul Wong now claims that the previously supplied $1,138,490.00 figure represented the cost to Lam's Jade center and not the fair market value of the goods, and that the goods would be worth $4 million if sold. [Ex. 1-76, P. Wong Depo. at 182:6 – 182:21].

**Response:**    Admitted.

219.    Paul Wong calculated the loss of Lam's Jade Center's inventory by "adding three or four times of our cost for the sales of those items." [Ex. 1-76, P. Wong Depo. at 60:15 – 61:4].

**Response:**    Admitted.

According to Lam's Jade, the parcel that was not stolen on July 11, 2022 contained goods bought for $150,000 which could be sold for $300,000. [Ex. 1-76, P. Wong Depo. at 181:23 – 183:23]; [Beech Decl. Ex. A (Lam's Jade Center Pickup Manifest); Redmond Decl. Ex. 1-37 (Lam's Jade Center, Inc.'s Responses to Requests for Admission, Set Two, Nos. 25, 26)]; Ex. 125 (Brink's Global Services USA, Inc.'s Second Requests for Admission to Lam's Jade Center, Ex. 13 (Lam's Jade Center, Inc. San Mateo 2022 InterGem Pickup Manifest) (BRINKS_0006109-10)].

**Response:**    Admitted.

**F.    Lee's International Jewelry, Inc.**

220.    Defendant Lee's International Jewelry, Inc. ("Lee's International") is owned and operated by Mr. Shu Shun "Tony" Lee. [Redmond Decl., Ex 1-78 (T. Lee Depo.) at 33:2-33:7.]

**Response:**    Admitted.

221.    Lee's International declared $1,100,000 as the value of its shipment on the July 10, 2022 Pickup Manifest, but is now claiming that the value of its one parcel is $2,449,380.40. [Redmond Decl., Ex 1-78 (T. Lee Depo.) at 150:24-152:18; 174:15-174:19; Ex __ (Brink's Second Requests for Admission to Lee's International, Ex., 2); Ex 1-38 (Lee's International's Responses to Brink's Second Request for Admissions, No. 11); Ex 1-26 (Brink's First Interrogatories to Lee's

International, No. 5); Ex 1-16 (Lee's International's Responses to Brink's First Interrogatories, No. 5)].

**Response:**   Disputed.  Lee's International bought insurance in the amount of $1,100,000 from Brinks; it did not declare that to be the value of its shipment.  Otherwise, admitted. Redmond Decl., Ex 1-78 (T. Lee Depo.) at 150:24-152:18; 174:15-174:19

222.   Mr. Lee was born on September 7, 1953 in Taiwan and immigrated to the United States around 1982. [Redmond Decl., Ex 1-78 (T. Lee Depo.) at 24:7-24:14.]

**Response:**   Admitted.

223.   When Mr. Lee first arrived in the United States, he and his then-wife Meiling Lee opened a jewelry business together in San Francisco, California. [Redmond Decl., Ex 1-78 (T. Lee Depo.) at 42:5-43:8.]

**Response:**   Admitted.

225.   Mr. Lee has been working in the jewelry industry for over 40 years. [Redmond Decl., Ex 1-78 (T. Lee Depo.) at 50:5-53:5; 53:10-54:5.]

**Response:**   Admitted.

226.   A central component of Lee's International's business involves participating in traveling exhibitions and trade shows by routinely entering into contracts with show organizers. These contracts are always in English. [Redmond Decl., Ex 1-78 (T. Lee Depo.) at 54:21-56:10.]

**Response:**   Admitted.

227.   Mr. Lee converses with customers in English, and Sarah Lu, who has worked for Lee's International since 2003, also understands English. [Redmond Decl., Ex 1-78 (T. Lee Depo.) at 56:10-57:1; 75:2-75:17.]

**Response:**   Disputed.  Mr. Lee converses with most customers in Chinese; he and Ms. Lu can converse only in simple English.  Admitted that Lu has worked for Lee's

International since 2003, but only part-time.  Redmond Decl., Ex 1-78 (T. Lee Depo.) at 56:10-57:1; 75:2-75:17

228.    Besides owning the jewelry company, Mr. Lee is also the owner and manager of the Shu Shun Lee Trust which was formed in 2014 or 2015. The Shu Shun Lee Trust contains multiple rental properties in northern California that provide Mr. Lee with significant additional monthly rental income. [Redmond Decl., Ex 1-78 (T. Lee Depo.) at 27:13-30:4.]

229.    **Response:**    Admitted that besides owning the jewelry company, Mr. Lee is also the owner and manager of the Shu Shun Lee Trust which was formed in 2014 or 2015. The Shu Shun Lee Trust contains three rental properties in northern California that provide Mr. Lee with rental income.  Unable to respond as to "significant" because it is vague. [Redmond Decl., Ex 1-78 (T. Lee Depo.) at 27:13-30:4.]

230.    Mr. Lee hired an attorney to create the trust and to draft the numerous lease agreements for his tenants in English. The Shu Shun Lee Trust generates approximately $230,000 per year from Mr. Lee's rental properties. [Redmond Decl., Ex 1-78 (T. Lee Depo.) at 29:19-30:4; 36:5-36:15.]

**Response:**    Admitted, with the caveat that the $230,000 is gross rental income, before all expenses of property ownership (e.g. mortgages, insurance, taxes, maintenance, management, and rental costs).  Redmond Decl., Ex 1-78 (T. Lee Depo.) at 36:5-36:15.

231.    Mr. Lee is a member of both NCAJA and JIMA, and in 2020, he signed the Brink's Special Rate Agreement on behalf of Lee's International which expressly stated: "this rate agreement is subject to the Brink's Global Services Terms and Conditions of Contract." [Redmond Decl., Ex 1-26 (Brink's Second Requests for Admission to Lee's International, Ex. 5) Ex 1-38 (Lee's International's Responses Brink's Second Requests for Admissions, No. 17).]

**Response:**   Disputed that the document is an Agreement, but otherwise admitted, with the observation that the quoted language appears in the middle of smaller print than the rest of the document, so calculated not to be noticed.

232.   Prior to the July 10, 2022 theft, Lee's International had shipped jewelry with Brink's on 29 occasions across New York, California, Florida, Virginia, Texas, Nevada, Hawaii, Arizona, and Kentucky. [Beech Decl., ¶ 17; Redmond Decl., Ex 1-78 (T. Lee Depo.) at 110:14113:22; 123:5-123:25; Ex 1-38 (Brink's Second Requests for Admission to Lee's International, Exs. 3, 5, 7) Ex 1-26 (Lee's International's Responses Brink's Second Requests for Admissions, Nos. 13, 17, 19)]

**Response:**   Admitted as to shipments over the course of ten years, an average of less than three times per year.

232.   Each time Lee's International shipped its goods with Brink's, it signed a Pickup Manifest and expressly stated that it was agreeing to the Brink's Contract. [Redmond Decl., Ex 1-78 (T. Lee Depo.) at 123:5-123:25; Ex 1-26 (Brink's Second Requests for Admission to Lee's International, Ex. 3); Ex 1-38 (Lee's International's Responses to Brink's Second Requests for Admissions, No. 13)].

**Response:**   Admitted that Each time Lee's International shipped its goods with Brink's, it signed a Pickup Manifest.  Disputed that Lee's International expressly stated that it was agreeing to the Brink's Contract because Mr. Lee cannot read English other than basic words and sentences, and because the print on the reverse side of the manifest was too small to read.  Shuman Decl., Ex. A-20 (T. Lee Depo), pp. 74:7-75:1 and 77:11-78:23; Redmond Decl., Ex 1-6 (Brink's First Discovery to Lee's International, Request for Admission No. 4); Ex 1-16 (Lee's International's Responses to Brink's First Discovery, Requests for Admissions, No. 4).

233.     Besides having previously received and assented to Brink's Contract on at least 29 prior occasions before to the July 10, 2022 shipment, Mr. Lee also received multiple emails from Brink's employees that included an email signatures stating: "**All services subject to the terms and conditions of the Brink's Global Services Valuables Transport Contract**." The hyperlink in the emails directed Lee's International to the large-font version of the Brink's Contract that is available on Brink's website http://www.brinksglobal.com/terms_of_use/transport_contract.aspx) [Redmond Decl., Ex 1-78 (T. Lee Depo.) at 123:5-123:25; Ex 1-26 (Brink's Second Requests for Admission to Lee's International, Ex. 3); Ex 1-38 (Lee's International's Responses Brink's Second Requests for Admissions No. 13)].

**Response:** Disputed that the quoted language is part of the e-mail signature. It appears below the signature and in smaller letters than the rest of the e-mail, so calculated not to be noticed. Otherwise admitted.  Redmond Decl., Ex 1-26 (Brink's Second Requests for Admission to Lee's International, Ex. 4-5).

234.     Mr. Lee has also shipped jewelry with Malca-Amit on behalf of Lee's International on several prior occasions through NCAJA and JIMA. [Redmond Decl., Ex 1-78 (T. Lee Depo.) at 102:20-103:14.]

**Response:**    Admit that when the show operator required use of Malca-Amit for shipping, Lee's International used Malca-Amit.  Redmond Decl., Ex 1-78 (T. Lee Depo.) at 102:20-103:14.  As for the subject shipment on July 10, 2022, Sarah Lu, as an authorized employee, signed the Pickup Manifest on behalf of Lee's International, while assenting to Brink's Contract. [Beech Decl. Ex. A; Redmond Decl., Ex 1-78 (T. Lee Depo.) at 77:10-77:20; Ex. 1-6, Brink's First Discovery Requests to Lee's International Jewelry, Exhibit A; Ex. , Lee's International Responses to Brink's Request for Admission No. 1; Ex. 1-16, Brink's Second

Requests for Admission to Lee's International, Ex 2; Ex. 1-38, Lee's International Jewelry's Responses to Brink's Second Requests for Admission, Request Nos. 11, 12)].

**Response:**   Disputed that Ms. Lu assented to Brink's Contract, as she was a part-time employee who could not read anything but simple English, and the verbiage on the back of the manifest was illegible.  Otherwise admitted.  Redmond Decl., Ex 1-78 (T. Lee Depo.) at p. 76:2-17; Redmond Decl., Ex. 1-26, Brink's Second Requests for Admission to Lee's International, Ex 2.

235.    For the July 10, 2022 shipment, Lee's International declared the value its shipment as $1,100,000 for one parcel of jewelry. [Redmond Decl., Ex 1-78 (T. Lee Depo.) at 77:10-77:20; [Beech Decl. Ex. A; Redmond Decl., Ex 1-78 (T. Lee Depo.) at 77:10-77:20; Ex. 1-6, Brink's First Discovery Requests to Lee's International Jewelry, Exhibit A; Ex. 1-16, Lee's International Responses to Brink's Request for Admission No. 1; Ex. 1-26, Brink's Second Requests for Admission to Lee's International, Ex 2; Ex. 1-38, Lee's International Jewelry's Responses to Brink's Second Requests for Admission, Request Nos. 11, 12)].

**Response:**   Disputed.  Lee's International bought insurance in the amount of $1,100,000 from Brinks; it did not declare that to be the value of its shipment.  The "parcel" was a 47-pound bag containing its entire inventory.  Redmond Decl., Ex 1-78 (T. Lee Depo.) at 150:24-152:18; 174:15-174:19; Redmond Decl., Ex. 1-26, Brink's Second Requests for Admission to Lee's International, Ex 2.

236.    Lee's International Jewelry elected to put $1,100,000 as the declared value of its parcel because it was an amount that company would be able to undertake. [Beech Decl. Ex. A; Redmond Decl., Ex 1-78 (T. Lee Depo.) at 77:10-77:20; 174:15-174:19; Ex. 1-6, Brink's First Discovery Requests to Lee's International Jewelry, Exhibit A; Ex. 1-16, Lee's International Responses to Brink's Request for Admission No. 1; Ex. 1-26, Brink's Second Requests for

Admission to Lee's International, Ex 2; Ex. 1-38, Lee's International Jewelry's Responses to
Brink's Second Requests for Admission, Request Nos. 11, 12)].

> **Response:**   Disputed as to "declared value"; Lee's International bought insurance in the
> amount of $1,100,000 from Brinks; it did not declare that to be the value of its shipment.
> Otherwise, admitted.  Redmond Decl., Ex 1-78 (T. Lee Depo.) at 150:20-23; 174:15-174:19.

237.   During this litigation, Lee's International has now claimed that its one parcel of lost
jewelry is not actually worth the declared amount of $1,100,000, but that it is now really valued at
$2,449,380.49. [Redmond Decl., Ex 1-78 (T. Lee Depo.) at 150:24-152:18; Ex 1-16 (Lee's
International's Responses to Brink's First Interrogatories, No. 5).]

> **Response:**   Admitted that during this litigation, Lee's International has claimed the full
> retail value of its stolen bag of jewelry is $2,449,380.49.  Disputed that the $1,100,000 was
> a "declared amount"; it was the amount of insurance Lee's International bought from
> Brink's.  Redmond Decl., Ex 1-78 (T. Lee Depo.) at 150:20-23; 174:15-174:19.

239.   However, Lee's International represented to the I.R.S., in its 2021 Form 1120-S
U.S. Income Tax Return, that the value of its entire inventory was only $███████. [Redmond
Decl., Ex 1-49 (Lee's International Tax Return – Confidential).]

> **Response:**   Admitted, at historical cost.

