# REDACTED VERSION - PUBLIC

**DECLARATION OF DANIEL LUPTON**

**EXHIBIT B-1**

September 27th, 2023

Mr. Steven C. Shuman, Esq.
Engstrom, Lipscomb & Lack, PC
10100 Santa Monica Blvd. 12th Fl.
Los Angeles, CA 90067

RE: Brinks Global Services USA, Inc. (Plaintiff) v. Bonita Pearl, Inc. (Defendant) Case No.: 1:22-cv-06653-PGG

Dear Mr. Shuman,

I have been retained by Engstrom, Lipscomb & Lack, PC to rebut statements made by Michael Beech and Don Tullos concerning standards and practices in the OTR trucking industry pertaining to DOT "Hours of Service" (HOS) rules, in regard to the Brinks Global Services USA, Inc. v. Bonita Pearl, Inc matter. I reserve the right to change, amend, and/or supplement the opinions expressed in this document based on any additional information that may be provided to me.

### I. Introduction, Background & Qualifications

I will be rebutting statements made by Michael Beech and Don Tullos on the basis of my experience in both the Cash-in-Transit (CIT) and Over-the-Road (OTR) trucking industries. I have approximately seven years of experience being employed by Loomis Armored, US. I have approximately four years of experience being employed by Western Flyer Express, LLC. During the course of my employment with the aforementioned entities, I have occupied both operational and management roles. I have been both subject to, and enforced industry standards and practices concerning compliance with HOS rules. While employed for Loomis Armored, US, I was responsible for auditing our CIT operations to ensure compliance with established security procedures, modifying and editing those procedures in response to any findings, corrective actions in regard to any violations of those procedures, as well as liaising with other customers and vendors to improve their own physical security protocols. At my current employer, I am responsible for the maintenance and operation of our Transportation Management System (TMS), as an administrator

1

for our telematics providers, and as an administrator of data integration connections.

My current business address is 4050 W. I-40 Service Road, Oklahoma City, Oklahoma, 73108.

1) A copy of my resume is attached as **Exhibit "A"**.

2) I graduated from Rockdale County High School in Conyers, GA in May of 2004. I attended Marion Military Institute in Marion, AL for one semester (2004), and Rose State College in Midwest City, OK for one semester (2007). In 2010, I completed an "Emergency Medical Technician - Basic" vocational program at Gordon Cooper Technology Center in Shawnee, OK; and held both Oklahoma State Department of Health and National Registry of Emergency Medical Technicians (NREMT) registries from 2010 to 2013. In 2013, I completed Oklahoma Council on Law Enforcement Education and Training (CLEET) accredited "Unarmed Security Guard" and "Armed Security Guard" technical programs at Security Officer Requalification Training Center (SOR) in Moore, OK and have held a license as an Armed Security Guard in the State of Oklahoma since approximately April of 2013.

3) In April 2012, I was employed by Loomis Armored, US - Oklahoma City Branch (Branch 3720) as a Driver/Guard. My duties included the receipt and delivery of coin, cash, check, and precious metals liability; maintaining security of an armored vehicle in CIT operations, and compliance with industry standards and practices concerning HOS rules. In March of 2014, I was promoted to Operations Supervisor and held that position until my resignation in August 2015. As a Supervisor my responsibilities were extensive - some notable duties would include auditing ATM reconciliation reports and thoroughly investigating any variances, training of new employees, and ensuring compliance with our various risk management strategies; as well as maintaining industry standards and practices concerning compliance with HOS rules for the CIT crews under my supervision - as many as sixty direct reports.

4) In August of 2015, I was employed by Western Flyer Express, LLC as a PM Operations Specialist. In this role, I was responsible for maintaining

2

the effective operation of our fleet of approximately 600 units during overnight hours, which included reviewing ELD logs and determining how to maximize production while maintaining full compliance with industry standard and practices, as well as fuel and route planning – among a host of others. I resigned from that position in November of 2018.

