UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:    9/18/2024

BRINK'S GLOBAL SERVICES USA, INC.,

Plaintiff,

-against-

BONITA PEARL INC., et al.,

Defendants.

22-CV-6653 (PGG) (BCM)

**OPINION AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

Plaintiff Brink's Global Services USA, Inc. (Brink's) moves to strike the rebuttal reports of defendants' experts Timothy W. Griffin, James McGuffey, Daniel W. Lupton, Walter Jeffery Stiles, and Fred Del Marva. (Dkt. 208.) For the reasons set forth below, plaintiff's motion will be granted in part as to the rebuttal reports of Griffin, McGuffey, and Lupton; denied as to the rebuttal report of Stiles; and granted as to the rebuttal report of Del Marva.

## I.    BACKGROUND

Brink's is in the business of, *inter alia*, transporting valuables "over the road" (OTR). Defendants are eleven corporations and sole proprietorships in the business of selling jewelry at gem and jewelry shows. *See* Compl. (Dkt. 1) ¶¶ 2-15.[1] Defendants contracted with Brink's to transport their jewelry to and from shows. *Id*. ¶¶ 16-17. On the evening of July 10, 2022, a tractor-trailer owned and operated by Brink's left a San Mateo, California, jewelry show, bound for Los Angeles, carrying 73 bags of jewelry and related items. *Id*. ¶¶ 18-19. Two armed Brink's employees were assigned to the shipment. *Id*. ¶ 19. One drove, while the other slept in the tractor's sleeping berth. *Id*. Shortly after 2:00 a.m. on July 11, 2022, the driver pulled into the Flying J truck stop in Lebec, California, parked the rig, and went inside to eat, leaving his partner asleep. *Id*. When the

---

[1] There were originally thirteen defendants. Two have since settled. (*See* Dkts. 123, 136.)

driver returned, 27 minutes later, the padlock on the rear of the trailer had been cut and 22 bags of jewelry were missing, including jewelry owned by the remaining defendants (sometimes referred to herein as the Jewelers). *Id*. ¶¶ 19-22.

Brink's filed this action less than a month later, on August 4, 2022, seeking a declaration that its Global Services Valuable Transport Contract (the Contract) (Dkt. 1-1) limits each defendant's maximum recovery to the value of its jewelry as declared in the Pickup Manifest signed by or on behalf of that defendant – notwithstanding that, according to Brink's, they "substantially under-declared the value of their shipments on the Pickup Manifest" in order to save associated costs. Compl. ¶¶ 16-17, 22, 40-43.[2] The aggregate declared value of all thirteen original defendants' shipments, according to their Pickup Manifests, was $8.7 million. *Id.* ¶ 21.

On March 13, 2024, the Jewelers answered and counterclaimed, alleging, among other things, that plaintiff's security equipment was so unsophisticated, its protocols so lax, and its driver's conduct so unprofessional as to constitute "willful misconduct and/or gross negligence that precludes enforcement of any contractual limits that would otherwise benefit Brinks." Countercl. (Dkt. 235 at 8-34) ¶ 23. The Jewelers seek damages, including lost profits, on theories of breach of contract, negligence, fraud (based on their allegation that Brink's encouraged them to understate the value of their property, to save money, without disclosing that the figure they chose would be the limit of Brink's liability even if the loss resulted from its own negligence), and violation of N.Y. Gen. Bus. Law § 349 and Cal. Bus. & Prof. Code § 17200 *et seq*. Countercl. ¶¶ 5-60.[3]

---

[2] Brink's relied on a mandatory forum selection clause in the Contract identifying "Manhattan, New York" as the exclusive forum for judicial resolution of disputes. *See* Compl. ¶ 36.

[3] Defendants do not provide a damages figure in their pleading. However, in a parallel action initiated by them in a California state court, they alleged that the stolen shipments were worth approximately $100 million. *See* Redmond Decl. Ex. 1-103 (Dkt. 251-167) ¶¶ 2, 31, 41, 50, 56. 74.

### A.    The First Two Rounds of Expert Disclosure

On November 14, 2022, the Hon Paul G. Gardephe, United States District Judge, issued a

scheduling order providing for two rounds of expert disclosure:

> 8.    The parties must complete expert discovery no later than April 3, 2023.
>
>> a.    Every party-proponent that intends to offer expert testimony in respect of a claim – including any counterclaim, cross-claim or third-party claim – must make the disclosures required by Federal Rule of Civil Procedure 26(a)(2) by March 3, 2023. Every   party-opponent of such claim that intends to offer expert testimony in respect of such claim must make the disclosures required by Federal Rule of Civil Procedure 26(a)(2) by March 17, 2023.
>
>> b.    No party may offer expert testimony – whether designated as "rebuttal" or otherwise – beyond the scope of the opinions that the aforesaid disclosures cover, except with leave of the Court, application for which must be made no later than 7 calendar days after the latter of the dates specified in paragraph 8(a). The parties may depose all experts, but such depositions must occur within the time limit set forth for expert discovery in paragraph 8.

(Dkt. 91 ¶ 8.) On April 13, 2023, Judge Gardephe referred this action to me for general pretrial

management. (Dkt. 129.) On April 14, 2023, I extended the initial "expert disclosure and report

deadline" to June 1, 2023. (Dkt. 132.) On that date, the Jewelers served three expert reports.

Timothy W. Griffin is a former Brink's employee who has also worked for other companies

in the "security business." Griffin Rep. (Dkt. 211-10) at 1. According to Griffin, Brink's "advises

customers to list the 'minimum value,' and or 'insurance value'" of their goods, rather than the

actual value, which Brink's was "not interested in knowing." *Id*. at 3. In fact, Griffin wrote, it was

"very common" throughout "the industry" for customers to be told "to just declare the minimum,

as opposed to the actual value of the cargo," to "save money." *Id*. Griffin then opined that Brink's

should have assigned three crew members to the tractor-trailer containing defendants' property;

should have used a chase vehicle; should have loaded the trailer differently, with valuable jewelry

at the front of the trailer rather than near the rear; and should have parked it more securely at the

Flying J. *Id*. Had Brink's done these things, Griffin concluded, it "would have more than likely prevented this theft." *Id*.

