UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BRINK'S GLOBAL SERVICES USA, INC.

Plaintiff,

- against -

BONITA PEARL INC., FORTY-SEVENTH
& FIFTH, INC., HAWAIIAN DESIGN
JEWELRY, CO., KIMIMOTO JEWELRY,
LAMS JADE CENTER, INC., LEES
INTERNATIONAL JEWELRY INC., PAN
LOVELY JEWELRY, PETRI GEMS. INC.,
S & N DIAMOND CORP., SUPREME
COLLECTION CORPORATION, and
TREASURE CONNECTION FINE
JEWELRY, INC.

Defendants.

**MEMORANDUM
OPINION & ORDER**

22 Civ. 6653 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

Plaintiff Brink's Global Services USA, Inc. ("Brink's") brings this declaratory

judgment action against eleven jewelers ("Defendants") seeking a declaration regarding the

rights and obligations of the parties under a standard form Brink's contract. (Cmplt. (Dkt. No. 1)

¶¶ 40-43)

On July 10, 2022, each jeweler defendant exhibited at a gem and jewelry show in

San Mateo County, California. (Brink's R. 56.1 Stmt. (Dkt. No. 249-1) ¶ 36) At the conclusion

of the jewelry show, each jeweler contracted with Brink's to transport their merchandise to

another jewelry show in Pasadena, California, or to a company office. (Id. ¶ 37) The next

morning – while the Brink's tractor-trailer transporting the jewelers' merchandise was in transit –

the Brink's truck was burglarized at a truck stop in Lebec, California, and millions of dollars in

jewelry was stolen. (Id. ¶¶ 73-75, 82)

In this action, Brink's seeks a declaration that the relationship between it and Defendants is governed by the Brink's's standard form contract that the parties entered into, and that the limitation of liability provisions contained in that contract are applicable. (Cmplt. (Dkt. No. 1) ¶ 43)

Brink's filed the Complaint on August 4, 2022. (Dkt. No. 1) In their March 13, 2023 answer, Defendants assert counterclaims for breach of contract, negligence, and fraud, and allege violations of New York General Business Law § 349 and California Business & Professions Code § 17200 et seq. (Answer (Dkt. No. 235) at 10-33)[1] On May 6, 2024, Brink's moved for summary judgment on four aspects of its declaratory judgment claim. (Mot. for Sum. J. (Dkt. No. 248))[2] On June 18, 2024, Brink's moved to dismiss Defendants' four non-contract counterclaims and to strike Defendants' request for lost profit damages, punitive damages, interest, and an award of attorneys' fees. (Mot. to Dismiss (Dkt. No. 277))

For the reasons stated below, Brink's motion for summary judgment will be granted in part and denied in part, and its motion to dismiss Defendants' non-contract counterclaims will be granted. Brink's motion to strike Defendants' request for lost profit damages, punitive damages, interest, and an award of attorneys' fees will be denied as moot as to Counterclaims Two, Three, Four, and Five, and granted as to Counterclaim One.

---

[1] Except for deposition transcripts, the page numbers of documents cited in this opinion correspond to page numbers designated by this District's Electronic Case Files ("ECF") system. Deposition page numbers refer to the pagination assigned by the court reporter.
[2] Defendant Arat Jewelry Corp. and Defendant El Dorado Jewelry, Inc. settled their claims against Brink's in March and April 2023, respectively. (Dkt. Nos. 123, 136)

# BACKGROUND

## I. FACTS[3]

### A. Parties

Plaintiff Brink's provides secure transportation for valuables, including jewelry. (Pltf. R. 56.1 Stmt. (Dkt. No. 249-1) ¶ 1)  Its operations include an "Over-the-Road" tractor-trailer division.  (Id. ¶¶ 2-3)  Prior to the theft at issue in this case, Brink's Over-the-Road division had not suffered a loss in thirty-five years.  (Id. ¶ 3)

### B. The Jewelers

Defendants are eleven jewelry companies who exhibited merchandise at a jewelry show in San Mateo, California, on July 10, 2022.  (Id. ¶ 43)  Each Defendant is owned by one or two people, most of whom are immigrants who have varying levels of English language ability.[4] (See id. ¶¶ 90, 92-94 (Bonita Pearl); id. ¶¶ 115, 117-19 (Forty-Seventh & Fifth); id. ¶¶ 146, 148-51 (Hawaiian Design); id. ¶¶ 176, 178-82 (Kimimoto); id. ¶¶ 196, 199-200 (Lam's Jade Center); id. ¶¶ 221, 226-27 (Lee's International); id. ¶¶ 241, 242-44 (Pan Lovely); id. ¶¶ 268, 270-72 (Petri

---

[3]  With respect to Brink's motion for summary judgment, to the extent that this Court cites facts drawn from Brink's Local Rule 56.1 statement, it has done so because Defendants have either not disputed those facts or have not done so with citations to admissible evidence.  See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted).  Where Defendants disagree with Brink's characterization of the cited evidence, and have presented an evidentiary basis for doing so, the Court relies on Defendants' characterization of the evidence.  Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion).

[4]  The parties dispute the English language capabilities of many of the owners of the Defendant jewelers, but Defendants generally admit that each owner has at least some capacity to understand English.  (Compare, e.g., Defendants' R. 56.1 Cntrstmt. (Dkt. No. 303-1) ¶ 94 (the owner and operator of Bonita Pearl, Inc., "Mr. Cheng[,] is only able to read limited jewelry-related emails and documents") with, e.g., id. at ¶ 118 (conceding that the owner and operator of Forty-Seventh & Fifth, Inc., "Mr. Malki[,] speaks English at home with his wife and children"))

Gems); id. ¶¶ 284, 286-90, 293 (S&N Diamond); id. ¶¶ 303, 305-07 (Supreme Collection); id. ¶¶ 332, 334 (Treasure Connection))

**C.    The Brink's Transport Contract**

When Brink's transports valuables, it does so pursuant to the "Brink's Global Services Valuable Transport Contract" (the "Contract").  The Contract contains a number of provisions that are relevant to the dispute here.  (Id. ¶ 9)

In Section II of the Contract – which is entitled "CUSTOMER REPRESENTATIONS AND WARRANTIES; INDEMNIFICATION OF BRINK'S" – Brink's customers provide the following representations and warranties:

> . . .
>
> - (c) You have properly and accurately described the Property in the Shipment and declared its actual monetary value [. . .] for carriage purposes ("Declared Value");
>
> . . .
>
> - (e) You agree to be bound by the accuracy of all descriptions, valuations and other particulars furnished to Brink's for customs, consular and other purposes;
>
> - (f) UNLESS OTHERWISE SPECIFICALLY AGREED IN WRITING, YOU WILL NOT TENDER TO BRINK'S ANY SHIPMENT WITH AN ACTUAL VALUE IN EXCESS OF THE LIMITS SET OUT IN SECTION X.C HEREINBELOW, OR ANY SHIPMENT IN EXCESS OF THE DECLARED VALUE;
>
> - (g) You understand that providing a Declared Value significantly below the actual value of the Shipment without the written consent of Brink's constitutes fraud against Brink's and may constitute insurance fraud[.]

(Id. ¶ 9 (emphasis in Contract); see also Beech Decl., Ex. B (Contract) (Dkt. No. 253-2) § II) The Contract also states that "Brink's has undertaken to provide the Service You have designated based upon the foregoing representations, warranties and undertakings made by You."  (Contract (Dkt. No. 253-2) § IV(A))

Section X of the Contract is entitled "DECLARED VALUES; BRINK'S

LIABILITY; LIMITATIONS ON BRINK'S LIABILITY" (id. § X), and provides as follows:

A. Declared Values. . . . You shall . . . provide Brink's the Declared Value for all Your Shipment(s), whether transported internationally or domestically, including each Consignment(s) and each container in Your Consignment(s), which shall be equal to or exceed the Customs Value.

B. Liability. In the event that any of the Property included in the Shipment is lost during the period in which Brink's is responsible, Brink's will pay You the actual monetary value of the Property which is lost, up to the Declared Value. . . . Payment shall be contingent upon Your cooperation with any investigation into the loss and execution of all documentation reasonably requested by Brink's. Any loss or damage payment is further subject to the terms and limitations contained in this Contract and any Rider(s) to this Contract. Under no circumstance will Brink's Liability for loss of or damage to Property exceed the lesser of the Declared Value or the actual monetary value of the Property as of the date of loss. . . .

(Id.) Section X also specifies that Brink's "will not be liable for loss or damage of a Shipment"

if the customer "fail[s] to comply with any of the representations and warranties set out in this

Contract." (Id. § X(C)(8))

Section X also restricts the type of damages a customer may recover:

Brink's Liability whether as a result of breach of contract, tort, indemnity, warranty or otherwise, shall not, under any circumstances, include special, incidental, consequential, indirect or punitive losses or damages including but not limited to, loss of profits (whether direct or indirect), loss of market, loss of business, loss of goodwill, lost sales or other indirect or consequential losses, interest or attorneys' fees, whether or not caused by the fault or neglect of Brink's and whether or not Brink's had knowledge that such losses or damages might be incurred.

(Id. § X(C)(2))

Section X(C)(8) addresses the parties' obligations in the event that property in

Brink's custody is lost or damaged:

Upon loss or damage to Property, the parties shall promptly and diligently assist each other to establish the identity of the Property lost or damaged and shall take all such other reasonable steps as may be necessary to assure the maximum amount of salvage at a minimum cost. Affirmative written proof of the Property

lost or damaged, subscribed and sworn to by You and substantiated by Your books, records and accounts shall be furnished to Brink's.

(Id. § X(C)(8))

> The Contract includes the following claim procedures where a customer has suffered a loss:

> A. Making a Claim.  In the event of any loss or damage to Your Property, You must notify Brink's in writing of Your intention to bring a claim within twenty-four (24) hours after discovery of any loss of or damage to Your Property, but in no event more than within
> - four (4) days of the agreed or anticipated date of delivery of Your Property, in the event of total loss of or non-delivery of Your Property[;]
> - seven (7) days following delivery of Your Property, in the event of partial loss of or damage to Your Property;
> - In the event that You do not notify Brink's of Your intention to bring a claim within the time limits herein, any claim shall be absolutely waived and barred.
> - In any event, any proceedings against Brink's must be commenced and written notice thereof provided to Brink's within one year of the event giving rise to the cause of action against Brink's.  If proceedings are not so commenced, the cause of action shall be absolutely barred and Brink's shall be discharged from all and any liability whatsoever and howsoever arising.

(Id. § XI(A))

> The Contract also contains an integration clause stating that the Contract "constitutes the entire agreement between the parties with respect to any Shipment and shall supersede all other understandings, offers and agreements, whether written or oral, between You and Brink's concerning the Shipment."  (Id. § XVI)  The Contract further provides that a customer "may not rely on any communications made outside of . . . official means of communication."  "Official means of communication" includes emails to a Brink's email address and communications on Brink's letterhead.  (Id. § XV)

> When Brink's takes possession of a shipment, a Brink's employee provides the customer with a Pickup Manifest form that the customer must complete and sign.  (Pltf. R. 56.1

Stmt. (Dkt. No. 249-1) ¶ 19)  The Pickup Manifest includes a line on which the customer states the "Carriage Value" of the shipment.  (Id.)  The Contract is printed on the back of each Pickup Manifest form.  (Id. ¶ 20)  When the customer signs the Pickup Manifest form, the customer acknowledges that "ALL SHIPMENTS ARE SUBJECT TO THE TERMS OF THE CONTRACT" and that the customer is "agree[ing] to the terms and conditions of the Brink's Global Services Valuables Transport Contract."  (Id. ¶ 21) (emphasis in original)  After the customer signs the original, white copy portion of the Pickup Manifest form, the customer is given a yellow carbon copy version of the form.  (Id. ¶ 22)  A copy of the Contract is also available on Brink's website.  (Id. ¶ 24)  Moreover, when corresponding by email with customers – including the jewelers here – Brink's employees frequently use an email signature that contains a hyperlink to the copy of the Contract on Brink's website.  (Id. ¶ 30)

D.    **Defendants' Prior Use of Brink's**

Between 2012 and 2022, each Defendant used Brink's to transport valuables on dozens of occasions.  A chart summarizing each Defendant's prior use of Brink's is set forth below:

| Defendant Jeweler | Shipments with Brink's between 2012 and July 2022 |
|---|---|
| Treasure Connection | 30 |
| Forty-Seventh & Fifth, Inc. | 41 |
| Lam's Jade Center, Inc. | 28 |
| Bonita Pearl, Inc. | 42 |
| S&N Diamond | 54 |
| Petri Gems, Inc. | 43 |
| Hawaiian Design Jewelry Company | 39 |
| Pan Lovely Jewelry Company | 32 |

7

| Lee's International Jewelry, Inc. | 29 |
| Supreme Collection Corporation | 70 |
| Kimimoto Jewelry | 49 |

(Id. ¶ 26)

> According to Brink's, on each such occasion the Defendant jeweler agreed to
> the same (or substantially similar) terms and conditions, including a New York
> forum selection clause, an express requirement that the customer accurately state
> the "Declared Value" of the shipment, and a limitation of liability provision that
> limited Brink's liability to the lesser of the Declared Value or the actual value of
> any lost or stolen items and an express exclusion of non-contract damages.

(Id. ¶ 27)[5] (emphasis in original)

### E.  The July 10, 2022 San Mateo Jewelry Show

On July 10, 2022, each Defendant exhibited merchandise at the International Gem and Jewelry Show at the San Mateo County Convention Center in San Mateo, California (the "San Mateo jewelry show").  (Id. ¶ 36)  At the conclusion of that jewelry show, each Defendant contracted with Brink's to transport its merchandise to another destination.  Most of the Defendants arranged for Brink's to transport merchandise to the International Gem show scheduled for Pasadena, California.  Others arranged for Brink's to transport merchandise to a company office.  (Id. ¶ 37)  When Brink's employees collected Defendants' merchandise for transport, they provided each jeweler with, inter alia, the Pickup Manifest form (a white original version with a yellow carbon copy attached).  (Id. ¶ 44)  As noted above, the Pickup Manifest

---

[5]  Defendants dispute this statement, alleging that "[t]he [C]ontract changed over time."  (Def. R. 56.1 Cntrstmt. (Dkt. No. 303-1) ¶ 27)  In support of this assertion, Defendants cite to "Woerner testimony and examples of Manifests."  (Id.)  This citation is insufficient, because Defendants provide no page numbers.  In any event, the Court has reviewed the portions of Bruce Woerner's deposition provided by the parties (see Schuman Decl., Ex. A-27 (Woerner Dep.) (Dkt. No. 256-28)), and none of these excerpts address changes to the Contract or Pickup Manifest over time.  Accordingly, Paragraph 27 of Brink's Local Rule 56.1 Statement is deemed admitted.  Giannullo, 322 F.3d at 140 ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted).

form provided to the jewelers included all the terms and conditions of the Contract. (Id.) Before agreeing to accept the merchandise for transport, Brink's required each Defendant to acknowledge its acceptance of the Contract's terms by having an authorized representative sign the Pickup Manifest. (Id. ¶¶ 38-39, 43)[6]

The Pickup Manifest includes a section headed "Carriage Value." (Id. ¶ 41; see also Beech Decl., Ex. A (Pickup Manifest Forms) (Dkt. No. 253-1)) Brink's contends that in this section the customer must fill in the "Declared Value" of the goods to be transported. (See Pltf. R. 56.1 Stmt. (Dkt. No. 249-1) ¶ 41) Defendants contend that in this section the customer indicates "the insurance amount desired." (See Def. R. 56.1 Cntrstmt. (Dkt. No. 303-1) ¶ 41).

Defendant Bonita Pearl's Pickup Manifest – which is representative of each Defendant's Pickup Manifest – is set forth below:

---

[6] Although Defendants admit that their authorized representatives signed the Pickup Manifests, they contend that their acceptance of the Contract is void, "because [the Contract] was illegible, unconscionable, and induced by fraud." (Def. R. 56.1 Cntrstmt. (Dkt. No. 303-1) ¶ 39)

**||||||BRINKS**
Global Services

Show Outbound
Pickup Manifest

**Pickup Location**

c/o: BONITA PEARL, LOS ANGELES, CA, 90014, US

Vault:  Main

Booth: 710

TT - LAX

INTERGEM - SAN MATEO JULY 2022
909 896 3638

11021429109

### Brink's Door-to-Door Details

| Deliver To | Air Bill Number | # Pieces | Carriage Value (USD) | Gross WL (LBS) | Seal Number |
|---|---|---|---|---|---|
| INTERGEM - PASADENA JULY 2022 PASADENA CONVENTION CENTER 300 E GREEN STREET PASADENA, CA, 91101 Tel 909 896 3638 c/o:  BONITA PEARL | 11021429109 | 1 | 200,000 | | A1473699 |
| | 11021429110 | 1 | 200,000 | | A1473700 |
| | | | | | |
| | | | | | |
| **Estimates:** | | 2 | 400,000.00 | 129.00 | |
| **Grand Totals:** | | | | | |

To be filled out by Brinks personnel

Received from BONITA PEARL   (2)   on  7/10/22     □AM □PM

Total number of items   Date (mm/dd/yy)   Time hh:mm

Gloria Corrales                    Gloria Corrales

Print Messenger Name              Messenger Signature

Received by Brink's Global Services and/or its affiliates or agents, as private contract carriers, the indicated number of containers to be delivered as indicated herein. All Shipments are Door to Door. Brink's does not accept C.O.D. shipments. Brink's does not service residential locations. ALL SHIPMENTS ARE SUBJECT TO THE TERMS OF CONTRACT.

I confirm the shipment details contained herein are correct and agree to the terms and conditions of Brink's Global Services Valuable Transport Contract.

Ming Chang

Print Shipper Name                Shipper Signature

(Beech Decl., Ex. A (Pickup Manifest Forms) (Dkt. No. 253-1) at 2)  Below the section regarding "Carriage Value" is a space for the customer to sign the Pickup Manifest.  As shown above, that section states that "ALL SHIPMENTS ARE SUBJECT TO THE TERMS OF THE CONTRACT" and that – by signing – the customer is "confirm[ing] [that] the shipment details contained herein are correct" and "agree[ing] to the terms and conditions of Brink's Global Services Valuable Transport Contract."  (Id.) (emphasis in original)

After signing the Pickup Manifest, each jeweler loaded its merchandise into bags supplied by Brink's, sealed the bags, and brought the sealed bags to Brink's for transport.  (Pltf. R. 56.1 Stmt. (Dkt. No. 249-1) ¶ 46)  Brink's did not open the bags after the jewelers sealed them.