240.   In this litigation, Mr. Lee claims that he calculated the value of Lee's International's
lost items by doubling the amount that the company paid for the jewelry. [Redmond Decl., Ex 178 (T.
Lee Depo.) at 166:16-167:15]

> **Response:**   Admit that value for the stolen items was calculated at double the cost, but not
> necessarily that cost is solely what was paid for the item or its components.

467257

### G.    Pan Lovely Jewelry

241.    Pan Lovely Jewelry ("Pan Lovely") is owned and operated by Victor Wu, who started the business in 2003. [Redmond Decl. Ex. 1-79 (V. Wu Depo.) at pp. 129:5 – 129:8; 153:10 – 153:23.]

Response:  Admitted.

242.    Mr. Wu was born in Taiwan in 1948 and after graduating from college there, entered the gem and souvenir business. [Redmond Decl. Ex. 1-79 (V. Wu Depo.), at pp. 147:3 – 149:23.]

**Response:**  Admitted.

243.    Mr. Wu has been selling jewelry at trade shows in the United States since 1986. [Redmond Decl. Ex. 1-79 (V. Wu Depo.), at pp. 153:10 – 153:23.]

**Response:**  Admitted.

244.    At trade shows, Mr. Wu speaks to most of his customers in English. [Redmond Decl., Ex. 1-79 (V. Wu Depo.) at pp. 154:10 – 154:23.]

**Response:**  Admitted; however, Mr. Wu testified that it was very simple English and he asks for help of he cannot understand.  [Redmond Decl., Ex. 1-79 (V. Wu Depo.) at pp. 154:10 – 154:23.]

246.    As with many of the Defendants' owners, Mr. Wu is active in the jeweler trade organization NCAJA, and in fact served as the president of NCAJA from 2004 to 2005, from 2017 to 2019, and from 2020-2021. [Redmond Decl., Ex. 1-79 (V. Wu Depo.), at pp. 12:18 – 13:14; 15:7 – 15:17.]

**Response:**  Admitted.

247.    As NCAJA president, Mr. Wu and the NCAJA board voted on and hired Joseph Chang, a NCAJA vice president, to negotiate group rates with Brink's and other secure transport companies. [Redmond Decl., Ex. 1-79 (V. Wu Depo.), at pp. 15:18 – 17:5.]

**Response:** Admitted.

248.    In the 1980s and 1990s, Wu would hand-carry his jewelry merchandise from trade show to trade show and assume the risk of the loss of his jewelry by theft or otherwise. [Redmond Decl., Ex. 1-79 (V. Wu Depo.), at pp. 155:16 – 156:6.]

Response:  Admitted.  However, Mr. Wu at that time dealt with cheaper jewelry and there was lower risk.  [Redmond Decl., Ex. 1-79 (V. Wu Depo.), at pp. 155:16 – 156:6.]

249.    Since 2003 or 2004, Pan Lovely Jewelry began using secure shipping companies for shipments of the company's jewelry. These include Brink's, Dunbar, Loomis, and Malca Amit. [Redmond Decl., Ex. 1-79 (V. Wu Depo.), at pp. 156:17 – 157:6.]

**Response**:  Admitted.

250.    Mr. Wu used Dunbar from approximately 2003 to 2013, Brink's from 2013 to 2016, and Loomis and Malca Amit starting in 2016. [Redmond Decl., Ex. 1-79 (V. Wu Depo.), at pp. 157:7 – 157:25.]

Response:  Admitted.

251.    Mr. Wu has filled out many pickup manifests with the various secure shippers, and he knows that secure shippers require pickup manifests with terms and conditions for shipment. [Redmond Decl., Ex. 1-79 (V. Wu Depo.), at pp. 158:2 – 158:20.]

Response:  Admitted.

252.    Over the years, Mr. Wu and Pan Lovely had many opportunities to review the terms and conditions of the Brink's Contract. For instance, Pan Lovely repeatedly used Brink's to ship

its jewelry throughout 2013 until 2016, but Mr. Wu did not read Brink's terms and conditions. [Redmond Decl., Ex. 1-79 (V. Wu Depo.), at pp. 158:17 – 160:21.]

> **Response:** Disputed that he had many opportunities to review the terms and conditions as Mr. Wu testified that the font is so small. Otherwise admitted.

253.    Mr. Wu understood the words on Brink's Pickup Manifest, but claims he did not know the meaning, and he never asked anyone to clarify the words or their meanings. [Redmond Decl., Ex. 1-79 (V. Wu Depo.), at pp. 161:10 – 161:24.]

> **Response:** Admitted. However, he testified that the font is too small that he cannot read. [Redmond Decl., Ex. 1-79 (V. Wu Depo.), at pp. 161:10 – 161:24.]

254.    Nor did Mr. Wu review the terms and conditions of the Brink's Contract or those of any other secure shipper contract while he was president of the NCAJA. Instead, Mr. Wu decided to rely on Joseph Chang (owner of Defendant Treasure Connection) to handle such things. [Redmond Decl. Ex. 1-79 (V. Wu Depo.), at pp. 161:25 – 162:6.]

> **Response:** Disputed that Mr. Wu testified that he relied on Joseph Chang to handle the terms and conditions. He testified that Joseph change "simply came back to advise of the rate and nothing else." [Redmond Decl. Ex. 1-79 (V. Wu Depo.), at pp. 161:25 – 162:10.]

253.    Pan Lovely also used Brink's on dozens of more occasions in the past few years. Pan Lovely shipped with Brink's at least 32 separate times since 2019, and every time, Mr. Wu signed a pickup manifest that referenced and attached the Brink's Contract. [Redmond Decl. Ex. 1-79 (V. Wu Depo.), at pp. 46:22 – 47:13; Ex. 1-39 (Pan Lovely Jewelry, Inc.'s Responses to Requests for Admission, Set Two, No. 45); Ex. 1-27 (Brink's Global Services USA, Inc.'s Second Requests for Admission to Pan Lovely Jewelry, Inc., Ex. 34, BRINKS_0006696 – 6766).]

> **Response:** Admitted, but he was unable to read it. Redmond Decl. Ex. 1-79 (V. Wu Depo.), at pp. 46:22 – 48:12; Ex. 1-39 (Pan Lovely Jewelry, Inc.'s Responses to Requests for

Admission, Set Two, No. 45); Ex. 1-27 (Brink's Global Services USA, Inc.'s Second Requests for Admission to Pan Lovely Jewelry, Inc., Ex. 34, BRINKS_0006696 – 6766).]

254.    Prior to the July 10, 2022 shipment, Pan Lovely also received emails from Brink's employees that included an email signature stating: "**All services subject to the terms and conditions of the Brink's Global Services Valuables Transport Contract.**" The hyperlink in the emails directed Pan Lovely to the large-font version of the Brink's Contract that is available on Brink's website (http://www.brinksglobal.com/terms_of_use/transport_contract.aspx). [Redmond Decl., Ex. 1-39 (Pan Lovely Jewelry, Inc.'s Responses to Requests for Admission, Set Two, No. 11)]; Ex. 1-27 (Brink's Global Services USA, Inc.'s Second Requests for Admission to Pan Lovely Jewelry, Inc., Ex. 2 (N. Rosario Dec. 30, 2019 Email, BRINKS_0020518 - 19); Ex. 139 (Pan Lovely Jewelry, Inc.'s Responses to Requests for Admission, Set Two, No. 18)]; Ex. (Brink's Global Services USA, Inc.'s Second Requests for Admission to Pan Lovely Jewelry, Inc., Ex. 9, BRINKS_0020503 through BRINKS_0020506).]

> **Response:**  Disputed that the quoted language is part of the e-mail signature.  It appears below the signature and in smaller letters than the rest of the e-mail, so calculated not to be noticed.  Otherwise admitted.   ). [Redmond Decl., Ex. 1-39 (Pan Lovely Jewelry, Inc.'s Responses to Requests for Admission, Set Two, No. 11)]; Ex. 1-27 (Brink's Global Services USA, Inc.'s Second Requests for Admission to Pan Lovely Jewelry, Inc., Ex. 2 (N. Rosario Dec. 30, 2019 Email, BRINKS_0020518 - 19); Ex. 139 (Pan Lovely Jewelry, Inc.'s Responses to Requests for Admission, Set Two, No. 18)]; Ex. (Brink's Global Services USA, Inc.'s Second Requests for Admission to Pan Lovely Jewelry, Inc., Ex. 9, BRINKS_0020503 through BRINKS_0020506).]

255.    On July 10, 2022, Mr. Wu, on behalf of Pan Lovely, signed a Pickup Manifest and asked Brink's to ship two sealed bags to the Pasadena, California Intergem show. Mr. Wu signed

the Pickup Manifest immediately next to statements that: "ALL SHIPMENTS ARE SUBJECT TO THE TERMS OF CONTRACT," and "I confirm the shipment details contained herein are correct and agree to the terms and conditions of Brink's Global Services Valuable Transport Contract." [Beech Decl., Ex. A (Pan Lovely Jewelry Pickup Manifest); Redmond Decl. Ex.1-39 (Pan Lovely Jewelry, Inc.'s Responses to Requests for Admission, Set Two, Nos. 43, 44); Ex. 1-27 (Brink's Global Services USA, Inc.'s Second Requests for Admission to Pan Lovely Jewelry, Inc., Ex. 33, BRINKS_0006281 through BRINKS_0006282); Ex. 1-79, (V. Wu Depo. at 68:4 – 69:20).]

> **Response:**   Disputed that "ALL SHIPMENTS ARE SUBJECT TO THE TERMS OF CONTRACT," and "I confirm the shipment details contained herein are correct and agree to the terms and conditions of Brink's Global Services Valuable Transport Contract" is immediately next to Mr. Wu's signature.  That is in the same box as Gloria Corrales' signature. [Beech Decl., Ex. A (Pan Lovely Jewelry Pickup Manifest); Redmond Decl. Ex.1-39 (Pan Lovely Jewelry, Inc.'s Responses to Requests for Admission, Set Two, Nos. 43, 44); Ex. 1-27 (Brink's Global Services USA, Inc.'s Second Requests for Admission to Pan Lovely Jewelry, Inc., Ex. 33, BRINKS_0006281 through BRINKS_0006282); Ex. 1-79, (V. Wu Depo. at 68:4 – 69:20).]

257.   The terms and conditions of the Brink's Global Services Valuable Transport Contract were printed on the reverse of the Show Outbound Pickup Manifest. [Beech Decl., Ex. 17 (Pan Lovely Jewelry Pickup Manifest); Redmond Decl. Ex. 1-39 (Pan Lovely Jewelry, Inc.'s Responses to Requests for Admission, Set Two, Nos. 43, 44)]; Ex. 1-27 (Brink's Global Services USA, Inc.'s Second Requests for Admission to Pan Lovely Jewelry, Inc., Ex. 33, BRINKS_0006281 through BRINKS_0006282).]

> **Response**:  Admitted, but the terms and conditions are so small they are illegible.  [Beech Decl., Ex. 17 (Pan Lovely Jewelry Pickup Manifest); Redmond Decl. Ex. 1-39 (Pan Lovely

Jewelry, Inc.'s Responses to Requests for Admission, Set Two, Nos. 43, 44)]; Ex. 1-27 (Brink's Global Services USA, Inc.'s Second Requests for Admission to Pan Lovely Jewelry, Inc., Ex. 33, BRINKS_0006281 through BRINKS_0006282).]

258.    For the July 10, 2022 shipment, Mr. Wu declared a value of $100,000 for each of the two parcels he shipped, totaling $200,000. [Beech Decl., Ex. A (Pan Lovely Jewelry Pickup Manifest); Redmond Decl., Ex.1-39(Pan Lovely Jewelry, Inc.'s Responses to Requests for Admission, Set Two, Nos. 43, 44); Ex. 1-27 (Brink's Global Services USA, Inc.'s Second Requests for Admission to Pan Lovely Jewelry, Inc., Ex. 33, BRINKS_0006281 through BRINKS_0006282).]

**Response:**  Disputed. For the July 10, 2022 shipment, Mr. Wu assigned an insurance value of  $100,000 for each of the two parcels he shipped, totaling $200,000.  Redmond Decl. Ex. 1-79 (V. Wu Depo.), at pp. 143:10-13; Wu Decl. at ¶1.

259.    Pan Lovely's habit was to put a Declared Value of $200,000 for all its shipments with Brink's, and with the exception of one shipment on January 8, 2022, all of Wu's 2022 shipments with Brink's had a Declared Value of $200,000.00. Wu stated that the reason he decided to declare $200,000.00 value for these shipments was because that is what he historically did. [Redmond Decl. Ex. 1-79 (V. Wu Depo.), at pp. 70:3 – 70:21.]

**Response:**  Disputed. The amount was an insurance value.  Otherwise admitted.  Redmond Decl. Ex. 1-79 (V. Wu Depo.), at pp. 70: 3-21; 143:10-13; Wu Decl. at ¶1.

Mr. Wu listed a Declared Value of $100,000.00 per parcel because that was the base rate offered for shipping with Brink's. [Redmond Decl., Ex. 1-79 (V. Wu Depo.), at pp. 143:10 – 144:11.] Mr. Wu agreed he could have increased the Declared Value but did not want to increase the cost of the shipment. [Redmond Decl., Ex. 1-79 (V. Wu Depo.), at pp. 143:10 – 144:11.]

467257

**Response:** Disputed.  The amount was an insurance value.  Otherwise admitted.  Redmond Decl. Ex. 1-79 (V. Wu Depo.), at pp. 70: 3-21; 143:10-144:11; Wu Decl. at ¶1.