5) It is not listed on my resume for the sake of brevity, but during my time at Western Flyer Express (2015-2018) I would occasionally work part-time for Fortress Security Systems (dba Signal88 of Edmond) as an Armed Security Guard.

6) In November of 2018, I returned to Loomis Armored, US - Oklahoma City Branch (Branch 3720) as an Operations Supervisor – assuming all of the duties I had performed previously in that same role. In June of 2021, I was asked to temporarily relocate to Loomis Armored, US – Wichita (Branch 1815) and act as Interim Branch Manager during an absence of their Branch Manager. Upon the return of Branch Manager from their Leave of Absence, I was relieved from that assignment and returned to Loomis Armored, US – Oklahoma City (Branch 3720) in September of 2021 and resumed my role as Operations Supervisor. I resigned from my position in August of 2022.

7) In August of 2022, I returned to Western Flyer Express, LLC as a System Administrator. I oversee all dispatching, ELD, and telematics systems we use in the course of operations, as well as many of our data integrations. This requires both strong technical knowledge of the systems in use, and a strong operational knowledge of the trucking industry. In April of 2023 I was promoted to Manager of Application Administration.

8) I have previously provided an expert opinion in the Brinks Global Services USA, Inc. v. Bonita Pearl, Inc. matter; Case No.: 1:22-cv-06653-PGG.

## II. Materials Reviewed

1) September 12th, 2023 Deposition of K. Don Tullos
2) September 13th, 2023 Deposition of Michael F. Beech

3

3) April 5th, 2023 Deposition of James E. Beaty, Sr.
4) April 5th, 2023 Deposition of Tandy Jay Motley
5) Exhibit 5 - Motley, Tandy ELD Logs
6) Exhibit 4 - Beaty, James Edward ELD Logs
7) Exhibit 7 - Brinks Global Services OTR Division Manual
8) Expert Opinion of K. Don Tullos
9) Expert Opinion of Michael F. Beech
10) Expert Opinion of Daniel Lupton
11) 8/4/22 Complaint by Brinks in The US District Court, Southern District of New York

### III. Incident Being Evaluated

This document is in reference to a theft-loss incident involving Brinks Global Services that occurred on July 11th, 2022 in Lebec, CA.

### IV. Opinions

In my review of Mr. Tullos' opinion and deposition, there are some opinions stated regarding standards and practices in the trucking industry as they relate to compliance with the HOS rules that I disagree with.

1) Mr. Tullos accurately states in his deposition that the ELD logs are a document that demonstrate compliance with all applicable DOT rules. As such, whenever ELD logs are reviewed in the trucking industry - it is the logs themselves that are reviewed. It would be inconsistent with standards and practices in the OTR trucking industry to rely on personal anecdotal testimony taken at the time of, or any point after the fact versus the logs themselves. A review of the depositions of both Mr. Motley and Mr. Beaty illustrate why this is the case; Mr. Motley - for example - states on Pg. 72 of his April 5th deposition that the events he was being asked to recall occurred more than six months ago, and that he could not remember or otherwise recall some important details. Mr. Beaty echoes a similar sentiment during his deposition - as demonstrated on Pg. 102 - he states that he cannot accurately answer as to when he went into sleeper berth status without consulting his ELD log. On Pg. 33 of Mr. Tullos' deposition, he does not accurately reflect the testimony

4

of Mr. Beaty or Mr. Motley as to the timeline of events. It is my opinion, and wholly consistent with my experience in the OTR trucking industry, that personal anecdotes or second-hand recollection of personal anecdotes would not be relied on in preference to the ELD logs.

2) As to the accuracy of these logs, Mr. Tullos states in his deposition that it is the driver's responsibility to accurately log their activities (Pg.36) and that he has reviewed the logs and in his opinion, there were no errors that he observed (Pg. 27). Mr. Beaty has been a professional truck driver since approximately April of 2013 - as per his testimony on Pgs. 13-14 of his April 5th deposition; and Mr. Motley has been a professional truck driver for approximately ten years (Pg. 9) who is, according to his testimony - constantly refreshing himself on his understanding of industry standards and practices insofar as compliance with HOS rules, as he uses them daily.