James McGuffey, a former Brink's employee and current security consultant, offered a list of twenty "recommended best practices," including assigning a third armed guard, deploying a chase vehicle, loading and parking the vehicle differently, and using an alarmed electronic locking mechanism and an "enforcer lock" rather than a simple padlock and hasp on the trailer. McGuffey Rep. (Dkt. 211-7) at 3-5. He then opined that "[t]his Brink's operation," which did not incorporate the recommended practices, "was shockingly reckless." *Id*. at 5; *see also id*. at 11 ("this operation was grossly reckless and totally void of adequate security"). McGuffey further opined that the Brink's OTR Policy Manual, governing (among other things) the conduct of its drivers while on the road, was "outdated, ambiguous, and grossly lacking in basic security procedures." *Id*. at 6.

Daniel W. Lupton, whose industry experience includes working for Brink's competitors Loomis Armored and Western Flyer Express, opined that the Brink's driver should have proceeded directly from San Mateo to Los Angeles without a meal break, because the total drive time was only 7.25 hours and Department of Transportation (DOT) regulations did not require a meal break until he accumulated eight hours of driving time; that if he did stop to eat he should have parked in a different location, where it would have been more difficult to access the rear of the trailer; that he should have ordered his food "to go" and returned to the vehicle to eat; that before he left the vehicle he should have awakened his partner (who had been off-duty for more than ten hours and was thus eligible under DOT regulations to return to on-duty status); and that Brink's should have

4

used an Enforcer lock rather than a simple padlock on the back of the trailer. Lupton Rep. (Dkt. 211-9) at 6-11.[4]

Brink's did not serve any expert reports on June 1, 2023.

On June 12, 2023, I so-ordered the parties' stipulation extending the deadline for "opposing party expert disclosure" to June 22, 2023. (Dkt. 173.) On June 22, Brink's served four expert reports.

Nigel Paxman is an insurance executive who previously worked for Malca-Amit, a Brink's competitor. Paxman Rep. (Dkt. 182-1, at ECF pp. 7-15) at ECF p. 11. According to Paxman, it is "standard practice" in what he calls the "secure logistics" industry (including at Malca-Amit) to require shippers to declare the "actual value" of the consigned goods, and it is important to the carrier that the declarations be accurate. *Id.* at ECF pp. 7-8, 9-10. For example, Paxman wrote, although carriers like Brink's do not "provide insurance to their clients," they rely on the shippers' disclosures to obtain their own "carrier's liability insurance policy" with enough coverage to indemnify them against customer claims in the event of a loss. *Id.* at ECF p. 7. If the shippers understate the value of their goods, the carriers could "breach their insurance policy limits[.]" *Id.* at ECF p. 9. Paxman also opined that "Brink's fully complied with the standards and practices of the secure logistics industry" on July 10-11, 2022, including by using a tractor-trailer (even though the trailer was not armored) and a two-man crew to ship defendants' jewelry. *Id.* at ECF p. 10.

---

[4] Lupton explains that Enforcer locks (model 1217) "have heavy plate steel blocks that secure around the locking rods of a swing-door trailer, and lock with an Abloy padlock. These blocks, when locked in place, physically prevent the swing doors from being opened." Lupton Rep. at ECF p. 10. According to Lupton, Western Flyer Express has used Enforcer locks since late 2016 or early 2017 "on every single load regardless of the value or contents." *Id.* Lupton adds that Enforcer locks "take more time to defeat than a simple padlock," and are inexpensive, listing for only $249.99 (including the Abloy padlock). *Id.* at 11.

Michael F. Beech, a recently retired Brink's executive and former Army officer, noted that Brink's had never previously experienced even one robbery from a tractor-trailer in 30 years of operating OTR transport services. Beech Rep. (Dkt. 182-1 at ECF pp. 17-26) at 1. From this he concluded that "the threat of loss was low, and the security measures [used] were appropriate to this threat based upon zero prior incidents of loss." *Id.* at 2. Beech added that the Brink's drivers did not violate the Brink's OTR Policy Manual, and that the procedures used on July 11, 2022 were "consistent with the industry['s] commonly accepted practices." *Id.* Beech specifically disagreed with defendants' experts regarding the padlock, opining that even an Enforcer lock "can be easily defeated by portable mechanical tools, cutting devices and torches." *Id.* As for the other enhanced security tools and protocols discussed by defendants' experts, Beech opined that while they were arguably appropriate for cash-in-transit (CIT) operations (such as delivering currency to and from banks and retailers), those operations have a "significantly higher risk profile" than OTR transport, making comparisons misleading. *Id.* at 3-4. Finally, Beech noted that had the Jewelers accurately declared the value of their shipments – as they were contractually required to do – they would have been fully protected against theft loss. *Id.* at 4-5.

K. Don Tullos, a retired FedEx safety advisor, opined that defendants' experts "do not appear to understand how over-the-road trucking (OTR) works, nor accepted OTR practices." Tullos Rep. (Dkt. 182-1 at ECF pp. 28-38) at 3. The Brink's driver, according to Tullos, "followed industry standards and accepted practices when he stopped at the Flying J." *Id.* at 3. In particular, Tullos disputed the idea that the driver should have awakened the second crew member, arguing that since "[a] rested driver is a safe driver," it is reasonable for the on-duty driver to permit his partner to keep sleeping – even if the partner is DOT-eligible to return to duty – "until the driver who is at the controls had become tired or their on duty time has expired." *Id.* at 5.