(Id. ¶ 47)  After obtaining the executed Pickup Manifests and receiving the jewelers' sealed bags, Brink's loaded the bags onto a Brink's tractor-trailer.[7]  (Id. ¶ 48)  The Brink's tractor-trailer then left the San Mateo jewelry show for a secure storage yard in Los Angeles.  (Id. ¶ 49)

### F.    **The Theft**

The Brink's tractor-trailer that left San Mateo was staffed with two Brink's truck drivers: Tandy Motley and James Beaty.  (Id. ¶ 50)  Brink's truck drivers such as Motley and Beaty are required to follow regulations issued by the U.S. Department of Transportation, including a mandate that drivers have at least ten hours of rest time between fourteen-hour shifts. (Id. ¶ 54); see also 49 C.F.R. § 395.5.  Brink's drivers working as a team on long distance routes generally take turns driving and taking required rest time in the truck's sleeper berth.  (Pltf. R. 56.1 Stmt. (Dkt. No. 249-1) ¶ 55)

Motley and Beaty left Salt Lake City, Utah in the early morning of July 10, 2022. Motley drove to Spring Creek, Nevada, while Beaty rested.  (Id. ¶ 58)  After arriving in Spring Creek, the drivers switched, with Beaty driving the rest of the way to San Mateo, California, while Motley took his mandated rest.  (Id. ¶ 59)  The Brink's truck arrived at the San Mateo jewelry show at about 3:00 p.m. P.T.  (Def. R. 56.1 Cntrstmt. (Dkt. No. 303-1) ¶ 60)

Beaty then spent some amount of time assisting other Brink's employees with processing shipments; there is conflicting evidence as to how long he worked before retiring to the sleeper berth.  (See id. ¶ 61 (noting that Beaty testified that he assisted for "a couple of hours" after the 3:00 p.m. arrival, but also testified that he entered the sleeper berth at 3:39 p.m.))  After

---

[7]  The parties disagree as to the number of bags Defendants provided to Brink's for transport. Brink's says that Defendants provided 73 bags for transport (see Pltf. R. 56.1 Stmt. (Dkt. No. 249-1) ¶ 48), while Defendants say that they provided 74 bags to Brink's.  (See Def. 56.1 Cntrstmt. (Dkt. No. 303-1) ¶ 48)

Beaty finished assisting his colleagues, he began his mandated ten-hour rest period.  (Pltf. R. 56.1 Stmt. (Dkt. No. 249-1) ¶ 64)

At about 8:21 p.m., the Brink's truck loaded with Defendants' merchandise left the San Mateo jewelry show bound for Los Angeles, with Motley driving.  (Id. ¶ 63)  When the Brink's truck reached Lebec, California – about 300 miles south of San Mateo – at about 1:56 a.m., Motley pulled into the Flying J Truck Stop.  (Id. ¶¶ 65-67; Def. R. 56.1 Cntrstmt. (Dkt. No. 303-1) ¶ 67)  Motley parked the Brink's truck in a well-lit area near other tractor-trailers and went into the Flying J.  (Pltf. R. 56.1 Stmt. (Dkt. No. 249-1) ¶ 68)  Beaty remained in the Brink's truck, asleep in the sleeper berth.  (Id. ¶ 70)  According to Brink's, Motley was inside the Flying J for about seventeen minutes.  (Id. ¶ 69)  The jewelers contend, however, that Motley was inside the Flying J for twenty-seven minutes.  (Def. R. 56.1 Cntrstmt. (Dkt. No. 303-1) ¶ 69)

When Motley returned to the truck, he noticed that a seal on the back doors of the tractor-trailer had been cut and was lying on the ground, and that the lock on the back doors had been removed.  (Pltf. R. 56.1 Stmt. (Dkt. No. 249-1) ¶ 73)  Motley entered the trailer and discovered that of the 73-74 bags that had been loaded onto the tractor-trailer in San Mateo, only 49 bags remained.  (Id. ¶ 75)  Motley then reported the theft to local law enforcement and his Brink's supervisors.  (Id. ¶ 74)

Two Los Angeles County Sheriff's Department deputies reported to the scene to investigate the theft.  (Id. ¶ 76)  They found metal shavings near the ledge of the trailer, indicating that the thieves had cut the lock off the doors of the trailer while it was parked at the Flying J truck stop.  (Id. ¶ 77)  Although Motley and Beaty fully cooperated with the deputies' investigation, law enforcement has not determined who committed the theft.  (Id. ¶¶ 78-79)

According to the amounts listed in the "Carriage Value" boxes on the Pickup Manifests, the total value of the merchandise stored in the stolen bags is $8.7 million. Of that amount, Defendants' merchandise accounts for $6.45 million. (Id. ¶ 82, 85)

A summary of Defendants' missing bags and the declared value of the merchandise they contained – as indicated in the Pickup Manifest "Carriage Value" boxes – is set forth below:

| Jeweler | Total Bags in Shipment | Stolen Bags | Jeweler's Declared Value |
|---|---|---|---|
| Bonita Pearl | 2 | 2 | $200,000.00 |
| | | | $200,000.00 |
| Forty-Seventh & Fifth | 2 | 2 | $50,000.00 |
| | | | $50,000.00 |
| Hawaiian Design Jewelry | 1 | 1 | $400,000.00 |
| Kimimoto | 5 | 4 | $1,800,000.00 |
| | | | $350,000.00 |
| | | | $350,000.00 |
| | | | $350,000.00 |
| Lam's Jade Center | 2 | 1 | $200,000.00 |
| Lee's International Inc. | 1 | 1 | $1,000,000.00 |
| Pan Lovely Jewelry | 2 | 2 | $100,000.00 |
| | | | $100,000.00 |
| Petri Gems | 1 | 1 | $300,000.00 |
| S&N Diamond | 2 | 1 | $400,000.00 |
| Supreme Collection | 2 | 2 | $200,000.00 |
| | | | $200,000.00 |
| Treasure Connection | 2 | 1 | $200,000.00 |
| | | **Total:** | $6,450,000.00 |

(Pltf. R. 56.1 Stmt. (Dkt. No. 249-1) ¶ 82)

As discussed above, the Contract's notice provisions require Brink's customers to provide Brink's with timely notice of their intent to bring a claim. (Id. ¶ 88; Contract (Dkt. No. 253-2) § XI) Defendants Bonita Pearl, Inc., Hawaiian Design Jewelry Co., S&N Diamond Corp., and Treasure Connection Fine Jewelry Inc. never submitted a notice of claim to Brink's, however. (Pltf. R. 56.1 Stmt. (Dkt. No. 249-1) ¶ 88)[8]

## II.    PROCEDURAL HISTORY

Brink's filed the Complaint on August 4, 2022. (Dkt. No. 1) In the Complaint, Brink's asks this Court to

A. Declare that Brink's duties to each Defendant are governed by the plain language of the Contract including all loss calculations;

B. Declare that "under no circumstances will Brink's Liability for loss of or damage to [Defendants'] Property exceed the lesser of the Declared Value or the actual monetary value of the [Defendants'] Property as of the date of loss." . . .

C. In the alternative, declare that Brink's is not liable for loss of those Defendants who failed to comply with the representations and warranties related to "properly and accurately" describing the "actual monetary value ("Declared Value")" of property. . . .

D. In the alternative, declare that those Defendants who failed to comply with the notification provisions of the Contract have waived their claims. . . .

E. Declare that Brink's has no liability for "special, incidental, consequential, indirect or punitive losses or damages including but not limited to loss of profits (whether direct or indirect), loss of market, loss of business, loss of goodwill, lost sales or other indirect or consequential losses, interest, or attorney fees." . . .

---

[8] In their summary judgment opposition brief, Defendants contend that S&N Diamond and Bonita Pearl "came in person to give their notices," citing "Corrales Dep. 283:25-286:15." (See Def. Sum. J. Opp. (Dkt. No. 303-2) at 30) In Defendants' response to Brink's Local Rule 56.1 Statement, however, Defendants admit that Bonita Pearl and S&N Diamond never submitted written notices of claim to Brink's as required by the Contract. (Def. R. 56.1 Cntrstmt. (Dkt. No. 303-1) ¶¶ 88, 111, 299) Moreover, the Corrales deposition excerpts submitted to the Court do not include pages 283 to 286 (see Redmond Decl., Ex. 1-57 (Corrales Dep.) (Dkt. No. 251-85); Schuman Decl., Ex. A-17 (Corrales Dep.) (Dkt. No. 256-17)), and the pages that have been provided do not demonstrate that Bonita Pearl and S&N Diamond submitted written notice to Brink's. (Id.)

(Id. ¶ 43) (internal citations omitted, alterations in original)

On December 20, 2022, Defendants moved to dismiss or, in the alternative, for a stay. (Dkt. No. 98)  This Court denied Defendants' motion in a February 28, 2024 bench ruling. (See Feb. 28, 2024 Order (Dkt. No. 231); Feb. 28, 2024 Tr. (Dkt. No. 233))  Defendants filed an Answer on March 13, 2024, that contains counterclaims for (1) breach of contract; (2) negligence; (3) fraud; (4) violation of New York General Business Law § 349; and (5) violation of California Business & Professional Code § 17200 et seq.  (Dkt. No. 235)

On May 6, 2024, Brink's moved for summary judgment on four aspects of its declaratory judgment claim (Dkt. No. 248),[9] and on June 18, 2024, Brink's moved to dismiss Defendants' non-contract counterclaims and to strike Defendants' request for lost profit damages, punitive damages, interest, and an award of attorneys' fees.  (Dkt. No. 277)

## DISCUSSION

## I.   BRINK'S MOTION FOR SUMMARY JUDGMENT

### A.   Summary Judgment Standard

Summary judgment is warranted when the moving party shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008).  "If the movant meets its burden, 'the nonmoving party must come forward with admissible evidence sufficient to raise a genuine

---

[9]  In the Complaint, Brink's seeks a declaration that it is "not liable for the loss of those Defendants who failed to comply with the representations and warranties related to 'properly and accurately' describing the 'actual monetary value ("Declared Value")' of property." (Cmplt. (Dkt. No. 1) ¶ 43(C))  In moving for summary judgment, however, Brink's does not seek a ruling on this aspect of its declaratory judgment claim.  (Mot. for Sum. J. (Dkt. No. 248) at 1-2)

issue of fact for trial in order to avoid summary judgment.'" UMB Bank, N.A. v. Bluestone

Coke, LLC, No. 20-CV-2043 (LJL), 2020 WL 6712307, at *3 (S.D.N.Y. Nov. 16, 2020) (quoting

Jaramillo v. Weyerhaeuser Co., 536 F.3d 140, 145 (2d Cir. 2008)).

       In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities,

and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing

summary judgment.'" Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting

Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)). However, a "'party may not rely on

mere speculation or conjecture as to the true nature of the facts to overcome a motion for

summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create

a genuine issue of material fact where none would otherwise exist.'" Hicks v. Baines, 593 F.3d

159, 166 (2d Cir. 2010) (alterations in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456

(2d Cir. 1995)).

       "'A court may properly address the merits of a declaratory judgment action

through a motion for summary judgment.'" Peter Mayer Publishers Inc. v. Shilovskaya, 11 F.

Supp. 3d 421, 424 (S.D.N.Y. 2014) (quoting Middlesex Ins. Co. v. Mara, 699 F.Supp.2d 439, 444

(D. Conn. 2010)).

    **B.**    **Analysis**

       Brink's argues that it is entitled to summary judgment on its declaratory judgment

claim because (1) the Contract is valid, enforceable, and unambiguous, and all Defendants agreed

to it; (2) the Contract limits Defendants' recovery to the Declared Value; (3) the Contract is not

otherwise unenforceable; and (4) certain Defendants are barred from making a claim under the

Contract because they did not give contractually-mandated notice to Brink's of their alleged loss.

(Pltf. Sum. J. Br. (Dkt. No. 249) at 2)

As an initial matter, the Court notes that it is undisputed that on July 10, 2022, each Defendant entered into a contract with Brink's to transport their merchandise after the conclusion of the San Mateo jewelry show.  (See Def. R. 56.1 Cntrstmt. (Dkt. No. 303-1) ¶ 37 (admitting that each Defendant entered into a contract with Brink's))  Defendants contend, however, that summary judgment is not warranted because the Contract is ambiguous and thus unenforceable.  (See Def. Sum. J. Opp. (Dkt. No. 303-2) at 17-21)

### 1.    **Whether the Contract is Ambiguous**

### a.    **Applicable Law**[10]

"'[A] written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed.'"  Rockland Exposition, Inc. v. Alliance of Auto. Serv. Providers of N.J., 08-CV-7069 (KMK), 08-CV-11107 (KMK), 2009 WL 1154094, at *5 (S.D.N.Y. Mar. 19, 2009) (quoting Terwilliger v. Terwilliger, 206 F.3d 240, 245 (2d Cir. 2000)).  "Typically, the best evidence of intent is the contract itself; if an agreement is 'complete, clear and unambiguous on its face[, it] must be enforced according to the plain meaning of its terms.'"  Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 177 (2d Cir. 2004) (quoting Greenfield v. Philles Records, Inc., 98 N.Y.2d

---

[10]  In a diversity suit such as this, a federal court "applies the choice-of-law rules of the forum state."  Maryland Cas. Co. v. Cont'l Cas. Co., 332 F.3d 145, 151 (2d Cir. 2003) (citation omitted).  "In New York, valid contractual choice of law provisions are generally enforced."  Tyurin v. B & H Photo Video Pro Audio LLC, No. 17 CIV. 5983 (AJN), 2018 WL 4760658, at *3 (S.D.N.Y. Sept. 28, 2018) (citing AEI Life LLC v. Lincoln Benefit Life Co., 892 F.3d 126, 132 (2d Cir. 2018)).  Here, the Contract provides that "for any claim or dispute arising out of or relating to any Shipment originating within the United States of America, such claim or dispute shall be governed by the laws of the State of New York, without regard to conflict of law principles." (Contract (Dkt. No. 253-2) § XI(B)(2))  The parties also cite to New York law in their briefing.  Where "both parties' briefing relies on New York law and neither party disputes its applicability, the Court shall apply New York law."  Aretakis v. Caesars Ent., No. 16 CIV. 8751 (KPF), 2018 WL 1069450, at *7 n.5 (S.D.N.Y. Feb. 23, 2018) (citing Celle v. Filipino Reporter Enters. Inc., 209 F.3d 163, 175 (2d Cir. 2000)).  Accordingly, this Court will apply New York law.

562, 569 (2002)) (alteration in <u>Eternity Global</u>).  Accordingly, where a "'contract is clear and

unambiguous on its face, the intent of the parties must be gleaned from within the four corners of

the instrument, and not from extrinsic evidence.'"  <u>RJE Corp. v. Northville Indus. Corp.</u>, 329

F.3d 310, 314 (2d Cir. 2003) (quoting <u>De Luca v. De Luca</u>, 300 A.D.2d 342, 342 (2d Dept. 2002)).

> [A]mbiguity exists where a contract term could suggest more than one meaning
> when viewed objectively by a reasonably intelligent person who has examined the
> context of the entire integrated agreement and who is cognizant of the customs,
> practices, usages and terminology as generally understood in the particular trade
> or business.

<u>World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co.</u>, 345 F.3d 154, 184 (2d Cir. 2003)

(internal quotation marks omitted).

 "Language whose meaning is otherwise plain does not become ambiguous merely

because the parties urge different interpretations in the litigation[, however]."  <u>Hunt Ltd. v.

Lifschultz Fast Freight, Inc.</u>, 889 F.2d 1274, 1277 (2d Cir. 1989).  "Thus, the court should not find

[a] contract ambiguous where the interpretation urged by one party would 'strain [ ] the contract

language beyond its reasonable and ordinary meaning.'"  <u>Law Debenture Trust Co. of New York

v. Maverick Tube Corp.</u>, 595 F.3d 458, 467 (2d Cir. 2010) (quoting <u>Bethlehem Steel Co. v. Turner

Constr. Co.</u>, 2 N.Y.2d 456, 459 (1957)) (first alteration added).  Moreover, courts "'should

construe a contract in a manner that avoids inconsistencies and reasonably harmonizes its

terms,'" and "'should not . . . interpret[ a contract] to produce a result that is absurd.'"  <u>Alpha

Cap. Anstalt v. Real Goods Solar, Inc.</u>, 311 F. Supp. 3d 623, 629 (S.D.N.Y. 2018) (quoting <u>Gessin

Elec. Contractors, Inc. v. 95 Wall Assocs., LLC</u>, 74 A.D.3d 516, 518 (1st Dept. 2010) and <u>Lipper

Holdings v. Trident Holdings</u>, 1 A.D.3d 170, 171 (1st Dept. 2003)).

 "Under New York law, 'if a contract is unambiguous on its face, its proper

construction is a question of law' that may be resolved on summary judgment."  <u>LVP Assocs.

L.L.C. v. Bank of China, New York Branch</u>, 17 Civ. 5274 (SHS), 2017 WL 5514523, at *4

(S.D.N.Y. Nov. 16, 2017) (quoting Gaia House Mezz LLC v. State St. Bank & Tr. Co., 720 F.3d

84, 89 (2d Cir. 2013)).  However, "'when the meaning of [a] contract is ambiguous . . . a question

of fact is presented which cannot be resolved on a motion for summary judgment.'"  LaSalle

Bank Nat. Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 205 (2d Cir. 2005) (quoting

Postlewaite v. McGraw–Hill, Inc., 411 F.3d 63, 67 (2d Cir. 2005)).

### b.  Brink's Argument that the Contract is Unambiguous

In moving for summary judgment, Brink's asserts that the relevant terms of the

Contract are unambiguous.  (Pltf. Sum. J. Br. (Dkt. No. 249) at 16-17)  In particular, Brink's relies

on Section X of the Contract, which it refers to as the "Declared Value Provision."  (Id. at 11)

That provision states, in relevant part, that "[i]n the event that any of the Property included in the

Shipment is lost during the period in which Brink's is responsible, Brink's will pay to You the

actual monetary value of the Property which is lost, up to the Declared Value. . . ."  (Contract

(Dkt. No. 253-2) § X(B))  Brink's argues that "[t]he Declared Value Provision at issue [is] clear,"

and that its unambiguous meaning is "apparent from both the Contract terms and the parties'

longstanding course of dealing."  Accordingly, Defendants' recovery is limited to "the actual

monetary value of the Property which was lost, up to the Declared Value[.]"  (Pltf. Sum. J. Br.

(Dkt. No. 249) at 22 (emphasis in original))  In arguing that "Defendants may not avoid the

Declared Value Provision," Brink's contends that there would be "fundamental unfairness in

allowing a party to try to recover more than the value they declared on a shipment of goods."

(Id.)

### c.  Defendants' Arguments Regarding Alleged Ambiguities

Defendants contend that summary judgment should be denied because the

Contract is ambiguous and unclear as to (1) "what comprises the contract"; (2) the meaning of

"lost" property, as used in the Contract's limitation of liability provision; (3) the meaning of

"Carriage Value" and "Declared Value" as used in the Pickup Manifest; (4) the meaning of the phrase "whether or not caused by the fault or neglect of Brink's," which appears at multiple points in the Contract but which is not included in the Contract's limitation of liability provision; (5) whether "Declared Value" is synonymous with "actual monetary value"; and (6) what a customer is entitled to recover in the event of a loss where the customer declared a value below the actual value of the merchandise transported by Brink's.  (Def. Sum. J. Br. (Dkt. No. 303-2) at 18-21)

### i.     What Comprises the Contract

Defendants contend that "[t]he Brink's Contract is fundamentally unclear as to what comprises the contract."  (Def. Sum. J. Opp. (Dkt. No. 303-2) at 18)  Section I(2) of the Contract defines the Contract as

> the agreement set forth in this document and any other document provided by Brink's or its agents that refer specifically to this Contract or are issued pursuant to this Contract such as, for example, air way bills, collection notices, receipts, riders, etc., all of which are part of the agreement between You and Brink's.