260.    On July 25, 2022, after the loss, Mr. Wu sent an email to Gloria Corrales, on behalf of Pan Lovely Jewelry, attaching a claim form in connection with the missing shipment and declaring a loss of $1,000.000.00. [Redmond Decl. Ex. 1-39 (Pan Lovely Jewelry, Inc.'s Responses to Requests for Admission, Set Two, No. 26); Ex. 1-27 (Brink's Global Services USA, Inc.'s Second Requests for Admission to Pan Lovely Jewelry, Inc., Ex. 17, BRINKS_000998-001000); Ex. 1-79, (V. Wu Depo.), at pp. 128:18 –129:11.]

Response: Admitted.

261.    On August 17, 2022, Mr. Wu, on behalf of Pan Lovely Jewelry, sent another claim form via e-mail to Gloria Corrales, increasing the declared loss to $1,290.000.00. [Redmond Decl., Ex.1-39 (Pan Lovely Jewelry, Inc.'s Responses to Requests for Admission, Set Two, No. 34); Ex. 1-27 (Brink's Global Services USA, Inc.'s Second Requests for Admission to Pan Lovely Jewelry, Inc., Ex. 25, BRINKS_001052 – 54); Ex. 1-79, (V. Wu Depo.), at pp. 131:6 – 132:15.].

**Response**: Admitted.

262.    Mr. Wu admits that the newly increased $1,290.000.00 figure pertained to the same jewelry, but claims that he provided the prior $1,000.000.00 figure as an estimate and that the actual value was higher. [Redmond Decl., Ex. 1-79 (V. Wu Depo.), at pp. 131:20 – 132:15.]

**Response:** Disputed to the extent that it does not accurately reflect Mr. Wu's testimony. He testified that at the time they hadn't finished the inventory account yet and were advised to come up with something close for the moment.  Thereafter they found out the real loss. Otherwise admitted.  [Redmond Decl., Ex. 1-79 (V. Wu Depo.), at pp. 131:20 – 132:15.]

263.    Once this litigation started, Pan Lovely then increased its claimed value even more, by now claiming that the fair market value of the lost property is $2,580,000.00. [Redmond Decl.,

Ex. 1-7 (Brink's Global Services USA, Inc.'s First Interrogatories to Pan Lovely Jewelry, Inc.,
No. 5); Ex. 1-17 (Pan Lovely Jewelry Response to Brink's Global Services, Inc's First Set of
Interrogatories, Requests for Production, and Requests for Admission, No. 5).]

> **Response:**  Admitted.  This was the fair market value.  The prior value was the cost.
> [Redmond Decl., Ex. 1-79 (V. Wu Depo.), at pp. 131:20 – 132:23.]

265.    Mr. Wu now claims that his increased amount represents the value if the jewelry
were sold at a market, as compared to the prior figures of $1,000.000.00 and $1,290.000.00, which
represented the cost to Pan Lovely. Contrary to the terms of Brink's Contract, Pan Lovely now
seeks to benefit from the theft by demanding that Brink's pay Pan Lovely as if the company sold
its entire inventory at its maximum prices. [Redmond Decl., Ex. 1-79 (V. Wu Depo.), at pp. 132:16
– 132:23].

> **Response:**  Disputed that Pan Lovely seeks to benefit from the theft.  Pan Lovely seeks its
> fair market value.  There is no evidence to show that this is maximum prices.  [Redmond
> Decl., Ex. 1-79 (V. Wu Depo.), at pp. 132:16 – 132:23].

266.    To arrive at the $2,580,000.00 figure, Mr. Wu simply doubled the cost of the
$1,290.000.00 inventory. [Redmond Decl., Ex. 1-79 (V. Wu Depo.), at pp. 133:5 – 134:2.] He
claimed that this method was Pan Lovely Jewelry's standard method for calculating retail prices.
[Redmond Decl., Ex. 1-79 (V. Wu Depo.), at pp. 133:5 – 134:2.]

Response:  Admitted.

267.    In its end of year 2021 tax return, Pan Lovely represented to the I.R.S. that the total
value of its inventory as of the end of 2021 was $▮▮▮▮▮▮. [Redmond Decl. Ex. 1-50, (Pan
Lovely 2021 Tax Return, Pan_000076-77).]

> **Response**:  Admitted.

**H.      Petri Gems Inc.**

268.      Defendant Petri Gems, Inc. ("Petri Gems") is owned and operated by Fariborz "Frank" Petri. Redmond Decl. Ex. 1-80 (F. Petri Depo., pp. 38:22 – 38:25).

**Response:**  Admitted.

269.      Mr. Petri declared $300,000 as the value of his shipment on the July 10, 2022 Pickup Manifest, but he is now claiming the value of his lost shipment is $3,952,74 7.00. Beech Decl. Ex. A; Redmond Decl. Ex. 1-18 Petri Gems' Responses to Brink's Global Services First Discovery Requests, Interrogatory No. 5.

**Response:**  Disputed.  $300,000 is the amount of insurance Petri Gems purchased from Brinks; it did not declare that to be the value of its shipment.  Otherwise, admitted.  [Petri Dec. parag. 1].

270.      Mr. Petri was born in Iran, but he has lived in the United States since he was a teenager and attended high school in California, taking courses in English. Redmond Decl. Ex. 1-80 (F. Petri Depo., pp. 22:1 – 25:7, 30:24 – 32:1).

Response:  Admitted; however, Mr. Petri did not graduate from high school.   .
Redmond Decl. Ex. 1-80 (F. Petri Depo., pp. 22:1 – 25:7).

271.      Mr. Petri worked in the retail jewelry industry for nearly fifty years, including spending many years selling jewelry to tourists and English-speaking locals in San Francisco, California. Redmond Decl. Ex. 1-80 (F. Petri Depo., pp. 25:11 – 30:20, 31:23 – 32:1, 32:2 – 35:6).

**Response:**  Admitted

272.      Mr. Petri not only attended schooling in English and conducted business in English, he also was involved in legal proceedings in English: in 2003, Mr. Petri filed an

application with the United States Patent & Trademark Office and in 2003, Mr. Petri filed for the

mark "F.P.G." and he also filed for bankruptcy, declaring the value of his stock in Petri Gems at

$0. Redmond Decl. Ex. 1-80 (F. Petri Depo. 168:19 – 169:21, 372:15 – 373:7); Redmond Decl.

Ex. 1-28, Brink's Second Requests for Admission to Petri Gems, Inc., Exhibit 23; Redmond

Decl. Ex. 1-40, Petri Gems' Responses to Brink's Second Requests for Admission, Nos. 12, 37;

Redmond Decl. Ex. 1-81 (F. Petri Depo., Exhibits 2, 6).

**Response:**  Admitted.  However, Mr. Petri was represented by counsel in the bankruptcy.

273.    Petri Gems has sold jewelry at shows since 1992. Redmond Decl. Ex. 1-80 (F.

Petri Depo., pp. 38:19 – 40:12). During this time, Mr. Petri became familiar with the practices of

secured transport services like Brink's, Malca-Amit, Loomis, and Dunbar. [Redmond Decl. Ex.

1-80 (F. Petri Depo. 215:13 – 216:10, 292:19 – 292:25); Redmond Decl. Ex. 1-40 Petri Gems'

Responses to Brink's Requests for Admission, Set Two, Nos. 31, 32; Redmond Decl. Ex. 1-28

Brink's Second Requests for Admission to Petri Gems, Inc., Exhibits 17, 18.

> **Response:**  Admit that Petri Gems has sold jewelry at shows since 1992.  Admit that Petri
> Gems used Brink's Malca-Amit, Loomis, and Dunbar, but it is unclear to what "practices
> this refers.

274.    Mr. Petri shipped with Brink's and assented to the Contract at least 43 separate

times before the July 10, 2022 theft. Beech Decl. ¶ 17; Redmond Decl. Ex. 1-40 Petri Gems'

Responses to Brink's Requests for Admission, Set Two, No. 19; Redmond Decl. Ex. 1-28

Brink's Second Requests for Admission to Petri Gems, Inc., Exhibit 8.

> **Response:**  Disputed that Mr. Petri assented to the Contract at least 43 separate times
> before the July 19, 2022 theft.  Mr. Petri didn't understand and because the print on
> the reverse side of the manifest was too small to read.  (Redmond Decl., Ex. 1-80 (F.

467257

Petri Depo., p. 337:7 – 13; Ex. 1-28 Brink's Second Requests for Admission to Petri Gems, Exhibit 6; Redmond Decl. Ex. 1-80 (F. Petri Depo. 238:19-21.]

275.    Every time that Petri Gems Design shipped its goods with Brink's, it signed a Pickup Manifest and expressly stated that it was agreeing to the Brink's Contract. Redmond Decl., Ex. 1-80 (F. Petri Depo., pp. 231:7 – 233:21, 339:21 – 339:24).

Response:  Admitted that Each time Petri Gems Design shipped its goods with Brink's, it signed a Pickup Manifest.  Disputed that Petri Gems Design expressly stated that it was agreeing to the Brink's Contract because Mr. Petri didn't understand and because the print on the reverse side of the manifest was too small to read.  (Redmond Decl., Ex. 1-80 (F. Petri Depo., p. 337:7 – 13; Ex. 1-28 Brink's Second Requests for Admission to Petri Gems, Exhibit 6).

276.    Mr. Petri had even signed a full-size copy of the Brink's Contract in early 2022, – before the July 10, 2022 loss – after asking a Brink's employee to send him a copy of the contract. [Redmond Decl. Ex. 1-40 Petri Gems Responses to Brink's Second Requests for Admission, No.16; Redmond Decl. Ex. 1-28 Brink's Second Requests for Admission to Petri Gems, Exhibit 6].

Response:  Admit that he signed the Contract marked as Exhibit 6.  Disputed that the evidence shows that he asked a Brink's employee to send him a copy.  [Redmond Decl. Ex. 1-40 Petri Gems Responses to Brink's Second Requests for Admission, No.16; Redmond Decl. Ex. 1-28 Brink's Second Requests for Admission to Petri Gems, Exhibit 6

277.    Not only had Petri Gems shipped with Brink's and other secured transport companies many times prior to the theft and previously signed the full-size Brink's Contract, Petri Gems – like other Defendants – also received numerous e-mails from Brink's employees that

included an e-mail signature stating: "**All services subject to the terms and conditions of the**

**Brink's Global Services Valuables Transport Contract.**" The hyperlink in the e-mails directed

Petri Gems to the large-font version of the Brink's Contract that is available on Brink's website

(http://www.brinksglobal.com/terms_of_use/transport_contract.aspx). Redmond Dec., Ex. 1-40

(Petri Gems, Inc.'s Responses to Requests for Admission, Set Two, Nos. 13, 14, 15, 21, and 22);

Redmond Decl., Ex. 1-28, (Brink's Global Services USA, Inc.'s Second Requests for Admission

to Petri Gems, Inc., Exhibits 3, 4, 5, 10, and 11).

> **Response:**   Disputed that the quoted language is part of the e-mail signature.  It appears
>
> below the signature and in smaller letters than the rest of the e-mail, so calculated not to be
>
> noticed.  Otherwise admitted.   Redmond Decl., Ex 1-40 (Petri Gems, Inc.'s Responses to
>
> Requests for Admission, Set Two, Nos. 13, 14, 15, 21, and 22); Redmond Decl., Ex. 1-28,
>
> (Brink's Global Services USA, Inc.'s Second Requests for Admission to Petri Gems, Inc.,
>
> Exhibits 3, 4, 5, 10, and 11).

278.    Additionally, as a member of JIMA, Petri Gems received multiple rate sheets from

NCAJA/JIMA prior to July 10, 2022, each providing that the rates were explicitly, "subject to the

Brink's global services Terms and Conditions." Redmond Dec., Ex. 1-40 (Petri Gems' Responses

to Requests for Admission, Set Two, Nos. 24, 26, 30, and 35); Redmond Decl., Ex. 1-28, (Brink's

Global Services USA, Inc.'s Second Requests for Admission to Petri Gems, Exhibits 13, 15, and

21).

> **Response:**  Admitted; however, the  sentence on the rate sheet "subject to the Brink's global
>
> services Terms and Conditions" is such small printing that it is calculated not to be noticed.
>
> (Redmond Decl., Ex. 1-28, (Brink's Global Services USA, Inc.'s Second Requests for
>
> Admission to Petri Gems, Exhibits 13, 15, and 21).

279.    For the July 10, 2022 shipment, Mr. Petri declared the value of Petri Gems'

shipment as $300,000. Beech Decl. Ex. A (Petri Gems Design Pickup Manifest); Redmond Decl.,

Ex. 1-40 (Petri Gems' Responses to Requests for Admission, Set Two, Nos. 17 and 18); Redmond

Decl., Ex. 1-28, (Brink's Global Services USA, Inc.'s Second Requests for Admission to Petri

Gems, Exhibit 7).

> **Response:** Disputed.  Petri Gems Design bought insurance in the amount of $300,000 from
>
> Brinks; it did not declare that to be the value of its shipment.  Redmond Decl., Ex. 1-80 (F.
>
> Petri Depo., p. 231:7-11; Petri Decl. ¶1.

280.    After the theft, Mr. Petri submitted a letter to Brink's noting, "I had insured my

package for $300,000.00 but depended upon Brink's to safeguard my shipment that had a fair

market value of $3,952,747.00[.]" Redmond Decl. Ex. 1-28 Brink's Second Requests for

Admission to Petri Gems, Exhibit 1; Redmond Decl. Ex. 1-40 Petri Gems Responses to Brink's

Second Requests for Admission, No. 11.