3) Mr. Beaty indicates on his ELD log that he entered the sleeper berth at 4:39 Mountain Time on July 10th, 2022. If we consider his testimony as to his activities, he states that he was walking around the trade show, and volunteered to assist in the preparation of the sealed packages that he and Mr. Motley were to transport. He states that after their arrival to the San Mateo Jewelry Expo, that he was awake and outside of the truck for anywhere between one to two hours (Pg.55), and then he went to sleep. Mr. Tullos agrees in his deposition on Pg. 75, that a driver is under no obligation to actually be asleep when logged into the sleeper berth. When asked what he was doing during that time, Mr. Beaty states that he volunteered to help out with the preparation of the packages he and Mr. Motley were to transport. He testifies that he was not obligated by Brinks Global Services to do so, that this was not a required job function - but that he volunteered his time. Mr. Beaty's actions, while courteous and I'm sure appreciated by the InterGem staff, would be irrelevant to his logs as, again, according to Mr. Tullos - Mr. Beaty is under no obligation to actually be asleep. Mr. Beaty's testimony is clear that he was volunteering his time and that he was not performing a work function that would have obligated him to be in an on-duty duty status. However, in my opinion it would be more appropriate to defer to the log - which indicates that Mr. Beaty was in the sleeper-berth.

4) If we assume that Mr. Beaty's actions did constitute a work function and that he logged his time incorrectly, according to Mr. Beaty's testimony he was only performing these tasks for approximately two hours after

5

their arrival to the San Mateo Jewelry Expo. This would also be consistent with Mr. Motley's testimony on Pg. 92 of his deposition. This would put Mr. Beaty's entry into the sleeper berth at approximately 6:00 PM PST. At the time Mr. Motley stopped the Brinks tractor in Lebec, CA at 1:56 AM PST on July 11th, Mr. Beaty would have been in the sleeper-berth for seven hours and fifty-six minutes. Mr. Tullos agrees with this calculation in his deposition (Pg. 67 and again on Pg. 103) that depending on whether we use the time that was logged, or based on Mr. Beaty's testimony (Mr. Beaty also testifies that according to his logs he had satisfied the ten-hour rest requirement) - that Mr. Beaty had anywhere between seven to ten hours in the sleeper berth. Mr. Tullos has also testified that after accumulating ten hours in either an off-duty status, sleeper berth status, or combination of the two statuses - that drivers are able to begin working again, having satisfied the ten-hour rest rule. This is consistent with my experience and the standards and practices in the OTR trucking industry. Mr. Tullos also concurs that the ten-hour rest rule can be satisfied with a split sleeper-berth break. If we assume that Mr. Beaty's anecdotes of his activities are correct, and using the seven hours and fifty-six minutes of sleeper-berth he would have accumulated, Mr. Beaty could have logged into an on-duty status without violating standards and practices insofar as compliance with the HOS rules.

    a) It is important to understand how the split sleeper-berth break provision works. The split sleeper-berth break provision allows drivers to achieve the equivalent of a ten-hour rest period through qualifying shorter rest periods that add up to a minimum of ten hours. For these shorter rest periods to qualify, one rest period must be at least seven hours - and must be logged as sleeper berth, and the shorter of the two rest periods must be at least two hours, and can be either in an off-duty status or sleeper berth status, but it cannot be a combination of off-duty or sleeper-berth - it has to be one or the other.

    b) The rest periods can be any combination of, for example; seven hours and three hours, three hours and seven hours, eight hours and two hours, or two hours and eight hours - or any combination of times so long as the longer rest period is at least seven hours and the shorter rest period is not shorter than two hours. A rest period of seven hours and fifty-six minutes followed by another

rest period of two hours and four minutes would be wholly consistent with industry standards and practices as both rest periods are of a qualifying length, and the two rest periods combined would equal ten hours of rest. Hypothetically, if we assume that Mr. Beaty had actually been in an off-duty status after his arrival in San Mateo for as long as Mr. Tullos later suggests without a basis for doing so, this time period could also be used to satisfy the split sleeper-berth provision.