Robert William Scally, a Hong Kong-based loss adjuster, opined that in light of plaintiff's 30-year OTR operating history with no theft losses, the policies and procedures it employed in transporting jewelry from the San Mateo jewelry show in July 2022 "were reasonable and appropriate." Scally Rep. (Dkt. 182-1 at ECF pp. 40-71) at 1-2.[5]

### B.    The Court Permits Rebuttal Reports

On August 2, 2023, defendants filed a letter-application seeking (among other things) the exclusion of all of the Brink's expert reports on the ground that Brink's, as the plaintiff and "party-proponent," should have designated all four experts, and served all four reports, on June 22. *See* Def. 8/2/23 Ltr. (Dkts. 179, 180) at 3.[6] Defendants were prejudiced by the delay, they argued, because they would have "no opportunity to obtain party opponent experts or otherwise rebut the opinions contained in the reports of Brinks experts." *Id.* Alternatively, defendants asked the Court to limit plaintiff's expert testimony to "matters of security procedures and the conduct of the drivers" (relevant to defendants' anticipated negligence counterclaims), while disallowing belated expert testimony as to "contract issues" (relevant to plaintiff's declaratory judgment claim), such as the importance of accurate value disclosure and the effect of inaccurate disclosures on plaintiff's insurance coverage. *Id.*[7] In its response, Brink's argued that all of its expert disclosures "rebutted Defendants' expert disclosures about Defendants' expected counterclaims." (Dkt. 186 at 1.)

---

[5] Scally also contradicted certain statements made in the Complaint. For example, after reviewing the Brink's Shipment Manifest, Scally concluded that 24 bags were stolen from the trailer at the Flying J, not 22. Scally Rep. at 5.

[6] Defendants filed their letter-application publicly at Dkt. 179 (with redactions), and under seal at Dkt. 180. I follow the same citation convention throughout this Order.

[7] At this juncture, defendants had not yet filed their answer and counterclaim. Shortly after Brink's filed its Complaint here, seeking declaratory relief, defendants filed their own lawsuit in California against Brink's, its drivers, and others, seeking damages. They then sought an order dismissing this action for lack of personal jurisdiction and/or improper venue, or, in the alternative, staying this action in favor of the California lawsuit. (Dkt. 98.) That motion remained *sub judice* throughout the fact and expert discovery period. On February 28, 2024, the District Judge denied the motion.

On August 31, 2023, after a discovery conference, I declined to strike the Brink's expert reports but gave defendants "an opportunity to serve . . . true rebuttal reports limited to rebutting the Paxman, Tulos, Beech, and/or Scally reports," to be followed by depositions "with respect to the rebuttal reports." *See* 8/31/2023 Tr. (Dkt. 195) at 31:25-32:5. In a written order issued after the conference, I confirmed that "defendants may, at their option, serve rebuttal expert reports, 'intended solely to contradict or rebut evidence on the same subject matter identified by' plaintiff, *see* Fed. R. Civ. P. 26(a)(2)(D)(ii)." 8/31/23 Order (Dkt 190) at 1.

Defendants then served five rebuttal reports: three signed by their original experts (McGuffey, Griffin, and Lupton), and two from newly-disclosed experts Stiles and Del Marva.

### C.      The Motion to Strike the Rebuttal Reports

On October 20, 2023, Brink's filed the instant motion to strike all five rebuttal reports, accompanied by a memorandum of law (Pl. Mem.) (Dkts. 210, 212), and the declaration of Matthew D. Fender (Dkt. 211), attaching (among other things) the relevant expert reports, including the rebuttal reports. *See* McGuffey Rebuttal Rep. (Dkt. 211-2); Griffin Rebuttal Rep. (Dkt. 211-3); Lupton Rebuttal Rep. (Dkt. 211-4); Del Marva Rebuttal Rep. (Dkt. 211-5); Stiles Rebuttal Rep. (Dkt. 211-6.) Brink's argues that the new reports from Griffin, McGuffey, and Lupton are improper "supplemental reports," serving primarily to shore up or expand their original reports, rather than true rebuttal reports responding to the substance of the Brink's reports. Pl. Mem. at 1, 5, 7-12. The Del Marva and Stiles reports, according to Brink's, are "[a]t best, late affirmative reports," *id*. at 12, which likewise fail to address and rebut anything in the Brink's reports. *Id*. at 12-14.

---

(Dkt. 231.) Defendants filed their answer and counterclaim two weeks later, on March 13, 2024. (Dkt. 235.)

On November 8, 2023, defendants filed their opposition brief (Def. Opp.) (Dkt. 221), accompanied by the declaration of Steven C. Shuman (Dkt. 221-1), attaching charts comparing the opinions contained in the rebuttal reports to the corresponding parts of the Brink's expert opinions being rebutted. Defendants argue that although their written rebuttal reports are "not always explicit about it," each of them, in substance, "responds to specific opinions expressed by Brink's experts." Def. Opp. at 1. Defendants add that since Brink's elected to depose Griffin for a second time, it should not be barred from "revers[ing] its position" and seeking to strike his second report. *Id*. at 15.[8]

On November 15, 2023, Brink's filed its reply brief (Pl. Reply) (Dkts. 224, 225), to which it attached (among other things) excerpts of the April 17, 2023 deposition of Michael F. Beech (Beech Dep.) (Dkt. 224-1), the August 28, 2023 deposition of James McGuffey (McGuffey Dep.) (Dkt. 224-6), and the October 24, 2023 deposition of Timothy W. Griffin (Griffin Dep.) (Dkt. 224-11). Brink's argues that defendants "could have and should have disclosed all of the opinions in the third round reports when they served their initial reports on June 1, 2023." Pl. Reply at 2.