(Contract (Dkt. No. 253-2) § I(2))[11]

According to Defendants, this provision

> . . . makes the [National Chinese American Jewelers Association/Jewelry Importers & Manufacturers Association International] rate sheet part of the Contract.  It makes invoices part of the Contract, as they are issued pursuant to the Contract.  It makes every e-mail string with a footer referring to the Contract part of the Contract.  Indeed, it makes every e-mail from every jeweler discussing any transportation governed by the Contract (including every e-mail requesting "insurance value") part of the Contract, especially since the definition is not limited to documents "issued" by Brink's.

---

[11]  As noted above, the Contract also contains an integration clause stating that the Contract "constitutes the entire agreement between the parties with respect to any Shipment and shall supersede all other understandings, offers and agreements, whether written or oral, between You and Brink's concerning the Shipment."  (Contract (Dkt. No. 253-2) § XVI)

(Def. Sum. J. Opp. (Dkt. No. 303-2) at 18)[12]

According to Brink's, the purpose of the language from Section I(3) quoted above "is to include the ancillary documents provided by Brink's with the Contract, including, for example, the waybill and receipt – which establish the amount of money owed by the customer for its shipment costs and its satisfaction of the payment." (Pltf. Sum. J. Reply (Dkt. No. 265) at 12)  Brink's also notes that "an integrated written agreement [can] include[] documents that it incorporates by reference."  (Id. (citing VFS Fin. v. Ins. Servs. Corp., 111 A.D.3d 505, 505-06 (1st Dept. 2013))

The Court concludes that the Contract unambiguously defines the documents that make up the Contract.  Section I(2) states that the Contract includes "the agreement set forth in this document and any other document provided by Brink's or its agents that refer specifically to this Contract or are issued pursuant to this Contract. . . ."  (Contract (Dkt. No. 253-2) § I(3))  This description clearly describes the documents that make up the Contract.[13]

---

[12]  Defendants Bonita Pearl, Kimimoto, Lee's International, Pan Lovely, and Treasure Connection are members of the National Chinese American Jewelers Association ("NCAJA"). (Pltf. R. 56.1 Stmt. (Dkt. No. 249-1) ¶¶ 96, 187, 231, 246, 336)  Defendants Forty Seventh & Fifth, Hawaiian Design, Lee's International, Petri Gems, Supreme Collection, and Treasure Connection are members of the Jewelry Importers & Manufacturers Association International ("JIMA").  (Id. ¶¶ 132, 159, 231, 278, 314, 336)  These two trade organizations had negotiated a group rate with Brink's for members who used Brink's to transport their merchandise.  (Pltf. R. 56.1 Stmt. (Dkt. No. 249-1) ¶ 28)

[13]  As to the miscellaneous documents that Defendants contend are part of the Contract, the rate sheets provided to the trade organizations do not fall within this definition, because they do not "refer specifically" to the Contract.  The Brink's invoices, by contrast, would fall within this definition, because they were issued by Brink's pursuant to the Contract.  (See Pltf. Sum. J. Reply (Dkt. No. 265) at 12 (noting that "ancillary documents provided by Brink's," which "establish the amount of money owed by the customer for its shipment costs and its satisfaction of that payment," are part of the Contract))  As to emails between the parties, they are part of the Contract only to the extent that they were sent by Brink's and "refer specifically to th[e] Contract."

### ii.    "Lost" Property

Defendants contend that "lost" property – as used in Section X(B) of the Contract – is ambiguous.  Section X(B) states that,

> [i]n the event that any of the Property included in the Shipment is lost during the period in which Brink's is responsible, Brink's will pay to You the actual monetary value of the Property which is lost, up to the Declared Value.

(Contract (Dkt. No. 253-2) § X(B))  Defendants argue that "lost" – as used in Section X(B) – is "subject to at least two reasonable interpretations, one of which could be 'strayed or misplaced' *i.e.*, if Brink['s] simply could not find a package without knowing it disappeared.  That is different than a felonious theft, so it is unclear if the purported contractual limitation applies to a theft."  (Def. Sum. J. Opp. (Dkt. No. 303-2) at 18-19)

In response, Brink's asserts that "[t]he entire purpose of the Contract is to define and limit Brink's liability.  That liability is triggered whenever the shipper's package is not delivered – whether through accident, damage, loss, or theft."  (Pltf. Sum. J. Reply (Dkt. No. 265) at 15)

The Court concludes that Defendants have not shown that the term "lost" – as used in the Contract – is ambiguous, because Defendants and Brink's have not offered conflicting, plausible interpretations of that term.  Brink's concedes that – under the Contract – "lost" property includes stolen merchandise, and that it is liable to Defendants for the "actual monetary value" of the property, "up to the Declared Value."  (Pltf. Sum. J. Reply (Dkt. No. 265) at 15 ("Here, Brink's is not arguing for an exclusion of liability based on the shipments being stolen by a third party, but rather is agreeing that it is liable under § X.B since 'Property included in the Shipment [was] lost during the period in which Brink's [was] responsible.'") (quoting Contract (Dkt. No. 253-2) § X(B)))  Moreover, most of the Defendants submitted claims to Brink's under the Contract on the grounds that their merchandise had been "lost" under the

Contract as a result of the theft. (See Pltf. R. 56.1 Stmt. (Dkt. No. 249-1) ¶¶ 16, 87-88)[14] And in this lawsuit, all of the Defendants have asserted that they are entitled to damages under the Contract because their merchandise was stolen while in Brink's custody. (See Answer (Dkt. No. 235) at 10-22) Where, as here, the parties agree as to the meaning of a contractual term, there is no basis for the Court to find that that term is ambiguous. See, e.g., MBL Contracting Corp. v. King World Prods., Inc., 98 F. Supp. 2d 492, 497 (S.D.N.Y. 2000) ("It is axiomatic that 'where the parties [to a contract] have attached the same meaning to a promise or agreement or a term thereof, it is interpreted in accordance with that meaning.'") (quoting Restatement (Second) of Contracts § 201(1)) (alteration in original); McPherson v. City of New York, No. 09 CIV. 4682 BSJ THK, 2011 WL 4431163, at *5 (S.D.N.Y. Sept. 23, 2011) ("[A] party cannot manufacture a factual dispute by themselves creating conflicts in the record.") (citation omitted); Emery v. Emery, 166 A.D.2d 787, 788 (3rd Dept. 1990) (adopting an interpretation of a contractual provision as a matter of law where "there was no disputed issue of fact as to the parties' intent on the meaning of the provision").

SS&C Tech. Holdings, Inc. v. AIG Specialty Ins. Co., 436 F. Supp. 3d 739 (S.D.N.Y. 2020) – cited by Defendants (see Def. Sum. J. Opp. (Dkt. No. 303-2) at 19) – is not on point. SS&C involved an insurance dispute between a financial technology company and AIG, its insurer. Id. at 741. SS&C suffered a "spoofing" attack, in which the perpetrators fraudulently obtained $5.9 million in funds that belonged to an SS&C client. Id. at 742. The client sued SS&C, which settled the claim. Id. AIG refused to cover the settlement payment, citing an exclusion in the insurance policy for "the monetary value of any funds lost due to the Insured's

---

[14] As discussed below, Defendants Bonita Pearl, Hawaiian Design, S&N Diamond, and Treasure Connection never submitted a written notice of claim to Brink's. (Id. ¶ 88)

exercise of . . . authority or discretionary control." Id. at 742, 744. The court granted SS&C summary judgment on its breach of contract claim, finding that the exclusion that AIG relied on was not applicable, because "SS&C lacked authority or discretionary control" over the client's accounts. Id. at 745.

In dicta, the court went on to consider SS&C's alternative argument that the exclusion did not apply because the client's funds were not "lost," but had instead been stolen. While acknowledging that the client's funds had been stolen, AIG argued that the term "lost" was broad enough to include funds that had been stolen. Id. ("[I]n AIG's view, the funds at issue were, broadly speaking, 'lost.'"). The court found "both parties' interpretations equally plausible," and "[b]ecause the ambiguity [had to] be resolved in favor of the insured," the court also granted SS&C summary judgment on this alternative ground. Id. at 746.

SS&C Tech. Holdings has no application here, because the parties have not offered conflicting, "equally plausible" interpretations of the term "lost." Instead, Brink's and the Defendants agree that "lost" property – under the Contract – includes customers' property stolen while in Brink's custody. (Pltf. Sum. J. Reply (Dkt. No. 265) at 15; Answer (Dkt. No. 235) at 14 (alleging that Brink's "breached the contract to securely transport Counterclaimants' jewelry and gemstones from the San Mateo jewelry show to the Pasadena jewelry show by failing to deliver Counterclaimants' jewelry and gems," and seeking "tens of millions of dollars" as a result); see Contract (Dkt. No. 253-2) § X(B)) In sum, Defendants cannot argue that the term "lost" is ambiguous in the context of this case, because the parties have not offered plausible, conflicting interpretations of that term, and instead agree that – under the Contract – "lost" property includes stolen merchandise. See Minasian v. IDS Prop. Cas. Ins. Co., 676 F. App'x 29, 32 (2d Cir. 2017) ("covered loss" found unambiguous where "plaintiffs submitted

claims" which "proves that they recognized that the purportedly stolen items constituted covered losses").

### iii.    "Carriage Value" and "Declared Value"

As discussed above, the front side of the Pickup Manifest directs a Brink's customer to state the "Carriage Value" of the merchandise that Brink's will transport (Beech Decl., Ex. A (Pickup Manifest Forms) (Dkt. No. 253-1)), while the Contract's warranty and limitation of liability provisions – printed on the back side of the Pickup Manifest – refer to the "Declared Value" of the customer's merchandise "for carriage purposes."  (Contract (Dkt. No. 253-2) §§ II(c), X(B))  "Carriage Value" is not a defined term in the Contract.  Indeed, the term "Carriage Value" does not appear in the Contract.

Defendants contend that Brink's use of "Carriage Value" and "Declared Value" in the Pickup Manifest and Contract renders the Contract ambiguous.  According to Defendants, "there is no way for the customer to know what value is supposed to be the 'Declared Value.'" (Def. Sum. J. Opp. (Dkt. No. 303-2) at 19)  And Defendants further contend that they thought the purpose of the box for "Carriage Value" on the Pickup Manifest was to elicit the "insurance value desired, not any measure of actual value."  (Def. R. 56.1 Cntrstmt. (Dkt. No. 303-1) ¶ 381)

"A contract does not become ambiguous simply because a term is undefined or the parties argue different interpretations[, however]."  500 W. 43rd St. Realty, LLC v. Thukral, No. 23-CV-09510 (LJL), 2025 WL 315375, at *10 (S.D.N.Y. Jan. 28, 2025) (citations omitted). Here, when the Pickup Manifest and the Contract – which are the front and back of the same document – are considered together, the meaning of "Carriage Value" is clear.  Given that the Contract requires a Brink's customer to accurately report the property's "actual monetary value . . . for carriage purposes ('Declared Value')" (Contract (Dkt. No. 253-2) § II(c)) – in declaring the "Carriage Value" of the property to be transported by Brink's on the front of the Pickup

Manifest – it would have been clear to a Brink's customer that the customer was obligated to accurately report the property's "actual monetary value . . . for carriage purposes."  (Id.)

Indeed, when read "'in light of the obligation as a whole and the intention of the parties as manifested thereby,'" JA Apparel Corp. v. Abboud, 568 F.3d 390, 397 (2d Cir. 2009) (quoting Kass v. Kass, 91 N.Y.2d 554, 566 (1998)), this reading is the only reasonable reading of the language at issue.  Providing the "Declared Value" of the property to be shipped is a condition precedent to shipping with Brink's.  (See Contract (Dkt. No. 253-2) §§ II(c), X(A))  If "Carriage Value" on the front of the Pickup Manifest meant the "insurance value desired" – as Defendants argue (Def. R. 56.1 Cntrstmt. (Dkt. No. 303-1) ¶ 381) – there would be no place on the Pickup Manifest for Brink's customers to state the "Declared Value" of the goods to be transported, and therefore a condition precedent of the Contract would be impossible to fulfill. This would be an absurd result and, as discussed above, courts "'should construe a contract in a manner that avoids inconsistencies and reasonably harmonizes its terms'" and "'should not . . . interpret[ a contract] to produce a result that is absurd.'"  Alpha Cap. Anstalt, 311 F. Supp. 3d at 629 (quoting Gessin Elec. Contractors, 74 A.D.3d at 518 and Lipper Holdings, 1 A.D.3d at 171).

Defendants argue, however, that the term "'actual monetary value[,]' as used in the definition of 'Declared Value[,]' is ambiguous in the jewelry industry, as it could mean historical cost, current replacement cost, selling price at the jewelry shows, or full retail price[.]" (Def. Sum. J. Opp. (Dkt. No. 303-2) at 19)  As Brink's points out, however, the shipper of property is in the best position to know its "actual monetary value" (Pltf. Sum. J. Reply (Dkt. No. 265) at 14 (citing Beech Decl. (Dkt. No. 253) ¶ 16; Pltf. R. 56.1 Stmt. (Dkt. No. 249-1) ¶¶ 46-47)), and while the Brink's customer has the obligation to report the "actual monetary value," the

value chosen by the customer has consequences for the rate that Brink's will charge and the amount that the customer can recover from Brink's in the event of a loss.[15]

In sum, the Pickup Manifest's reference to "Carriage Value," and the reference to "actual monetary value" in the Declared Value provision of the Contract, do not render the Contract ambiguous.[16]

---

[15] Defendants also argue that Section II(g) of the Contract – which addresses "Declared Value" – is ambiguous. (Def. Sum. J. Opp. (Dkt. No. 303-2) at 20) Section II(g) states: "You understand that providing a Declared Value significantly below the actual value of the Shipment, without the written consent of Brink's constitutes fraud against Brink's and may constitute insurance fraud[.]" (Contract (Dkt. No. 253-2) § II(g)) According to Defendants, the fact that the Contract refers to "insurance fraud" – "while at the same time Brink's disclaims providing insurance yet agrees to pay for the fortuity of 'loss[]'" – "reinforc[es] [their argument] that the value stated should be the insurance value desired." (Def. Sum. J. Opp. (Dkt. No. 303-2) at 20)

This isolated reference to "insurance fraud" does not render the Contract ambiguous, however. For reasons explained above, the Contract clearly conveys that a Brink's customer must state the "actual monetary value" of its merchandise, and that the customer's recovery in the event of loss will be limited to the value the customer reported on the Pickup Manifest. Defendants have not offered evidence demonstrating that, or explained how, this reference in the Contract to "insurance fraud" led them to believe that the "Carriage Value" they filled out on the front of the Pickup Manifest was actually the amount of insurance coverage they wished to purchase.

[16] Defendants assert that "[e]very Defendant thought the Carriage Value blank [on the Pickup Manifest] was supposed to be filled in with the insurance value desired, not [with] any measure of actual value." (Def. Sum. J. Opp. (Dkt. No. 303-2) at 21) But this is not a reasonable interpretation of the Carriage Value box on the Pickup Manifest or the Contract. As discussed above, Brink's customers are required – as a condition precedent to entering into a contract with Brink's – to state a "Declared Value" of the merchandise that they want Brink's to transport (Contract (Dkt. No. 253-2) §§ II(c), X(A)), and the Contract provides that the "Declared Value" is the "actual monetary value . . . for carriage purposes." (Id. § II(c)) The only place in the Pickup Manifest to indicate the value of the property to be transported is the Carriage Value line. (See Beech Decl., Ex. A (Pickup Manifest Forms) (Dkt. No. 253-1) at 2)

And while Defendants note that certain Brink's invoices refer to "Ins. Value" (Def. R. 56.1 Cntrstmt. (Dkt. No. 303-1) ¶ 380), the Brink's invoices cited by Defendants were issued after Defendants completed the "Carriage Value" section of the Pickup Manifest; accordingly, the invoices could not have influenced or affected Defendants' understanding of "Carriage Value" at the time they entered the "Carriage Value" on the Pickup Manifest.

### iv.    "Whether or Not Caused by the Fault or Neglect of Brink's"

Defendants contend that the Contract is ambiguous as to whether the "contractual liability limit would apply to insulate [Brink's] from property loss or damage liability arising from its own negligence." (Def. Sum. J. Opp. (Dkt. No. 303-2) at 20)  Defendants note that while "Section X(C)(2) [of the Contract] bars recovery of lost profits and consequential damages 'whether or not caused by the fault or neglect of Brink's,'" "[t]hat quoted phrase does not appear in the limitation on recovery of the value of property in §X(B) . . . [,] indicat[ing] that recovery of the value of property would not be limited if 'caused by the fault or neglect of Brink['s].'" (Id. at 19)

Defendants go on to argue that,

> [b]y using different language to limit remedies for other damages in §X(C)(2) than the language used to limit the remedy for property loss or damage in §X(B), Brink's created [an] ambiguity concerning whether its contractual liability limit would apply to insulate it from property loss or damage liability arising from its own negligence.

(Id. at 20)  This argument is not persuasive.

Section X(B) of the Contract states that "[u]nder no circumstance will Brink's Liability for loss of or damage to Property exceed the lesser of the Declared Value or the actual monetary value of the Property as of the date of loss." (Contract (Dkt. No. 253-2) § X(B))  "The New York Court of Appeals recognizes that courts should normally honor [such] liability limiting provisions," Camofi Master LDC v. Coll. P'ship, Inc., 452 F. Supp. 2d 462, 478 (S.D.N.Y. 2006) (citing Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc., 84 N.Y.2d 430, 436 (1994)), and Defendants have not offered any cogent reason why this limitation on liability provision should not be enforced here.  While there are differences between the language used in the Contract provision barring recovery of lost profits and consequential damages (see Contract (Dkt. No.

253-2) § X(C)(2)) and the language used in the Contract's limitation of liability provision (id. § X(B)), those differences do not render these provisions ambiguous, because "the use of inconsistent phraseology . . . alone does not render ambiguous a contractual provision that is otherwise clear." Summit Health, Inc. v. APS Healthcare Bethesda, Inc., 993 F. Supp. 2d 379, 394 (S.D.N.Y. 2014), aff'd sub nom. APEX Emp. Wellness Servs., Inc. v. APS Healthcare Bethesda, Inc., 725 F. App'x 4 (2d Cir. 2018)). Here, the limitation of liability provision is clear, and the differences in phraseology between this provision and the provision barring recovery of lost profits and consequential damages is thus of no moment.

### v.    Declared Value as Actual Value

Defendants also contend that this same Contract provision – Section X(B), which limits Brink's liability to "the lesser of the Declared Value or the actual monetary value of the Property as of the date of the loss" – is ambiguous because "Declared Value is actual monetary value" according to Section II(c), and thus it is "logically impossible for one to be less than the other, unless Brink's tells people to fill in a lesser amount[.]" (Def. Sum. J. Opp (Dkt. No. 303-2) at 19-20 (emphasis in original))

It is not "logically impossible" for the Declared Value and actual monetary value to differ, however. In listing the Declared Value in the Carriage Value section of the Pickup Manifest, the customer – as here – may not have listed the "actual monetary value" of the property to be shipped. The Declared Value could thus be less than, or greater than, the actual monetary value of the property. Section X(B) makes clear that – in such circumstances – Brink's liability is limited to the "lesser of the Declared Value or the actual monetary value of the Property as of the date of the loss." Differences between the Declared Value and the actual monetary value could also arise where a customer's property was damaged during shipment. (See Contract (Dkt. No. 253-2) § X(C)(4) (providing that "Brink's will only be liable for losses

29

relating to . . . damage to the Property within any container if," inter alia, "the container has been

properly sealed and packaged as required by this Contract")) Accordingly, the Contract's

references to Declared Value and "actual monetary value" do not render the Contract ambiguous.