> **Response:** Admitted that that statement was in the letter.

281.    Mr. Petri purchased a Jeweler's Block Insurance Policy for Petri Gems' inventory,

but declined to purchase protection for goods in transit. Redmond Decl. Ex. 1-28 Brink's Second

Requests for Admission to Petri Gems, Exhibit 19; Redmond Decl. Ex. 1-40 Petri Gems'

Responses to Brink's Second Requests for Admission, No. 33. When he completed his Jewelers

Block policy application, Mr. Petri certified that the value of his entire inventory was $600,000.

Redmond Decl. Ex. 1-80 (F. Petri Depo.), pp. 446:5 – 449:21.

> **Response:** Admitted.

282. In this litigation, Petri Gems claims that its lost property is worth more than 10

times the declared value: $3,952,747.00. Redmond Decl., Ex. 1-40 (Petri Gems Responses to

Brink's First Set of Discovery, Interrogatory No. 5); Redmond Decl. Ex. 1-80 (F. Petri Depo.), pp. 237:17 – 238:6.

> **Response**:  Disputed that the $300,000 was the value, it was the insurance amount otherwise admitted.  Redmond Decl., Ex. 1-80 (F. Petri Depo., p. 231:7-11; Petri Decl. ¶1.

283.    In Petri Gems' year-end tax return for 2021, however, Petri Gems represented to the I.R.S. that the value of its entire inventory was only $▮▮▮▮▮▮▮. Redmond Decl., Ex. 1-50 (Petri Gems 2021 Tax Return).

**Response:**  Admitted as to historical value of the 2021 year end.

## I.    Defendant S & N Diamond Corp.

284.    Defendant S & N Diamond Corp. ("S & N Diamond") is owned and operated by Mr. Shahram "Herschel" Lavian ("Mr. Lavian") and his brother Sioun Lavian. Redmond Decl., Ex 1-82 (S. Lavian Depo. (Vol. I)) at pp. 71:4-74:21; Ex 1-84 (S. Lavian Depo, Ex. 7).

**Response:**  Admitted.

285.    Mr. Lavian, on behalf of S & N Diamond, declared $800,000 as the value of his two parcels of jewelry on the July 10, 2022 Pickup Manifest, but is now claiming that the value of S & N Diamond's lost shipment is actually $5,486,260. Redmond Decl., Ex 1-82 (S. Lavian Depo. (Vol. I)) at pp. 176:16-177:25; 213:3-16; Ex 1-84 (S. Lavian Depo, Ex. 15); Ex 1-29 (Brink's Request for Admissions to S & N Diamond, Set Two, Ex. 14); Ex 1-41 (S & N Diamond's Responses to Brink's Requests for Admissions, Set Two), No. 25.

**Response:**  Disputed.  S & N Diamond purchased insurance value in the amount of $800,000 in the amount of $800,000 from Brinks; it did not declare that to be the value of its shipment.  Admitted that the value of his lost shipment is $5,486,260 based on full retail value.  Redmond Decl., Ex 1-82 (S. Lavian Depo. (Vol. I)) at pp. 176:16-177:25; 213:3-16; Ex 1-84 (S. Lavian Depo, Ex. 15)

286.     Mr. Lavian moved to Kansas City, Kansas in 1987 from Iran and has been living in the United States for 37 years. Redmond Decl., Ex 1-82 (S. Lavian Depo.(Vol. I)) at pp. 65:8-67:23).

**Response:  Admitted**

287.     Mr. Lavian first began working in the jewelry industry in 1989 in New York when he was employed by a gold selling business for six to nine months before returning to Los Angeles, California to work for his brother's jewelry store. Redmond Decl., Ex 1-82 (S. Lavian Depo. (Vol. I)) at pp. 68:19-69:22).

**Response:  Admitted**

288.     In addition to his jewelry business, Mr. Lavian is a sophisticated businessman who owns ten rental properties in both Las Vegas, Nevada and Los Angeles, California that generate over $35,000 a month in rent. Redmond Decl., Ex 1-82 (S. Lavian Depo. (Vol. I)) at pp. 86:192:3; 100:6-106:4).

**Response:  Admitted that Mr. Lavian owns a total of ten rental properties, 3 units in Los Angeles, Nevada and the remainder in Los Angeles that generate over $35,000 per month in rent.**  Redmond Decl., Ex 1-82 (S. Lavian Depo. (Vol. I)) at pp. 86:192:3; 100:6-106:4).

289.     Mr. Lavian manages his properties through two LLCs with addresses located at 550 South Hill Street, Suite 1259, Los Angeles, California – the same location where S & N Diamond has its principal place of business. Redmond Decl., Ex 1-82 (S. Lavian Depo. (Vol. I)) at pp. 86:292:3; Ex 1-84 (S. Lavian Depo, Ex. 7).]

Response:  Admit that seven properties are manage through two LLCs.  Disputed that all are managed through two LLCs.  One is managed by a tenant manager and two others are

managed by a property management company.  Redmond Decl., Ex 1-82 (S. Lavian Depo. (Vol. I)) at pp. 90:22-91:11.

290.    Mr. Lavian is a convicted felon. He was found guilty on two counts of federal tax evasion in 2008 and did not request an interpreter when present in court during his criminal case. Redmond Decl., Ex 1-82 (S. Lavian Depo. (Vol. I)) at pp. 15:9-39:16. Mr. Lavian insisted on a Farsi interpreter for his two depositions in this case. [Redmond Decl., Ex 1-82 (S. Lavian Depo. (Vol. I)) at pp. 233:3-17; Ex 1-85 S. Lavian Depo. (Vol. II)) at pp. 8:13-9:15.

> Response.  Admitted, however ,the errata sheet to page 34, line 23 which states "That is why I requested an interpreter for the day of my deposition to translate for me in Farsi.  I only speak English in order to handle my business sales.  I had requested my council [sic] to bring an interpreter to ensure I understand every legal term mentioned during my deposition, m[sic] and to make sure I am giving a response to the best of my knowledge." Shuman Dec., Ex. A-18, Errata Sheet.

291.    Between 2019 and 2022, S & N Diamond has used Brink's to transport its jewelry on 54 prior occasions across Ohio, California, Illinois, Virginia, Texas, Maryland, Nevada, Mississippi, Louisiana, Tennessee, and Arizona. Redmond Decl., Ex 1-82 (S. Lavian Depo. (Vol. I)) at pp. 115:8-119:24; 158:23-207:22; Ex 1-84 (S. Lavian Depo, Ex. 8); Ex 1-84 (S. Lavian Depo, Ex. 9); Ex 1-84 (S. Lavian Depo, Ex. 13); Beech Decl., ¶ 17.

> **Response:**  Admitted.

292.    On each one of these 54 occasions, S & N Diamond received and assented to Brink's Contract, and Mr. Lavian also received multiple e-mails from a Brink's employee that included an email signature stating: "**All services subject to the terms and conditions of the Brink's Global Services Valuables Transport Contract."** The hyperlink in the emails directed S & N Diamond to the large-font version of the Brink's Contract that is available on Brink's website

(http://www.brinksglobal.com/terms of use/transport contract.aspx). Redmond Decl., Ex 1-82 (S. Lavian Depo. (Vol. I)) at pp. 115:8-119:24; Ex 1-84 (S. Lavian Depo, Ex. 8); Ex 1-84 (S. Lavian Depo, Ex. 12); Ex 1-29 (Brink's Request for Admissions to S & N Diamond, Set Two, Ex. 2); Ex 1-41 (S & N Diamond's Responses to Brink's Requests for Admissions, Set Two), No. 11.

> **Response:** Disputed that S & N assented to Brink's Contract. Disputed that the quoted language is part of the e-mail signature. It appears below the signature and in smaller letters than the rest of the e-mail, so calculated not to be noticed. Otherwise admitted. Redmond Decl., Ex 1-82 (S. Lavian Depo. (Vol. I)) at pp. 115:8-119:24; Ex 1-84 (S. Lavian Depo, Ex. 8); Ex 1-84 (S. Lavian Depo, Ex. 12); Ex 1-29 (Brink's Request for Admissions to S & N Diamond, Set Two, Ex. 2); Ex 1-41 (S & N Diamond's Responses to Brink's Requests for Admissions, Set Two), No. 11.

293.    Mr. Lavian, on behalf of S & N Diamond, has had numerous e-mail communications in English with Brink's employees between 2020 and 2021. On specific instances, Mr. Lavian references speaking to Gloria Corrales and asking for updated invoices so that he can pay all outstanding charges on behalf of S & N Diamond. Redmond Decl., Ex 1-82 (S. Lavian Depo. (Vol. I)) at pp. 115:8-119:24; Ex 1-84 (S. Lavian Depo, Ex. 8); Ex 1-84 (S. Lavian Depo, Ex. 9).

**Response:** Admit that there are a few email communications, but the evidence cited does not show numerous email communications. The specific instances cited; Mr. Lavian testified that his children wrote those emails. Redmond Decl., Ex 1-82 (S. Lavian Depo. (Vol. I)) at pp. 115:8-119:24; Ex 1-84 (S. Lavian Depo, Ex. 8); Ex 1-84 (S. Lavian Depo, Ex. 9).

294.    In addition to his extensive business dealings with Brinks, Mr. Lavian's son also owns a jewelry business and has shipped diamonds with Brinks after the July 10, 2022 theft. Redmond Decl., Ex 1-85 (S. Lavian Depo. (Vol. II)) at pp. 82:14-83:9.

**Response**:  Admitted.

295.    On July 10, 2022, Mr. Lavian signed the Pickup Manifest on behalf of S & N Diamond and assented to Brink's Contract in order to have two parcels of jewelry delivered from San Mateo to Los Angeles, California. Redmond Decl., Ex 1-84 (S. Lavian Depo, Ex. 12); Ex 129 (Brink's Request for Admissions to S & N Diamond, Set Two, Ex. 15); Ex 1-41 (S & N Diamond's Responses to Brink's Requests for Admissions, Set Two), No. 26).

> **Response:**  Disputed.  Mr. Lavian did not assent to Brink's Contract on behalf of S & N Diamond.  Mr. Lavian testified that he has difficulty reading legal documents.  Otherwise admitted.  Redmond Decl., Ex 1-82 (S. Lavian Depo. (Vol. I)) at pp. 115:8-119:24; 169:5-170:4.

296.    For the July 10, 2022 shipment, Mr. Lavian only declared $800,000 ($400,000 per parcel) because it would have been too expensive to declare a higher value. Redmond Decl., Ex 1-82 (S. Lavian Depo. (Vol. I)) at pp. 176:16-177:25.

> **Response**:  Disputed.  $800,000 ($400,000 per parcel) was the insurance value that was purchased and that is the insurance value he could afford.  Redmond Decl., Ex 1-82 (S. Lavian Depo. (Vol. I)) at pp. 176:16-177:25.

297.    As a matter of fact, on several prior occasions dating back to 2020, S & N Diamond only insured $400,000 per parcel of declared value for its Brink's deliveries and pickups. [Redmond Decl., Ex 1-84 (S. Lavian Depo, Ex. 12); Ex 1-29 (Brink's Request for Admissions to S & N Diamond, Set Two, Ex. 14); Ex 1-41 (S & N Diamond's Responses to Brink's Requests for Admissions, Set Two), No. 25.]

467257

**Response:** Admitted.

298.     On July 12, 2022, Brink's employee Gloria Corrales sent an email to Mr. Lavian requesting that he fill out a written claim form on behalf of S & N Diamond, and on July 22, 2022, Mr. Corrales sent a follow-up email correspondence requesting a status update on S & N Diamond' written notice of claim. [Redmond Decl., Ex 1-84 (S. Lavian Depo, Ex. 16); Ex 1-29 (Brink's Request for Admissions to S & N Diamond, Set Two, Ex. 5, 6); Ex 1-41 (S & N Diamond's Responses to Brink's Requests for Admissions, Set Two), No. 14 and 15.]

**Response:** Admitted.

299.     S & N Diamond never submitted a written notice of claim to Brinks in relation to the theft. [Redmond Decl., Ex 1-82 (S. Lavian Depo. (Vol. I)) at pp. 224:18-226:4; Beech Decl., ¶¶ 30 – 31.]

**Response:** Admitted.

300.     During the course of this litigation, S & N Diamond now claims the two lost parcels of jewelry are not actually worth the declared amount of $800,000, but are actually valued at $5,486,260. [Redmond Decl., Ex 1-82 (S. Lavian Depo. (Vol. I)) at pp. 213:3-16; Ex 1-41 (S & N Diamond's Responses to Brink's Interrogatories, Set One), No. 5).]

Disputed.  The $800,000 was the insurance value.  He had been told by Phil Schiotis after he joined Brink's that Brink's knew the value of his property is more than the insurance amount and if something happens Brink's will take care of it.  Otherwise admitted.  Redmond Decl., Ex 1-82 (S. Lavian Depo. (Vol. I)) at pp. 176:16-177:25; Shuman Decl., Ex.A-18, (S. Lavian Depo. (Vol.II) at pp. 70:25-71:14.

301.     However, S & N Diamond represented to the I.R.S., in its 2021 Form 1120-S U.S. Income Tax Return, that the value of its entire inventory was $███████ at the end of 2021. [Redmond Decl., Ex 1-46 (S&N Tax Return).]

467257

**Response:**  Admitted as historical cost.

302.    In this litigation, Mr. Lavian personally determined the value for each of S & N Diamond's lost items based on his experience in the jewelry business, which has allowed him to determine the fair market value of each item as being roughly 40% to 60% above S & N Diamond's costs. [Redmond Decl., Ex 1-82 (S. Lavian Depo. (Vol. I)) at pp. 217:3-218:22; Ex 1-84 (S. Lavian Depo, Ex. 15).]