c) The split sleeper-berth provision allows drivers to extend their fourteen hour on-duty clock beyond what would normally be allowed. Mr. Beaty began his work-day at 5:01 AM Mountain Time on July 10th, his fourteen hour on-duty clock would have required him to stop working by 7:01 PM Mountain Time on July 10th. However, utilizing the split-sleeper berth provision, neither rest period is counted when calculating the extension of a driver's work day using this provision. If we are to assume that Mr. Beaty truly began his sleeper-berth rest period at 7:00 PM Mountain Time, at 2:54 AM Mountain Time when the vehicle stopped in Lebec, CA – Mr. Beaty would have been able to return to duty for the balance of his on-duty time that had not been used up to that point. Mr Beaty could even have driven without incurring a violation – as long as his cumulative drive time did not exceed his eleven-hour drive clock. Mr. Beaty's logs indicate that he was in driving status for ten hours twenty-two minutes and in on-duty status for approximately twenty-three minutes on July 10th. At the time that the vehicle stopped in Lebec, CA – Mr. Beaty would have been fully complying with industry standards to return to an on-duty status for up to three hours and fifteen minutes (this figure is reached by subtracting the total of all driving hours and on-duty hours from his fourteen hour workday), and during that time period could have even driven up to twenty-eight minutes (this figure is reached by subtracting the total amount of drive time on 7/10 from his eleven-hour driving time) before then having to return to an off-duty or sleeper berth status to complete the split sleeper-berth break.

d) After having completed the rest of the split sleeper-berth break, Mr. Beaty would be able to return to duty, having achieved the equivalent of a ten-hour rest period. His available hours for that

7

day would be recalculated from the end of the first break period used in this split sleeper-berth break. So, if Mr. Beaty had been awakened when the vehicle arrived in Lebec, CA to stand guard while Mr. Motley took his thirty-minute break from driving, and then immediately returned to the sleeper berth for two hours and four minutes – Mr. Beaty would have had his full eleven-hour drive clock available, and he would have a total of thirteen hours and thirty minutes available on his fourteen-hour on-duty clock – as we would have to count those thirty minutes on-duty – none of the times worked on 7/10 would be included in the calculation – as we calculate from the end of the first rest period. In my opinion, it would not have been unreasonable to assume that Mr. Beaty would have been able to complete the remaining two hours and four minutes to complete a split sleeper-berth break as the remaining drive-time from Lebec, CA took approximately an hour and a half, and the remaining thirty-four minutes would have likely been while the vehicle was at a secure Brinks facility being unloaded, with Mr. Motley available and guarding the vehicle during this process.

5) Mr. Tullos is, in my opinion, incorrect when he states that a regulator would round-up times on an ELD log (Pg. 109). This would be inconsistent with my experience in the OTR trucking industry. One of the advantages of ELD logs is the ability to more precisely account for a driver's HOS, and thus both ensure that drivers are fully able to utilize the hours available to them to work, and that drivers are getting sufficient rest. Mr. Tullos is also inaccurate when he states that drivers are allowed only eleven hours of on-duty time. In the OTR trucking industry, drivers are allowed to drive up to eleven hours per day, and have a total of fourteen hours of on-duty or working time (which includes driving) within which to do so.

6) It is my opinion that there is nothing in the standards and practices of the OTR trucking industry that would necessarily prevent a driver from being woken up by his co-driver for any reason. Mr. Beaty has also testified to the same, on Pg. 124 of his deposition, he states that his co-driver could wake him for any reason. Mr. Tullos agrees multiple times during his testimony (Pg. 53, 113 and Pg. 116, for example) that Mr. Beaty was available to work according to his logs, and that he could have been woken and in an on-duty status when Mr. Motley took his break from driving in Lebec, CA. Mr. Beaty also concurs on Pgs. 134-135 of his

       deposition that he could have been woken, on-duty, and guarding the vehicle while Mr. Motley was off-duty.