## II.   LEGAL STANDARDS

The purpose of a rebuttal report is to "contradict or rebut evidence on the same subject matter" previously identified by another party. Fed. R. Civ. P. 26(a)(2)(D)(ii). Since "[t]he function of rebuttal evidence is to explain or rebut evidence offered by the other party," *United States v. Casamento*, 887 F.2d 1141, 1172 (2d Cir. 1989), a rebuttal report is admissible only "when it will

---

[8] Brink's exercised its option to take Griffin's deposition as to his rebuttal report, after agreeing, during an October 4, 2023 scheduling conference, that Griffin "rebuts Paxman." *See* 10/4/23 Tr. (Dkt. 205) at 27:18-19; *see also id*. at 30:18-25 (indicating that defendants likely would not move to strike the Griffin rebuttal report because he offered "a rebuttal to Mr. Paxman"). Brink's did not depose McGuffey, Lupton, Stiles, or Del Marva as to the rebuttal reports. At the end of its moving brief, Brink's requests leave to take these depositions *if* the Court denies its motion to strike. Pl. Mem. at 17.

explain, repel, counteract or disprove" that evidence. *S.W. v. City of New York*, 2011 WL 3038776, at *2 (E.D.N.Y. July 25, 2011) (citation and internal quotation marks omitted).

"[D]istrict courts have been reluctant to narrowly construe the phrase 'same subject matter' beyond its plain language." *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 44 (S.D.N.Y. 2016) (quoting *Allen v. Dairy Farmers of Am., Inc.*, 2013 WL 211303, at *5 (D. Vt. Jan. 18, 2013)); *accord Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 360 (S.D.N.Y. 2023); *Rekor Sys., Inc. v. Loughlin*, 2022 WL 2063857, at *7 (S.D.N.Y. June 8, 2022). Thus, the rebuttal expert is permitted some leeway in how he or she explains, counteracts, repels, or disproves the opinion being rebutted. *See, e.g.*, *Scott*, 315 F.R.D. at 44 ("A rebuttal expert is permitted to use new methodologies 'for the purpose of rebutting or critiquing the opinions of [the opposing party's] expert witness'") (quoting *Park W. Radiology v. CareCore Nat'l LLC*, 675 F.Supp.2d 314, 326 (S.D.N.Y. 2009)).

However, a party may not use its rebuttal opportunity to "correct oversights in [that] party's case in chief," *Suazo v. Ocean Network Express (N. Am.), Inc.*, 2023 WL 2330428, at *11 (S.D.N.Y. Mar. 2, 2023), *reconsideration denied*, 2024 WL 68428 (S.D.N.Y. Jan. 5, 2024), or to offer new opinions that could and should have been included in its initial report. *Sec. & Exch. Comm'n v. McGinnis*, 2019 WL 13172404, at *14 (D. Vt. Feb. 1, 2019). Nor may a party "subvert" the sequence contemplated by Rule 26(a)(2)(D) "by serving a deficient or bare-bones opening report . . . and then serving a full and complete report" for the first time on rebuttal. *Camarata v. Experian Info. Sols., Inc.*, 2018 WL 1738335, at *2 (S.D.N.Y. Mar. 5, 2018); *see also, e.g.*, *Lidle v. Cirrus Design Corp.*, 2009 WL 4907201, at *5 (S.D.N.Y. Dec. 18, 2009) (excluding Leffe's purported rebuttal report because it "merely rehashe[d] the conclusions reached in Leffe's opening

report" and supported those conclusions with testing that could and should have been conducted "before his initial report was drafted").

"A district court has wide discretion in determining whether to permit evidence on rebuttal." *United States v. Tejada*, 956 F.2d 1256, 1266 (2d Cir. 1992); *accord Scott*, 315 F.R.D. at 44. Even where the proposed rebuttal report presents "new legal arguments" or otherwise goes beyond the bounds of Rule 26(a)(2)(D)(ii), the court may permit the rebuttal report if the untimely disclosure "causes no prejudice." *Ebbert v. Nassau Cnty.*, 2008 WL 4443238, at *13 (E.D.N.Y. Sept. 26, 2008) (citations omitted). "Precluding testimony of an expert, even when there has not been strict compliance with Rule 26, may at times tend to frustrate the Federal Rules' overarching objective of doing substantial justice to litigants." *In re Zimmer M/L Taper Hip Prosthesis or M/L Taper Hip Prosthesis With Kinectiv Tech. & Versys Femoral Head Prod. Liab. Litig.*, 2021 WL 1405185, at *3 (S.D.N.Y. Apr. 14, 2021) (citations omitted).

## III.    ANALYSIS

As an initial matter, I reject plaintiff's argument, made throughout its motion papers, that it is improper for defendants' experts to address the deposition testimony of Brink's experts (as opposed to the text of their written reports). *See, e.g.*, Pl. Mem. at 3 ("The Court's allowance of rebuttal reports was expressly premised on rebutting Brink's expert reports, not depositions."); *id.* at 10 (arguing that the Lupton rebuttal report should be stricken because, although Lupton specifically discusses statements made by Beech and Tullos at deposition, he "never mentions the Beech or Tullos reports"). Plaintiff reads too much into this Court's shorthand directive, at the conclusion of the August 31, 2023 discovery conference, permitting "true rebuttal reports limited to rebutting the **Paxman, Tulos, Beech, and/or Scally reports,**" *see* Pl. Mem. at 3, 14 (quoting 8/31/2023 Tr. at 32:1-3). The Court's written order, which controls the scope of the permitted rebuttal, utilizes the language of the rule itself, stating that "defendants may, at their option, serve

rebuttal expert reports, 'intended solely to contradict or rebut *evidence on the same subject matter* identified by' plaintiff, *see* Fed. R. Civ. P. 26(a)(2)(D)(ii)." 8/31/23 Order at 1 (emphasis added). Consequently, the threshold question for this Court is not whether defendants' new reports quote the Brink's reports; it is whether they fairly meet the expert "evidence" offered by Brink's on the same subject matter.