### vi.    Consequences of Under-Declaring Shipment Value

Defendants argue that the Contract "is highly ambiguous as to what happens if the

customer declares a significantly lower value than the actual monetary value." (Def. Sum. J.

Opp. (Dkt. No. 303-2) at 20-21) In support of this argument, Defendants cite the following

Contract provisions:

- Section X(B), which provides (in relevant part), that recovery is
  limited to "the actual monetary value of the Property . . . up to the
  Declared Value";

- Section X(B)(2), which provides (in relevant part) that if a
  customer "fail[s] to specify a Declared Value for a Shipment or
  provide[s] a Declared Value significantly below the actual value of
  the Shipment," recovery is limited to "the lesser of (a) the total of
  all charges payable by You to Brink's under this Contract or (b)
  $500"; and

- Section X(C)(8), which provides (in relevant part) that "Brink's
  will not be liable for loss or damage of a Shipment if You fail to
  comply with any of the representations and warranties set out in
  this Contract," (including warranties that a customer will not
  tender a shipment with an actual value in excess of the declared
  value).

(Def. Sum. J. Opp. (Dkt. No. 303-2) at 20-21) According to Defendants, "these provisions leave

a customer in complete doubt about whether the consequence of an actual value greater than the

Declared Value is zero recovery, recovery in the amount paid for the shipment or $500, or

recovery of the Declared Value." (Id. at 21)

Sections X(B)(2) and X(C)(8) are the Contract damage provisions least favorable

to Defendants, however, and Brink's is not seeking to enforce these provisions in this litigation.

Consistent with Section X(B) of the Contract, Brink's instead seeks a declaration that its liability

does not "exceed the lesser of the Declared Value or the actual monetary value of the

Defendants' Property as of the date of loss." (Mot. for Sum. J. (Dkt. No. 248) at 1)  In any event,

under the election of remedies doctrine, a party may choose among contractual remedies in the

event of a breach.  See ESPN, Inc. v. Off. of Com'r of Baseball, 76 F. Supp. 2d 383, 389

(S.D.N.Y. 1999) ("[A]n election is simply a choice among remedies by the party; it is a decision

by that party as to how it should proceed in the wake of the breaching party's nonperformance.

In other words, 'an election is not a waiver of any rights under the contract but rather a choice

between two inconsistent remedies for breach of the contract.'") (quoting Bigda v. Fischbach

Corp., 898 F. Supp. 1004, 1014 (S.D.N.Y. 1995)).  And the fact that a contract provides for

multiple potential remedies in the event of a breach does not render that contract ambiguous.

See Steuben Tr. Corp. v. Genesee Metal Prods., Inc., 63 A.D.3d 1677, 1678 (4th Dept. 2009)

(granting plaintiff summary judgment; "Even assuming, arguendo, that the option provision is

indeed ambiguous, we note that plaintiff is not seeking to enforce that provision.  Instead,

plaintiff is seeking to recover rent that was unambiguously due pursuant to the lease, and there is

no question that the parties intended to be bound by the lease."); Yonkers Ave. Dodge, Inc. v. BZ

Results, LLC, 95 A.D.3d 774, 775 (1st Dept. 2012) ("While the contract contained various

provisions for its termination, those differing contingencies did not render the

contract ambiguous.").

   In sum, the Contract's damage provisions do not render the Contract ambiguous.

###   d.  **Findings**

   Each Pickup Manifest executed by Defendants contains a box labeled "Carriage

Value (USD)."  Each Defendant inserted a dollar value in this box.  (Beech Decl., Ex. A (Pickup

Manifest Forms) (Dkt. No. 253-1))  The Pickup Manifest states that "ALL SHIPMENTS ARE

SUBJECT TO THE TERMS OF THE CONTRACT," and above the signature line on the Pickup

Manifest each Defendant provided the following confirmation: "I confirm the shipment details contained herein are correct and agree to the terms and conditions of Brink's Global Service Valuable Transport Contract." (Id.) On the reverse side of the Pickup Manifest, all the terms of the Contract are printed. (See Contract (Dkt. No. 253-2))

The Contract required each Defendant to represent and warrant that it had "properly and accurately described the Property in the Shipment and declared its actual monetary value . . . for carriage purposes ('Declared Value')." (Contract (Dkt. No. 253-2) § II(c)) Each Defendant also "agree[d] to be bound by the accuracy of all descriptions, valuations and other particulars furnished to Brink's for customs, consular and other purposes." (Id. § II(e)) And – in signing the Pickup Manifest – each Defendant warranted that, "UNLESS OTHERWISE SPECIFICALLY AGREED IN WRITING, YOU WILL NOT TENDER TO BRINK'S ANY SHIPMENT WITH AN ACTUAL VALUE IN EXCESS OF THE LIMITS SET OUT IN SECTION X.C HEREINBELOW, OR ANY SHIPMENT IN EXCESS OF THE DECLARED VALUE." (Id. § II(f)) (emphasis in original)

Under the Contract, the "Declared Value" listed by the customer in the Pickup Manifest provides a ceiling for Brink's liability in the event of a loss:

> B. Liability. In the event that any of the Property included in the Shipment is lost during the period in which Brink's is responsible, Brink's will pay to You the actual monetary value of the Property which is lost, up to the Declared Value. . . . Under no circumstances will Brink's Liability for loss of or damage to Property exceed the lesser of the Declared Value or the actual monetary value of the Property as of the date of loss.

(Id. § X(B))

The meaning of these provisions is unambiguous. In other words, "'a reasonably intelligent person who has examined the context of the entire integrated agreement who is cognizant of the customs, practices, usages and terminology as generally understood'" in the

secured shipping business, would only understand the above terms in one way. <u>World Trade Ctr.</u> <u>Props.</u>, 345 F.3d at 184 (quoting <u>Morgan Stanley Group Inc. v. New England Ins. Co.</u>, 225 F.3d 270, 275 (2d Cir. 2000)). The clear import of these provisions is that a Brink's customer must accurately declare the actual monetary value of the merchandise to be shipped in the "Carriage Value" box on the front of the Pickup Manifest, and that Brink's liability to its customer will be limited to the value that is so declared.

"'The very purpose of a limitation of liability clause [such as that found in the Contract] is[, of course,] to permit a carrier to anticipate the amount of risk it takes on, charge appropriately for bearing that risk, and avoid unforeseeable risk.'" <u>ABN Amro Verzekeringen</u> <u>BV v. Geologistics Americas, Inc.</u>, 253 F. Supp. 2d 757, 768 (S.D.N.Y. 2003), <u>aff'd</u>, 485 F.3d 85 (2d Cir. 2007) (quoting <u>Nippon Fire & Marine Ins. Co. v. Skyway Freight Sys., Inc.</u>, 45 F.Supp.2d 288, 294 (S.D.N.Y. 1999)). "To allow [a shipping customer] not to declare the proper value of its shipment, avoid paying a higher rate, but then recover the true value of its goods would allow [the shipping customer] to have it both ways." <u>Id.</u>; <u>see also</u> <u>Perera Co. v. Varig</u> <u>Brazilian Airlines, Inc.</u>, 775 F.2d 21, 24 (2d Cir. 1985) ("One who ships goods at a declared value substantially below their actual worth in order to receive a reduced freight rate is gambling that the goods will not be lost through someone's negligence. If such loss occurs, the shipper or his consignee should not be entitled to recover the full value of the goods by misdescribing as wilful misconduct acts which at most are questionably negligent.").

In sum, the Contract unambiguously requires a Brink's customer to accurately declare the "actual monetary value" of the merchandise it is requesting Brink's to transport, and to do so by entering that value in the "Carriage Value" box on the front of the Pickup Manifest.

The Contract likewise unambiguously limits Brink's liability to the Carriage Value specified by the customer or the actual monetary value of the customer's merchandise, whichever is lower.

### 2.    Whether the Contract is Enforceable

"When an agreement is unambiguous on its face, it must be enforced according to the plain meaning of its terms."  Lockheed Martin Corp. v. Retail Holdings, N.V., 639 F.3d 63, 69 (2d Cir. 2011) (citing S. Rd. Assocs., LLC v. Int'l Bus. Machines Corp., 4 N.Y.3d 272, 277 (2005)).  Defendants argue, however, that even if the Contract is unambiguous, it is unenforceable because (1) it is an illegal insurance contract; (2) Brink's committed fraud; (3) Brink's has unclean hands; (4) the doctrine of equitable estoppel precludes enforcement; (5) Brink's has waived the Contract's limitation of liability provisions; and (6) Brink's acted with gross negligence.  (See Def. Sum. J. Opp. (Dkt. No. 303-2) 10-17, 21-29)[17]  The Court addresses each of these arguments below.

### a.    Whether the Contract is an Illegal Insurance Contract

Defendants contend that the Contract is not enforceable because it is a contract for insurance, and Brink's is not licensed to provide insurance in New York.  (See Def. Sum. J. Opp. (Dkt. No. 303-2) at 21-24)

Under New York law, an insurance contract is:

[A]ny agreement or other transaction whereby one party, the "insurer," is obligated to confer [a] benefit of pecuniary value upon another party, the

---

[17]  In moving for summary judgment, Brink's argues that the Contract is not unconscionable. (See Pltf. Sum. J. Br. (Dkt. No. 249) at 23)  In response, Defendants merely state – without explanation – that "fact issues exist as to whether the contract is procedurally and substantively unconscionable."  (Def. Sum. J. Opp. (Dkt. No. 303-2) at 9)  Given these circumstances, Defendants have waived any unconscionability argument.  Palmieri v. Lynch, 392 F.3d 73, 87 (2d Cir. 2004) (failure to raise an argument in opposition to summary judgment waives it); VW Credit, Inc. v. Big Apple Volkswagen, LLC, No. 11 CIV. 1950 PAE, 2012 WL 5964393, at *5 (S.D.N.Y. Nov. 29, 2012) (in opposing summary judgment, "'[i]t is not sufficient merely to assert a conclusion without supplying supporting arguments or facts'") (quoting BellSouth Telecommunications, Inc. v. W.R. Grace & Co.-Conn., 77 F.3d 603, 615 (2d Cir. 1996)).

> "insured" or "beneficiary," dependent upon the happening of a fortuitous event in which the insured or beneficiary has, or is expected to have at the time of such happening, a material interest which will be adversely affected by the happening of such event.

N.Y. Ins. Law § 1101(a)(1). A "fortuitous event" is "any occurrence or failure to occur which is, or is assumed by the parties to be, to a substantial extent beyond the control of either party." Id. § (a)(2). N.Y. Ins. Law § 1102(a) prohibits people and entities from engaging in the business of insurance in New York without a license to do so. Id. § 1102(a).

In arguing that the Contract is unenforceable, Defendants contend that the Contract is "an all-risk insurance policy" and that Brink's "has no license to do insurance business and no exemption." (Def. Sum. J. Opp. (Dkt. No. 303-2) at 22)

As an initial matter, the Contract contains an explicit disclaimer stating that "BRINK'S IS NOT AN INSURER OF YOUR SHIPMENT." (Contract (Dkt. No. 253-2) § VIII) (emphasis in original)

Moreover, the primary purpose of the Contract was to arrange for the transport of Defendants' merchandise from the San Mateo jewelry show to the International Gem show scheduled for Pasadena, California, or to a Defendant's office. (Pltf. R. 56.1 Stmt. (Dkt. No. 249-1) ¶ 37) Any risk-shifting effectuated by the Contract was incidental to this primary purpose. And "an agreement is not 'insurance' when the element of risk is merely only an incident of the contract." 1 Couch on Insurance § 1:9 (2023) (citing Castleberry v. Goldome Credit Corp., 418 F.3d 1267, 1273 (11th Cir. 2005) ("When assumption of risk is only collateral to a contract that has a principal purpose other than risk shifting, the contract is not a contract of insurance.")); Higger v. Radziminsky & Zeger, Inc., 8 A.D.2d 967, 967 (2nd Dept. 1959) (a company "is not doing an insurance business within the meaning of the Insurance Law" where "any element of warranty or guarantee in the agreement in suit is merely incidental to [the company's] servicing business");

Grp. Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. 205, 211 (1979) ("The primary elements of an insurance contract are the spreading and underwriting of a policyholder's risk.").

Moreover, the loss of property that took place here while Brink's was transporting Defendants' valuables does not constitute a "fortuitous event" within the meaning of N.Y. Ins. Law § 1101(a)(2), because such a theft is not "to a substantial extent beyond the control of either party." N.Y. Ins. Law § 1101(a)(2). Indeed, a carrier such as Brink's retains control over the valuables throughout the delivery process and has the ability and the responsibility to take steps to ensure that a customer's property is not stolen during transport. (See, e.g., Contract (Dkt. No. 253-2) § IX(A)) For these reasons, the New York State Office of General Counsel has opined – as to UPS – that UPS is not engaged in the business of insurance: "UPS as the shipper retains control over the package throughout the delivery process," and "[l]oss or damage to the package is not an occurrence which is 'beyond its control.'" Therefore, "any loss or damage would not be considered a fortuitous event under New York Law." New York General Counsel Opinion 8-15-94 (#1) (Aug. 15, 1994).

Similarly, courts have consistently concluded that shippers such as Brink's are not engaged in the business of insurance. See, e.g., Nichols v. Mayflower Transit, LLC, 368 F. Supp. 2d 1104, 1107 (D. Nev. 2003) (a transportation contract with a "declared value" provision "is not an insurance agreement, nor is it anything analogous to one"); Thermal Techs., Inc. v. United Parcel Serv., Inc., No. 08-CV-102-GKF-FHM, 2008 WL 4838681, at *8 (N.D. Okla. Nov. 5, 2008) ("[T]he UPS language is a limitation on liability and not an insurance agreement.").

The cases cited by Defendants (see Def. Sum. J. Opp. (Dkt. No. 303-2) at 22-23) are not to the contrary, because in each such case the primary service rendered by the service provider was loss prevention. See Ollendorff Watch Co. v. Pink, 279 N.Y. 32, 35-36 (1938)

(concluding that agreement to replace a watch if it was stolen was an insurance contract, because the agreement to replace "has nothing whatever to do with the sale of the watch or the contract of sale"); Hamberg v. Guaranteed Mortg. Co. of New York, 180 Misc. 276, 280 (N.Y. Sup. Ct. 1942) (finding that defendant was engaged in the business of insurance where it guaranteed mortgages "regularly and as its sole business"); Gerenstein v. Weiner, 9 Misc. 2d 259, 260 (2nd Dept. 1957) (contracts involving a business that services neon signs for a monthly charge found to be an insurance contract because the business's "obligation was not related to the quality or efficiency of an article made or sold by him"); People by Abrams v. Am. Motor Club, Inc., 133 A.D.2d 593, 594 (1st Dept. 1987) (holding that a "prepaid collision service contract" sold by a motor club was an insurance contract where (1) the consumer paid a premium to the motor club and had to satisfy a deductible before making a claim, and (2) the motor club – "in the event of body damage or mechanical or electrical damage caused by collision, fire, theft, windstorm, hail, flood, malicious mischief, or vandalism [–] was obligated to repair the damaged car or reimburse the consumer for the loss, regardless of cost"); Seekamp v. Fuccillo Auto. Grp., Inc., No. 1:09-CV00018LEKDRH, 2010 WL 980581, at *5-7 (N.D.N.Y. Mar. 15, 2010) (contract providing for 10% discount on replacement vehicle after a theft is an insurance contract).

By contrast, under the Contract here, Brink's accepts liability only for the time that a customer's property is within Brink's possession and control – i.e., only for risks that directly relate to Brink's transportation services. Accordingly, the Contract is not an illegal insurance contract.

### b.    **Fraud**

Defendants argue that "Brink's intentionally induced its customers to write down only their insurance value, meaning the amount of insurance they wanted," which constitutes

fraud and "precludes enforcement of the Contract." (Def. Sum. J. Opp. (Dkt. No. 303-2) at 10-14)

To prevail on a fraud claim under New York law, a claimant must demonstrate: "'(1) a misrepresentation or a material omission of fact which was false, (2) knowledge of its falsity, (3) an intent to induce reliance, (4) justifiable reliance . . . , and (5) damages.'" Minico Ins. Agency, LLC v. B & M Cleanup Servs., 165 A.D.3d 776, 777 (2nd Dept. 2018) (quoting Fox Paine & Co., LLC v Houston Cas. Co., 153 A.D.3d 673, 677 (2nd Dept. 2017)).

Here, all Defendants have stated that they did not read the Contract. (See Def. R. 56.1 Cntrstmt. (Dkt. No. 303-1) ¶¶ 105-06, 136-37, 153, 163-64, 207, 232, 234, 252-53, 274, 295, 310, 317, 347; see also Redmond Decl., Exs. 1-11 to 1-20 (Def. Interrogatory Resps.) (Dkt. Nos. 251-12 to 251-21))[18] Given this admission, Defendants' fraud claim fails, because they cannot demonstrate reasonable reliance. "A plaintiff's ability to establish reasonable reliance is irreparably impaired when [he or she] simply fails to read a binding document prior to executing the document." Washington Cap. Ventures, LLC v. Dynamicsoft, Inc., 373 F. Supp. 2d 360, 366 (S.D.N.Y. 2005) (dismissing plaintiff's fraud claim, because any alleged false statements "were plainly contradicted by the meaning of the written document that the claimant failed to read")

---

[18] In Defendants' Rule 56.1 Counterstatement, Defendants say that they did not read the Contract because (1) they had only a limited understanding of English; and (2) the Contract as printed on the back of the Pickup Manifest was printed in a small font. (See, e.g., Def. R. 56.1 Cntrstmt. (Dkt. No. 303-1) ¶ 207 ("Admitted that Paul Wong, on behalf of Lam's Jade, signed the July 10, 2022 Pickup Manifest. Disputed that he entered into the Brink's Global Services Valuables Transport Contract because the manifest did not direct him to it, the words on the back of the manifest were illegible, and Mr. Wong does not read English.") In their opposition to Brink's summary judgment motion, however, Defendants do not raise either point in support of their fraud claim. Accordingly, any such argument has been abandoned. Plahutnik v. Daikin Am., Inc., 912 F.Supp.2d 96, 104 (S.D.N.Y. 2012) ("[A]rguments not made in opposition to a motion for summary judgment are deemed abandoned.") (citation omitted).

(citing Morby v. Di Siena Associates LPA, 291 A.D.2d 604, 737 (3rd Dept. 2002)); Ballas v. Virgin Media, Inc., 18 Misc.3d 1106(A), 2007 WL 4532509, at *3 (N.Y. Cnty. Sup. Ct. Dec. 6, 2007) ("A party is under an obligation to read a document before accepting its terms and cannot avoid the effect of the document by asserting [that] he or she did not read or understand [its] contents[.]"), aff'd, 60 A.D.3d 712, (2nd Dept. 2009).