> **Response:**  Admitted

### J.    Supreme Collection Corporation

303.    Defendant Supreme Collection Corp. ("Supreme Gems") is owned and operated by Lee Cheng Tek, who goes by "Kenny" Lee. [Redmond Decl. Ex. 1-87A (K. Lee Depo. Vol. II), pp. 9:10 – 9:25; 12:8 – 13:1].

> **Response:  Admitted.**

304.    Mr. Lee declared $400,000 as the value of his shipment on the July 10, 2022 Pickup Manifest, but he is now claiming that the value of his lost shipment is $13,027,037.00. [Beech Decl. Ex. A (K. Lee Pickup Manifest); Redmond Decl. Ex. 1-42 (Supreme Collection Corp.'s Responses to Brink's Second Requests for Admission, No. 10); Ex. 1-30 (Brink's Second Requests for Admission to Supreme Collection Corp., Exhibit 1); Ex. 1-87A (K. Lee Depo. Vol. II.), pp. 32: 3 – 32:20]; Ex. 1-20 (Supreme Collection Corp.'s Responses to Brink's First Discovery Requests, Interrogatory No. 5); Redmond Decl. Ex. 1-87 (Exhibit 08 to K. Lee Depo. Vol. I).]

> **Response:**  Disputed.  Mr. Lee set forth the desired insurance value on the July 10,
>
> 2022 Pickup Manifest.  Admitted that the value of his lost shipment is $13,027,037.00.
>
> based on full retail value.  Redmond Decl., Ex. 1-86 at pp. 48:6-49:12; Redmond Decl.,
>
> Ex. 1-87A at p. 31:3-20.

305.    Mr. Lee was born in Malaysia, but he has lived in California for more than 36 years. [Redmond Decl. Ex. 1-86 (K. Lee Depo. Vol. I), pp. 23:21 – 24:12.]\

**Response:**  Admitted.

306.    Just a few years after moving to Los Angeles, in 1992, Mr. Lee opened Supreme Gems, which he has operated ever since. [Redmond Decl. Ex. 1-86 (K. Lee Depo. Vol. I), pp. 24:1 – 25:19].

**Response:**  Admitted.

307.    In the many years that Mr. Lee has sold jewelry through Supreme Gems, he communicated with customers in English, including selling jewelry in a retail operating at South Hill Street in Los Angeles. [Redmond Decl. Ex. 1-86 (K. Lee Depo. Vol. I, pp. 25:17 – 25:19, 36:6 – 37:18); Redmond Decl. Ex. 1-20 (Supreme Collection Corp.'s Responses to First Discovery Requests, Interrogatory No. 4).]

   **Response:**  Admitted that Supreme Gems is a jewelry company that sells retail and
   wholesale at South Hill Street in Los Angeles. [Redmond Decl. Ex. 1-86 (K. Lee Depo.
   Vol. I, pp. 25:17 – 25:19, 36:22 – 37:18.  However, it is unclear as to what is meant by he
   communicated with customers in English.  The exhibits cited do not support this fact and
   Mr. Lee testified that he does not read English.  Shuman Decl. Ex. A-19 (K. Lee Depo.
   Vol. p. 224:1-10

308.    Not only did Mr. Lee speak to customers in English, Mr. Lee also sent various e-mails to Brink's in English and spoke with the press in English after the July 2022 theft. [Redmond Decl. Ex. 1-86 (K. Lee Depo. Vol. I, pp. 40:25 – 42:2, 97:12 – 97:20; 102:21 – 103:23)]. Mr. Lee also has a You Tube video where he touts his jewelry in perfect English. Redmond Decl. Ex. 1-87A (K. Lee Depo. Vol. II, pp. 11:6 – 15:21)].

Response:  Admit that Mr. Lee testified that he understands every day conversation, that he sent various e-mails to Brink's in English and spoke with the press in English after the July 2022 theft and has a You Tube video where he discusses his jewelry in English.

309.    In Mr. Lee's more than thirty years in the jewelry show business, he became intimately familiar with secured transport companies like Brink's, Dunbar, and Dunbar. [Redmond Decl. Ex. 1-86 (K. Lee Depo. Vol. I., pp. 196:23 – 197:3); Ex. 1-42 (Supreme Collection Corp.'s Responses to Brink's Second Requests for Admission, No. 35); Ex. 1-30 (Brink's Second Requests for Admission to Supreme Collection Corp., Exhibit 23).].

**Response:**  Disputed.  There is nothing in the evidence cited that shows that Mr. Lee became "intimately familiar with secured transport companies like Brink's Dunbar, and Dunbar."

310.    In fact, Supreme Collection transacted with Brink's and assented to the Contract at least 70 separate times before the July 10, 2022 theft. [Beech Decl., ¶ 17]; Redmond Decl., Ex. 1-86 (K. Lee Depo. Vol. I), pp. 45:5 – 12; Redmond Decl. Ex. 1-30 (Brink's Second Requests for Admission to Supreme Collection Corp., Exhibit 6); Redmond Decl. Ex. 1-42 (Supreme Collection Corp.'s Responses to Brink's Second Requests for Admission, No. 17).]

**Response:**  Admitted that Supreme Collection transacted with Brink's more than 50 times in the seven years before the July 10, 2022 theft.  Disputed that Supreme Collection assented to the Contract.  Mr. Lee could not read or understand the contract.   Redmond Decl., Ex. 1-86 (K. Lee. Depo. Vol. I), pp.  40:12-42:13; 44:3-7; 45:5-8.

311.    Every time that Supreme Gems shipped its goods with Brink's, it signed a Pickup Manifest, entered a declared value, and expressly stated that it was agreeing to the Brink's Contract. [Redmond Decl., Ex. 1-86 (K. Lee. Depo. Vol. I), pp. 45:5 – 12.]

**Response**:  Admitted that each time Supreme Gems shipped its goods with Brink's, it signed a Pickup Manifest which stated that it was agreeing to the Brink's Contract.  Disputed that

Supreme Gems intended to agree to those terms as Mr. Lee was unable to read not only the terms, but the statement that Supreme Gems was agreeing to them.  Redmond Decl., Ex. 1-86 (K. Lee Depo. Vol. I), pp.  40:12-42:13; 44:3-7; 45:5-8; Shuman Decl. Ex. A-19 (K. Lee Depo. Vol. p. 224:1-10

312.     Supreme Gems did the same when it shipped its goods with Dunbar and Loomis. [Redmond Decl., Ex. 1-86 (K. Lee Depo. Vol. I), pp. 196:11 – 203:10.]

**Response:**  Admit that the insurance value entered on the document, but dispute that the format was the same as Brinks.  The documents marked as Exhibit 17 state "Terms and Conditions on reverse side also apply."  [Redmond Decl., Ex. 1-86 (K. Lee Depo. Vol. I), pp. 196:11 – 197:20; 198:8-13; Shuman Decl. Ex. A-19  (Ex. 17 to K. Lee Depo. Vol. II).

313.     In addition to shipping with Brink's and other secured transport companies for many years, Supreme Gems had also – like many other Defendants – received a multitude of e-mails from Brink's employees that included an e-mail signature stating: "**All services subject to the terms and conditions of the Brink's Global Services Valuables Transport Contract.**" The hyperlink in the e-mails directed Supreme Gems to the large-font version of the Brink's Contract that is available on Brink's website (http://www.brinksglobal.com/terms_of_use/transport_contract.aspx). [Redmond Dec., Ex. 1-42 (Supreme Collection Corp.'s Responses to Requests for Admission, Set Two, Nos. 12, 13, 14, 15, 16, 23, 25, and 26); Redmond Decl., Ex. 1-30, (Brink's Global Services USA, Inc.'s Second Requests for Admission to Supreme Collection Corp., Exhibits 3, 4, 5, 11, 13, and 14).]

**Response:** Admitted Supreme Gems had shipped with Brink's and other secured transport companies prior to the theft and that Supreme Gems received multiple e-mails containing the hyperlink referred to, but below the signature and in smaller letters than

the rest of the e-mail, so calculated not to be noticed.  Shuman Decl. Exs.25 and 26

(Exs. 9 and 10 to K. Lee Depo. Vol. II).

314.     Additionally, as a member of JIMA, Supreme Gems received rate sheets from

NCAJA/JIMA prior to July 10, 2022, each providing that the rates were explicitly, "subject to the

Brink's global services Terms and Conditions." Redmond Dec., Ex. 1-42 (Supreme Collection

Corp.'s Responses to Requests for Admission, Set Two, No. 12); Ex. 1-30, (Brink's Global Services

USA, Inc.'s Second Requests for Admission to Supreme Collection Corp., Exhibit 3); Ex. 1-87B (K.

Lee Depo. Vol. II, Exhibit 6).

> **Response:** Disputed.  Evidence cited contains only one rate sheet for 2022.  Admitted that
>
> the quoted language is on it, but again in very small print calculated to obscure rather than
>
> highlight the language.  Redmond Dec., Ex. 1-87B (K. Lee Depo. Vol. II, Exhibit 6).

315.     Supreme Gems not only contracted with Brink's for secured transport between

jewelry shows, it also contracted with Brink's to store its goods during the COVID-19 pandemic.

Redmond Decl., Ex. 1-86 (K. Lee Depo. Vol. I), pp. 188:18 – 190:14, 193:25 – 196:6; Ex. 1-42

(Supreme Collection Corp.'s Responses to Requests for Admission, Set Two, No. 20); Ex. 1-30

(Brink's Global Services USA, Inc.'s Second Requests for Admission to Supreme Collection Corp.,

Exhibit 8).

> **Response:  Admit.**

316.     Like the Brink's Contract, the Storage Agreement limited Brink's liability in the

event of a loss and required Supreme Gems to select a declared value prior to signing. Redmond

Decl., Ex. 1-42 (Supreme Collection Corp.'s Responses to Requests for Admission, Set Two, No.

20); Redmond Decl., Ex. 1-30 (Brink's Global Services USA, Inc.'s Second Requests for

Admission to Supreme Collection Corp., Exhibit 8).

**Response:**  Admitted that the Storage Agreement limited Brink's liability in the event of a loss and required Supreme Gens to select a declared value prior to signing.  Disputed that this was like the Brink's Contract because the Pickup Manifest called for Carriage Value, a term not used in the Brink's Contract, and one explained by Brinks as insurance value. Shuman Decl., Ex. A-19  (K. Lee Depo. Vol. I pp. 40:12-41:2; 48:6-49:22; 51:15-52:1.

317.    In his more than thirty years in the jewelry show business, not once did Mr. Lee read the Brink's Contract, or even the Dunbar or Loomis contracts, before shipping his goods with those companies. Redmond Decl. Ex. 1-86 (K. Lee Depo. Vol. I), pp. 201:3 – 202:7, 205:1 – 205:20, 210:8 – 210:17.

**Response:  Admitted that in the testimony cited, Mr. Lee did not read the reverse side of the packing slips and invoices.  However, Mr. Lee testified that no one told hm to read what was on the back.  Mr. Lee testified that he could not read English. Disputed that the evidence presented supports that statement "**in his more than thirty years in the jewelry show business, not once did Mr. Lee read the Brink's Contract, or even the Dunbar or Loomis contracts, before shipping his goods with those companies.**"** Redmond Decl. Ex. 1-86 (K. Lee Depo. Vol. I), pp. 40:12-42:13; 44:3-7; 45:5-8; 201:3 – 202:7, 205:1 – 205:20, 210:8 – 210:17; Shuman Decl. Ex. A-19 (K. Lee Depo. Vol. I, p. 224:1-10.

318.    The day of the theft, Mr. Lee signed the Pickup Manifest on behalf of Supreme Gems, assenting once more to the Brink's Contract. Beech Decl. Ex. A; Redmond Decl., Ex. 142 (Supreme Collection Corp.'s Responses to Requests for Admission, Set Two, No. 10, 17); Ex. 1-30, (Brink's Global Services USA, Inc.'s Second Requests for Admission to Supreme Collection Corp., Exhibits 1, 7).

**Response:**  Admitted that Mr. Lee signed the Pickup Manifest for the subject shipment on behalf of Supreme Gems.  Disputed that Supreme Gems assented to the Contract.  Mr.

Lee could not read or understand the contract.   Redmond Decl., Ex. 1-86 (K. Lee. Depo. Vol. I), pp.  40:12-42:13; 44:3-7; 45:5-8.

319.    For the July 10, 2022 shipment, Mr. Lee declared the total value of Supreme Gems' shipment as $400,000; $200,000 each for two parcels. Beech Decl. Ex. A (Supreme Gems Pickup Manifest); Redmond Decl., Ex. 1-42 (Supreme Collection Corp.'s Responses to Requests for Admission, Set Two, No. 10, 17); Ex. 1-30, (Brink's Global Services USA, Inc.'s Second Requests for Admission to Supreme Collection Corp., Exhibits 1, 7); Ex. 1-86, (K. Lee Depo. Vol. I, pp. 48:6 – 49:9).

> **Response:**  Disputed.  Supreme Gems bought insurance in the amount of $400,000 from Brinks; it did not declare that to be the value of its shipment.  Shuman Decl., Ex. A-19  (K. Lee Depo. Vol. I pp. 40:12-41:2; 48:6-49:22; 51:15-52:1.