7) As to the nature of Mr. Motley's break in question, it is consistent with industry standards and practices that a driver must take a thirty-minute break from driving before the driver accumulates eight hours of driving time during any given shift. This is a break from driving, and Mr. Motley was certainly able to – but in no way obligated to take his break outside of the vehicle. Mr. Tullos testifies to the same in his deposition on Pg. 46 – that Mr. Motley could have satisfied the thirty-minute break requirement having not left the driver's seat. I would agree with Mr. Tullos insofar as that would be unusual in the OTR trucking industry – that most drivers would indeed exit the vehicle to stretch or use the restroom, eat, etc. etc. However, leaving the vehicle unattended and unguarded while transporting valuables would be wildly inconsistent with my experience in the secure transport industry. We have already established it was not necessary that Mr. Beaty not be disturbed, or that Mr. Beaty was unable to be disturbed – as such it is my opinion that while the break was not in itself a breach of standards and practices, the nature in which the break was taken absolutely was. Mr. Motley states on Pg. 122 of his deposition that the thirty-minute break was his, and his absolutely – and that at the time of the theft there was no one guarding the valuables in his custody (Pg. 56) – which again is in conflict with standards and practices in the secure transport industry in my experience.

In my review of Mr. Beech's deposition, there are some statements made regarding standards and practices in the secure transport industry that I disagree with.





11) In Mr. Beech's expert opinion, Mr. Beech states that CIT Operations and OTR or "Secure Transport" as it is sometimes referred to have little to no meaningful similarities – and that comparisons to regular cargo-hauling trucking services are also inappropriate. I disagree with this conclusion on several points.

   a) In both CIT and OTR operations, the carrier is transporting sealed packages containing cash, coin, checks, precious metals, or any other type of liability from one location to another, with an objective of delivering those pieces intact and whole.

   b) The distances involved in these modalities may be different, but there are standards and practices insofar as compliance with the HOS rules that both modalities abide by. Though the applicable rules may differ slightly, the principle is the same.



   d) Based on Item C, it would be inaccurate for Mr. Beech to have claimed as he does in both his expert opinion and his depositions, that BGS's security protocols were above and beyond the procedures employed by any other carrier, be it his competition or a general freight carrier, at the time of the theft. Especially when considering that – as mentioned in my expert opinion – a general freight carrier is seen in body camera footage utilizing an Enforcer Lock – and to the best of our knowledge that vehicle was not tampered with. Mr. Beech states in his deposition that he is unaware of how long Enforcer locks have been available on the market.

11



14) As such, it would then be very relevant, in my opinion, for BGS and Brinks as a whole to have examined the statistics concerning cargo theft, including cargo theft from general freight carriers. It is my opinion that it is highly likely that to an outside observer, there is not any discernible difference between BGS's armored tractors and an unarmored tractor used by any general freight carrier. We have already established that the trailer in question is the same type of equipment used by general freight carriers. It would follow that BGS, bearing those considerations in mind, should have absolutely considered broader crime statistics when establishing and evaluating their security protocols - which according to Mr. Beech's testimony on Pg. 235, was not only not done - but deemed to be unnecessary.

### V. Previous Testimony and/or Depositions

I have previously provided an expert opinion in the Brinks Global Services USA, Inc. v. Bonita Pearl, Inc. matter; Case No.: 1:22-cv-06653-PGG.

I was deposed in regard to the same on August 30th, 2023. During the last four years, I have not testified or offered an expert opinion in any other matter.

### VI. Compensation

My established hourly rate is $200.00 for review, $275.00 for deposition, and a flat rate of $500.00 per diem for any testimony. Those are the rates at which I am being compensated in this matter.

_____

As previously stated, I reserve the right to change, amend, and/or supplement the opinions expressed in this document based on any additional information that may be provided to me. This document has been prepared by my own hand, and is signed to attest as to such below.


Daniel W. Lupton

September 27th, 2023

13