Brink's also complains, broadly, that although "rebutting Mr. Paxman on insurance was a primary driver of the Defendants' request for rebuttal experts," Pl. Mem. at 3, none of defendants' rebuttal experts has insurance expertise, *see id*. at 3, 5, 12, and none specifically rebuts the portion of Paxman's report regarding insurance. *See id*. at 5 n.4, 14. It is true (and to Brink's advantage) that none of defendants' experts rebuts Paxman as to the relationship between its need for accurate value disclosure from its customers and its own insurance coverage. This Court, however, clearly gave defendants leave to rebut all four Brink's experts, so long as they did so within the bounds of Rule 26(a)(2). 8/31/23 Tr. at 32:1-3; 8/31/23 Order at 1.

For similar reasons, I reject defendants' argument that Brink's cannot move to strike Griffin's testimony because it chose to take his deposition. During the October 4, 2023 conference, I warned that Brink's had to decide whether to move to strike "without first taking their depositions, in which case, if you lose the motion, you may never get their depositions, or if you want to take their depositions first *and then see where you're at and try your luck with the motion*." 10/4/23 Tr. at 28:6-12 (emphasis added). Thus, taking Griffin's deposition did not preclude Brink's from moving to strike his rebuttal report.

The Court now turns to the specifics of each proffered rebuttal report.

### A.    Timothy W. Griffin

The Griffin rebuttal report begins by taking issue with Paxman's contention that it is both "standard practice" in the industry and important to the carriers to require shippers to declare the

actual value of their goods. Griffin does this first by summarizing the testimony of various Brink's fact witnesses, who – he says – testified that Brink's used terms like "insurance," "actual value," "declared value," and "carriage value" interchangeably, *see* Griffin Rebuttal Rep. at ECF pp. 4-5, and then by comparing Malca-Amit's shipping manifest to Brink's, which in his opinion is "ambiguous" and not "substantially similar" to "industry standards." *Id*. at ECF p. 5. This testimony may prove to be inadmissible under Fed. R. Evid. 702 and *Daubert v. Merrill Dow Pharmaceuticals Inc*., 509 U.S. 579 (1993), and its progeny.[9] But that question is not presently before me. Griffin's opinion concerning the Brink's contract language is clearly designed to "rebut evidence offered by the other party," *Casamento*, 887 F.2d at 1172, in this case through Paxman, and therefore meets the test of Rule 26(a)(2)(D)(ii).

Griffin next opines that in his "professional, expert opinion, customers choose armored secure logistics companies, such as Brinks, to move their valuables for security, for the ease of mind, for the 'sometimes you take chances, other times you use Brinks' reasons." Griffin Rebuttal Rep. at ECF p. 7. Griffin bases this opinion on the Brink's website (for example, "[w]e're the trusted names for moving highly-secure and valuable assets over the road"); statements made to him when he worked at Brink's; the language Brink's uses to describe the job responsibilities of OTR drivers (such as "[m]aintain the safety, security, and control of the tractor trailer unit at all times"); and the contents of the Brink's OTR Policy Manual (including a section headlined "Professionalism/Courtesy/Security"). *Id*. at ECF pp. 6-7. Additionally, Griffin quotes a letter that Brink's sent one of the Jewelers two days after the theft. *Id*. at ECF p. 7.[10]

---

[9] It is generally the job of a party's lawyers, not its expert witnesses, to point out inconsistencies in the fact testimony and to argue that a contract is "ambiguous."

[10] The letter, signed by Senior Finance Director Shawn McMahon, read in part, "Our customers count on us to provide safety, security, and peace of mind. We take this responsibility seriously.

This portion of Griffin's second report does not contradict or rebut the evidence offered by Brink's experts. Griffin asserts that he is responding to deposition testimony from Beech, who stated that nowhere in "our agreement do we – do we agree with the customers that we are going to guard their goods. What we agree to is we're going to take possession of their goods; we're going to transport them from one place to another. And if a loss occurs, we will cover the entirety of the loss, make that customer – make that customer whole, if you will, up to the value they declared and that's what – that's what we guarantee." *Id*. Assuming that Griffin is accurately quoting the deposition testimony, Beech did not offer an expert opinion about why customers choose Brink's. Rather, he testified about the limited promises made in the Contract. That testimony therefore did not open the door for Griffin to offer a broad new opinion about customer decision-making.[11]

Still relying on the OTR Policy Manual, Griffin opines that leaving a single, sleeping Brink's employee in the tractor-trailer at a rest stop "would not be an acceptable example of the valuables being attended or guarded," Griffin Rebuttal Rep. at ECF p. 7, and that when the driver went inside the truck stop, he "made the decision to leave the valuables unguarded." *Id*. According to Griffin, this is a response to Beech's claim "that the driver was inside the truck stop due to his DOT required break." *Id*. But Beech said no such thing in his report,[12] and during his deposition

---

To that end, we strive to implement the best security practices to protect our customers' assets. We regret that this incident occurred despite these efforts." Griffin Rebuttal Rep. at ECF pp. 7-8.

[11] In their motion papers, defendants claim that Beech went on to testify that customers should not have "had an expectation" that "we would, quote, unquote, as you use the term guard their – their sh – their product." *See* Griffin Comparison Chart (Dkt. 221-6) at 2. But this is still a long way from an expert opinion as to why customers choose to ship with Brink's. Moreover, Griffin does not mention this portion of the Beech deposition testimony in his rebuttal report.