Moreover, to the extent that Defendants' fraud claim is premised on statements allegedly made by a Brink's employee (see Def. Sum. J. Opp. (Dkt. No. 303-2) at 10-11), reliance on any such statements would not be reasonable to the extent that they contradict the terms of the Pickup Manifest which – as discussed above – required the jewelers to provide a "Declared Value." Lancer Offshore, Inc. v. Dominion Income Mgmt. Corp., No. 01 Civ. 4860 (LMM), 2002 WL 441309, at *4 (S.D.N.Y. Mar. 20, 2002) ("[A]ny alleged reliance on an outside statement which so clearly contradicts the language in the [contract] is unreasonable and not justified."); see also Bango v. Naughton, 184 A.D. 2d 961, 963 (3d Dept. 1992) ("[C]onflict between the provisions of the written contract and oral representations negates the claim of reliance upon the latter.").

And to the extent that Defendants' fraud arguments are premised on Brink's employees' statements regarding the effectiveness of Brink's security measures (see Def. Sum. J. Opp. (Dkt. No. 303-2) at 10), any such statements are not actionable misrepresentations, because they "amount[] to no more than opinions and puffery or ultimately unfulfilled promises," and therefore are "not actionable as fraud." Jacobs v Lewis, 261 A.D.2d 127, 127-28 (1999).[19]

---

[19] "'Puffery is an exaggeration or overstatement expressed in broad, vague and commendatory language.'" Duran v. Henkel of Am., Inc., 450 F. Supp. 3d 337, 347 (S.D.N.Y. 2020) (quoting Kacocha v. Nestle Purina Petcare Co., No. 15-CV-5489 (KMK), 2016 WL 4367991, at *16 (S.D.N.Y. Aug. 12, 2016)).

c.    **Unclean Hands**

Defendants further contend that Brink's "unclean hands" render the Contract unenforceable. According to Defendants, Brink's has unclean hands because it "[k]nowingly misinform[ed] customers about how to fill out a manifest[.]" (See Def. Sum. J. Opp. (Dkt. No. 303-2) at 14)

The unclean hands doctrine "'closes the doors of a court of equity to one tainted by inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant.'" Motorola Credit Corp. v. Uzan, 561 F.3d 123, 129 (2d Cir. 2009) (quoting Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. 806, 814 (1945)). "In New York, the doctrine of unclean hands requires a defendant to prove (1) that the plaintiff is guilty of immoral, unconscionable conduct directly related to the subject matter in litigation; (2) that the conduct was relied upon by the defendant; and (3) that the defendant was injured thereby." Lia v. Saporito, 909 F. Supp. 2d 149, 174 (E.D.N.Y. 2012).

The unclean hands defense is not applicable here, because it is "'an equitable defense to equitable claims' and does not apply to claims that 'seek damages in an action at law.'" Puebla Palomo v. DeMaio, 403 F. Supp. 3d 42, 61 (N.D.N.Y. 2019) (quoting Aetna Cas. & Sur. Co. v. Aniero Concrete Co., 404 F.3d 566, 607 (2d Cir. 2005)). "Declaratory judgment actions have no inherently legal or equitable nature, but take on the character of the underlying dispute." Settlement Funding, LLC v. AXA Equitable Life Ins. Co., No. 09 CV 8685 HB, 2011 WL 1097635, at *2 (S.D.N.Y. Mar. 21, 2011). The underlying dispute here arises from Brink's alleged breach of contract, and "[t]he classic remedy for breach of contract is an action at law for monetary damages." Register.com, Inc. v. Verio, Inc., 126 F. Supp. 2d 238, 248 (S.D.N.Y. 2000); see also Progressive Cas. Ins. Co. v. Featherstone Foods Inc., No. 18 CIV. 7923 (AKH), 2019 WL 13249028, *1-2 (S.D.N.Y. Oct. 18, 2019) (lawsuit seeking a declaration "regarding [a party's]

liability, or lack thereof, under an insurance contract" is an action at law, because "[a]bsent the declaratory judgment mechanism, Defendants would have brought suit against the Plaintiff alleging breach of the insurance contract and seeking coverage for the damages"); American Lumbermens Mut. Cas. Co. of Illinois v. Timms & Howard, 108 F.2d 497, 499 (2d Cir. 1939) (a declaratory judgment suit is legal in nature where "at bottom," it "concerns the duty of the contract-obligor to pay money on the fulfillment of a condition."); Stonewall Ins. Co. v. Nat'l Gypsum Co., No. 86 CIV. 9671 (JSM), 1992 WL 281401, at *1 (S.D.N.Y. Sept. 25, 1992) (same).

Accordingly, the unclean hands defense is not available here.

### d.    Estoppel

Defendants also contend that Brink's "should be estopped from asserting that its liability is limited to the Declared Value because of its inducing Defendants to set forth a lower value in the Carriage Value box than they would have if given full information." (Def. Sum. J. Opp. (Dkt. No. 303-2) at 15)

To prevail on a claim of equitable estoppel, a party must show "(1) a misrepresentation by the plaintiff, (2) reasonable reliance by the defendant, and (3) prejudice." Veltri v. Bldg. Serv. 32B-J Pension Fund, 393 F.3d 318, 326 (2d Cir. 2004). Defendants' equitable estoppel argument fails for the same reason that their fraud claim fails: they have not shown reasonable reliance. See Mindspirit, LLC v. Evalueserve Ltd., 470 F. Supp. 3d 366, 383 (S.D.N.Y. 2020) ("Courts addressing claims of equitable estoppel have repeatedly held that it is unreasonable to rely on oral representations that contradict a written contract's express terms.") (collecting cases).

### e.    Waiver

Defendants contend that Brink's waived the Contract's limitation of liability provision because it "knew [that the] jewelers stated amounts in the Carriage Value box that were

less than actual value," but "undertook the transportation . . . without requiring [the] jewelers to adhere to the Contract." (Def. Sum. J. Opp. (Dkt. No. 303-2) at 16)

"Under New York law, '[c]ontractual rights may be waived [only] if they are knowingly, voluntarily and intentionally abandoned.'" That's What She Said, Inc. v. Gutter Games Ltd., No. 22 CIV. 4230, 2024 WL 3678473, at *12 (S.D.N.Y. Aug. 5, 2024) (quoting Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P., 7 N.Y.3d 96, 104 (2006)) (alterations in That's What She Said). "[W]aiver 'should not be lightly presumed' and must be based on 'a clear manifestation of intent' to relinquish a contractual right." Id. (quoting Gilbert Frank Corp. v. Fed. Ins. Co., 70 N.Y.2d 966, 968 (1988)). "Generally, the existence of an intent to forgo such a right is a question of fact." Fundamental Portfolio Advisors, 7 N.Y.3d at 104 (citing Jefpaul Garage Corp. v. Presbyterian Hosp. in City of N.Y., 61 N.Y.2d 442, 446 (1984)); see also Christian Dior-New York, Inc. v. Koret, Inc., 792 F.2d 34, 39-40 (2d Cir. 1986) (holding that defendant claiming waiver "must . . . be given an opportunity to prove its waiver defense at trial"). For a party's conduct to amount to waiver, however, "it 'must not otherwise be compatible with the agreement as written.'" Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 783 (2d Cir. 2003) (quoting Rose v. Spa Realty Assocs., 42 N.Y.2d 338, 344 (1977)). Moreover, "'the conduct of the parties must evidence an indisputable mutual departure from the written agreement.'" Id. (quoting Rose, 42 N.Y.2d at 344); see also That's What She Said, 2024 WL 3678473, at *12 (finding no waiver as a matter of law at summary judgment).

Here, Defendants appear to argue that Brink's waived compliance with the customer representations and warranties provisions found in Section II of the Contract (see, e.g., Contract (Dkt. No. 253-2) § II(f) ("UNLESS OTHERWISE SPECIFICALLY AGREED IN WRITING, YOU WILL NOT TENDER TO BRINK'S ANY SHIPMENT WITH AN ACTUAL

VALUE IN EXCESS OF THE LIMITS SET OUT IN SECTION X.C HEREINBELOW, OR

ANY SHIPMENT IN EXCESS OF THE DECLARED VALUE) (emphasis in original)) by

accepting merchandise for shipment when it knew that the jewelers had not accurately declared

the value of the merchandise.

Brink's denies that it knew (1) the value of Defendants' merchandise; or (2) that

Defendants were not accurately declaring the value of their merchandise.  In this regard, Brink's

notes that Defendants packed and sealed their merchandise in bags supplied by Brink's, and then

brought the sealed bags to Brink's for shipment.  Brink's did not re-open the bags once sealed by

Defendants, and relied on Defendants' representations concerning the Declared Value of each

Defendant's shipment.  (Pltf. R. 56.1 Stmt. (Dkt. No. 249-1) ¶¶ 46-47)

The Court concludes that Defendants have not proffered evidence sufficient to

create a material issue of fact as to waiver.  Given that it is undisputed that Defendants packed

and sealed the bags in which their merchandise was prepared for transport, Brink's would have

had no way to determine the contents of the bags, much less whether Defendants had accurately

estimated the value of their shipments.  Accordingly, Brink's did not waive the Contract's

provisions requiring that Defendants accurately state the value of their shipments.[20]

---

[20]  In arguing that "Brink['s] knew [that the] jewelers stated amounts in the Carriage Value box
that were less than actual value," Defendants cite to excerpts from the depositions of Jean Malki,
Bruce Woerner, and Sammy Leung.  (See Def. Sum. J. Opp. (Dkt. No. 303-2) at 16 (citing Def.
R. 56.1 Cntrstmt. (Dkt. No. 303-1) ¶ 379))  Malki – an owner/operator of Defendant Forty-
Seventh & Fifth, Inc. – testified about a conversation he had with Brink's employee Gloria
Corrales in or about January 2022, when a new Brink's group rate available to members of the
Jewelry Importers & Manufacturers Association took effect.  (Shuman Decl., Ex. A-8 (Makli
Dep.) (Dkt. No. 256-8) at 149:9-24, 217:20-218:10 (Malki testifying the conversation took place
"when I got that new rate"); Redmond Decl., Ex. 1-70 (Malki Dep.) (Dkt. No. 251-102) at 275:5-
22 (Malki testifying that he received the new rate sheet in January 2022))  Malki and Corrales
were discussing the Declared Value Malki would indicate on a Pickup Manifest for a January
2022 jewelry show.  Malki testified that he said to Corrales, "Well, Gloria, you know that I have

In any event, "a waiver of one provision of a contract or one breach of contract does not waive other provisions and other breaches of the contract." <u>Tutor Perini Corp. v. State</u>, 209 A.D.3d 692, 697 (2nd Dept. 2022); <u>see also</u> 13 Williston on Contracts § 39:17 (4th ed. 2024) ("When the party whose performance is subject to a condition precedent waives performance of the condition, the contract remains enforceable despite the nonoccurrence of the condition.") Here, even assuming <u>arguendo</u> that Brink's waived – as to one or more of Defendants – the representations and warranties provisions of the Contract requiring Defendants to accurately declare the value of their merchandise, any such waiver would not extend to the Contract's limitation of liability provision – which Brink's also seeks to enforce in this action. That provision limits Brink's liability to the actual monetary value of the lost property, up to the Declared Value (Contract (Dkt. No. 253-2) § X(B)), and Defendants have not proffered any argument or evidence suggesting that Brink's waived enforcement of that provision.

---

one ring that is worth more than [$]100,000," and she responded, "[i]t's just an insurance value." (Shuman Decl., Ex. A-8 (Makli Dep.) (Dkt. No. 256-8) at 218:4-10) Malki listed a total Declared Value of $100,000 for transportation of Defendant Forty-Seventh & Fifth's merchandise in January 2022. (Redmond Decl., Ex. 1-22 (Dkt. No. 251-28) at 32-37) This conversation did not concern the July 10-11, 2022 shipment at issue in this lawsuit, however, and does not constitute evidence that Brink's knew that Defendant Forty-Seventh & Fifth had not accurately stated the actual monetary value of the merchandise it shipped with Brink's at that time.

Defendants also cite the deposition testimony of Bruce Woerner, Brink's former "director of security," who testified that with respect to jewelry "shows in particular, . . . customers were declaring values that were less than the actual value that was being transported." (Schuman Decl., Ex. A-27 (Woerner Dep.) (Dkt. No. 256-28) at 78, 87; <u>see also</u> <u>id.</u> at 88-89) Woerner raised his concerns about the under-declaring of value with his Brink's supervisors in about 2012. (<u>Id.</u> at 80-89, 91) The shipment and theft at issue here took place on July 10-11, 2022, however. Any concerns that Woerner expressed to his Brink's supervisors in 2012 does not shed light on conduct and circumstances that took place ten years later, in July 2022.

Finally, Defendants cite the deposition testimony of Sammy Leung. (<u>See</u> Schuman Decl., Ex. A-12 (Leung Dep.) (Dkt. No. 256-12)) The cited page – page 147 – is not in the exhibit that Defendants cite, however.

####     f.     **Gross Negligence**

Finally, Defendants contend that the Contract's limitation of liability provision is rendered unenforceable as a result of Brink's gross negligence. (See Def. Sum. J. Opp. (Dkt. No. 303-2) at 24-29)

####     i.     **Applicable Law**

As a matter of public policy, "New York courts will decline to enforce a contractual limitation or waiver of liability clause when there is willful or grossly negligent or recklessly indifferent conduct." Baidu, Inc. v. Register.com, Inc., 760 F. Supp. 2d 312, 318 (S.D.N.Y. 2010) (citing Kalisch-Jarcho, Inc. v. City of New York, 58 N.Y.2d 377, 384-85 (1983)).

> New York [c]ourts set the bar quite high in placing misconduct within the exceptions, [however,] "demanding nothing short of . . . a compelling demonstration of egregious intentional misbehavior evincing extreme culpability: malice, recklessness, deliberate or callous indifference to the rights of others, or an extensive pattern of wanton acts."

Deutsche Lufthansa AG v. Boeing Co., No. 06 Civ. 7667 (LBS), 2007 WL 403301, at *3 (S.D.N.Y. Feb. 2, 2007) (quoting Net2Globe Int'l, Inc. v. Time Warner Telecom of N.Y., 273 F. Supp. 2d 436, 454 (S.D.N.Y. 2003) (omission in Deutsche Lufthansa AG, other alterations added)). "When the setting is . . . a contract between two sophisticated parties 'the conduct must evince a reckless disregard for the rights of others, or be of a kind that smacks of intentional wrongdoing.'" Id. (quoting Industrial Risk Insurers v. Port Authority of N.Y. and N.J., 387 F. Supp. 2d 299, 305 (S.D.N.Y. 2005)). "'Intentional' . . . is not the legal equivalent of "willful[,]'" and a plaintiff must establish "more than an intentional abandonment of the agreement by defendant." Metro. Life, 192 A.D. 2d at 90, aff'd, 84 N.Y.2d 430 (1994). "A party acting in their own economic self-interest is not enough to constitute gross negligence or willful misconduct." Morgan Stanley & Co. Inc. v. Peak Ridge Master SPC Ltd., 930 F. Supp. 2d 532, 545 (S.D.N.Y.

2013) (citing <u>Metro. Life</u>, 84 N.Y.2d at 439; <u>DynCorp v. GTE Corp.</u>, 215 F. Supp. 2d 308, 318

(S.D.N.Y. 2002)).

Moreover,

> in a breach of contract action, the public policy rule prohibiting parties from insulating themselves from damages caused by grossly negligent conduct applies only to exculpatory clauses or provisions that limit liability to a nominal sum. The rule does not apply to contractual limitations on remedies that do not immunize the breaching party from liability for its conduct.

<u>Matter of Part 60 Put-Back Litig.</u>, 36 N.Y.3d 342, 348-49 (2020).

### ii.    <u>Analysis</u>

The limitation of liability provision that Brink's seeks to enforce limits its liability

to "the actual monetary value of the Property which is lost, up to the Declared Value." (Contract

(Dkt. No. 253-2) § X(B))  Given that no party contends that the actual monetary value of any of

the stolen merchandise is less than the Declared Value, the Declared Values mark the upper limit

of Brink's liability under its interpretation of the Contract.  The chart below shows the Declared

Value that each Defendant provided on its Pickup Manifest:

| Jeweler | Total Bags in Shipment | Missing Bags | Declared Value from Jeweler |
|---|---|---|---|
| Bonita Pearl | 2 | 2 | $200,000.00 |
| | | | $200,000.00 |
| Forty-Seventh & Fifth | 2 | 2 | $50,000.00 |
| | | | $50,000.00 |
| Hawaiian Design Jewelry | 1 | 1 | $400,000.00 |
| Kimimoto | 5 | 4 | $1,800,000.00 |
| | | | $350,000.00 |
| | | | $350,000.00 |
| | | | $350,000.00 |
| Lam's Jade Center | 2 | 1 | $200,000.00 |

| Lee's International Inc. | 1 | 1 | $1,000,000.00 |
|---|---|---|---|
| Pan Lovely Jewelry | 2 | 2 | $100,000.00 |
| | | | $100,000.00 |
| Petri Gems | 1 | 1 | $300,000.00 |
| S&N Diamond | 2 | 1 | $400,000.00 |
| Supreme Collection | 2 | 2 | $200,000.00 |
| | | | $200,000.00 |
| Treasure Connection | 2 | 1 | $200,000.00 |
| | | **Total:** | $6,450,000.00 |

(Pltf. R. 56.1 Stmt. (Dkt. No. 249-1) ¶ 82)

Accordingly, under Brink's interpretation of the Contract – and setting aside certain Defendants' alleged non-compliance with the Contract's notice provision – Brink's liability ranges from a low of $100,000 as to Defendant Forty-Seventh & Fifth to a high of $2,850,000 as to Defendant Kimimoto.

Because the Contract's limitation of liability provision does not fully exculpate Brink's, and does not limit Brink's liability to a nominal sum, this provision does not run afoul of New York law. As the New York Court of Appeals has stated, "the public policy rule prohibiting parties from insulating themselves from damages caused by grossly negligent conduct applies only to exculpatory clauses or provisions that limit liability to a nominal sum." Part 60 Put-Back Litig., 36 N.Y.3d at 349. Accordingly, even assuming arguendo that Defendants could establish that Brink's acted with gross negligence, such a finding would not preclude enforcement of Section X(B) of the Contract, which limits Brink's liability to the lesser of the actual monetary value or the Declared Value of the merchandise that Brink's agreed to transport.

And while Defendants argue that contractual clauses that insulate a party from liability for its own negligence are "closely scrutinized and must be clear and unequivocal" (Def.

47

Sum. J. Opp (Dkt. No. 303-2) at 28), the limitation of liability provision at issue here is clear and unequivocal.