320.    Mr. Lee trusted Brink's and had "gotten used to" declaring $400,000 for his property, knowing that selecting a higher amount would make the cost of shipping higher. [Redmond Decl. Ex. 1-86 (K. Lee Depo. Vol. I), pp. 205:13 – 24.

> **Response:**  Admitted that Mr. Lee trusted Brink's and that if he insured for a higher amount, the cost would be really high.  [Redmond Decl. Ex. 1-86 (K. Lee Depo. Vol. I), pp. 205:13 – 24; .  He heard  from Rick Johnson at Brinks many years ago to understate the value.  He was assured company was very safe.  Shuman Decl., Ex. A-19  (K. Lee Depo. Vol. I pp. 225:7-227:8.

321.    Mr. Lee explained this to the Los Angeles Times in August 2022, just after the July 2022 theft: "We never thought to insure [our property] for more because it was so costly, so expensive." Redmond Decl. Ex 1-87 (K. Lee Depo. Vol. I, Exhibit 13); Redmond Decl. Ex 1-86 (K. Lee Depo. Vol. I.), pp. 95:23-97:11; 117:3-123:7.

467257

**Response:** Admitted.

322.    In Mr. Lee's early years in the jewelry show business, he did not always ship his goods via a secured transport service like Brink's, Dunbar, or Loomis. Redmond Decl. Ex. 1-86 (K. Lee Depo. Vol. I, pp. 131:24 – 132:8. As a result, his goods were stolen from shows on multiple occasions, including a strong-arm robbery in 1996. Redmond Decl. Ex. 1-86 (K. Lee Depo. Vol. I, pp. 131:24 – 132:8). After those thefts, Mr. Lee purchased insurance. [Redmond Decl. Ex. 1-86 (K. Lee Depo. Vol. I), pp. 132:6 – 8; Ex. 1-87 (K. Lee Vol. I Depo. Exhibit 15).]

>   **Response:** Admitted that Mr. Lee testified that From '96 to July 11 he experienced 2 thefts during the shows and that he purchased insurance.  Disputed that the testimony states this was as a result of not shipping his goods via a secured transport service like Brink's, Dunbar, or Loomis.  His testimony states that the robbery occurred coming home from his office in 1996.   Redmond Decl. Ex. 1-86 (K. Lee Depo. Vol. I, pp. 123:8-23; 131:24 – 132:8.

323.    After the 1996 robbery, Supreme Gems purchased a Jeweler's Block insurance policy to protect its inventory of jewelry. [Redmond Decl. Ex. 1-86, (K. Lee Depo. Vol. I, pp. 133:22 – 137:22.]

>   **Response:** Admitted.

324.    The Jeweler's Block policy in effect for the July 11, 2022 loss was offered by XL Specialty Insurance Company, and had a $5,000,000 coverage limit for goods in transit. Redmond Decl. Ex. 1-30 (Brink's Second Requests for Admission to Supreme Collection Corp., Exhibit 15); Ex. 1-42 (Supreme Collection Corp. Responses to Brink's Second Requests for Admission, No, 27).

>   **Response:** Admitted.

114

467257

325.   When he submitted a claim, Mr. Lee stated that his total loss and damage was $5,000,000 on the Sworn Statement in Proof of Loss. [Redmond Decl. Ex. 1-86, (K. Lee Depo. Vol. I), pp. 154:6 – 154:23.]

**Response:**  Admitted.

326.   Mr. Lee filed a claim with his insurer after the July 2022 loss, and he received a $5,000,000 payment on that claim before he was even deposed in this action in January 2023. [Redmond Decl. Ex. 1-86 (K. Lee Depo. Vol. I), pp. 155:14 – 161:6.].

**Response:**  Admitted.

327.   Mr. Lee used the insurance funds to build a second home, pay off loans, and pay off his mortgage, among other things. [Redmond Decl. Ex. 1-86 (K. Lee Depo. Vol. I), pp. 155:14 – 161:6.]

**Response: Admitted, but Mr. Lee did not testify that he had paid off his mortgage.**

[Redmond Decl. Ex. 1-86 (K. Lee Depo. Vol. I), pp. 158:22-159:11.]

328.   Meanwhile, he used only a "little bit" of the payment to purchase replacement inventory for Supreme Gems. [Redmond Decl. Ex. 1-86__ (K. Lee Depo. Vol. I_, pp. 155:14 – 157:3.]

**Response:  Admitted, but Mr. Lee testified that he can't engage in the jewelry business anymore.**  [Redmond Decl. Ex. 1-86 (K. Lee Depo. Vol. I), pp. 159:1-8.]

329.   In this litigation, Mr. Lee now claims the value of his lost property is more than $13,000,000. [Redmond Decl. Ex. 1-86 (K. Lee Depo. Vol. I), pp. 174:22 – 176:5; Ex. 1-87A, (K. Lee Depo. Vol. II), pp. 45:5 – 45:8; Ex. 1-20 (Supreme Collection Corp.'s Responses to Brink's First Discovery Requests, Interrogatory No. 5).]

**Response:**  Admitted that Mr. Lee claims his loss was $13,000,000 market value.

[Redmond Decl. Ex. 1-86 (K. Lee Depo. Vol. I), pp. 174:18-75:3.

115

330.    In its 2021 Year End Tax Form, however, Supreme Gems noted that the value of its *total assets* was only $⬛⬛⬛⬛⬛⬛, far less than Mr. Lee already recovered from his insurance. [Redmond Decl. Ex. 1-87A (K. Lee Depo. Vol. II Exhibit 4).]

**Response:**  Admitted that the inventory value on the end of year 2021 tax return, at historical cost, was $2,755,914.00.  [Redmond Decl. Ex. 1-87A, (K. Lee Depo. Vol. II), pp. 33:23-34:19]

331.    In this litigation, Mr. Lee arrived at his new $13,000,000 calculation by multiplying his believed cost for the jewelry by a factor of four or four and a half times, to reach what he believes to be the fair market value of the items. [Redmond Decl. Ex. 1-86 (K. Lee Depo. Vol. I), pp. 173:9 – 173:25, 186:17 – 186:17.]

**Response:  Admitted.**

### K.      Defendant Treasure Connection Fine Jewelry, Inc.

332.    Defendant Treasure Connection Fine Jewelry, Inc. ("Treasure Connection") is owned and operated by Mr. Joseph Chang and his wife Theresa Chang. Redmond Decl., Ex 1-88 (J. Chang Depo. (Vol. I)) at pp. 11:4-12:14; Ex 1-89 (J. Chang Depo, Ex. 17).

**Response:**    Admitted.

333.    Mr. Chang declared $400,000 as the value of Treasure Connection's shipment on the July 10, 2022 Pickup Manifest, but he is now claiming that the value of his lost shipment is actually worth $2,187,624. Redmond Decl., Ex 1-90 (J. Chang Depo. (Vol. II)) at pp. 191:13-193:15; 375:5-377:2; Ex 1-32 (Treasure Connection's Responses to Brink's Interrogatories, Set One), No. 5.

**Response:**  Disputed. Mr. Chang set forth the desired insurance value on the July 10, 2022 Pickup Manifest.  Admitted that the value of his lost shipment is $2,187,624. Redmond Decl., Ex 1-90 (J. Chang Depo. (Vol. II)) at pp. 191:13193:15; 202:14-16; 206:15-23;

375:5-377:2; Ex 1-32 (Treasure Connection's Responses to Brink's Interrogatories, Set One), No. 5); Shuman Decl., Ex. A-24 (J. Chang Depo. (Vol. II) at 244:9-13).

334.    While Mr. Chang was born in Taiwan, he moved to San Francisco, California in 1981 at the age of 22. Redmond Decl., Ex 1-90 (J. Chang Depo.(Vol. II)) at pp. 278:6-13.

**Response:**  Admitted.

335.    Mr. Chang has been in the jewelry trade show business since 1986 when he first worked for House of Jade and participated in trade shows such as InterGem. Redmond Decl., Ex 1-90 (J. Chang Depo. (Vol. II)) at pp. 283:2-284:1.

**Response**:    Admitted

336.    Like the other Defendants' owners, Mr. Chang is a member of both NCAJA and JIMA. Redmond Decl., Ex 1-90 (J. Chang Depo. (Vol. II)) at pp. 285:1-286:22; 287:4-289:11.

**Response:**  Disputed.  The testimony is that he was in JIMA in the beginning, and he moved to NCAJ.  Redmond Decl., Ex 1-90 (J. Chang Depo. (Vol. II)) at p. 285:15-17.

337.    In fact, Mr. Chang was NCAJA's Treasurer and, in that role, regularly negotiated the NCAJA's annual rates with the various shippers over the years including Loomis and Malca-Amit. Redmond Decl., Ex 1-88 (J. Chang Depo. (Vol. I)) at pp. 74:15-81:21.

**Response:**  Disputed.  Mr. Chang was secretary of NCAJA when he negotiated the rate sheet with Brink's on behalf of NCAJA. He was V.P. when he signed the Brink's Global Services Valuables Transport Contract on behalf of Treasure Connection on May 1, 2019. Admit that he negotiated the NCAJA's annual rate with the shippers.  Redmond Decl., Ex 1-88 (J. Chang Depo. (Vol. I)) at pp. 76:21-25; 128:6-14; Ex 1-89 (J. Chang Depo, Ex. 8).

338.    Mr. Chang, as Treasurer of NCAJA, signed the Brink's Global Services Valuables Transport Contract on behalf of Treasure Connection on May 1, 2019 by initialing all 10 pages of

the agreement. Redmond Decl., Ex 1-88 (J. Chang Depo.(Vol. I)) at pp. 74:23-78:19; Ex 1-89 (J. Chang Depo, Ex. 8).

> **Response:** Disputed.  Mr. Chang was V.P.  Admit that he signed the Brink's Global Services Valuables Transport Contract on May 1, 2019.  Redmond Decl., Ex 1-88 (J. Chang Depo. (Vol. I)) at pp. 74:23-78:19; Ex 1-89 (J. Chang Depo, Ex. 8).

339.    Treasure Connection has shipped jewelry with Malca-Amit, Loomis, and Brink's prior to Brink's taking over the secured shipping at trade shows from Loomis in 2019. Redmond Decl., Ex 1-88 (J. Chang Depo. (Vol. I)) at pp. 74:15-81:21; Ex 1-89 (J. Chang Depo, Ex. 9).

> **Response:** Admitted.

340.    In 2007, Mr. Chang's wife, Theresa Chang, received a felony conviction for Making a False Statement to federal officials in relation to her transporting powdered nickel into Taipei without an export license. Redmond Decl., Ex 1-88 (J. Chang Depo. (Vol. I)) at pp. 26:2-30:19; Ex 1-89 (J. Chang Depo, Ex. 5).

> **Response:** Admit.  However, in the USA's sentencing Memorandum it is noted that "otherwise [Ms. Chang] lived an upstanding and productive life since emigrating to this country"  and that "she admitted her lie when next interviewed."  Redmond Decl., Ex 1-89 (J. Chang Depo, Ex. 5 at BRINKS_0020761..

341.    Theresa Chang has also owned Huei Enterprises since 2014. Redmond Decl., Ex 1-90 (J. Chang Depo. (Vol. II)) at pp. 385:19-389:4.

> **Response:** Admitted.

342.    Huei Enterprises purchases a large number of booths at large jewelry trade shows and then resells them to other vendors for a profit. Redmond Decl., Ex 1-90 (J. Chang Depo. (Vol. II)) at pp. 385:19-389:4.

**Response:**  Admit.  However, to clarify the testimony is two trade shows, the ASD show and the JA shows.  Redmond Decl., Ex 1-90 (J. Chang Depo. (Vol. II)) at p. 388:21-24.

343.    Huei Enterprises' customers enter into a contract. Like the Brink's Contract, the Huei Enterprises contract terms and conditions are found on a page different from the signature page and printed in 8-point font. Redmond Decl., Ex 1-102 (Huei Form Blank Treasure_001468).

**Response**:  Disputed.  The document attached as Ex. 1-102 is for Hawaii Market Expo 2022 and no mention of Huei Enterprises. Redmond Decl., Ex 1-102 (Huei Form Blank Treasure_001468).

344.    Since 2018, Treasure Connection Fine Jewelry, Inc. has used Brink's to transport its jewelry on 30 prior occasions across Texas, Kentucky, Louisiana, California, Maryland, Nevada, Pennsylvania, Virginia, Michigan, Hawaii, and New York. Beech Decl., ¶ 17.]

**Response:**  Disputed.  The chart at paragraph 17 of the Beech Declaration states since 2012 not 2018.  Beech Decl., ¶ 17.]

345.    Each time Treasure Connection shipped its goods with Brink's, it signed a Pickup Manifest and expressly stated that it was agreeing to the Brink's Contract. Redmond Decl., Ex 190 (J. Chang Depo. (Vol. II)) at pp. 198:11-212:3; Ex 1-89 (J. Chang Depo, Ex. 12).

**Response:**    Admitted that each time Treasure Connection shipped its goods with Brink's, it signed a Pickup Manifest which stated that it was agreeing to the Brink's Contract. Disputed that Treasure Connection intended to agree to those terms as is that Mr. Chang did not understand, the print was very small and didn't see the statement that Treasure Connection was agreeing to the terms as it was at the very bottom.  Redmond Decl., Ex 190 (J. Chang Depo. (Vol. II)) at pp. 183:8-13; 185:10-13; 188:18-23; 189:7-14; 200:8-21.