[12] Rather, Beech stated that no regulations *required* the driver to "drive the whole trip without stopping for needed breaks," and that it was reasonable for him to stop at the Flying J if he "needed a stop to use the restroom and to get food." Beech Rep. at ECF p. 31.

14

he acknowledged that he was "not an expert" on DOT regulations. *See* McGuffey Comparison Chart (Dkt. 221-5) at 6. Consequently, this portion of the Griffin rebuttal must also be stricken.

Finally, Griffin opines that the "'best security practices' that Mr. McMahon is referring to in his letter were not followed, because if they were, the theft most likely would not have occurred." Griffin Rebuttal Rep. at ECF p. 8. Griffin does not identify the adverse expert opinion to which this portion of his rebuttal report relates, and neither does defendants' opposition brief or the Griffin Comparison Chart. Construing Rule 26(a)(2)(D)(ii) broadly, however, I conclude that Griffin's final rebuttal opinion may be viewed as an attempt to contest the opinions of both Paxman and Beech to the effect that Brink's complied with industry standards for OTR transport.[13] Accordingly, while the Court GRANTS the motion to strike the portion of the Griffin rebuttal report beginning at the top of ECF p. 6 ("Mr. Beech gave his deposition . . .") and ending near the bottom of ECF p. 7 (". . . absolutely included and expected."), it DENIES the motion as to the opinions and supporting material before and after the stricken portion.

## B.    James McGuffey

In the first section of McGuffey's rebuttal opinion, he discusses and critiques the deposition testimony of Michael Beech, in the process repeating – in many cases verbatim – the opinions set forth in his initial report concerning security steps that he thinks Brink's should have taken to prevent the July 11, 2022 theft. McGuffey Rebuttal Rep. at 2-7. Plaintiff argues that this section should be stricken because its "clear focus . . . is to shore up his first report," Pl. Mem. at 7 (noting that McGuffey recycled "nearly a full page[] of his first report" into his rebuttal). Even where he

---

[13] As noted above, the present motion is limited to the expert disclosure and sequencing issues that defendants raise under my 8/31/23 Order and Rule 26(a)(2). Whether Griffin's final opinion (or indeed any of the rebuttal opinions offered by defendants) is sufficiently reliable to pass muster under Rule 702 and *Daubert* is an issue for another day.

is not copying himself word for word, plaintiff points out, "McGuffey simply restates his previous opinions." *Id*.

Plaintiff is largely correct. But while the repetitive nature of McGuffey's rebuttal report may render it ineffective, it does not render it violative of Rule 26(a)(2)(D)(ii), which requires only that the rebuttal report be "intended" solely to contradict or rebut an opposing expert. *See also Medidata Sols., Inc. v. Veeva Sys., Inc.*, 2022 WL 576089, at *2 (S.D.N.Y. Feb. 25, 2022) (rebuttal experts "have no burden to produce models or methods of their own; they need only attack those of plaintiffs' expert"). Moreover, a rebuttal report that merely repeats the expert's original points is harmless, as it adds nothing to the sum of expert evidence arrayed against Brink's.

The second section of McGuffey's rebuttal report, however, must be stricken. In this section, headlined "Information on Cargo Thefts in the State of California," McGuffey writes, "As mentioned during my deposition on August 28, 2023, I found reliable information which I am attaching, related to Cargo Thefts in California," McGuffey Rebuttal Rep. at 7, adding, "I share this information only to strengthen my May 2023 report that Brink's security and Brink's management should have been tracking this sort of data[.]" *Id.* McGuffey then provides three and a half pages of data concerning cargo theft statistics from 2017 to 2022 – which he says Brink's should have been tracking – together with commentary from other security professionals about how best to avoid the increasing risk. *Id*. at 7-10. Defendants do not argue that this section constitutes appropriate rebuttal evidence. Rather, they claim that the cargo theft data was included pursuant to Rule 26(e)(2), which "requires an expert to supplement his report with additional information elicited at his deposition." Def. Opp. at 9. This argument is unavailing.

Fed. R. Civ. P. Rule 26(e)(1)(A) requires that a disclosure (including an expert disclosure) be supplemented when the party who made it "learns that in some material respect the disclosure

. . . is incomplete or incorrect." However, Rule 26(e) is not "a vehicle to permit a party to serve a deficient opening report and then remedy the deficiency through the expedient of a 'supplemental' report." *Lidle*, 2009 WL 4907201, at *5. An expert is required to provide a "complete statement" of her opinions in her initial report, along with all "facts or data" considered in forming them. Fed. R. Civ. P. 26(a)(2)(B). The purpose of the rule is to provide certainty to the opposing party, so that it can prepare for trial accordingly. If the expert is permitted to shore up her original report – weeks or months later – with additional facts and data, "the very purpose of the rule is nullified." *Lidle*, 2009 WL 4907201, at *5 (quoting *Coles v. Perry*, 217 F.R.D. 1, 4 (D.D.C. 2003)). Thus, before an expert can supplement her report, she must show that the information she seeks to add "was previously unknown or unavailable," and that its absence rendered her prior report "inaccurate or misleading because it was incomplete." *Gyllenhammer v. Am. Nat'l Red Cross*, 2018 WL 1956426, at *4 (N.D.N.Y. Jan. 23, 2018) (internal quotation and citation omitted); *see also Sandata Technologies, Inc. v. Infocrossing, Inc*., 2007 WL 4157163 at *4 (S.D.N.Y. Nov. 16, 2007) ("It is only if the expert subsequently learns of information that was previously unknown or unavailable, that renders information previously provided in an initial report inaccurate or misleading because it was incomplete, that the duty to supplement arises."); *Lidle*, 2009 WL 4907201, at *6 (rejecting supplemental report containing new test results because the expert could and should have performed the tests "prior to the submission of his opening report"); *Exist, Inc. v. Tokio Marine Am. Ins. Co.*, 2023 WL 7117369, at *3 (S.D.N.Y. Oct. 5, 2023) (disallowing proposed supplemental report where plaintiff "fail[ed] to explain why the information it pledges to provide in its amended expert report . . . could not have been included in the original Santicola Report").