Defendants also argue that the limitation on damages provision in <u>Part 60 Put-Back Litig.</u> was upheld "only [because] it was negotiated at arm's length by sophisticated parties," and here the jewelers are "not sophisticated financial entities" but instead "mom and pop jewelers." According to Defendants, the "Brink['s] contract was not negotiated but rather imposed on a take-it-or-leave-it basis in a rushed environment of closing down the jewelry show." (<u>Id.</u> at 28-29)

But Defendants' arguments ignore the fact that each jeweler had used Brink's to transport their merchandise dozens of times prior to the theft in July 2022, as shown in the chart below:

| Defendant Jewelry Company | Shipments with Brink's between 2012 and July 2022 |
|---|---|
| Treasure Connection | 30 |
| Forty-Seventh & Fifth, Inc. | 41 |
| Lam's Jade Center, Inc. | 28 |
| Bonita Pearl, Inc. | 42 |
| S&N Diamond | 54 |
| Petri Gems, Inc. | 43 |
| Hawaiian Design Jewelry Company | 39 |
| Pan Lovely Jewelry Company | 32 |
| Lee's International Jewelry, Inc. | 29 |
| Supreme Collection Corporation | 70 |
| Kimimoto Jewelry | 49 |

(Pltf. R. 56.1 Stmt. (Dkt. No. 249-1) ¶ 26)

Each time that a Defendant contracted with Brink's to transport their jewelry, they agreed to the same or substantially similar terms. (Id. ¶ 27)[21]  Given that each Defendant had encountered Brink's Pickup Manifest and Contract on dozens of past occasions, Defendants did not lack sophistication in connection with these documents. See, e.g., Dabriel, Inc. v. First Paradise Theaters Corp., 99 A.D.3d 517, 520 (1st Dept. 2012) (signatory did not lack sophistication given that he had previously entered into leases and acted as a principal of the entity at issue).  Moreover, Defendants are businesspeople with significant experience in the jewelry industry who routinely handle hundreds of thousands of dollars' worth of jewelry.

Finally, Defendants point out that Part 60 Put-Back Litig. addresses a breach of contract claim, whereas here – "[f]or Brink's to get the declaratory judgment it seeks on this motion" – "it must defeat not only a contract claim but also any potential tort claim." (Def. Sum.

---

[21] Defendants contend that "[t]he contract changed over time" (Def. R. 56.1 Cntrstmt. (Dkt. No. 303-1) ¶ 27), referring to "Woerner testimony and examples of Manifests" without providing any citations to the record. (Id.)  Having reviewed the Woerner deposition excerpts submitted by the parties (see Schuman Decl., Ex. A-27 (Woerner Dep.) (Dkt. No. 256-28)), the Court finds that none of these excerpts address changes to the Contract or Pickup Manifest.  Moreover, Defendants have not identified any language in the Pickup Manifest that changed over time.

Brink's has submitted a declaration from Michael Beech, head of security for Brink's Inc., Brink's parent company. (See Beech Decl. (Dkt. No. 253) ¶ 2)  Beech states that – in connection with each of Defendants' shipments prior to the July 10-11, 2022 shipment – each Defendant "agreed to the same (or substantially similar) terms and conditions," including "an express provision that limited Brink's liability to the lesser of the Declared Value or the actual value of any lost or stolen items." (Id. ¶ 18) (emphasis in original)

Given that Defendants have not cited evidence in the record contradicting this assertion, the Court finds that each Defendant agreed to the same or substantially similar terms and conditions in connection with the dozens of occasions they had shipped with Brink's prior to July 10-11, 2022. See Canon Sols. Am., Inc. v. Lucky Games, Inc., No. 15 CIV. 6606 (KMW), 2017 WL 1653563, at *3 (S.D.N.Y. May 1, 2017) ("Where a moving party has made a statement of fact substantiated by admissible evidence, and the nonmoving party fails to 'specifically controvert[]' those facts with its own admissible evidence, the moving party's stated fact is deemed admitted.") (citing Local Civ. R. 56.1(c) and Jackson v. Fed. Express, 766 F.3d 189, 194 (2d Cir. 2014)).

J. Opp. (Dkt. No. 303-2) at 29)  As discussed below, however, Defendants' tort counterclaims are duplicative of their contract counterclaim.  In any event, declaratory judgment actions "take on the character of the underlying dispute," <u>Settlement Funding</u>, 2011 WL 1097635, at *2, which here is a contract claim.  (<u>See</u> Cmplt. (Dkt. No. 1) ¶¶ 40-43)

In sum, because "the public policy rule prohibiting parties from insulating themselves from damages caused by grossly negligent conduct applies only to exculpatory clauses or provisions that limit liability to a nominal sum," <u>Part 60 Put-Back Litig.</u>, 36 N.Y.3d at 349, and because the limitation of liability provision at issue here is not an exculpatory clause and does not limit customers' recovery to only a nominal sum, the limitation of liability provision is enforceable.

*  *  *  *

For the reasons stated above, Brink's is entitled to summary judgment on its declaratory judgment claim to the extent it seeks a declaration that (1) "Brink's duties to each Defendant are governed by the plain language of the Contract including all loss calculations"; and (2) "under no circumstances will Brink's Liability for loss of or damage to Defendants' Property exceed the lesser of the Declared Value or the actual monetary value of the Defendants' Property as of the date of loss[.]"  (Mot for Sum. J. (Dkt. No. 248) at 1)

### 3. Brink's Argument that Four Defendants Did Not Provide Proper Notice of Loss

Brink's contends that it is also entitled to summary judgment as to Defendants Bonita Pearl, Hawaiian Design Jewelry, S&N Diamond, and Treasure Connection Fine Jewelry because they did not comply with the Contract's notice provision, and are therefore barred from any recovery under the Contract.  (<u>See</u> Pltf. Sum. J. Br. (Dkt. No. 249) at 30-31)

The Contract's notice of claim provision states:

A.  <u>Making a Claim</u>.  In the event of any loss or damage to Your Property, You
must notify Brink's in writing of Your intention to bring a claim within
twenty-four (24) hours after discovery of any loss or damage to Your Property,
but in no event more than within
- four (4) days of the agreed or anticipated date of delivery of Your Property, in the
  event of a total loss of or non-delivery of Your Property;
- seven (7) days following delivery of Your Property, in the event of partial loss of
  or damage to Your Property;
- In the event that You do not notify Brink's of Your intention to bring a claim
  within the time limits herein, any claim shall be absolutely waived and barred. . . .

(Contract (Dkt. No. 253-2) § XI(A))

Defendants Bonita Pearl, Hawaiian Design Jewelry, S&N Diamond, and Treasure

Connection Fine Jewelry did not comply with this provision.  Indeed, they did not provide

Brink's with a notice of claim prior to the filing of the instant action on August 4, 2022.  (Pltf. R.

56.1 Stmt. (Dkt. No. 249-1) ¶ 88; Def. R. 56.1 Cntrstmt. (Dkt. No. 303-1) ¶ 88)[22]

In seeking summary judgment against these Defendants based on their failure to

provide notice, Brink's argues that "New York courts routinely treat such contractual notice of

claim provisions as conditions precedent to a carrier's obligation to compensate a customer in

connection with a loss of property."  (Pltf. Sum. J. Br. (Dkt. No. 249) at 30 (citing <u>Pryhuber v.</u>

<u>Maffucci Storage Corp.</u>, 170 A.D.2d 660, 661-62 (2d Dept. 1991) (granting defendant summary

judgment where plaintiff customer did not comply with notice provision))); <u>see also</u> <u>Reliance</u>

---

[22]  Defendants contend that S&N Diamond and Bonita Pearl "came in person to give their
notices," citing "Corrales Dep. 283:25-286:15."  (<u>See</u> Def. Sum. J. Opp. (Dkt. No. 303-2) at 30)
Pages 283 to 286 of the Corrales Deposition are not in the record, however.  (<u>See</u> Redmond
Decl., Ex. 1-57 (Corrales Dep.) (Dkt. No. 251-85); Schuman Decl., Ex. A-17 (Corrales Dep.) (Dkt.
No. 256-17))  Accordingly, Defendants' assertion is unsupported.  Defendants also contend that
"Bonita Pearl filled out the claim form and tried to send it in, but had a glitch in the e-mail
address."  (Def. Sum. J. Opp. (Dkt. No. 303-2) at 30; <u>see also</u> Cheng Decl. (Dkt. No. 258) ¶ 4
(the owner of Bonita Pearl explaining that he "completed the claim form Brink's sent to me on
August 8, 2022" and "tried to e-mail it back to Brink's," but "an error in the e-mail address
apparently prevented Brink's from receiving the claim"))  In any event, in Defendants' Rule 56.1
Counterstatement, Defendants admit that Bonita Pearl and S&N Diamond did not submit written
notices of claim as required by the Contract.  (Def. R. 56.1 Cntrstmt. (Dkt. No. 303-1) ¶¶ 111, 299)

Ins. Co. v. Fed. Exp. Corp., No. 84 CIV. 6498 (PNL), 1985 WL 2241, at *1-2 (S.D.N.Y. Aug. 1, 1985) (enforcing 15-day notice of claim provision and dismissing, after a bench trial on stipulated facts, plaintiff's claim due to non-compliance with notice provision).

In opposing Brink's summary judgment motion, Defendants contend that (1) Brink's waived compliance with the notice provision; (2) enforcing the notice provision would "exonerate Brink's completely for its gross negligence"; (3) the notice provision is "contrary to the norms in the industry and . . . is unconscionable"; (4) Brink's "cannot show prejudice" from the jewelers' non-compliance because "it already knew everything it needed to know"; (5) these four Defendants "substantially complied" with the notice provision; and (6) Brink's is estopped from utilizing the notice provision because of its "deceptive conduct." (Def. Sum. J. Opp. (Dkt. No. 303-2) at 29-31)

As to Defendants' waiver argument, as a general matter, waiver can be "'established by affirmative conduct or by [a] failure to act so as to evince an intent not to claim a purported advantage.'" Fundamental Portfolio Advisors, 7 N.Y.3d at 104 (quoting Gen. Motors Acceptance Corp. v. Clifton-Fine Cent. Sch. Dist., 85 N.Y.2d 232, 236 (1995)). However, "waiver 'should not be lightly presumed' and must be based on 'a clear manifestation of intent' to relinquish a contractual right.'" That's What She Said, 2024 WL 3678473, at *12 (quoting Gilbert, 70 N.Y.2d at 968). Under New York law, "as a matter of law, a [party's] apparent willingness to honor a . . . claim is insufficient to prove waiver." Galin Corp. v. MCI Telecommunications Corp., 12 F.3d 465, 470-71 (5th Cir. 1994) (applying New York law) (citing Silverstein Properties, Inc. v. Webber, Jackson & Curtis, Inc., 480 N.Y.S.2d 724, 726 (1st Dept. 1984), aff'd, 65 N.Y.2d 785 (1985) (holding that evidence of landlord's willingness to address

merits of tenant's claim, after the time allowed by contract for such a claim had expired, was insufficient to support reasonable inference of waiver)).

Here, a Brink's employee sent emails to each of the four Defendant jewelers on July 12, 2022 – the day after the theft – providing a notice of claim form. Because there was no response, Brink's sent a follow-up email to the same four Defendants on July 22, 2022.[23] (See Pltf. R. 56.1 Stmt. (Dkt. No. 249-1) ¶¶ 109-11 (Bonita Pearl); id. ¶¶ 173-75 (Hawaiian Design); id. ¶¶ 298-99 (S&N Diamond); id. ¶¶ 353-55 (Treasure Connection); Redmond Decl., Ex. 1-21 (Dkt. No. 251-22) at 26 (emails to Bonita Pearl showing no response from Bonita Pearl); Sobers Decl., Ex. 2 (Dkt. No. 254-2) (same, as to Hawaiian Design); Redmond Decl., Ex. 1-29 (Dkt. No. 251-44) at 24 (same, as to S&N Diamond); id., Ex. 1-89 (Dkt. No. 251-153) at 68-70 (same, as to Treasure Connection)) Bonita Pearl, Hawaiian Design, S&N Diamond, and Treasure Connection did not respond to the July 22, 2022 follow up emails. (Redmond Decl., Ex. 1-21 (Dkt. No. 251-22) at 26; Sobers Decl., Ex. 2 (Dkt. No. 254-2); Redmond Decl., Ex. 1-29 (Dkt. No. 251-44) at 24; id., Ex. 1-89 (Dkt. No. 251-153) at 68-70)

Although the July 12, 2022 emails were sent within the four-day notice period applicable to a total loss or non-delivery of property, the July 22, 2022 emails were transmitted after the deadline for notice had passed. According to Defendants, Brink's transmission of the

---

[23] For example, Brink's employee Gloria Corrales sent a July 12, 2022 email to Ming Cheng of Bonita Pearl stating: "please see attached claim for[m] as per our conversation. Please provide this information as soon as you can." (Redmond Decl., Ex. 1-21 (Dkt. No. 251-22) at 22) The claim form Corrales attached to her email directed Bonita Pearl to list the "Declared Value" of the lost goods and to provide a "Brief Description of [the] Goods." (Id. at 24) Cheng did not respond to Corrales's email. Accordingly, on July 22, 2022, Corrales sent another email to Cheng stating: "Hi Ming, just wanted to follow up on the email below. Please advise. Thank you." (Id. at 26) The Brink's emails sent to Hawaiian Design, S&N Diamond, and Treasure Connection are substantially similar. (See Sobers Decl., Exs. 1-2 (Dkt. Nos. 254-1 and 254-2) (Hawaiian Design); Redmond Decl., Ex. 1-29 (Dkt. No. 251-44) at 20-24 (S&N Diamond); id., Ex. 1-89 (Dkt. No. 251-153) at 68-70 (Treasure Connection))

July 22, 2022 emails indicates "that Brink's had no intention of enforcing the deadline." (Def. Sum. J. Opp. (Dkt. No. 303-2) at 31) Defendants' opposition contains no further analysis of their waiver argument.

As discussed above, in order to prevail on a waiver argument, a party must proffer evidence "from which one could reasonably infer 'a clear manifestation of intent' to waive [a right]" – in this case, the right to notice of a claim. That's What She Said, 2024 WL 3678473, at *12. While Brink's sent follow-up emails to Bonita Pearl, Hawaiian Design, S&N Diamond, and Treasure Connection concerning their failure to submit a notice of claim – and did so after the contractual notice period had expired – this action is not sufficient to create a material issue of fact as to waiver, because the emails Brink's sent do not show a "clear manifestation of intent by [Brink's] to relinquish the protection of the contractual [notice] . . . period." Gilbert, 70 N.Y.2d at 968. Indeed, the Brink's follow-up emails make no representation as to how Brink's will handle any claim that these Defendants submit. Accordingly, these follow-up emails are the sort of "doubtful or equivocal" acts from which an intent to waive "cannot be inferred." E. 56th Plaza, Inc. v. Abrams, 91 A.D.2d 1129, 1130 (3rd Dept. 1983).

Courts applying New York law have rejected waiver arguments on evidence much more substantial than that proffered by Defendants here. In Gilbert, for example, the defendant insurance company had four meetings and numerous telephone conversations with plaintiffs about settlement, and eventually made a settlement offer – all after the contractual notice period had expired. Gilbert, 70 N.Y.2d at 968. The New York Court of Appeals nonetheless upheld summary judgment for the insurer, finding the evidence insufficient to create a material issue of fact as to whether there was "a clear manifestation of intent" to waive notice. Id.; see also Inter-Power of New York, Inc. v. Niagara Mohawk Power Corp., 213 A.D.2d 110, 114-15 (3rd Dept.

1995) (finding no material issue of fact as to waiver where defendant told plaintiff that "an extension of a few months would be 'no problem'" and "'we'll work with you'"; "a willingness to discuss an extension and renegotiate the . . . deadline . . . [is] far too equivocal to warrant denial of [defendant's motion for summary judgment]"); <u>Fitzpatrick v. Am. Int'l Grp., Inc.</u>, No. 10 CIV. 142 MHD, 2013 WL 709048, at *16 (S.D.N.Y. Feb. 26, 2013) ("Plaintiffs have failed to put forward sufficient evidence to allow a reasonable factfinder to find that defendants intentionally waived the notice requirement of the employment agreement. Continuing to employ Fitzgerald and hold meetings relating to his employment is not, by itself, conduct evidencing an unequivocal intent to waive the condition precedent, nor could any reasonable factfinder so find."). Accordingly, Defendants' waiver argument fails.

Defendants' remaining arguments – which are likewise not supported by factual or legal analysis – also fail. As to gross negligence, this Court has already ruled that the limitation of liability provision is enforceable regardless of any allegation of gross negligence. As to unconscionability, Defendants have not explained in any fashion what "norms in the industry" the notice provision contradicts, or why the provision is otherwise unconscionable. (<u>See</u> Def. Sum. J. Opp. (Dkt. No. 303-2) at 30) With respect to prejudice, under New York law, no showing of prejudice is required to enforce a notice of claim provision. <u>See</u> <u>Argo Corp. v. Greater New York Mut. Ins. Co.</u>, 4 N.Y.3d 332, 336-37 (2005) (failure to comply with notice of claim provision "is a failure to comply with a condition precedent which, as a matter of law, vitiates the contract," even where no prejudice is shown); <u>see</u> <u>also</u> <u>NASDI LLC v. Skanska Koch Inc. Kiewit Infrastructure Co. (JV)</u>, No. 17CV3578 (DLC), 2020 WL 5768319, at *15 (S.D.N.Y. Sept. 28, 2020) ("It is well-established under New York law that actual notice is not a substitute for compliance with notice-of-claim provisions.") (collecting cases).

As to substantial compliance, the four jewelers who did not submit notice of claim did not "substantially comply" with the notice requirement.  They simply did not comply at all with the Contract's notice provision.  Finally, as to estoppel, Brink's did not engage in "deceptive conduct" after the theft by failing to affirmatively inform the jewelers of the deadline to submit claims.  The Contract specifically informs Defendants of the notice requirement.  (See Contract (Dkt. No. 253-2) § XI(A))

The Court concludes that the notice of claim provision is enforceable against Defendants Bonita Pearl, Hawaiian Design, S&N Diamond, and Treasure Connection.  As to these Defendants, Brink's is also entitled to summary judgment on that part of its declaratory judgment claim seeking a declaration that "those Defendants who failed to comply with the notification provisions of the Contract have waived their claims[.]"[24]  (Mot. for Sum. J. (Dkt. No. 248) at 1)

## II.    BRINK'S MOTION TO DISMISS DEFENDANTS' NON-CONTRACTUAL COUNTERCLAIMS AND TO STRIKE DEFENDANTS' DAMAGE CLAIMS

Defendants have asserted counterclaims against Brink's for (1) breach of contract; (2) negligence; (3) fraud; (4) violation of New York General Business Law ("GBL") § 349; and (5) violation of California Business & Professions Code § 17200 et seq.  (Answer (Dkt. No. 235)

---

[24]  In its summary judgment motion, Brink's states that it also seeks a declaration that it "has no liability for special[,] incidental, consequential, indirect or punitive losses or damages including but not limited to loss of profits (whether direct or indirect), loss of market, loss of business, loss of goodwill, lost sales or other indirect or consequential losses, interest, or attorney fees[.]" (Mot. for Sum. J. (Dkt. No. 248) at 1-2)  Brink's does not address these matters in its summary judgment briefing, however.  (See Dkt. Nos. 249, 265)  Therefore, that application has been abandoned.  Fieldcamp v. City of New York, 242 F. Supp. 2d 388, 391 (S.D.N.Y. 2003) ("The failure to provide argument on a point at issue constitutes abandonment of the issue.").  Accordingly, Brink's summary judgment motion will be denied as to this requested declaration.  The Court addresses Defendants' damage claims in connection with Brink's motion to strike, however.

at 10-32)  In connection with their counterclaims, Defendants seek "damages, punitive damages, interest, [attorneys'] fees, [and] costs" as well as lost profits.  (Id. at 22, 25, 29, 31, 33)

Brink's has moved to dismiss Defendants' non-contractual counterclaims (see Mot. to Dismiss (Dkt. No. 277); Pltf. Mot. to Dismiss Br. (Dkt. No. 278) at 15-26), and has moved to strike Defendants' request for punitive damages, interest, attorneys' fees, and lost profits.  (Pltf. Mot. to Dismiss Br. (Dkt. No. 278) at 26)

### A.    Legal Standards

#### 1.    Motion to Dismiss Counterclaims

"'A motion to dismiss a counterclaim is evaluated under the same standard as a motion to dismiss a complaint.'"  Holborn Corp. v. Sawgrass Mut. Ins. Co., 304 F. Supp. 3d 392, 397 (S.D.N.Y. 2018) (quoting Orientview Techs. LLC v. Seven for All Mankind, LLC, No. 13-cv-0538 (PAE), 2013 WL 4016302, at *2 (S.D.N.Y. Aug. 7, 2013)).