467257

346.    Besides having previously received and assented to Brink's Contract on at least 30 prior occasions prior to the July 10, 2022 shipment, Mr. Chang also received multiple emails from a Brink's employee that included an email signature that stated: "**All services subject to the terms and conditions of the** Brink's Global Services Valuables Transport Contract." The hyperlink in the emails directed Treasure Connection to the large-font version of the Brink's Contract that is available on  Brink's website (http://www.brinksglobal.com/terms_of_use/transport_contract.aspx).  Redmond Decl., Ex 1-89 (J. Chang Depo, Ex. 11).

> **Response:**  Disputed that Mr. Chang assented to Brink's Contract.  Mr. Chang never saw
> the back of the manifest prior to the day of the deposition and he could not read it as the
> print was very small and didn't look like language, but looked like a pattern.  He didn't see
> the statement that Treasure Connection was agreeing to the terms as it was at the very
> bottom.  Disputed that Exhibit 11 to Mr. Chang's deposition contains the language
> referenced and a hyperlink.  Admitted that Mr. Chang received multiple e-mails containing
> the hyperlink referred to, but below the signature and in smaller letters than the rest of the
> e-mail, so calculated not to be noticed.  Shuman Decl., Ex A-24 (J. Chang Depo, Ex. 21);
> Shuman Decl., Ex A-24 (J. Chang Depo., Vol. II, 188:14-23 234:3-237:15)..

347.    As for the subject shipment on July 10, 2022, Mr. Chang signed the Pickup Manifest on behalf of Treasure Connection and assented to Brink's Contract. [Redmond Decl., Ex 1-89 (J. Chang Depo, Ex. 11).]

> **Response:**  Admitted that Mr. Chang signed the July 10, 2022 Pickup Manifest on behalf of
> Treasure Connection.  Disputed that he assented to Brink's Contract, as he never saw it and
> he could not read it as the print was very small and didn't look like language, but looked
> like a pattern.  He didn't see the statement that Treasure Connection was agreeing to the

terms as it was at the very bottom.  Shuman Decl., Ex. A-24 (J. Chang Depo., Vol. II,

188:14-23 234:3-237:15).

348.    In addition to the July 10, 2022 Pickup Manifest, on January 6, 2022, Mr. Chang

negotiated and executed a Brink's contract which provided a special rate for secured delivery of

items to InterGem in San Mateo on behalf of NCAJA members. Redmond Decl., Ex 1-88 (J. Chang

Depo. (Vol. I)) at 118:2-119:14; Ex 1-89 (J. Chang Depo, Ex. 10).

> **Response:**  Disputed that Mr. Chang negotiated the July 10, 2022 Pickup Manifest.
>
> Disputed that Mr. Chang negotiated a Brink's contract on January 6, 2022.  Admit that Mr.
>
> Chang negotiated and signed a rate sheet. Redmond Decl., Ex 1-88 (J. Chang Depo. (Vol.
>
> I)) at 119:18-120:9; Ex 1-89 (J. Chang Depo, Ex. 10).

349.    Mr. Chang sent the special rate agreement to Brink's employee Gloria Corrales

after reviewing and signing the contract. Redmond Decl., Ex 1-88 (J. Chang Depo. (Vol. I)) at

118:2-119:14; Ex 1-89 (J. Chang Depo, Ex. 10).

> **Response:**  Disputed.  Mr. Chang sent the rate sheet not a contract to Brink's employee
>
> Gloria Corrales.  Redmond Decl., Ex 1-88 (J. Chang Depo. (Vol. I)) at 119:18-120:9; Ex
>
> 1-89 (J. Chang Depo, Ex. 10).

350.    For the July 10, 2022 shipment, Mr. Chang declared the value of Treasure

Connections' shipment as $400,000 ($200,000 each for two bags). Redmond Decl., Ex 1-89 (J.

Chang Depo, Ex. 11).

> **Response:**  Disputed. The insurance amount stated on the Treasure Connections was
>
> $400,000 ($200,000 each for two bags).  Shuman Decl., Ex. A-24 (J. Change Depo. (Vol.
>
> II) at 244:9-13: 245:16-24).

351.     Mr. Chang has designated $400,000 of declared value on behalf of Treasure Connection Fine Jewelry, Inc on numerous prior occasions. Redmond Decl., Ex 1-88 (J. Chang Depo. (Vol. I)) at 191:13-193:14.

**Response:  Disputed.  Mr. Chang arranged for an insurance value of $400,000 on behalf of Treasure Connection on prior occasions.**  Redmond Decl., Ex 1-88 (J. Chang Depo. (Vol. I)) at 191:13-193:15.

352.     Most notably, Treasure Connection declared $400,000 for a Brink's shipment from Loomis hub in Louisville, Kentucky to the Helen Brett show in New Orleans, Louisiana just eight weeks after the July 2022 theft. Redmond Decl., Ex 1-88 (J. Chang Depo. (Vol. I)) at 191:13-193:14.

**Response:  Disputed.  The shipment referenced in Bates number 6289 of Exhibit 12 to Mr. Chang's deposition is a shipment of goods from the Loomis hub in Louisville to the Helen Brett show in New Orleans on May 6, 2019.** Redmond Decl., Ex 1-88 (J. Chang Depo. (Vol. I)) at 191:13-193:14; Redmond Decl., Ex 1-89 (J. Chang Depo, Ex. 12, Bates No. 6289 )..

353.     After the theft, Brink's employee Gloria Corrales sent an email to Mr. Chang on July 12, 2022 requesting information about Treasure Connection's loss. Redmond Decl., Ex 1-90 (J. Chang Depo. (Vol. II)) at 368:17-369:25; Ex 1-89 (J. Chang Depo, Ex. 25).

**Response:**   Admitted.

354.     Ms. Corrales sent a second email on July 22, 2022 requesting a written claims form on behalf of Treasure Connection. Redmond Decl., Ex 1-90 (J. Chang Depo. (Vol. II)) at 368:17-369:25; Ex 1-89 (J. Chang Depo, Ex. 25).

**Response:**   Admitted

467257

355.    Treasure Connection never filled out or submitted a Notice of Claim to Brink's. Redmond Decl., Ex 1-90 (J. Chang Depo. (Vol. II)) at 368:17-369:25; Ex 1-89 (J. Chang Depo, Ex. 25).

**Response:  Admitted.**

356.    During this litigation, Treasure Connection has now claimed that its two lost parcels are actually valued at $2,187,624, instead of the previously declared $400,000. [Redmond Decl., Ex 1-90 (J. Chang Depo. (Vol. II)) at 375:5-377:2.

**Response:**  Admitted that the market value Treasure Connections claims is $2,187,624. Disputed that Mr. Chang previously declared a value of $400,000.  The manifest reflects the insurance value.  Shuman Decl., Ex. A-24 (J. Chang Depo. (Vol. II) at 244:9-13; 245:16-24).

357.    However, despite this new valuation, Treasure Connection represented to the I.R.S. in its 2020 Form 1120-S U.S. Income Tax Return, that the total value of all of its inventory at the end of 2020 was $▮▮▮▮▮▮▮▮.  Redmond Decl., Ex 1-47 (Treasure Connection Tax Return – Highly Confidential).

**Response:**    Admitted as tot the amount in its 2020 Form 1120-S U.S. Income Tax Return. Disputed that this is a new valuation because on the manifest is the insurance value. Shuman Decl., Ex. A-24 (J. Chang Depo. (Vol. II) at 244:9-13; 245:16-24).

358.    In this litigation, Mr. Chang claims that his general experience in the jewelry industry is the basis for multiplying the cost of each item by either 1.5 or 1.6 to determine the fair market value of Treasure Connection's lost items. Redmond Decl., Ex 1-90 (J. Chang Depo. (Vol. II)) at 377:9-379:18.

**Response:  Admitted**

359.     Treasure Connection's costs for each item of lost jewelry are not present in the company's inventory spreadsheets. Redmond Decl., Ex 1-90 (J. Chang Depo. (Vol. II)) at 377:9-379:18; Ex 1-89 (J. Chang Depo, Ex. 26).

**Response:**  Admitted.  However, the actual cost Mr. Chang paid is in the attached invoices. Redmond Decl., Ex 1-90 (J. Chang Depo. (Vol. II)) at 378:25-379:8.)  Exhibit 26 to the Chang Depo is not attached to Ex 1-89 of the Redmond Decl.)

## VIII.   DEFENDANTS' LATER-FILED PARALLEL LAWSUIT IN CALIFORNIA

360.     On August 22, 2022, after Brink's had already filed this lawsuit before this Court, Defendants filed a later-filed parallel lawsuit in California state court, styled *Chang, et al. v. Brink's Global Services USA, Inc., et al.* (Los Angeles Superior Court, Case No. 22STCV27209) before Judge Thomas Long. Redmond Decl., Ex 1-103 (Defendants' California Complaint); Ex 1-105 (Docket for California Case).

**Response:**   Admitted.

361.     In the California action, on September 7, 2023, the court granted a stay as to Brink's pending resolution of this case, based on the parties' New York forum selection clause. [Redmond Decl., Ex 1-103 (Judge Long's September 7, 2023 Order).]

**Response:**  Admitted.

362.  Following full briefing from the parties and oral argument, Judge Long found that the Brink's Contract was enforceable, that the Contract was not unconscionable, and that "this action against Brink's should proceed in New York." Redmond Decl., Ex 1-103 (Judge Long's September 7, 2023 Order).

**Response:**  Disputed. Judge Long didn't find that the Brink's Contract was unenforceable. Further, Judge Long didn't find that the Contract was not unconscionable.  Judge Long ruled that "Plaintiffs have shown some procedural unconscionability but no substantive

unconscionability, the Contract and its forum selection clause should not be invalidated due to unconscionability." Redmond Decl., Ex 1-103 (Judge Long's September 7, 2023 Order) Arguably, when determining a showing of unconscionability, the Court was solely considering the forum selection clause. At the hearing, the Courts stated that it did not disagree that a number of sections of the contract appear to be substantively unconscionable, other than the forum selection clause, but specifically asked about unconscionability of the forum selection clause. The Court compared the forum selection clause to an arbitration clause which can be severed "and that would be what would be enforced." Shuman Decl., Ex. A-25, at 50:7-51:3.

363. On June 26, 2023, the jewelers dismissed with prejudice their claims against Brink's driver James Beaty, without any payment. Redmond Decl., Ex 1-103 (June 26, 2023 Dismissal).

**Response:** Admitted that on June 26, 2023, the jewelers dismissed with prejudice their claims against Brink's driver James Beaty; however, the reason for the dismissal is that the Plaintiffs in the California state court case didn't want Beatty's bankruptcy to stay the case and Beatty was asleep at the time of the theft.

364. As for the other remaining parties, including Brink's employee Gloria Corrales, Brink's driver Tandy Motley, and Pilot Travel Center, Judge Long has sustained demurrers as to the allegations against each party, and the jewelers recently served their Fourth Amended Complaint, which is their fifth attempt to plead viable allegations. The case remains stayed as to Brink's. Redmond Decl., Ex 1-103 (Judge Long's September 7, 2023 Order); Ex 1-103 (Defendants' Fourth Amended Complaint in California Case).

**Response:** Disputed that the Court has sustained a demurrer as to Brink's driver Tandy Motley. Admitted that the Court has sustained Demurrers with leave to amend as to Gloria

Corrales and Pilot Travel Center.  Admitted that Plaintiff has filed a Fourth Amended

Complaint.

365.   In December 2022, Brink's offered to pay each Defendant in this action the Declared Value

of their lost shipments, none of the Defendants accepted these offers. See Redmond Decl., Exs. 1-

91, 1-92, 1-93, 1-94, 1-95, 1-96, 1-97, 1-98, 1-99, 1-100, 1-101 (Offers of Judgment to

Defendants).

**Response:**  Admit that Brink's offer to pay checked as the carriage value on the pickup

manifests.

## DEFENDANTS' ADDITIONAL FACTS

366.   Brink's Show Specialist Gloria Corrales admitted that she told Frank Petri to put down his insurance

value.  Shuman Decl., Ex. A-17 (Corrales Depo) at pp.123:24-124:6; 124:22-125:14.

367.   Jean Malki of Forty-Seventh & Fifth told Corrales more than once that he had individual pieces

worth more than the $100,000 insurance value included in the base rate, and she told him, "It's just

insurance."  Shuman Decl., Ex. A-8 (Malki Depo.) at pp. 213:19-214:10; 217:20-218:10; 218:22-219:21;

220:1-221:2; 221:9-10; 222:2-14; 322:6-20; 358:8-21; 387:13-388:6; 389:4-19; 392:23-393:14.

368.   Malki's employees also used "insurance value" in e-mails to Brink's, and never were told they

needed to provide actual value.  Shuman Decl., Ex. A-8 (Malki Depo.) at pp. 147:11-19; 148:14-20;

149:6-24; 188:2-14; 188:20-190:20; 194:5-20; 217:20-218:10; 218:22-219:23; 220:14-221:2;

222:2-14; 281:4-10; 322:6-20; 358:8-25; 393:24 – 398:8; Redmond Decl., Ex. 1-22, Exs. 7 and 10.

369.   Leona Wong of Lam's Jade likewise e-mailed using the term "insurance value" and was never told

she had to provide actual value.  Her manifests also came pre-printed. Shuman Decl., Ex. A-15 (Wong

Depo.) at pp. pp. 53:5-54:17, 73:15-25, 74:9-25, 77:6-11, 79:12-80:1, 82:15-84:4, 118:20-119:5,

147:23-148:16. 158:14-25 and Ex. A-16.