McGuffey makes no claim that the cargo theft data appearing in his rebuttal report was unknown or unknowable when he submitted his opening report four months earlier.[14] To the contrary: during his deposition (taken in August 2023), he testified about the data, and recalled "reading it," but admitted that he failed to cite it in his initial report. *See* McGuffey Dep. at 112:3-113:17. The conclusion is therefore inescapable that McGuffey simply neglected to include the relevant data in his initial report. Consequently, the Court DENIES the motion to strike as to the first section of the McGuffey rebuttal report but GRANTS it as to the second section, beginning with the headline, "Information on Cargo Thefts in the State of California."

### C.    Daniel W. Lupton

In the first portion of his rebuttal report, Lupton disagrees with the opinions expressed by Tullos, both in his report and at deposition, as to how to calculate the second Brink's employee's time in the sleeper berth, whether he had satisfied the DOT's "ten hour rest rule," and thus whether he could have been awakened when the tractor-trailer stopped at the Flying J. Lupton Rebuttal Rep. at 4-9. In the second portion of his rebuttal, Lupton disagrees with Beech about "standards and practices in the secure transport industry," including whether the tractor-trailer should have been guarded by an awake, on-duty employee while at the truck stop, and whether Beech was correct about the differences between CIT and OTR security measures. *Id.* at 9-12.

In its opening brief, plaintiff argues that both portions simply restate Lupton's initial opinions, and that the entire report should be stricken for this reason. *See* Pl. Mem. at 3-4, 11. In its reply brief, plaintiff seemingly admits that Lupton's comparison of CIT and OTR security features is new, but argues that the analysis could and should have been included in his original

---

[14] Indeed, if the information were unavailable in May 2023, when McGuffey signed his original report, he could hardly expect Brink's to have been "tracking" it, and increasing its security protocols accordingly, prior to the robbery at the Flying J in July 2022.

report, because Beech provided fact (not opinion) testimony about both CIT and OTR practices in April 2023, prior to Lupton's initial report. Pl. Reply at 3; *see also* Beech Dep. at 125:16-129:18.

It is true that Lupton adheres to his originally stated opinions, and consequently restates them, to some degree, in his rebuttal report. But that it not all he does. With regard to sleeper berth time and the ten hour rest rule, Lupton takes on Tullos point by point, explaining where they agree (for example, that each driver was required to keep an electronic logging device or "ELD log"), where they disagree (for example, whether to rely on the ELD log or the employees' recollection of their activities on July 10, 2022), and why, in Lupton's opinion, his approach is more sound (because, he says, the logs are required to be accurate, whereas human memory is fallible). Lupton Rebuttal Rep. at 4-5, ¶ 1. Similarly, Lupton challenges Beech's opinions regarding whether the driver complied with the Brink's OTR Policy Manual and industry standards, and specifically responds, on a point-by-point basis, to Beech's opinion – raised for the first time in his written expert report – that CIT and OTR transport operations had little in common. *Id.* at 11. These may be "third round opinions," Pl. Reply at 3, but that does not make them improper rebuttal.

However, the Court will strike the (brief) portion of the Lupton rebuttal report attacking Beech's supposed testimony that "Brink's is not actually obligated to guard a customer's valuables in their custody." Lupton Rebuttal Rep. at 9-10, ¶¶ 8-9. As explained above, I do not read Beech's testimony so broadly. Beech did testify that the language of the Contract makes no promises about guarding the customer's property. Rather than respond to that point, however, Lupton asserts that there was "some quantifiable expectation that [Brink's] employees do in fact guard valuables that they have taken custody of." *Id.* at 10 ¶ 9. Because this does not respond to any opinion that Beech actually expressed, it is not proper rebuttal. Consequently, the Court GRANTS plaintiff's motion

with respect to ¶¶ 8 and 9 of the Lupton rebuttal report but DENIES the motion as to the remainder of that report.

### D.    Walter Jeffery Stiles

As noted above, Beech stated that he "disagreed with Defendants' experts [meaning McGuffey and Lupton] who claim that other locking devices would have prevented this loss. Other locking devices (such as Enforcer locks) can be easily defeated by portable mechanical tools, cutting devices and torches." Beech Rep. at 2. Walter Jeffery Stiles – a locksmith – demonstrates on rebuttal that an Enforcer lock would have significantly slowed down the thieves who stole the Jewelers' property. Stiles Rebuttal Rep. at ECF p. 5. He does so by describing (and providing a video showing) an experiment he performed in which he "reenacted" the crime, first using "the Enforcer 1217 with an Abeloid [sic] padlock," and then using the simpler padlock and hasp that was on the Brink's tractor-trailer on July 11, 2022. *Id.* at ECF p. 4. It took Stiles six minutes to get through the Enforcer with a cutting wheel, but only six seconds to bypass the padlock and hasp. *Id.* Moreover, the assault on the Enforcer "required the use of multiple batteries" to power the cutting wheel, which "caused visible sparks to fly," increasing the chance of detection the longer it was in use. *Id.*

Brink's notes that Stiles did not actually read the Beech report before performing his experiment, and argues that his opinion should be stricken for this reason, and because it is "wholly new" and "based on an experiment he conducted at some unspecified time at some unspecified place." Pl. Mem. at 4, 14. Whether Stiles read the Beech report or not, however, his own report responds directly to it, with an experiment that would have made no sense to perform until Beech articulated the premise that Stiles challenged, that is, that an Enforcer lock would not have made an appreciable difference. *See Sci. Components Corp. v. Sirenza Microdevices, Inc.*, 2008 WL 4911440, at *2 (E.D.N.Y. Nov. 13, 2008) (accepting, as "archetypal rebuttal testimony," a report

that "identifies a flawed premise in an [opposing] expert report"). I therefore conclude that the Stiles rebuttal report meets the test of Rule 26(a)(2)(D)(ii). Consequently, as to the Stiles rebuttal report, the Court DENIES plaintiff's motion.