"To survive a motion to dismiss, a counterclaim must include 'enough facts to state a claim to relief that is plausible on its face.'"  Est. of Close v. Cigna Health & Life Ins. Corp., No. 22-CV-7449 (RA), 2023 WL 8846562, at *2 (S.D.N.Y. Dec. 21, 2023) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "A claim has 'facial plausibility' when the pleaded factual content 'allows the court to draw the reasonable inference' that the [adversary] is liable for the alleged misconduct."  Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "[T]he Court must 'accept as true the factual allegations in the counterclaim and draw all inferences in the counterclaimant's favor[.]'"  We the Protesters, Inc. v. Sinyangwe, 724 F. Supp. 3d 281, 290 (S.D.N.Y. 2024) (quoting Biro v. Condé Nast, 807 F.3d 541, 544 (2d Cir. 2015)) (alterations in original omitted).  However, a court "need not 'accept as true legal conclusions couched as factual allegations[.]'"  Id. (quoting LaFaro v. N.Y. Cardiothoracic Grp., PLLC, 570 F.3d 471, 475-76 (2d Cir. 2009)).  In resolving a motion to dismiss a counterclaim, "[c]ourts limit

their consideration to 'the factual allegations in the Answer, the Counterclaims, and those documents attached as exhibits or incorporated by reference.'" Est. of Close, 2023 WL 8846562, at *2 (quoting Gortat v. Capala Bros., Inc., 585 F. Supp. 2d 372, 375 (E.D.N.Y. 2008)).

### 2.    Motion to Strike

Fed. R. Civ. P. 12(f) provides that "[t]he court may strike from a pleading an insufficient defense or any redundant immaterial, impertinent, or scandalous matter." Although "'[f]ederal courts have discretion in deciding whether to grant motions to strike,'" Capri Sun GmbH v. Am. Beverage Corp., 414 F. Supp. 3d 414, 423 (S.D.N.Y. Oct. 29, 2019) (quoting Orientview, 2013 WL 4016302, at *3), such motions "are generally 'disfavored and granted only if there is strong reason to do so.'" Sweigert v. Goodman, No. 118CV08653VECSDA, 2021 WL 603069, at *1 (S.D.N.Y. Feb. 16, 2021) (quoting Anderson News, L.L.C. v. Am. Media, Inc., No. 09-CV-02227 (PAC), 2013 WL 1746062, at *3 (S.D.N.Y. Apr. 23, 2013)). "[A]mple authority permits striking prayers for punitive damages where such relief is unavailable as a matter of law," however. Doe v. Indyke, 457 F. Supp. 3d 278, 284-85 (S.D.N.Y. 2020) (collecting cases).

### B.    Analysis

#### 1.    Negligence Counterclaim

In connection with their negligence counterclaim, Defendants contend that Brink's negligently (1) "safeguarded, handled, cared for, and transported" Defendants' property; and (2) "advised [Defendants] on completing the Pickup Manifests [so] as to deprive [them] of the information necessary to make an informed decision on the amount of value to be stated on the Pickup Manifests." (Answer (Dkt. No. 235) at 22-25)

As to the failure to safeguard, Defendants contend that Brink's (1) "left [their] valuable property . . . unguarded in a remote location in the middle of the night with no protection other than an easily defeated padlock"; (2) transported "jewelry and gemstones worth

millions of dollars in a trailer with an easily defeated locking mechanism"; and (3) "negligently

hired, trained and supervised its drivers."  (Id. at 23)

As to the negligent advice – a claim that sounds in negligent misrepresentation –

Defendants contend that Brink's personnel told them "that it was only necessary to fill in the

minimum amount on the rate sheet or the amount of insurance desired in the box for 'carriage

value' on the shipping manifest."  (Id. at 24)

### a.    **Applicable Law**

"To state a claim for negligence under New York law, [a party] must adequately

plead the existence of a duty, a breach of that duty by [the adversary], and that the breach

proximately caused [the claimant] to suffer harm."  Sullivan v. City of New York, No. 14-CV-

1334 JMF, 2015 WL 5025296, at *10 (S.D.N.Y. Aug. 25, 2015) (citing Baptiste v. N.Y.C. Transit

Auth., 28 A.D.3d 385, 386 (1st Dept. 2006)).

"Under New York law, in order to state a claim for negligent misrepresentation, a

[party] must allege, '(1) the existence of a special or privity-like relationship imposing a duty on

[the adversary] to impart correct information to the [claimant]; (2) that the information was

incorrect; and (3) reasonable reliance on the information.'"  J & R Elecs. Inc. v. Bus. & Decision

N. Am., Inc., No. 12 CIV. 7497 PKC, 2013 WL 5203134, at *6 (S.D.N.Y. Sept. 16, 2013) (quoting

Mandarin Trading Ltd. v. Wildenstein, 16 N.Y.3d 173, 180 (2011)).

A party cannot proceed with a negligence or negligent misrepresentation claim

that is duplicative of that party's contract claim.  Bayerische Landesbank, New York Branch v.

Aladdin Cap. Mgmt. LLC, 692 F.3d 42, 58 (2d Cir. 2012) (if the basis of a negligence claim "is a

breach of solely contractual obligations, such that the [claimant] is merely seeking to obtain the

benefit of the contractual bargain through an action in tort, the claim is precluded as

duplicative.") (citation omitted); Ixe Banco, S.A. v. MBNA Am. Bank, N.A., No. 07 CIV. 0432

(LAP), 2008 WL 650403, at *12 (S.D.N.Y. Mar. 7, 2008) ("Actions for . . . negligent misrepresentation will not lie when the factual underpinning for the claim is duplicative of a breach of contract claim.") (citations omitted)  Accordingly, a party "may be liable in tort [only] when it has breached a duty of reasonable care distinct from its contractual obligations, or when it has engaged in tortious conduct separate and apart from its failure to fulfill its contractual obligations." N.Y. Univ. v. Continental Ins. Co., 87 N.Y.2d 308, 316 (1995); see also Bayerische Landesbank, 692 F.3d at 58 ("[A] breach of contract will not give rise to a tort claim unless a legal duty independent of the contract itself has been violated.").

### b.    Analysis

In moving to dismiss, Brink's argues that Defendants' negligence counterclaim is duplicative of Defendants' breach of contract counterclaim and is barred by the Contract.  (See Pltf. Mot. to Dismiss Br. (Dkt. No. 278) at 15-19)

Defendants' breach of contract counterclaim is premised on the allegation that Brink's "fail[ed] to deliver [Defendants'] jewelry and gems to the Pasadena jewelry show or the Brink['s] Los Angeles office" and "exercise[ed] such lax security measures and procedures as to allow [Defendants'] jewelry and gemstones to be stolen right out from under the noses of the Brink['s] armed guards."  (Answer (Dkt. No. 235) at 14)

To the extent that Defendants' negligence counterclaim is premised on Brink's failure to safeguard their jewelry (see id. at 23), it is duplicative of their breach of contract counterclaim.  Brink's obligations to Defendants are governed by the Pickup Manifest and the Contract.  (Def. R. 56.1 Cntrstmt. (Dkt. No. 303-1) ¶¶ 38-39)  And "[m]erely charging a breach of a 'duty of care,' employing language familiar to tort law, does not, without more, transform a simple breach of contract into a tort claim." Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 390 (1987); Cohen v. Avanade, Inc., 874 F. Supp. 2d 315, 327 (S.D.N.Y. 2012)

(same).  Indeed, in opposing Brink's motion to dismiss, Defendants do not suggest that Brink's handling of their jewelry was somehow governed by a duty distinct from Brink's contractual obligations.  (See Def. Mot. to Dismiss Opp. (Dkt. No. 279) at 11-13)

Defendants' negligent misrepresentation claim is premised on statements that a Brink's employee allegedly made regarding how to complete the "Carriage Value" section of the Pickup Manifest.  (See Answer (Dkt. No. 235) at 24)  Although Defendants contend that Brink's owed a duty to them – "having undertaken to advise on filling in a number that would understate the value of their property" (Answer (Dkt. No. 235) at 24) – the "duties" a contracting party owes to a counter-party "originate[] from the [contract at issue] and nowhere else," and a contracting party does not "owe" a counter-party "an independent duty . . . to properly advise it" concerning the terms of a contract.  Trump Int'l Hotel & Tower v. Carrier Corp., 524 F. Supp. 2d 302, 313 (S.D.N.Y. 2007)

To adequately plead a negligent misrepresentation claim under New York law, Defendants must allege facts demonstrating that Brink's "had a duty, as a result of a special relationship to give correct information," and that Defendants "reasonably relied" on the information Brink's provided.  See Hydro Invs., Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20 (2d Cir. 2000) (citations omitted); see also Amusement Indus., Inc. v. Stern, 786 F. Supp. 2d 758, 778 (S.D.N.Y. 2011) (stating elements of negligent misrepresentation and emphasizing that "'reliance on the negligent misrepresentation'" must be "'justified'") (quoting Kimmell v. Schaefer, 89 N.Y.2d 257, 263 (1996)).

Here, Defendants have not pled a fiduciary or other special relationship between Defendants and Brink's.  Indeed, their pleading evinces "nothing more than an arm's length business arrangement between sophisticated and experienced parties, a circumstance insufficient

to create a 'special relationship.'" <u>Amusement Indus.</u>, 786 F. Supp. 2d at 779 (collecting cases); <u>see also</u> <u>Aerolineas Galapagos, S.A. v. Sundowner Alexandria, LLC</u>, 74 A.D.3d 652, 653 (1st Dept. 2010) (same).[25]

And any reliance on what the Brink's employee allegedly said – to the extent that the alleged advice contradicted the terms of the Contract – would not have been reasonable or justified for the same reasons discussed above in connection with Brink's summary judgment motion and Defendants' fraud arguments in opposition. The Contract clearly states that each contracting customer must represent and warrant that it has "properly and accurately described the Property in the Shipment and declared its actual monetary value . . . for carriage purposes ('Declared Value')" and that it has "NOT TENDER[ED] TO BRINK'S ANY SHIPMENT WITH AN ACTUAL VALUE IN EXCESS . . . OF THE DECLARED VALUE." (Contract (Dkt. No. 253-2) § II(c), (f) (emphasis in original)) And "reasonable reliance is precluded when 'an express provision in a written contract contradicts a prior alleged oral representation in a meaningful fashion.'" <u>Greenberg v. Chrust</u>, 282 F. Supp. 2d 112, 120 (S.D.N.Y. 2003) (quoting <u>Republic Nat'l Bank v. Hales</u>, 75 F.Supp.2d 300, 315 (S.D.N.Y.1999)); <u>see also</u> <u>Rotanelli v. Madden</u>, 172 A.D. 2d 815, 817 (2d Dept. 1991) (noting that a party "is presumed to have read" the contract and "cannot claim to have relied" on another party's negligent advice).

---

[25] While Defendants contend in their opposition brief that, "[a]s a bailee of the jewelry, Brink's . . . had additional duties arising in tort independent of the contract" (Def. Mot. to Dismiss Opp. (Dkt. No. 279) at 13), that argument is not persuasive. As an initial matter, Defendants did not plead this theory of liability, and "[i]t is well established that a [pleading] may not be amended by the briefs in opposition to a motion to dismiss." <u>Town & Country Adult Living, Inc. v. Vill./Town of Mount Kisco</u>, No. 17-CV-8586 (CS), 2019 WL 1368560, at *14 (S.D.N.Y. Mar. 26, 2019) (citations omitted). Second, the Contract explicitly states that "Brink's is a private, contract carrier and not a common carrier or a bailee under this Contract." (Contract (Dkt. No. 253-2) § I(1))

In opposing Brink's motion to dismiss their negligence counterclaim, Defendants argue that the Brink's employee's explanation of how to fill out the Carriage Value section of the Pickup Manifest "occurred <u>before</u> the contract was entered into." (Def. Mot. to Dismiss Opp. (Dkt. No. 279) at 12 (emphasis in original)) But this fact does not change the requirement that "the alleged [negligent] misrepresentation [must] concern[] a matter which is extraneous to the contract itself[.]" <u>Alamo Contract Builders, Inc. v. CTF Hotel Co.</u>, 242 A.D.2d 643, 644 (2d Dept. 1997) (citation omitted). Here, the alleged misrepresentation concerning the Carriage Value section of the Pickup Manifest concerned a matter – the customer's obligation to state the actual monetary value of its merchandise – that is addressed at length in the Contract.

<u>Fishberg v. State Farm Fire & Cas. Co.</u>, No. 20-CV-6664 (LJL), 2021 WL 3077478 (S.D.N.Y. July 20, 2021) – cited by Defendants (Def. Mot. to Dismiss Opp. (Dkt. No. 279) at 12) – is not to the contrary. In <u>Fishberg</u>, the court held that a breach of the duty of good faith and fair dealing claim was not duplicative of a breach of contract claim where the contract claim "addressed . . . the denial of insurance coverage," while the good faith and fair dealing claim "addressed . . . the process whereby defendant reached that result – the claim that it did not send an adjuster to the [p]remises." <u>Id.</u> at *4. Here, by contrast, Defendants' negligent misrepresentation claim concerns a matter addressed at length in the Contract.

Defendants also contend that when the Brink's employee gave advice as to how to fill out the Carriage Value section of the Pickup Manifest, Brink's thereby "assumed a duty to do so with due care." (Def. Mot. to Dismiss Opp. (Dkt. No. 279) at 12) Under New York law, however, a duty to speak with care in the commercial context "may be 'imposed only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party.'" <u>Phoenix Companies, Inc. v. Concentrix Ins.</u>

Admin. Sols. Corp., 554 F. Supp. 3d 568, 590 (S.D.N.Y. 2021) (quoting Dallas Aerospace, Inc. v.

CIS Air Corp., 352 F.3d 775, 788 (2d Cir. 2003)). "'[A]n arms-length commercial transaction,

without more, does not give rise to a special duty to speak with care.'" Id. (quoting Henneberry

v. Sumitomo Corp. of Am., 415 F. Supp. 2d 423, 452 (S.D.N.Y. 2006)). And, as discussed above,

Defendants have not pled a special relationship between them and Brink's. Accordingly, Brink's

had no duty to speak with due care.[26]

       Because Defendants' negligence counterclaim is duplicative of their breach of

contract claim and does not plausibly state a claim for relief, Brink's motion to dismiss the

negligence counterclaim will be granted.

---

[26] In their opposition brief, Defendants also argue that the Contract is unenforceable because it is
(1) unconscionable, and (2) an illegal insurance contract. (Def. Mot. to Dismiss Opp. (Dkt. No.
279) at 25-32) This Court ruled above that the Contract is not an illegal insurance argument. As
to unconscionability, Defendants complain that the Contract is "printed in 2-3 point font"; that
Defendants' principals "are almost all over 60 years old," and that many of them speak English
as a second language; that the Contract was "handed out at the end of the show, when everyone
was packing up and rushing to close down"; and that there was a "disparity in bargaining power"
between Brink's and Defendants. (Def. Mot. to Dismiss Opp. (Dkt. No. 279) at 27) This Court
rejected nearly identical arguments in connection with Defendants' motion to dismiss. (See Feb.
28, 2024 Tr. (Dkt. No. 233) at 10-14) As the Court explained at that time, "[u]nder New York
law, a party is under an obligation to read a document before he or she signs it, and a party
cannot generally avoid the effect of a [contract] on the ground that he or she did not read it or
know its contents." Marciano v. DCH Auto Grp., 14 F. Supp. 3d 322, 330 (S.D.N.Y. 2014)
(citation and internal quotation omitted); see also Spataro v. Kloster Cruise, Ltd., 894 F.2d 44, 46
(2d Cir. 1990) (enforcing "small type" found on page six of an eight-page cruise ticket);
Holcomb v. TWR Express, Inc., 11 A.D.3d 513, 514 (2nd Dept. 2004) ("A person who is illiterate
in the English language . . . must make a reasonable effort to have the contract read to them[.]");
Ulit4Less, Inc. v. FedEx Corp., No. 11-CV-1713 KBF, 2015 WL 3916247, at *4 (S.D.N.Y. June 25,
2015) ("That the agreements are standard form and FedEx holds more bargaining power than the
plaintiff is not in and of itself sufficient to invalidate a binding business transaction."). 
Defendants have not offered any legal authority suggesting that the contractual provisions at
issue here are "grossly unreasonable or unconscionable in light of the mores and business
practices" relevant here. Gillman v. Chase Manhattan Bank, N.A., 73 N.Y.2d 1, 10 (1988)
(internal quotation omitted).

### 2.    Fraud Counterclaim

Counterclaim Three alleges fraud.  According to Defendants, Brink's "represented" to them that they "should set forth in the 'Carriage Value' section of the Pickup Manifest the amount of insurance they wished to purchase on their merchandise" – not the actual value of the shipment – and "intentionally concealed both the consequences of [Defendants] choosing the minimum insurance amount and the fact that Brink's employed utterly deficient security practices."  (Answer (Dkt. No. 235) at 25-26)

### a.    Applicable Law

To state a claim for fraud under New York law, a party must plead "'(1) a misrepresentation or a material omission of fact which was false, (2) knowledge of its falsity, (3) an intent to induce reliance, (4) justifiable reliance . . . , and (5) damages.'"  Minico Ins. Agency, 165 A.D.3d at 777 (quoting Fox Paine & Co., 153 A.D.3d at 677).

A fraud claim must also meet the particularity requirements of Fed. R. Civ. P. 9(b).  Under Rule 9(b), a party alleging fraud must "'(1) detail the statements (or omissions) that the [claimant] contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent.'"  Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC, 783 F.3d 395, 403 (2d Cir. 2015) (quoting Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y., 375 F.3d 168, 187 (2d Cir. 2004)).  A claimant must also "'allege facts that give rise to a strong inference of fraudulent intent,'" "'either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'"  Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290-91 (2d Cir. 2006)

(quoting Acito v. IMCERA Grp., Inc., 47 F.3d 47, 52 (2d Cir. 1995) and Shields v. Citytrust

Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994)).

      **b.**    **Analysis**

      Defendants' fraud counterclaim is premised on alleged oral statements by Brink's

employees concerning "Declared Value," limitations on Brink's liability, and the security

measures that Brink's employs. (Answer (Dkt. No. 235) at 25-28)

      In moving to dismiss, Brink's contends that (1) Defendants "cannot show

'reasonable reliance' in light of the express terms of the Contract"; and (2) Defendants' "fraud

contentions do not satisfy the other elements of a viable fraud claim." (Pltf. Mot. to Dismiss Br.