467257

370.     Corrales told Kim Sater of Kimmimoto to lower his "insurance value" to save costs, so he did. Shuman Decl., Ex. A-13 (Sater Depo.) at pp. 41:19 – 44:2; 45:10 – 46:1; 209:14-25; 210:9-211:1; 211:17 – 212:9; 253:2-7.

371.     Phil Schiotis and Rick Johnson told Shahram Lavian of S&N Jewelers that Brink's operated the same way as Dunbar after having told Lavian while they were at Dunbar to just fill in the amount of insurance he wanted, his goods would still be protected, and he would get full value in the event of a loss. Shuman Decl., Ex. A-18 (Lavian Depo.) at pp. 228:6-231:5.

372.     Rick Johnson, while at Brink's, told Kenny Lee of Supreme Gems to reduce his insurance value because Brinks had really good guards who would watch his goods round the clock when the goods were in Brinks' possession.   Shuman Decl., Ex. A-19 (Kenny Lee Depo.) at pp. 225;23-227:11.

373.     Brink's told Ming Cheng of Bonita Pearl, Joseph Chang of Treasure Connection, and Tony Lee of Lee's International to write their insurance value, and even gave Lee's a pre-printed manifest. Shuman Decl., Ex. A-7 (Ming Cheng Depo.) at p. 131:1-23; Shuman Decl., Ex. A-20 (Tony Lee Depo.) at pp. 98:21-100:25; Shuman Decl., Ex. A-22 (Chang Depo.) at pp. 190:3-8; 198:16-19.

374.     Sammy Leung of Hawaiian Designs told Nelson Rosario of Brink's to put down a figure for "insurance value" and Rosario never told him actual value was required.  Shuman Decl., Ex. A-12 (Leung Depo.) at pp. 147:1-14.

375.     Brink's typed in the value for Victor Wu of Pan Lovely Jewelers and Corrales would just ask if he wanted the same "insurance value".    Shuman Decl., Ex. A-21 (Wu Depo.) at pp. 147:1-14.

376.     Neither Corrales nor Rosario never explained to Defendants that Brink's considered insurance value to be the same as Declared Value or actual value under the Contract.  Shuman Decl., Ex. A-17 (Corrales Depo.) at pp. 48:12-21; 77:2-23. Shuman Decl. Ex. A-22 (Rosario Depo.) at pp. 156:15-18; 305:16-20.

377.     Nobody at Brink's ever explained to the Defendants that the "insurance value" was the limit of any recovery from Brink's in the event their goods were stolen because of Brink's negligence.  Paragraph 1 in Declarations of Ming Cheng, Jean Malki, Sammy Leung, Kim Sater, Paul Wong, Tony Lee, Victor Wu,, Frank Petri, Shahram Lavian, Kenny Lee, and Joseph Chang.

378.    Brinks possessed superior knowledge about its own security procedures, or lack of them, and about the fact that it was not using armored vehicles when its website and office photos depicted almost exclusively armored vehicles.  Shuman Decl., Ex. A-26.

379.    Brink's has continued carrying the jewelers' merchandise knowing the jewelers were declaring less than the actual value of the merchandise, which Brink's claims violated its Contract.  Shuman Decl., Ex. A-9 (Malki Depo) at pp. pp. 213:19-214:10; 217:20-218:10; 218:22-219:21; 220:1-221:2; 221:9-10; 222:2-14; 322:6-20; 358:8-21; 387:13-388:6; 389:4-19; 392:23-393:14.  Shuman Decl Ex. A-12 (Leung Depo) at pp. 147:1-14.  Shuman Decl. Ex. A-27 (Bruce Woerner Depo) at pp. 78-92.

380.    Brink's invoices show the Carriage Value as "Ins. Value".  Redmond Decl. Exs. 1-21 pp. 13-14 (Bates BRINKS 631-632) and p. 295, 301, 312, 326, 354, 365 (Bonita Pearl invoices); 1-71, Ex. 17, doc 5488, 5495, 5531 (Forty-Seventh & Fifth invoices); 1-73, pp.9-10 (5207-5208), 29-30 (5227-5228), 38-39 (5236-5237), 60 (5258) (Hawaiian Design invoices); 1-24 (Brink's Request for Admissions to Kimmimoto, Set Two, Ex. 16), pp. 164-165 (2019), 256, 262-263, 274-275, as a sampling.

381.    Every Defendant thought the Carriage Value blank was supposed to be filled in with the insurance value desired, not any measure of actual value.   Paragraph 1 in Declarations of Ming Cheng, Jean Malki, Sammy Leung, Kim Sater, Paul Wong, Tony Lee, Victor Wu,, Frank Petri, Shahram Lavian, Kenny Lee, and Joseph Chang.

382.    Brink's own Trade Show Manager, Tiffany Sobers, testified that Brink's sells insurance to customers and includes it in the rate charged and the contract.  Shuman Decl., Ex. A-28 (Tiffany Sobers Depo) at pp. 121:20-125:21.

383.    Sobers testified that Defendants were committing insurance fraud by claiming more than the amounts put on the manifests, and all her colleagues at Brink's characterized these claims as insurance fraud. Shuman Decl., Ex. A-28 (Tiffany Sobers Depo) at pp. 71:5-21, 74:13-75:10.

384.    Brink's website promises the protection of Brink's comprehensive cargo insurance.  Shuman Decl., Ex. A-26.2.

385.   Corrales testified that carriage value meant the same as insurance value.  Shuman Decl., Ex. A-17 (Corrales Depo.) at pp. 43:22-44:6.

386.   The Brinks drivers were aware of suspicious activity at the jewelry show.  Yet neither the Brinks show personnel, nor the drivers, took any special precautions.  In fact, one Brinks' driver spent 90 minutes of his trip on his cell phone.  Shuman Dec Ex. A-3 (driver Tandy Motley dep.), 93:14-96:7, 101:11-102:4; Ex. A-4 (driver James Beaty dep.), 58:11-22, 62:21-64:25, 65:11-15, 67:13-68:20, 105:20-106:11; Ex. A-29 (show manager Brandy Swanson dep.) 8:13-13:14, 14:19-17:2, 29:15-30:12.

387.   The drivers had a manifest indicating they were carrying 73 bags with a combined value of $21,650,000 at the value stated.  One driver, James Beaty, acknowledged at the time (recorded on the body cam video) that one opal could be worth $1,000,000.  The bag count was erroneous, as the manifests show a starting count of 77 bags and three bags deleted.  Nobody has accounted for the missing bag.  Shuman Decl. Ex. 30.

388.   The theft occurred July 11, 2022 at a truck stop during a 27-minute period starting at 2:05 a.m. when one driver could not see the truck and the other driver was asleep in the sleeping berth.  The merchandise was unguarded.  Shuman Dec Ex. A-3 (Motley Depo) at 55:16-56:7, 108:25-109:19, 205:16-206:15.

389.   This, amazingly, complied with Brinks' procedures, indicating a corporate policy to leave goods in Brink's possession unguarded.  Shuman Dec Ex. A-3 (Motley Depo) at 150:15-19, 159:2-12.

390.   DOT regulations actually require that a driver have a ten-hour period of not driving, during which at least seven hours must be uninterrupted in a sleeping berth.  49 C.F.R. §395.1(g)(1);  Lupton Decl.

391.   At 2:05 a.m. Beaty had been in the sleeper berth for ten hours and twenty-five minutes according to his logs, or 8-1/2 hours if the Court relies on his testimony that he was helping at the show for a couple of hours.  Motley could have awakened him before leaving the truck.  He did not know why Motley failed to do so.  Had he been out of the sleeper berth, he would have been on guard outside.  Shuman Dec. Ex. A-4, (Beaty dep.)  at  120:14-20, 122:7-20, 123:21-124:12, 133:19-135:14.

467257

392.    Brink's' policy, and DOT regulations, prohibit a driver from driving more than eight hours without taking a half-hour break.  49 C.F.R. §395.3(a)(3)(ii),

393.    Motley had been driving 5-1/2 hours when he took his break.  Shuman Decl. Ex. A-3 at 189:18-24, 190:13-191:21.

394.    The trailer was not armored.  The only locking mechanism was a padlock the thieves easily defeated.  Neither the cab nor the trailer had cameras, signage indicating surveillance, or an alarm.  The trailer had no functioning internal light and no clear signage that it was a Brinks trailer.  ████████████ ██████████████████████████████████████████████████████████████████ .
████████████████████ at 54:23-56:7, 65:15-17; Ex. 2, 84:25-86:2, 107;16-108:8.

395.    **[Redacted]**

396.    Brinks leaves the decision where to stop in the drivers' discretion, and does not research  security or the crime statistics at proposed stops. Shuman Decl. Ex. A-3 (Motley Depo.), at 46:25-47:5.

397.    Had Brink's researched crime at the Flying J Truck Stop, it would have discovered a laundry list of crimes there, including a very similar theft from a trailer in 2019.  Shuman Decl., Ex. A-31.

398.    The theft occurred at an unsecured truck stop, one with no cameras in the parking area and no roving security guard.  Shuman Decl., Ex. A-2 (Sheriff Deputy David Swigert depo.), at 68:7-69:8.

399.    A truck stop with a roving guard was located just 15 miles north of where the Brinks drivers stopped.  Roy Burns Decl.

400.    Brinks color-coded the tags on the bags according to value:  orange for over $600,000, yellow for $100,000 - $600,000, and white for under $100,000. Shuman Decl., Ex.A-4 (Beaty Depo,) at 99:7-23, and Ex. A-2.

401.    Those Defendants who lost less than all their bags lost only the most valuable bags.  Decls. of Kim Sater, Joseph Chang, Paul Wong.

402.    Ming Cheng of Bonita Pearl has very limited ability to read English.  He is only able to read limited jewelry-related e-mails and documents.  He relies on his son or others to assist him with English, including e-mails.  Shuman Decl., Ex. A-8 (M. Cheng Depo. Vol. I), pp. 103:20-

467257

22; 107:24-108:7; 110:9-22; 112:1-9; 112:20-113:2; 118:15-119:1;146:18-147:1; 150:5-12; 151:8-15; 152: 12-14; 154:24-155:12; 155:23-156:4;166:14-168:4.

403     Ming Cheng was told repeatedly only to write down insurance value in the carriage value box, and was never told that this was the limit of reimbursement for any losses, or that recovery could potentially be limited to a nominal amount, or that this would violate representations Brinks claims are set forth in the contract.  Shuman Decl., Ex. A-8 (M. Cheng Depo) at pp. 131:1-25; 141:24-142:11; 150:13-21; 154:13-22; 189:19-190:6; 195:8-23; 196:8-20.

404.    Had someone at Brinks told Mr. Cheng of the language on the waybill and the manifest saying all services were carried out under the terms of the Brink's Valuables Transport Contract, or had Brinks placed that language prominently, or told him it was important, he would have sought an explanation and interpretation.  Shuman Decl., Ex. A-8 (M. Cheng Depo) at pp. 142:12 – 146:5; 151:20-152:9; 197:10-198:10.

405.    The words on the reverse side of the manifest are in print too small for Mr. Cheng to make out or see what is written.  Shuman Decl., Ex. A-8 (M. Cheng Depo) at pp.153:4 – 154:8.

406.    Turning in goods at the end of the show is a hurried process.  Mr. Cheng just writes down the insurance value he wants because others are in line.  Shuman Decl., Ex. A-8 (M. Cheng Depo) at pp.150:13-21

467257

407.    Jewelers did not decide which transport company to use.  Intergem designated and jewelers had to use that one.  Shuman Decl., Ex. A-8 (M. Cheng Depo) at pp.166:4-12.

Dated:  April 18, 2024
          New York, New York

/s/ Robert R. Viducich
Robert R. Viducich
Law Offices of Robert R. Viducich
40 Wall Street, 28th Floor
New York, New York
(212) 400-7135
Email:  rviducich@rrvlaw.com
Counsel for Defendants Bonita Pearl, Inc.
Et al.

Dated:  April 18, 2024
          Los Angeles, California

/s/ Steven C. Shuman
Steven C. Shuman (Pro Hac Vice)
Engstrom, Lipscomb & Lack
10100 Santa Monica Blvd., Ste. 1200
Los Angeles, CA  90067
(310) 552-3800
Email: sshuman@elllaw.com
Counsel for Defendants Arat Jewelry Corp.
Et al.

Gerald L. Kroll (Pro Hac Vice)
Kroll Law PLLC
970 W. Broadway, Ste. E-200
Jackson, Wyoming 83001
(202) 248-5423
Email: gkroll@kroll.lawyer
Counsel for Defendant sArat Jewelry Corp.et al.

467257

<u>**CERTIFICATE OF SERVICE**</u>

       I hereby certify that on April 19, 2024, a true and correct copy of: **DEFENDANTS'**
**AMENDED RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL**
**FACTS PURSUANT TO LOCAL CIV. R. 56.1**  was served via electronic. mail to all parties with an
email address on record who have consented to electronic service in this action as follows:

Matthew D. Fender
Robert F. Redmond, Jr. (admitted pro hac vice)
McGuireWoods LLP
800 E. Canal St.
Richmond, VA 23219
Tel: (804) 775-1000
Fax:: (804) 775-1061
E-mail: mfender@mcguirewoods.com
rredmond@mcguirewoods.com

Katherine A. Garland
McGuireWoods LLP
1251 Avenue of the Americas
20th Floor
New York, NY 10020-1104
kgarland@mcguirewoods.com
(212)548-7028

Counsel for Plaintiff,

BRINK'S GLOBAL SERVICES USA, INC

*/s/ Merlene Fletcher*
Merlene Fletcher

.