### E.    Fred Del Marva

Fred Del Marva, who describes himself as a "hospitality industry standard of care expert" and a licensed private investigator, *see* Del Marva Rebuttal Rep. at ECF pp. 6-8, submitted a four-page report in which he broadly reviews plaintiff's "operational practices, procedures, policies, protocols, and conduct," ostensibly to determine whether they "proximately caused the theft of millions of dollars in jewelry from the Plaintiff's tractor trailer truck while parked at the Pilot Flying J's parking lot." *Id*. at 1-2. Although Del Marva states that he reviewed and is responding to the expert reports and testimony of Beech and Scally, *see id.* at 2, the body of his report consists almost entirely of the same list of alleged security failings already proffered – repeatedly – by Griffin, McGuffey, Lupton, and Stiles. For example, when discussing the physical security of the tractor-trailer, Del Marva states that Brink's "could have" used a door alarm, an access control code system, camera surveillance, signage, and/or "stronger, harder to defeat locking mechanisms than a mere padlock on an easily compromised hasp." *Id*. at 2. Moving to Brink's OTR protocols, Del Marva opines that a driver taking a break "should be required to awaken his co-driver" if legally permissible, and "should be required to return to the vehicle as soon as possible." *Id*. at 3. He next faults Brink's for failing to analyze the "cargo theft risk at the particular location" and failing to test its locks to see "how long it would take for a thief to break in." *Id*. He then cites the same Shawn McMahon letter highlighted by Griffin and draws the same conclusion: that Brink's "did not come close to implementing best security practices." *Id*. at 4.

Not only is the Del Marva report cumulative; it fails to set forth the "basis and reasons" for any of his opinions, as required by Rule 26(a)(2)(B)(i). At no point, for example, does Del Marva

connect his opinions to his industry experience, or support them with any relevant data.[15] It thus appears that Del Marva simply harvested the views of defendants' other experts and repackaged them (without attribution) into a "highlights reel," concluding with the sweeping statement that, "but for all of the aforementioned gross negligent conduct and the conscious, reckless disregard for the defendant's [sic] property, their substantial loss would have never occurred." Del Marva Rebuttal Rep. at 4.

Defendants argue that the Del Marva report is "distinct from" that of their other experts in two minor respects: (i) Del Marva opines that security procedures should depend "more on the nature of the property than on the value of the property," and (ii) Del Marva's list of devices that Brink's "could have" used on its OTR tractor-trailers includes one device not expressly mentioned by defendants' other experts: an "access control code system that would require thieves to punch the right buttons to gain access," which some Starbucks stores use on their bathroom doors. Def. Opp. at 9 (referencing Del Marva Rebuttal Rep. at 2-3). This is insufficient to distinguish Del Marva's opinions from the "overlapping and substantially similar" opinions of defendants' other experts. *Bahadoran v. City of New York*, 2023 WL 7385909, at *2 (S.D.N.Y. Nov. 8, 2023) (directing plaintiff to show cause why he should not be precluded, on cumulativeness grounds, from calling two experts as to the same subject matter). The Court therefore GRANTS plaintiff's motion to strike the Del Marva rebuttal report, both because it fails to comply with Rule

---

[15] This may be because Del Marva has no background in OTR (or CIT) transport, does not claim to be familiar with industry standards, and (insofar as his report discloses) did not read the Brink's OTR Policy Manual (or comparable manuals used by its competitors). Although he claims to have expertise "in the areas of security[,] vulnerability assessment, locking systems, asset protection, surveillance systems, and methods of preventing and deterring crime with methods as simple as a $10.00 sign," Del Marva Rebuttal Rep. at 2, his resume states that he "has been in the hospitality industry for over 60 years," *id*. at ECF p. 7, and does not reflect any experience with the particular challenge of transporting high-value cargo over long distances.

26(a)(2)(B)(i) and because it is unreasonably cumulative of the testimony of defendants' four other experts. *See Highland Cap. Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 184 (S.D.N.Y. 2008) (precluding the testimony of seven proposed experts because "[i]t is unnecessary and would be a waste of time for all of these experts to opine on the same subjects"); *United States v. Walker*, 910 F. Supp. 861, 863 (N.D.N.Y. 1995) (a party may not "make its case through the sheer weight of successive expert testimony by even two experts as to their identical conclusions on identical issues").

### F.    Depositions

The Court declines to rule, at present, on plaintiff's alternative request for leave to depose McGuffey, Lupton, and Stiles as to their rebuttal reports. On May 6, 2024, Brink's moved for summary judgment on its declaratory judgment claim (Dkt. 249), and on June 18, 2024, it moved to dismiss defendants' non-contract counterclaims. (Dkt. 277.) The outcome of these motions (now pending before the District Judge) could moot plaintiff's request for additional expert depositions.

## IV.    CONCLUSION

For the reasons stated above, plaintiff's motion to strike defendants' rebuttal expert reports is GRANTED IN PART as to the rebuttal reports of Griffin, McGuffey, and Lupton; DENIED as to the rebuttal report of Stiles; and GRANTED as to the rebuttal report of Del Marva. Plaintiff may renew its request for additional expert depositions, if necessary, after its motions for summary judgment and to dismiss are decided.

Dated:  New York, New York
           September 18, 2024

SO ORDERED.

_____
**BARBARA MOSES**
**United States Magistrate Judge**

23