(Dkt. No. 278) at 19)

      For the reasons discussed above in connection with (1) Defendants' fraud

arguments in opposition to Brink's summary judgment motion; and (2) Defendants' negligence

counterclaim, any reliance by Defendants on statements made by a Brink's employee that

contradicted the terms of the Contract would not be reasonable. Lancer, 2002 WL 441309, at *4

(S.D.N.Y. Mar. 20, 2002) ("[A]ny alleged reliance on an outside statement which so clearly

contradicts the language in the [contract] is unreasonable and not justified as a matter of law.").

      Defendants argue, however, that they "actually and justifiably relied on Brinks'

representations," because "they entered into contracts for shipping their merchandise with

Brink['s] and filled [in] just the insurance amount . . . as instructed." (Answer (Dkt. No. 235) at

28-29) But it "is not sufficient [for a fraud claim] that a party have actually relied on a

misstatement. . . . [Instead,] the party claiming fraud must have at least conducted 'minimal

diligence'" before entering into the agreement. Cambridge Cap. LLC v. Ruby Has LLC, 675 F.

Supp. 3d 363, 429 (S.D.N.Y. 2023) (quoting Banque Franco-Hellenique de Com. Int'l et Mar.,

S.A. v. Christophides, 106 F.3d 22, 27 (2d Cir. 1997)). Here, Defendants have stated that they did

not read the Contract or the Pickup Manifest. (See Def. R. 56.1 Cntrstmt. (Dkt. No. 303-1) ¶¶ 105-06, 136-37, 153, 163-64, 207, 232, 234, 252-53, 274, 295, 310, 317, 347; see also Redmond Decl., Exs. 1-11 to 1-20 (Def. Interrogatory Resps.) (Dkt. Nos. 251-12 to 251-21)). They thus did not conduct even "minimal diligence."

According to Defendants, their reliance on Brink's alleged oral statements was reasonable because the Pickup Manifest is ambiguous. (Def. Mot. to Dismiss Opp. (Dkt. No. 279) at 18-20) But this Court rejected Defendants' arguments regarding ambiguity in connection with Brink's motion for summary judgment. As discussed above, the Contract clearly states that it "supersede[s] all other understandings, offers and agreements, whether written or oral, between You and Brink's concerning the Shipment"; that customers must "properly and accurately describe[] the Property in the shipment and declare[] its actual monetary value . . . for carriage purposes ('Declared Value')"; and that a customer may recover for lost goods only "up to the Declared Value." (Contract (Dkt. No. 253-2) §§ XVI, II(c), X(B)) Accordingly, to the extent that a Brink's employee's oral statements contradicted these Contract provisions, Defendants' alleged reliance on the oral statements would not have been reasonable.

Defendants have likewise not plausibly alleged the remaining elements of a fraud claim under New York law. To the extent that Defendants' fraud counterclaim is premised on alleged misrepresentations regarding the meaning of "Declared Value," Defendants have not plausibly alleged the scienter element, which requires a fraud claimant to "'plead the factual basis which gives rise to a strong inference of fraudulent intent.'" United States v. Strock, 982 F.3d 51, 66 (2d Cir. 2020) (quoting O'Brien v. Nat'l Prop. Analysts Partners, 936 F.2d 674, 676 (2d Cir. 1991)). In attempting to allege scienter, Defendants assert that – by making the alleged misrepresentations – Brink's "could achieve the dual benefit of putting itself in a position to deny

or limit compensation in the event of a loss and to save money on transportation because Brink['s] pegged the level of security provided for transporting the goods to the stated value of the goods being transported." (Answer (Dkt. No. 235) at 28)  But this allegation makes no economic sense, because it is premised on the notion that Brink's chose to forgo higher revenues from increased customer shipping costs that would have resulted from higher declared values, solely so that it could save later in the unlikely event that a theft occurred.  "An alleged scheme that defies common sense or economic reason 'does not yield a reasonable inference of fraudulent intent.'"  Puchtler v. Barclays PLC, No. 24-CV-1872 (LJL), 2025 WL 887502, at *14 (S.D.N.Y. Mar. 21, 2025) (quoting Kalnit v. Eichler, 264 F.3d 131, 140-41 (2d Cir. 2001)).

To the extent that Defendants' fraud counterclaim is premised on concealment of Brink's "utterly deficient security practices" (see Answer (Dkt. No. 235) at 26), Defendants have not adequately pled actionable misrepresentations.  Defendants' showing is limited to the allegation that a Brink's employee "told Kenny Lee of Counterclaimant Supreme Collection Corporation while at a show in Houston a few years ago not to insure for a high amount because Brink['s] had really good guards who would watch his goods round the clock when the goods were in Brinks' possession." (Answer (Dkt. No. 235) at 27)  Because this alleged misrepresentation "amount[s] to no more than opinions and puffery or ultimately unfulfilled promises," it is "not actionable as fraud."  Jacobs, 261 A.D.2d at 127-128.

In sum, whether Defendants' fraud counterclaim is premised on alleged statements regarding the "Carriage Value" or alleged statements regarding the effectiveness of Brink's security measures, no fraud claim is plausibly alleged.

### 3.    New York General Business Law § 349 Counterclaim

Counterclaim Four alleges a violation of New York GBL § 349, which prohibits "[d]eceptive acts or practices in the conduct of any business . . . or in the furnishing of any

service in this state[.]" N.Y. Gen. Bus. Law § 349(a). Defendants contend that Brink's "markets and promotes its services to [customers] in materially misleading ways" by (1) "depict[ing] only armored vehicles on its website, in its offices, and in its advertisements, [when] it uses unarmored vehicles to transport jewelry between trade shows"; (2) promoting itself as a "leader in secured logistics" when it failed to prevent the theft at issue in this case; and (3) charging a "security fee" when it failed to provide security in connection with the theft at issue in this case. (Answer (Dkt. No. 235) at 30)

### a.    **Applicable Law**

To state a claim under GBL § 349, a claimant "'must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) [the claimant] suffered injury as a result of the allegedly deceptive act or practice.'" Wynn v. Topco Assocs., LLC, 19 Civ. 11104 (RA), 2021 WL 168541, at *2 (S.D.N.Y. Jan. 19, 2021) (quoting Orlander v. Staples, Inc., 802 F.3d 289, 300 (2d Cir. 2015)). To survive a motion to dismiss, a claimant "must do more than plausibly allege that a '[representation] might conceivably be misunderstood by some few consumers.'" Twohig v. Shop-Rite Supermarkets, Inc., 519 F. Supp. 3d 154, 160 (S.D.N.Y. 2021) (quoting Sarr v. BEF Foods, Inc., 18 Civ. 6409 (ARR) (RLM), 2020 WL 729883, at *3 (E.D.N.Y. Feb. 13, 2020)). New York courts instead apply an objective standard, requiring a claimant to "'plausibly allege that a significant portion of the general consuming public or of targeted customers, acting reasonably in the circumstances, could be misled.'" Id. (quoting Sarr, 2020 WL 729883, at *3). "Although the question of whether a business practice or advertisement is misleading to the reasonable consumer is generally a question of fact, it is 'well settled that a court may determine as a matter of law that an allegedly deceptive practice would not have misled a reasonable consumer.'" Id. (quoting Wynn, 2021 WL 168541, at *2).

b.    **Analysis**

In moving to dismiss Defendants' GBL § 349 counterclaim, Brink's argues that Defendants have not pled facts showing that any Brink's advertisement or business practice is materially misleading. (See Pltf. Mot. to Dismiss Br. (Dkt. No. 278) at 23-25)

As to Brink's alleged depiction of armored vehicles in various marketing materials, Defendants have not identified any particular advertisement. And while Defendants cite – in their opposition brief – certain statements found on Brink's website, "[o]ne cannot amend a pleading through an opposition." Germain v. Nielsen Consumer LLC, 655 F. Supp. 3d 164, 184 n.6 (S.D.N.Y. 2023). Moreover, Defendants do not allege that they saw any particular depiction or description of Brink's services (on its website, in its offices, in its advertisements, or elsewhere) prior to contracting with Brink's. The absence of such an allegation is fatal to their GBL § 349 claim. Gale v. Int'l Bus. Machines Corp., 9 A.D.3d 446, 447 (2nd Dept. 2004) ("Although the plaintiff cites particular misleading statements by IBM regarding the reliability of the IBM Deskstar 75GXP, he nowhere states in his complaint that he saw any of these statements before he purchased or came into possession of his hard drive. If the plaintiff did not see any of these statements, they could not have been the cause of his injury[.]"); Lin v. Canada Goose US, Inc., 640 F. Supp. 3d 349, 360 (S.D.N.Y. 2022) ("Without allegations that Plaintiff actually saw the representations at issue, the NY GBL § 349 [claim] fails.").

As to Brink's promotion of itself as "a leader in secured logistics," this characterization is a subjective, non-specific statement that "'cannot be proved either true or false.'" Time Warner Cable, Inc. v. DIRECTV, Inc., 497 F.3d 144, 159 (2d Cir. 2007) (quoting Lipton v. Nature Co., 71 F.3d 464, 474 (2d Cir. 1995)). Such statements are puffery, and "[s]tatements that are mere puffery cannot support a claim under GBL §§ 349 or 350." Moreover, "'[c]ourts can determine that a statement is puffery as a matter of law.'" Duran, 450

F. Supp. 3d at 346-47 (quoting Lugones v. Pete & Gerry's Organic, LLC, 440 F. Supp. 3d 226, 241 (S.D.N.Y. 2020)) (first alteration added).

As to Brink's "security fee," Defendants have not plausibly alleged that a reasonable consumer would have been misled by Brink's charging such a fee. According to Defendants, Brink's supplied a locked tractor-trailer driven by two "armed guards," which was to be driven to a "secure Brink['s] storage yard." (Answer (Dkt. No. 235) at 13) Accordingly, Brink's did in fact provide security services, even if those services proved insufficient to prevent the theft at issue.

For all these reasons, Brink's motion to dismiss Defendants' GBL § 349 claim will be granted.

### 4.    California Unfair Competition Law Counterclaim

Counterclaim Five alleges a violation of California Business & Professions Code § 17200 et seq., which is commonly known as the California "Unfair Competition Law" ("UCL"). (See Answer (Dkt. No. 235) 31-32) The UCL prohibits "any unlawful, unfair or fraudulent business act or practice[.]" Cal. Bus. & Prof. Code § 17200.

Defendants allege that Brink's violated the UCL by "misrepresenting and concealing facts in connection with the sale of its transportation services" and "with respect to the security that would be provided." As a result of Brink's misrepresentations and concealment of facts, Defendants were induced "to set forth a carriage value significantly below the actual value of [their] jewelry[.]" (Answer (Dkt. No. 235) at 31-32)

Defendants' UCL claim is barred by the Contract, which states that "any claim or dispute arising out of or relating to any Shipment . . . shall be governed by the laws of the State of New York[.]" (Contract (Dkt. No. 253-2) § XI(B)(2)); see Coscarelli v. ESquared Hosp. LLC,

364 F. Supp. 3d 207, 220-21 (S.D.N.Y. 2019) (dismissing California § 17200 claim based on New York choice of law provision).

In opposing Brink's motion to dismiss the UCL claim, Defendants acknowledge that the UCL would only apply "[i]n the event the contract is held to be unenforceable." (Def. Mot. to Dismiss Opp. (Dkt. No. 279) at 24; id. at 24 n.5) As discussed above in connection with Brink's motion for summary judgment, the Contract entered into by the parties is enforceable, and therefore Defendants' UCL counterclaim is barred by the Contract.[27] Brink's motion to dismiss Defendants' UCL claim will therefore be granted.

### 5. Motion to Strike

In connection with their counterclaims, Defendants seek, inter alia, "punitive damages, interest, [and attorneys'] fees" (Answer (Dkt. No. 235) at 33), along with an award of "lost profits." (Id. at 22, 25, 29, 31) Brink's moves to strike these requests.

---

[27] Defendants have also not plausibly stated a claim under the UCL. The UCL "establishes three varieties of unfair competition – acts or practices which are unlawful, or unfair, or fraudulent." Berryman v. Merit Prop. Mgmt., Inc., 152 Cal. App. 4th 1544, 1554 (2007). A fraudulent practice must have "'a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care.'" Clemens v. DaimlerChrysler Corp., 534 F.3d 1017, 1026 (9th Cir. 2008) (quoting Brockey v. Moore, 107 Cal. App. 4th 86, 99 (2003)). For the same reasons discussed above in connection with Defendants' GBL claim, Defendants' allegations do not meet this standard. Under the unlawful prong, a claimant must allege "a predicate violation of an underlying law." Wang v. Bear Stearns Companies LLC, 14 F. Supp. 3d 537, 552 (S.D.N.Y. 2014) (citing Ingels v. Westwood One Broad. Servs., Inc., 129 Cal. App. 4th 1050, 1060 (2005)). Defendants' allegations here do not do so. (See Answer (Dkt. No. 235) at 31-32) And under the unfairness prong, "courts consider . . . (1) whether the challenged conduct is tethered to any underlying constitutional, statutory or regulatory provision, or that it threatens an incipient violation of an antitrust law, or violates the policy or spirit of an antitrust law; (2) whether the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers; or (3) whether the practice's impact on the victim outweighs the reasons, justifications and motives of the alleged wrongdoer." Doe v. CVS Pharmacy, Inc., 982 F.3d 1204, 1214-15 (9th Cir. 2020) (internal citations and quotations omitted). Defendants' conclusory unfairness allegations (see Answer (Dkt. No. 235) at 32) do not meet these standards.

As an initial matter, Brink's motion to strike Defendants' request for punitive damages, interest, attorneys' fees, and lost profits is moot as to Counterclaims Two, Three, Four, and Five, because this Court has dismissed these counterclaims. Accordingly, the motion to strike will be denied as moot with respect to those counterclaims.

As to Defendants' remaining counterclaim for breach of contract, the Contract explicitly bars the jewelers from seeking "punitive losses," "interest or attorneys' fees," or "loss of profits." (Contract (Dkt. No. 253-2) § X(C)(2)) This limitation of liability clause is enforceable here. See Metro. Life, 84 N.Y.2d at 438-39 (enforcing a provision limiting the recovery of consequential damages by a non-breaching party and noting that it "represents the parties' [a]greement on the allocation of risk of economic loss in the event" of non-performance).

Moreover, "'[w]here a demand for damages is not recoverable as a matter of law . . . it may be stricken.'" Protex Indus. (H.K.) Ltd. v. Vince Holding Corp., 748 F. Supp. 3d 234, 245 (S.D.N.Y. 2024) (quoting Phila. Stock Exch. v. Int'l Sec. Exch., Inc., No. 05 Civ. 5390, 2005 WL 2923519, at *1 (S.D.N.Y. Nov. 2, 2005)). "It is well established that punitive damages and attorneys' fees are [generally] not available in contract cases," Armored Grp., LLC v. Homeland Sec. Strategies, Inc., No. 07 CV 9694 (LAP), 2009 WL 1110783, at *4 (S.D.N.Y. Apr. 21, 2009) (collecting cases),[28] and here the Contract explicitly bars recovery of these remedies. Similarly, in a breach of contract action, "'[a] party may not recover damages for lost profits unless they were within the contemplation of the parties at the time the contract was entered into and are

---

[28] Punitive damages may be awarded in a breach of contract action only where "the defendant's conduct 'was so outrageous as to evince a high degree of moral turpitude and showing such wanton dishonesty as to imply a criminal indifference to civil obligations.'" Antus v. Frontrunner Techs. USA, Inc., No. 23-CV-07058 (MMG), 2025 WL 26109, at *8 (S.D.N.Y. Jan. 3, 2025) (quoting Walker v. Stroh, 192 A.D.2d 775, 776 (3d Dept. 1993)). Because Defendants have not pled facts that meet this exacting standard, their punitive damage claim would fail, even absent the explicit prohibition contained in the Contract.

capable of measurement with reasonable certainty.'" <u>Chen v. Wen Fang Wang</u>, 177 A.D.3d 694, 696 (2nd Dept. 2019) (quoting <u>Ashland Mgmt. Inc. v. Janien</u>, 82 N.Y.2d 395, 403 (1993)).  Here, there is no indication that the parties intended to provide for recovery of lost profits in the event of a breach.  Indeed, the Contract explicitly states that lost profits are not recoverable.  (Contract (Dkt. No. 253-2) § X(C)(2))  Finally, although "New York law [generally] entitles the party prevailing on a breach of contract claim to pre-judgment interest," <u>see</u> <u>Federated Retail Holdings, Inc. v. Sanidown, Inc.</u>, No. 06 CIV 6119 LTS THK, 2010 WL 5298113, at *11 (S.D.N.Y. Dec. 23, 2010) (citing N.Y. C.P.L.R. § 5001(a)), here the parties specifically agreed in the Contract that interest is not available in the event of a breach.  <u>See</u> <u>Katzman v. Helen of Troy Texas Corp.</u>, No. 12 CIV. 4220 PAE, 2013 WL 1496952, at *6 (S.D.N.Y. Apr. 11, 2013) ("[P]arties may contract around" the right to prejudgment interest where the waiver is "clear and express[.]")  In sum, punitive damages, attorneys' fees, lost profits, and interest are not available remedies under the Contract in the event of a breach.  Accordingly, Brink's motion to strike those requested remedies will be granted.

**CONCLUSION**

For the reasons stated above, Brink's motion for summary judgment (Dkt. No. 248) is granted in part and denied in part.  The Court declares that

1. Brink's duties to each Defendant are governed by the Contract;

2. Brink's liability for loss of or damage to Defendants' property will not exceed the lesser of the Declared Value or the actual monetary value of Defendants' property as of the date of loss; and

3. Defendants who did not comply with the notice of claim provisions of the Contract have waived their claims.

Brink's motion to dismiss Counterclaims Two, Three, Four, and Five (Dkt. No. 277) is granted.[29] Brink's motion to strike Defendants' request for punitive damages, interest, attorneys' fees, and lost profits (Dkt. No. 277) is denied as moot as to Counterclaims Two, Four and Five. As to Counterclaim One – the breach of contract counterclaim – the motion to strike is granted as to Defendants' request for punitive damages, attorneys' fees, lost profits, and interest. The Clerk of Court is directed to terminate the motions (Dkt. Nos. 248, 277).

The parties will submit a joint letter by **June 23, 2025** stating how they wish to proceed in light of the Court's rulings in this Opinion.

Dated: New York, New York
        June 12, 2025

SO ORDERED.

_Paul G. Gardephe_____
Paul G. Gardephe
United States District Judge

---

[29] Dismissal is with prejudice because (1) Defendants have not requested leave to amend (see Bright-Asante v. Wagner, No. 15-CV-9110 (ALC), 2017 WL 6948359, at *10 (S.D.N.Y. Dec. 1, 2017) ("Where [a claimant] does not even request leave to amend, a district court may decline to grant leave to amend sua sponte.") (citations omitted)); and (2) the defects in the counterclaims this Court has identified are not subject to cure and therefore amendment would be futile. Perrotta v. City Sch. Dist. of Yonkers, No. 16 CV 9101 (VB), 2017 WL 4236565, at *6 (S.D.N.Y. Sept. 22, 2017) (denying leave to amend because it "would be futile as it would not cure the defects in the complaint that is subject to the instant motion").